ACCEPTED
03-15-00252-CV
6432785
THIRD COURT OF APPEALS
AUSTIN, TEXAS
8/10/2015 4:53:21 PM
JEFFREY D. KYLE
CLERK

**No. 03-15-00252-CV**

**IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN**

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
8/10/2015 4:53:21 PM
JEFFREY D. KYLE
Clerk

**DR. BEHZAD NAZARI, D.D.S., ET AL.,**

**Appellants,**

**v.**

**THE STATE OF TEXAS,**

**Appellee,**

**v.**

**XEROX CORPORATION, XEROX STATE HEALTHCARE, LLC
F/K/A ACS STATE HEALTHCARE, LLC,**

**Appellees.**

On Appeal from the 53rd Judicial District Court of Travis County, Texas,
Trial Court Cause No. D-1-GN-14-005380

**BRIEF OF APPELLEES**

**BECK REDDEN LLP**
   Eric J.R. Nichols
   State Bar No. 14994900
   enichols@beckredden.com
   Gretchen Sween
   State Bar No. 24041996
   gsween@beckredden.com
   Christopher R. Cowan
   State Bar No. 24084975
   ccowan@beckredden.com
515 Congress Ave., Ste. 1900
Austin, TX 78701
(512) 708-1000
(512) 708-1002 (Fax)

**BECK REDDEN LLP**
   Constance H. Pfeiffer
   State Bar No. 24046627
   cpfeiffer@beckredden.com
1221 McKinney St., Ste. 4500
Houston, TX 77010
(713) 951-3700
(713) 951-3720 (Fax)

**GIBSON, DUNN & CRUTCHER LLP**
   Robert C. Walters
   State Bar No. 20820300
   rwalters@gibsondunn.com
2100 McKinney Ave., Ste. 1100
Dallas, TX 75201
(214) 698-3100
(214) 571-2900 (Fax)

**KELLY HART & HALLMAN LLP**
   C. Andrew Weber
   State Bar No. 00797641
   andrew.weber@kellyhart.com
301 Congress, Ste. 2000
Austin, TX 78701
(512) 495-6451
(512) 495-6930 (Fax)

**COUNSEL FOR APPELLEES, XEROX CORPORATION AND
XEROX STATE HEALTHCARE, LLC, F/K/A ACS STATE HEALTHCARE, LLC**

*Oral Argument Requested*

# TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS ..................................................................................i

INDEX OF AUTHORITIES................................................................... ii

STATEMENT OF THE CASE ...................................................................iv

STATEMENT OF JURISDICTION ..............................................................v

ISSUE PRESENTED..................................................................................v

STATEMENT OF FACTS .........................................................................1

SUMMARY OF ARGUMENT ....................................................................8

ARGUMENT ..........................................................................................9

    I.    The Court Should Decide Xerox's Original Proceeding Along with this Appeal to Ensure that the Entire Litigation Is Procedurally Consistent.....................................................................9

    II.    Counterclaims and Third-Party Claims May Be Brought When the State Brings a TMFPA Claim.............................................10

        A.    The ordinary rules of civil procedure apply when the State brings a TMFPA claim......................................................10

        B.    Because the State has brought a tort claim for damages, Chapter 33 applies and permits contribution claims as well. ..................................................................12

    III.    Xerox Will Raise Immunity Arguments Once the Providers' Claims Are Clearer.....................................................................15

PRAYER FOR RELIEF.............................................................................16

CERTIFICATE OF SERVICE......................................................................18

CERTIFICATE OF COMPLIANCE .............................................................19

# INDEX OF AUTHORITIES

**CASE**                                                                                           **PAGE(S)**

*Janek v. Harlingen Family Dentistry, P.C.*,
    451 S.W.3d 97 (Tex. App.—Austin
    2014, no pet.) ...........................................................................................4

*U.S. ex rel. Miller v. Bill Harbert Intern. Const., Inc.*,
    505 F. Supp. 2d 20 (D.D.C. 2007)...................................................................13

*Mortgages, Inc. v. U.S. Dist. Court for Dist. of Nev.*,
    934 F.2d 209 (9th Cir. 1991) ..........................................................................13

*Reata Const. Corp. v. City of Dallas*,
    197 S.W.3d 371 (Tex. 2006) .....................................................................*passim*

*Rusk State Hosp. v. Black*,
    392 S.W.3d 88 (Tex. 2012)..............................................................................15

*Sec. Trust Co. of Austin v. Lipscomb Cnty*,
    180 S.W.2d 151 (Tex. 1944) ...........................................................................12

*Shipp v. Malouf*,
    439 S.W.2d 432 (Tex. App.—Dallas
    2014, pet. denied)..............................................................................................3

*State v. Naylor*,
    No. 11-0114, 2015 WL 3852284
    (Tex. June 19, 2015) .....................................................................................8, 11

*Texas Dep't of Corr. v. Herring*,
    513 S.W.2d 6 (Tex. 1974)................................................................................11

*Texas Mut. Ins. Co. v. Ruttiger*,
    381 S.W.3d 430 (Tex. 2012) ...........................................................................11

*United States v. Campbell*,
    No. CIV.A. 08-1951, 2011 WL 43013
    (D.N.J. Jan. 4, 2011) .......................................................................................13

*Wortham v. Walker*,
    128 S.W.2d 1138 (Tex. 1939)
    (orig. proceeding)............................................................................................12

**STATUTES**

TEX. CIV. PRAC. & REM. CODE § 33.002(a)(1) ........................................................14

TEX. HUM. RES. CODE
    § 36.002 ..........................................................................................................4
    § 36.007 .......................................................................................................4, 5
    § 36.052 ..........................................................................................................4

**OTHER AUTHORITIES**

25 TEX. ADMIN. CODE § 33.71 (2015) ...............................................................2, 3

# STATEMENT OF THE CASE

*Nature of the case*   This is a civil Medicaid fraud case brought by the State of Texas against orthodontic-service providers.

The providers have brought counterclaims against the State and third-party claims against Xerox.

In <u>this</u> lawsuit, the State has sued only the providers. Although the State's fraud theory alleges intertwined claims against the providers and Xerox, the State is suing Xerox in a separate lawsuit, seeking to recoup from Xerox payments the State made to the providers.

*Trial court*   Honorable Stephen Yelenosky
345th Judicial District Court of Travis County

*Trial court disposition*:   The trial court ruled that counterclaims and third-party claims cannot be brought in a suit brought under the Medicaid fraud statute. Thus, the trial court:

(1)   granted the State's plea to the jurisdiction and dismissed the claims against the State with prejudice and

(2)   granted the State's motion to dismiss third-party claims against Xerox. **Tab A.**

## STATEMENT OF JURISDICTION

This Court has jurisdiction under TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8).

## ISSUE PRESENTED

Did the trial court err by dismissing the Dental Group's third-party claims against Xerox?

## STATEMENT OF FACTS

This fraud suit is brought by the State of Texas against Medicaid providers. It is factually intertwined with a separate fraud suit the State has brought against two Xerox entities. The State simultaneously accuses Medicaid providers and Xerox of a fraudulent scheme, yet it contends it can take a divide-and-conquer approach and seek double recovery by suing them in separate lawsuits.

Although Xerox benefits from the State's argument that the trial court adopted in this case, Xerox does not agree with it. There is no prohibition against counterclaims and third-party claims in a Texas Medicaid fraud suit. Because the order under review assumes there is, Xerox agrees that it is erroneous.

The Dental Group's statement of facts accurately sets forth the procedural background of this case. This statement of facts provides additional context for the broader landscape of this litigation and a related proceeding before this Court.

### *HHSC contracts for processing of Medicaid claims*

The Texas Health and Human Services Commission oversees the Texas Medicaid program, which serves low-income Texans. The program includes a process for reimbursing providers for the services provided to eligible children.

HHSC has in recent years hired contractors to assist it in claims processing. During the time period from 2004 to 2014, HHSC contracted with a private entity to be its fiscal agent and claims processor. **Tab B** at 30. That entity was later acquired by Xerox Corporation. *Id*. at 2.

Long known as a brand name for copiers, Xerox now has a business division that provides analytic, consulting, revenue improvement, technological, and business process outsourcing solutions to the healthcare industry worldwide. The Xerox entity that contracted with HHSC is Xerox State Healthcare, LLC. *Id*.[1]

HHSC contracted with Xerox State Healthcare to provide multiple Medicaid administrative and technical services, including the processing of "prior authorizations" for orthodontic services submitted by the providers. *Id*. at 3. The "prior authorization" process requires providers to submit forms, materials, and certifications related to the provider's diagnosis and the patient's condition in order to receive prior approval for the orthodontic services. Instead of performing services first and then submitting the bill for payment, Medicaid "[o]rthodontic services must be prior authorized" before the provider performs the service. 25 TEX. ADMIN. CODE § 33.71 (2015).

Under the contract, Xerox State Healthcare established the Texas Medicaid & Healthcare Partnership (TMHP), a consortium of Xerox State Healthcare and other subcontractors. TMHP processed hundreds of thousands of prior-authorization requests for orthodontic services over the span of a decade. During that time period, the State alleges that it spent approximately $1.1 billion for orthodontic services to Medicaid-eligible children. **Tab B** at 3.

---

[1] HHSC first contracted with ACS State Healthcare LLC, which changed its name to Xerox State Healthcare, LLC after it was acquired by Xerox Corporation. Tab B at 2. Xerox Corporation and Xerox State Healthcare, LLC are distinct entities with separate legal arguments; references to them jointly as "Xerox" are solely for ease of reading.

HHSC approved the contract and prior authorization policies under which TMHP operated, and it oversaw the work of Xerox State Healthcare (and the other TMHP contractors). **Tab C.**[2] In fact, HHSC's Office of Inspector General conducted a full contract audit of the prior authorization process, and the results were made public in a 2008 report. *Id.* Xerox State Healthcare continued to perform under its contract until May 2014, when the State terminated the contract.

### *Negative publicity prompts the State to cast blame*

As the Dental Group explained, there has been a great deal of negative publicity about HHSC and the State's spending on Medicaid orthodontic services. *See* Dental Group Br. 2-3; *see also Shipp v. Malouf*, 439 S.W.2d 432, 437–38 (Tex. App.—Dallas 2014, pet. denied) (discussing publicity about Medicaid provider). A series of "investigative" news reports in 2011 raised questions about the State's spending on orthodontic services to Medicaid-eligible children and about the medical judgments of orthodontic providers, causing HHSC to second-guess that spending and begin casting blame on others.

HHSC's Office of Inspector General, led by a now-departed deputy, made sweeping pronouncements of a vast fraud against the Medicaid program by orthodontic providers across the State. HHSC then filed separate administrative proceedings against members of the Dental Group. *See* Dental Group Br. 1.

---

[2] The 2008 audit report is publicly available at http://www.tdmr.org/texas-state-audit-report. It is not yet filed as evidence in this case but is cited merely as an uncontested background fact.

Meanwhile, Xerox State Healthcare continued to perform under its contract with HHSC. After all, HHSC had approved the contract and prior authorization policies under which TMHP operated, and it continued to oversee the work of Xerox State Healthcare (and the other TMHP contractors). **Tab B** at 19-20.

As HHSC received adverse findings and results in the administrative proceedings against the providers,[3] the State ultimately turned on Xerox and filed suit in Travis County against two Xerox entities in May 2014. **Tab B**. The State accused Xerox of failing to "catch" the providers' alleged fraud through the prior authorization process. Rather than suing for breach of the prior authorization procedures set by the State in the HHSC contract, the State brought a single tort claim under the Texas Medicaid Fraud Prevention Act ("TMFPA").

The TMFPA defines "unlawful acts," beginning with knowing misrepresentations and nondisclosures. *See* TEX. HUM. RES. CODE § 36.002.

It also provides for substantial civil remedies. A person who commits an "unlawful act" can be sued for the amount of payments made "as a result of the unlawful act," plus double damages, civil penalties for each unlawful act between $5,500 and $15,000, prejudgment interest, and reimbursement of the State's reasonable attorneys' fees, expenses, and costs. *See id.* §§ 36.052, 36.007.

---

[3] *See, e.g.*, *Janek v. Harlingen Family Dentistry, P.C.*, 451 S.W.3d 97 (Tex. App.—Austin 2014, no pet.).

4

***The State seeks the same recovery***
***from Xerox and the providers in separate lawsuits***

The State's suit against Xerox seeks "all relief possible" under the TMFPA. **Tab B** at 21. This relief even includes the value of payments made under the Medicaid program to the Medicaid orthodontic-service providers—not to Xerox. *Id.* The State's administrative proceedings against various providers sought recovery of the same payments.

Several providers then filed four separate suits against Xerox and the State. *See* CR47 n.2.[4] The State filed a plea to the jurisdiction, which the trial court granted. CR67. Those providers suits are now pending solely against Xerox.

Several other providers intervened in the State's suit against Xerox, asserting common-law tort claims against the State and Xerox and seeking to recover for losses incurred as a result of payment holds and administrative claims that the providers contend the State wrongfully asserted. **Tab D**. The State moved to strike the intervention, and its motion was granted. CR69-78 (motion to strike); CR61-62 (order in State v. Xerox suit).

Meanwhile, in December 2014, the State nonsuited its administrative cases against the Dental Group and filed this suit the next day. Just like the suit against Xerox, the State has sued the Dental Group solely under the TMFPA.

---

[4] *Harlingen Family Dentistry v. ACS State Healthcare, LLC*, Cause No. D-1-GN-14-000319; *Antoine Dental Center v. ACS*, No. D-1-GN-14-000320; *M&M et al. v. ACS*, D-1-GN-14-000321; and *Dr. Paul Dunn v. ACS*, No. D-1-GN-14-000322.

In this suit, the Dental Group answered the State's TMFPA claim and asserted counterclaims and third-party claims against Xerox. CR29. Xerox filed a general denial but has not yet asserted affirmative defenses or filed any motions. **Tab E**. The State answered and simultaneously asserted a plea to the jurisdiction, plea in bar, and a motion to dismiss the third-party claims. CR43.

The State maintains in both of its fraud suits that it can exclude any party that it has chosen not to name in that suit—even while it seeks the same damages against the excluded party elsewhere. It contends that counterclaims against the State and third-party claims against parties who may share responsibility for any damages are not permissible. Thus, while the State resists the counterclaims and third-party claims in <u>this</u> suit, it is simultaneously arguing that Xerox cannot file third-party claims against the providers in the State v. Xerox suit. CR69-109. The State further argues that Chapter 33 does not apply, such that Xerox could not even designate the providers as responsible third parties. CR91-108.

### *The trial court agrees with the State in both lawsuits and dismisses all counterclaims, third-party claims, and RTP designations*

The various lawsuits between the State, Medicaid providers, and the Xerox entities have all been specially assigned, through the Travis County district court administrative process, to one district judge. The trial court was made aware that the State is seeking the same damages against separate parties in separate lawsuits based on factually related allegations.

Yet the trial court decided that the State divide-and-conquer approach is permissible. In the State's suit against Xerox, the trial court struck the providers' petitions in intervention. CR61-62. It twice denied motions to consolidate the various lawsuits. CR286-92. It struck Xerox's third-party contribution claims against the providers. CR294. And it denied Xerox's motion for leave to designate the providers as responsible third parties. CR381-82. The last two rulings are pending before this Court in an original proceeding. *See* Cause No. 03-15-00401-CV (filed 7/1/15).

In this suit, the trial court reached the same result by granting the State's plea to the jurisdiction and dismissing the counterclaims, as well as granting the State's motion to dismiss the Dental Group's third-party claims against Xerox. **Tab A**. The order in this suit made plain that the trial court's rationale is consistent with the rulings in the State's suit against Xerox:

> Consistent with this Court's rulings in the State's litigation against Xerox, the Court finds that the State is entitled to bring this action against defendants to the exclusion of other parties.

**Tab A**; *see also* CR65 (Court letter to counsel: "The State is entitled to pursue a Medicaid Fraud claim against a defendant to the exclusion of all other parties[.]").

While the premise underlying the trial court's rulings in both proceedings is consistent, the differing postures require different analyses. Xerox responds to the part of the order that grants the State's motion to dismiss third-party claims. CR383-84.

7

## SUMMARY OF ARGUMENT

I.     The Court should decide the issue presented in Xerox's original proceeding along with the issues presented in this appeal.  The causes are on a parallel track; the issues are closely related; and it will promote fairness and efficiency to ensure the issues are all decided now.  The trial court's rulings have resulted in multiple skewed lawsuits.  Deciding related issues in the separate lawsuits together will assist the Court's decisional process and ensure that it understands how its holdings affect the entire litigation landscape.

II.    When the State sues, it must generally abide by the same rules that apply to private litigants.  The Texas Supreme Court recently reaffirmed this rule. *See State v. Naylor*, No. 11-0114, 2015 WL 3852284, at \*6 (Tex. June 19, 2015). This settled rule is equally true when the State brings a TMFPA claim, because nothing in the TMFPA prohibits counterclaims or third-party claims.

III.   The State has asserted sovereign immunity arguments on Xerox's behalf, and Xerox would welcome an affirmance on that ground.  But if the claims against Xerox are reinstated, Xerox may assert immunity arguments on its own behalf at a later date, once the Dental Group's claims are clearer. Any holding that the State has waived immunity should not implicate Xerox, because Xerox has not asserted its own claims for affirmative relief.  *See Reata Const. Corp. v. City of Dallas*, 197 S.W.3d 371, 377 (Tex. 2006).

8

## ARGUMENT

### I. The Court Should Decide Xerox's Original Proceeding Along with this Appeal to Ensure that the Entire Litigation Is Procedurally Consistent.

Before turning to the merits, it bears emphasis that the issues in this appeal are closely related to the issue presented in Xerox's original proceeding, which is currently pending in this Court. *See* Cause No. 03-15-00401-CV. In that proceeding, Xerox challenges orders striking its third-party claims against the providers and denying it leave to designate providers as responsible third parties. Xerox argues in that proceeding that Chapter 33 applies to the State's fraud claim for damages and thus permits it to bring third-party claims for contribution and to designate responsible third parties. Because the two causes are on virtually parallel tracks with nearly identical briefing schedules, it would be appropriate for the Court to decide them together.

Further, it would promote efficiency and ensure fairness in this entire landscape of litigation for the Court to decide all the issues presented by the Dental Group and Xerox together. While the issues in each cause are interrelated, they are not identical. Considering all the issues together would therefore assist the Court in understanding all the consequences of its holdings for all of the State's lawsuits. The trial court's rulings have resulted in a multiplicity of lawsuits that are procedurally skewed in the State's favor. The due process rights of all the defendants hinge on correcting these errors now.

## II. Counterclaims and Third-Party Claims May Be Brought When the State Brings a TMFPA Claim.

The threshold issue presented by this appeal is whether the State has waived sovereign immunity. Xerox agrees that the governing standard for waiver is set by *Reata Const. Corp. v. City of Dallas*, 197 S.W.3d 371, 377 (Tex. 2006). The State has asserted an affirmative claim for monetary relief and therefore "must participate in the litigation process as an ordinary litigant." *Id.* To the extent the Dental Providers show that their counterclaims satisfy the standard set forth in *Reata*, they should be allowed to bring them. Xerox takes no position on whether the Dental Group has met that burden.

The State has argued that *Reata* does not apply because its claim under the TMFPA is an "enforcement action." CR48. Xerox does take a position with respect to this conclusory assertion, which is the foundation for *all* of the State's arguments—including its position that third-party claims may not be brought in a suit under the TMFPA. Xerox agrees with the Dental Group that when the State brings a TMFPA claim, it is like any litigant subject to the rules of civil procedure.

### A. The ordinary rules of civil procedure apply when the State brings a TMFPA claim.

The State has never presented any authority for its assertion that a TMFPA claim is an "enforcement action" that somehow trumps the rules of procedure related to counterclaims and third-party claims. Yet the trial court agreed with this

10

argument in the State v. Xerox suit and presumably agreed with it here. CR297 (premising ruling on characterization of State's suit as an "enforcement action").

There is no basis for displacing these rules of civil procedure when the State brings suit under the TMFPA. It is immaterial whether the State calls its suit an "enforcement action" or simply a tort suit for damages. The label is irrelevant to the legal analysis.

The TMFPA does not address third-party claims or counterclaims, and there is no basis to infer from the Legislature's silence that it intended to displace the ordinary rules of procedure. Where statutes are silent on an issue, courts "presume the silence is a careful, purposeful, and deliberate choice." *See Texas Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 453 (Tex. 2012).

Absent any statutory directive in the TMFPA itself, the controlling rules are the same rules that apply to ordinary litigants. The Texas Supreme Court recently reaffirmed that these rules apply equally to the State when it becomes a litigant: "where the Legislature has given no indication to the contrary the State must abide by the same rules to which private litigants are beholden." *State v. Naylor*, No. 11-0114, 2015 WL 3852284, at *6 (Tex. June 19, 2015). "As a general rule, the State litigates as any other party in Texas courts." *Texas Dep't of Corr. v. Herring*, 513 S.W.2d 6, 7 (Tex. 1974).

11

This principle is settled:

> [W]hen a State enters the Courts as a litigant, it must be held subject to the same rules that govern the other litigants, and abide the consequences of the suit . . . . When a state appears as a party to a suit, she voluntarily casts off the robes of her sovereignty, and stands before the bar of a court of her own creation in the same attitude as an individual litigant; and her rights are determined and fixed by the same principles of law and equity . . . .

*Wortham v. Walker*, 128 S.W.2d 1138, 1145–46 (Tex. 1939) (orig. proceeding) (internal quotation marks omitted); *accord Reata*, 197 S.W.3d at 377 ("Once it asserts affirmative claims for monetary recovery, the City must participate in the litigation process as an ordinary litigant . . . ."); *Sec. Trust Co. of Austin v. Lipscomb Cnty*, 180 S.W.2d 151, 159 (Tex. 1944) ("When the state becomes a party to a suit it is subject to the same rules that govern other parties . . . ."). These rules likewise apply here.

**B.** **Because the State has brought a tort claim for damages, Chapter 33 applies and permits contribution claims as well.**

The Dental Group has set forth the correct analysis about counterclaims and third-party claims generally, but their analogy to the False Claims Act goes too far. Specifically, because contribution claims are not permitted in federal cases under the False Claims Act, the Dental Group incorrectly assumes that they are likewise unavailable under Texas law. This assumption is incorrect. Chapter 33's contribution scheme under the Texas Civil Practice and Remedies Code is the controlling law in state court.

12

Federal law has no analogue to the Texas contribution scheme in Chapter 33. Instead, federal law provides a right to contribution or indemnity only in limited circumstances:

> A defendant held liable under a federal statute has a right to contribution or indemnification from another who has also violated the statute only if such right arises (1) through the affirmative creation of a right of action by Congress, either expressly or implicitly, or (2) via the power of the courts to formulate federal common law.

*Mortgages, Inc. v. U.S. Dist. Court for Dist. of Nev.*, 934 F.2d 209, 212 (9th Cir. 1991) (citing *Texas Indus., Inc. v. Radcliff Materials*, 451 U.S. 630, 638 (1981); *Northwest Airlines v. Transport Workers Union of Am.*, 451 U.S. 77, 90–91 (1981)).

The False Claims Act does not contain an express or implied right to contribution, and over the last quarter century, federal courts have uniformly refused to create such a right as a matter of federal common law. *See Mortgages*, 934 F.2d at 212 ("We decline, therefore, to formulate federal common law on this basis.").[5] The federal rule—that contribution and indemnification claims are unavailable under the False Claims Act—prohibits all claims (no matter how styled) that are in substance claims for contribution or indemnity. If the instant case were a False Claims Act case in federal court, there is no doubt this rule would apply.

---

[5] *See, e.g.*, *United States v. Campbell*, No. CIV.A. 08-1951, 2011 WL 43013, at *10 (D.N.J. Jan. 4, 2011) (citing *Mortgages, Inc. v. U.S. Dist. Court of Nev.*, 934 F.2d 209 (9th Cir. 1991)); *U.S. ex rel. Miller v. Bill Harbert Intern. Const., Inc.*, 505 F. Supp. 2d 20, 25 (D.D.C. 2007) (same).

The Dental Group relies on this federal framework, arguing that their claims do not sound in contribution and would therefore not be barred by the False Claims Act. This may be true, but it is irrelevant to whether their claims are permissible in a Texas court under the TMFPA. In this case, the controlling legal framework for contribution claims is found in Chapter 33. Analogizing to the False Claims Act is helpful in many respects, but not where conflicting state law controls the issue. Xerox therefore disagrees with any suggestion in the Dental Group's arguments that contribution claims cannot be brought in a TMFPA suit. *See* Dental Group Br. 20-21 (counterclaims), 29-32 (third-party claims).

Xerox's mandamus petition fully sets forth the analysis for why a TMFPA claim is a "cause of action based on tort," and thus is governed by Chapter 33. TEX. CIV. PRAC. & REM. CODE § 33.002(a)(1). In short, the State's claim is merely a statutory fraud claim seeking to recover damages, so it is subject to Chapter 33's proportionate responsibility and contribution schemes.

Rather than fully briefing this argument here, Xerox incorporates it by reference. **Tab F**. It would be more appropriate to decide that issue in Xerox's original proceeding, where the issue will be fully joined by the State.

So long as the Dental Group is conceding that none of its claims sounds in contribution, the Court need not decide whether Chapter 33 applies in this appeal. The Court could narrowly hold that the Dental Group's claims are permissible on their own terms—regardless of whether contribution claims are permissible.

## III. Xerox Will Raise Immunity Arguments Once the Providers' Claims Are Clearer.

Xerox has not yet filed a plea to the jurisdiction or raised an affirmative defense of immunity. Instead, the State raised immunity on Xerox's behalf. CR54-57. While Xerox would welcome an affirmance on this basis (rather than on the incorrect premise that the TMFPA prohibits third-party claims), it leaves it to the State to assert those arguments. For now, Xerox addresses the issue simply to clarify that it would be premature to hold that Xerox does *not* have an immunity defense.

Xerox can and likely will raise immunity arguments in the trial court if the claims against it are reinstated. There is no deadline or risk of waiver, because sovereign immunity implicates subject-matter jurisdiction and can be raised at any time. *See Rusk State Hosp. v. Black*, 392 S.W.3d 88, 95 (Tex. 2012) (defense of governmental immunity is jurisdictional and can be raised for first time on appeal). Xerox may well benefit from sovereign immunity as to acts taken as a contractor for the State. Likewise, official immunity is an affirmative defense, which Xerox can still plead.

Any holding in this appeal about waiver of sovereign immunity under *Reata* should be limited to the State, because Xerox has not asserted any affirmative claims for relief. *Reata* holds that an entity waives immunity from affirmative damage claims brought against it as an offset by asserting its own affirmative

claims for monetary relief. *Reata*, 197 S.W.3d at 377. Under *Reata*, parties sued by the government may "assert, as an offset, claims germane to, connected with, and properly defensive to those asserted by the governmental entity." *Id.* Because Xerox has not brought any claims in this case, none of the Dental Group's claims against Xerox satisfies the *Reata* waiver standard.

## PRAYER FOR RELIEF

The Court should either affirm the order on immunity grounds or reverse the trial court's order. The Court should not allow the order to stand on the basis of an interpretation of Texas law that imposes a blanket prohibition on counterclaims and third-party claims when the State brings suit under the TMFPA.

Respectfully submitted,

By: */s/ Eric J.R. Nichols*
    Eric J.R. Nichols
    State Bar No. 14994900
    enichols@beckredden.com
    Christopher R. Cowan
    State Bar No. 24084975
    ccowan@beckredden.com
**BECK REDDEN LLP**
515 Congress Ave., Ste. 1900
Austin, TX 78701
(512) 708-1000
(512) 708-1002 (Fax)

    Robert C. Walters
    State Bar No. 20820300
    RWalters@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
2100 McKinney Ave., Ste. 1100
Dallas, TX 75201
(214) 698-3100
(214) 571-2900 (Fax)

By: */s/ Constance H. Pfeiffer*
    Constance H. Pfeiffer
    State Bar No. 24046627
    cpfeiffer@beckredden.com
**BECK REDDEN LLP**
1221 McKinney St., Ste. 4500
Houston, TX 77010
(713) 951-3700
(713) 951-3720

    C. Andrew Weber
    State Bar No. 00797641
    andrew.weber@kellyhart.com
**KELLY HART & HALLMAN LLP**
301 Congress, Ste. 2000
Austin, TX 78701
(512) 495-6451
(512) 495-6930 (Fax)

**COUNSEL FOR APPELLEES, XEROX CORPORATION AND XEROX STATE HEALTHCARE, LLC, F/K/A ACS STATE HEALTHCARE, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on August 10, 2015, a true and correct copy of the above and foregoing Brief of Appellees was forwarded to all counsel of record by the Electronic Service Provider, if registered, otherwise by email, and to Respondent, by hand delivery, as follows:

### *Counsel for Appellants:*

Jason Ray
Riggs, Aleshire & Ray, P.C.
700 Lavaca, Suite 920
Austin, TX 78701
jray@r-alaw.com

E. Hart Green
Weller, Green, Toups & Terrell, L.L.P.
Post Office Box 350
Beaumont, TX 77704-0350
hartgr@wgttlaw.com

### *Counsel for Appellee State of Texas:*

J. Campbell Barker
Deputy Solicitor General
Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, TX 78711-2548
Cam.Barker@texasattorneygeneral.gov

Philip A. Lionberger
Assistant Solicitor General
Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, TX 78771-2548
Philip.Lionberger@texasattorneygeneral.gov

Raymond Winter
Chief, Civil Medicaid Fraud Division
Office of the Attorney General
P.O. Box 12548
Austin, TX 78711-2548
raymond.winter@texasattorneygeneral.gov

Reynolds Brissenden
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548
Austin, TX 78711-2548
reynolds.brissenden@texasattorneygeneral.gov

By: */s/ Constance H. Pfeiffer*
Constance H. Pfeiffer

# CERTIFICATE OF COMPLIANCE

1.	This brief complies with the type-volume limitation of Tex. R. App. P. 9.4 because it contains 3,843 words, excluding the parts of the brief exempted by Tex. R. App. P. 9.4(i)(2).

2.	This brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14 point Times New Roman font.

Dated: August 10, 2015.


*/s/ Constance H. Pfeiffer*
Constance H. Pfeiffer
***Counsel for Appellees***

**No. 03-15-00252-CV**

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN

DR. BEHZAD NAZARI, D.D.S., ET AL.,
**Appellants,**
v.

THE STATE OF TEXAS,
**Appellee,**
v.

XEROX CORPORATION, XEROX STATE HEALTHCARE, LLC
F/K/A ACS STATE HEALTHCARE, LLC,
**Appellees.**

On Appeal from the 53rd Judicial District Court of Travis County, Texas,
Trial Court Cause No. D-1-GN-14-005380

APPENDIX TO
BRIEF OF APPELLEES

## TAB

A    Order Granting State's Plea to the Jurisdiction and
Motion to Dismiss Third Party Claims

B    Plaintiff's Original Petition in Cause No. D-1-GV-14-000581

C    Office of Inspector General Report dated August 29, 2008

D    Providers' Plea in Interventions in Cause No. D-1-GV-14-000581

E    Xerox's Original Answer to Defendants' Original Third Party Petition

F    Xerox Corporation and Xerox State Healthcare, LLC f/k/a
ACS State Healthcare, LLC's Mandamus Petition

# Tab A

**Order Granting State's Plea to the Jurisdiction
and Motion to Dismiss Third Party Claims**

Filed in The District Court
of Travis County, Texas

APR 28, 2015

At _____ 1.39 p. M.

Velva L. Price, District Clerk

CAUSE NO. D-1-GN-14-005380

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| DR. BEHZAD NAZARI, D.D.S. | § | TRAVIS COUNTY, TEXAS |
| D/B/A ANTOINE DENTAL | § | |
| CENTER, DR. BEHZAD NAZARI, | § | |
| DR. WAEL KANAAN, | § | |
| HARLINGEN FAMILY | § | |
| DENTISTRY, P.C., N/K/A, | § | |
| PRACTICAL BUSINESS | § | |
| SOLUTIONS, SERIES LLC, JUAN | § | |
| D. VILLAREAL D.D.S., SERIES, | § | |
| PLLC D/B/A HARLINGEN | § | |
| FAMILY DENTISTRY GROUP, | § | |
| DR. JUAN VILLAREAL, DR. | § | |
| VIVIAN TEEGARDIN, RICHARD | § | |
| F. HERRSCHER, D.D.S., M.S.D., | § | |
| P.C., DR. RICHARD F. | § | |
| HERRSCHER, M & M | § | |
| ORTHODONTICS, PA, DR. SCOTT | § | |
| MALONE, DR. DIANA MALONE, | § | |
| MICHELLE SMITH, NATIONAL | § | |
| ORTHODONTIX, MGMT, PLLC, | § | |
| DR. JOHN VONDRAK, RGV | § | |
| SMILES BY ROCKY L. SALINAS, | § | |
| D.D.S. PA, AND DR. ROCKY | § | |
| SALINAS | § | **53RD JUDICIAL DISTRICT** |
| | § | |
| *Defendants.* | § | |

## ORDER GRANTING STATE'S PLEA TO THE JURISDICTION
## AND MOTION TO DISMISS THIRD PARTY CLAIMS

On April 15, 2015, the Court heard the State of Texas's Plea to the Jurisdiction, Plea

in Bar and Motion to Dismiss Third Party Claims, filed on January 20, 2015. All parties

appeared through their respective counsel and announced ready.

Case # D-1-GN-14-005380



004002256

1



D-1-GN-14-005380
page 2 of 2

Having considered the Pleas, Motion, response briefs, and arguments of counsel, the Court ORDERS that the State of Texas's Plea to the Jurisdiction is GRANTED. Defendants' counterclaims against the State are DISMISSED with prejudice. The Court further ORDERS that the State of Texas's Motion to Dismiss Third Party Claims is also GRANTED. Consistent with this Court's rulings in the State's litigation against Xerox, the Court finds that the State is entitled to bring this action against defendants to the exclusion of other parties. Defendants' third party claims against Xerox are DISMISSED.

Signed this 28th day of April, 2015

_____
Judge Stephen Yelenosky

2

384

# Tab B

**Plaintiff's Original Petition in Cause No. D-1-GV-14-000581**

CAUSE NO. _____

D-1-GV-14-000581

| | |
|---|---|
| THE STATE OF TEXAS, | IN THE DISTRICT COURT |
| **Plaintiff,** | |
| v. | |
| XEROX CORPORATION; XEROX STATE HEALTHCARE, LLC; ACS STATE HEALTHCARE, LLC, A XEROX CORPORATION, | 53RD ___ JUDICIAL DISTRICT |
| **Defendants** | TRAVIS COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION

The State of Texas, by and through the Attorney General of Texas, Greg Abbott, brings this law enforcement action pursuant to the Texas Medicaid Fraud Prevention Act, ("TMFPA"), TEX. HUM. RES. CODE ANN. chapter 36. The State would show the Court:

### I.    DISCOVERY CONTROL PLAN

1.    Plaintiffs designate this case as a Level 3 case requiring a discovery control plan tailored to the circumstances of the specific suit.

### II.    THE PARTIES

2.    Plaintiff is the State of Texas, by and through the Attorney General of Texas ("Texas" or "the State").

3.    Defendant Xerox Corporation is a corporation organized under the laws of New York and may be served with process upon its registered agent, Prentice Hall Corporation, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218. Defendant Xerox State Health Care, LLC, is a wholly-owned subsidiary of Xerox Corporation organized under the laws of the State of Delaware with Texas offices at 2828 N. Haskell Ave., Dallas, Texas 75204, and may be served with process upon its registered agent, CSC-Lawyers Incorporating Service Company, 211 E. 7th

Street, Suite 620, Austin, Texas 78701-3218. Defendant ACS Healthcare, LLC, a Xerox Corporation, is a wholly-owned subsidiary of Xerox Corporation organized under the laws of the State of Delaware with its Texas offices at 2828 N. Haskell Ave., Dallas, Texas 75204, and may be served with process upon its registered agent, CSC-Lawyers Incorporating Service Company, 701 Brazos Street, Suite 1050, Austin, Texas 78701. Defendant Xerox Corporation acquired Defendant ACS in 2010. On information and belief, ACS State Healthcare, LLC, changed its name to Xerox State Healthcare, LLC, on April 1, 2012. Defendants are referred to hereafter as "Xerox."

### III. JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction over this action pursuant to section 36.052(d) of the TMFPA, which provides statutory remedies to redress the conduct of Defendants. The TMFPA provides authority for this action to be brought by the Attorney General. Tex. Hum. Res. Code §§ 36.052, 36.102. Jurisdiction is further proper because the amounts sought from each Defendant are in excess of the minimum jurisdictional limits of this Court.

5. This Court has jurisdiction over the Defendants named in this Petition, because each Defendant does business in the State of Texas and committed the unlawful acts alleged in this Petition in whole or in part in Texas.

6. Venue is proper in Travis County under section 36.052(d) of the TMFPA and because many of the unlawful acts committed by Defendants were committed in Travis County, including the making of false statements and misrepresentations of material fact to the Texas Medicaid Program.

## IV.   PRELIMINARY STATEMENT AND NATURE OF THIS ACTION

7.   This is a law enforcement action alleging unlawful acts and seeking civil remedies under the TMFPA.

8.   Xerox's unlawful acts resulted in a substantial breach of safeguards intended to protect taxpayer dollars, maintain the integrity of Medicaid policies, and ensure the appropriate delivery of services to Medicaid clients. Xerox permitted an unprecedented loss of Medicaid funds to predatory and unscrupulous dental providers. As a result of the conduct of both Xerox and these providers, the Medicaid program was deeply compromised. During the time period beginning January 1, 2004, when Xerox began its tenure as the State's Medicaid contractor, and ending March 1, 2012, when Texas shifted most of its dental benefits to managed care, Texas Medicaid expended approximately $1.1 billion dollars for orthodontic services to Medicaid clients. Although a comprehensive damage estimate has not been completed, initial reviews of those expenditures indicate that a substantial percentage was paid in violation of Medicaid policies, policies Xerox repeatedly assured Texas it was enforcing. Additionally, because of its misrepresentations, Xerox was paid tens of millions of dollars for services it was, in fact, not performing.

9.   Xerox's liability arises from its misrepresentations regarding, and concealment of, material facts regarding its discharge of contractual obligations. Xerox bid for, and won, contracts with the Texas Health and Human Services Commission ("HHSC") and its predecessors to perform program administration for Texas Medicaid. Included among the administration responsibilities was evaluation and proper disposition of prior authorization requests submitted to Medicaid by dental providers for approval of orthodontic treatment. Xerox repeatedly represented to Texas Medicaid officials that its prior authorization system ensured

proper pre-determinations of medical necessity and enforcement of Medicaid policy. Contrary to those representations, Xerox knowingly failed to adequately review the orthodontic PA requests and documentation submitted by providers to obtain prior authorization for orthodontic treatment. Orthodontic PA requests were routinely "rubber-stamped" by Xerox employees without proper review. Vast numbers of these orthodontic PA requests were for children whose condition did not meet Medicaid criteria for treatment. Xerox's failure to properly review these applications permitted Medicaid dental providers to receive payment for services that were not within the scope of medically necessary services permitted by Medicaid dental policy. Xerox's conduct violates the TMFPA.

10.     The State seeks to recover: (1) the amount of any payments or the value of any monetary or in-kind benefits provided under the Medicaid program, directly or indirectly, as a result of the Defendants' unlawful acts; (2) pre-judgment interest on the amount of the payments or the value of such payments; (3) two times the amount of the payments or the value of such payments; (4) civil penalties in an amount not less than $5,500 or more than $11,000 for each unlawful act committed by Defendants;[1] (5) costs, attorneys' fees, and expenses; and (6) any and all other remedies that may be allowed under the TMFPA.

## V. BACKGROUND

### A.     The Texas Medicaid Orthodontic Benefit

11.     Orthodontic services for children covered by Texas Medicaid are limited by rule and by policy. To qualify for orthodontic treatment, a child must meet a Medicaid-defined test of medical necessity. In general, a child must be age twelve or older, or have lost all primary

---

[1] This maximum civil penalty would rise to not more than $15,000, for each unlawful act which results in injury to a child under 18, disabled person, or elderly person. *See* TMFPA § 36.052(a)(3)(A).

dentition (sometimes known as "baby teeth"), and suffer from a severe handicapping malocclusion. Medicaid does not authorize orthodontic treatment for cosmetic correction.

12. To ensure compliance with policy, Texas requires dental providers to obtain prior authorization of orthodontic treatment plans. Claims submitted for treatment are not considered for payment unless prior authorization is obtained in advance. Each prior authorization request must include documentation specified by effective policy. These requirements include the submission of a treatment plan, a properly-completed and scored Handicapping Labio-Lingual Deviation score sheet ("HLD sheet") with a minimum score, and clinical documentation supporting medical necessity including but not limited to facial and intraoral photographs and radiographs. Medical necessity for the requested treatment can be verified only by examination and verification of the clinical documentation by a licensed dental professional. HHSC expected and required the prior authorization process implemented by Xerox to include a proper review of all documentation and verification of the client's eligibility for the services requested; that is, a thorough review to ascertain that the client and treatment plan met all program requirements.

B.    **The 2003 Contract**

13. On or about May 1, 2002, HHSC released a Request for Proposal ("2002 RFP") for fiscal and business administration of the Texas Medicaid Program. The 2002 RFP described the prior authorization performance required of a successful bidder:

> Prior authorization (PA) is a mechanism to determine the medical necessity of selected non-emergency, Medicaid-covered, and medical services prior to service delivery. . . .The PA function will serve as a utilization management measure allowing payment for only those services that are medically necessary, appropriate, and cost-effective, and reducing the misuse of specified services.

Additionally, the 2002 RFP listed Vendor Responsibilities that included:

> PAC-1    Receive, correctly disposition (i.e., approve, deny, modify, or determine incomplete) . . . prior authorization requests for services. . . .

PAC-5       Ensure that non-covered services are not prior authorized.

PAC-8       Conduct quality assurance reviews to ensure appropriateness of Medicaid . . . PA analyst decisions.

PAC-15      Ensure PA staff use well-defined processes and procedures for analysis and research for PA approvals.

PAC-17      Provide sufficient and adequate professional medical staff for staffing and managing the PA function, including medically knowledgeable PA analysts for processing requests and availability of licensed medical professionals to provide consultative services regarding all Medicaid . . . covered service types.

PAC-40      Implement a quality assurance process and establish procedures to periodically sample and review dispositioned [sic] PA requests to determine if PA policy and procedures are being followed.

14. In response, Xerox submitted a proposal on August 21, 2002 ("2002 Proposal"). In the 2002 Proposal, Xerox represented to Texas Medicaid that its prior authorization process would ensure the implementation of HHSC-approved dental criteria and policy and prevent medically unnecessary services and identify over-utilization of services. Xerox represented that qualified PA staff would review each request and determine whether the orthodontic PA requests complied with Medicaid policy and the services were medically necessary. Xerox assured Texas Medicaid that qualified clinical personnel would use their medical expertise and HHSC-approved policy to evaluate medical necessity and cost-effectiveness of requested services. Xerox promised that it would provide ongoing quality reviews of PA activities, including reviews of accuracy of the PA determinations and adherence to documented procedures.

15. HHSC awarded the Texas Medicaid Claims/Primary Care Case Management Administrative Services Agreement ("2003 contract") to Xerox. The parties executed the 2003 contract in February, 2003. The 2003 contract specifically incorporates the 2002 RFP and the 2002 Proposal. The 2003 contract expired by its terms on or about August 31, 2007.

16. During the transition period between execution of the contract and the assumption by Xerox of operations on or about January 1, 2004, Xerox personnel submitted for HHSC approval written policies and procedures ("P&Ps") specific to dental PA requests which specifically represented to HHSC that every PA request would be submitted to the dental director employed by Xerox for review. The Xerox P&Ps incorporated the procedure followed by the contractor preceding Xerox, a procedure HHSC expected Xerox to follow unless changes were authorized by HHSC. The P&Ps included a representation that the review of each PA request would include an examination of the HLD scoring sheet as well as the radiographs, facial photographs, and plaster cast models of the patient's teeth.

17. Xerox assumed operations under the 2003 contract on or about January 1, 2004. At or around that same time, Xerox implemented a different procedure than that described in the P&Ps. Without submitting documentation of this change to HHSC, Xerox instructed its dental clerical personnel to automatically approve applications for Medicaid-eligible children, age 12 or over, accompanied by an HLD score sheet that showed a score of 26 or above on its face. The employees assigned to this task had no qualifications to conduct a medical necessity evaluation; and, indeed, these employees made no attempt to do so. In most instances, the employees did not even ascertain that any or all of the required medical documentation was actually submitted by the provider as required by Medicaid policy. Further, the clerical personnel were inadequately trained to review the HLD sheet for obvious over-scoring. If the application was for a person who met Medicaid eligibility requirements and the HLD score was facially 26 or more, approval was entered by the clerical personnel without further examination. This new procedure drastically reduced the number of applications receiving review by the dental director, who was the only person employed by Xerox with the medical qualifications necessary to make a proper

review of these applications.

18. Clerical personnel were directed by Xerox to send only orthodontic PA requests for children whose age was under twelve or whose HLD scores were below 26 to the dental director for review. That was estimated to be 10% of all orthodontic PA requests. However, even the 10% reviewed by the dental director were not properly evaluated. The vast majority of those orthodontic PA requests were approved by the dental director, in many instances when the dental director knew the patient did not meet Medicaid policy requirements. Further, as time went on and the number of PA requests increased, Xerox clerical personnel were instructed to approve applications for children under twelve without dental director review or proper authentication that the child's primary dentition had been lost.

19. During the course of the 2003 contract, Xerox continued to promulgate written documents indicating that every dental PA request was submitted for dental director review. These documents misrepresented material facts regarding the actual procedures followed by Xerox employees.

20. The Xerox clerical personnel processing dental PA requests repeatedly observed providers were submitting dental PA requests that, on their face, indicated a need for professional review by the dental director to ascertain compliance with Medicaid policy. They reported their observations and concerns to their superiors. Despite the concerns raised, Xerox made no changes in its process to increase the level of review. Further, despite its representations regarding the efficacy of its quality assurance processes, Xerox made no attempt to test the accuracy of its orthodontic PA dispositions. Xerox did not even retain the medical documentation necessary to conduct such a test.

21. In fact, Xerox implemented cost-saving measures that made adequate reviews less

likely. In or around August of 2006, Xerox launched its so-called Activity Based Compensation ("ABC"). Under ABC, Dental PA Specialists began working from home and were compensated on a piece-work basis. This incentivized employees to process more PA requests in less time. Xerox's home-based employees had no access to the medical documentation submitted by providers.

22. In 2008, the HHSC Office of Inspector General ("HHSC-OIG") began an audit of the PA processes followed by Xerox employees. HHSC-OIG auditors observed Xerox clerical personnel approving orthodontic PA requests without any review of submitted medical documentation. HHSC-OIG questioned whether this process met Xerox's contractual obligations. Xerox management vigorously contested the issue. Xerox represented to HHSC-OIG that its procedures constituted a medical necessity review of each dental PA request and that the vast majority of the dental PA requests submitted met Medicaid coverage requirements. Xerox made those representations even though it had not verified medical necessity for, in its own estimation, 90% of the dental PA requests submitted and even though Xerox's dental director was approving most of the 10% he reviewed himself even when they did not qualify for services under Medicaid policy. Moreover, Xerox made its representations knowing it had done nothing to test the validity of any prior authorization approvals made by clerical personnel or the dental director.

23. On or about August 29, 2008, HHSC-OIG published its Performance Audit Report ("2008 HHSC-OIG Audit"), finding: "The PA dental team members could be approving a portion of orthodontic PA requests that are not for the treatment of severe handicapping malocclusion and other specially medically necessary circumstances. Dollars paid for orthodontic treatment, for the months of September 2007 through February 2008, were at least

$52.6 million." HHSC-OIG made the formal recommendation that Xerox should sample the orthodontic PA requests approved by its personnel to ensure the PA requests meet the criteria for Texas Medicaid benefits. In its management response to the audit findings and recommendations, Xerox represented that it reviewed the orthodontic PA requests "in accordance with the Medicaid administration contract, policies and rules." Xerox further represented, "[T]he absence of PA reviews by a licensed dental professional does not mean that payments for orthodontic treatment during the audit period of September 2007 through February 2008 were inappropriate." Xerox maintained that dental director review was not required by the contract, only staffing by "medically knowledgeable analysts." Xerox made that representation, knowing that, in fact, none of the clerical personnel processing orthodontic PA requests were medically knowledgeable. Xerox never implemented a process to sample for and confirm compliance with Medicaid policy and/or the documentation of medical necessity in applications approved by its personnel.

24.     In or around March, 2009, in response to demands by HHSC for updated P&Ps for all areas of operations, Xerox submitted Dental Prior Authorization P&Ps and Work Instructions to HHSC that indicated that all requests for dental PA were scrutinized to determine that all required documentation was submitted, that the dental and orthodontic PA requests and HLD sheets met Medicaid policy requirements, and that qualifying dental and orthodontic PA requests were routinely submitted for dental director review to determine medical necessity.

25.     In or about April, 2009, the HHSC Deputy Medicaid/CHIP Director for Claims Administrator Operations ("HHSC Deputy") became concerned about Xerox's orthodontic PA process. The HHSC Deputy was responsible for oversight of Xerox's contractual performance and was vested with authority to impose sanctions under the contract. The HHSC Deputy's

concerns arose from a review of the 2008 HHSC-OIG Audit and a letter written to HHSC-OIG in November, 2008, by the Texas Office of Attorney General Medicaid Fraud Control Unit ("MFCU letter"). The MFCU letter set out information obtained by MFCU from Xerox's dental director regarding the way Xerox was reviewing orthodontic PA requests.

26.    On or about April 15, 2009, the HHSC Deputy issued a State Action Request (SAR) to the Managing Director for Xerox. The SAR attached the MFCU letter of November, 2008, noting: "The contract required that [Xerox] research, analyze, and evaluate all PA decisions and ensure all facts are considered and documented prior to making a PA determination. The contract further requires that [Xerox] correctly disposition all PA requests." The SAR further stated:

> The remarks attributed to the [Xerox] Dental Director by the OAG, if accurate, suggest a serious lack of understanding of the prior authorization requirements for the Medicaid dental program. It is absolutely imperative that [Xerox] exercise clinical judgment for each individual dental prior authorization request submitted and approve only those services that are clinically appropriate.
>
> If the . . . Dental Directors [sic] comments are accurate then those comments represent a serious and material breach of the contract. [Xerox] may be subject to actual damages for any procedures that were not clinically evaluated but were authorized and/or liquidated damages for failure to adequately manage the dental prior authorization program.
>
> Prepare a response to each comment attributed to the . . . dental director in the attached [MFCU] letter and provide HHSC with assurances that each prior authorization for dental services is reviewed by an appropriately credentialed professional to determine dental necessity for the service. Provide HHSC with assurance that every dental service during the current [Xerox] Dental Directors [sic] tenure has been reviewed for clinical necessity.

27.    In a meeting held in or about early May, 2009, the HHSC Deputy confronted Xerox with the evidence that Xerox was not reviewing orthodontic PA requests to determine medical necessity and ensure Medicaid policy was properly enforced. Xerox was asked specifically whether it was "rubber-stamping" these requests based solely on the HLD score;

Xerox's Managing Director assured the HHSC Deputy that such was not the case. Xerox represented that it was following policy and properly reviewing orthodontic PA requests. Xerox did not reveal to HHSC that it had, without authorization from HHSC, interpreted HHSC's policies to mean that clerical personnel without any dental training whatsoever were making determinations of medical necessity based solely on whether they saw a 26 or above on the HLD score sheet.

28. On or about May 13, 2009, the Managing Director submitted Xerox's formal written response to HHSC's SAR. Xerox stated: "We have reviewed the SAR comments with [the Dental Director] who states his comments were taken out of context." Xerox made the following representations:

> We review the documentation the provider submits to determine the medical necessity criteria, as outlined in the Texas Health Steps (THSteps) Orthodontic Dental Services Medical Policy. . . .[Xerox] reviews the dental services prior authorization request for medical necessity based on the medical policy guidelines established by HHSC and the dental policy and procedures that are approved by HHSC. The dental specialists who review the requests are trained in the dental Medical Policy and follow the approved policy and procedures to appropriately disposition the PA requests.

29. On or about July 3, 2009, HHSC issued another SAR requesting information regarding Xerox's corrective measures to address the HHSC-OIG audit recommendations had been appropriately implemented. Specifically, HHSC required Xerox to provide to HHSC documentation demonstrating Xerox's quality assurance process and the existing P&P describing that process. HHSC also requested updated work instructions used to train PA staff. On or about July 20, 2009, Xerox issued its response to the July 3, 2009, SAR. Xerox stated that it had not added the sample step recommended by HHSC-OIG but had reviewed an internal sample of ten cases approved by its dental team. Xerox represented to HHSC: "The results of that sample were that all ten cases reviewed showed evidence of a malocclusion and were approved correctly

according to dental policy." Xerox attached what it represented to be its current quality assurance ("QA") P&P for PA. The QA P&P represents that the QA process tests whether "[a]ll medical facts are considered and documented in the PA determination." In addition to the QA P&P, Xerox attached what it represented were current Dental PA work instructions. The described procedure represents dental authorization requests assigned to Dental PA specialists are reviewed "to be certain the request is submitted in its entirety." The procedure continues: "After the request is checked for client and provider eligibility and duplications, the request is forwarded to the Dental Director's in-box for review, and x-rays/photographs (molds, if necessary) are prepared for his inspection." The work instruction adds: "The Dental Director will enter the decision . . ." This documentation submitted by Xerox to HHSC misrepresented material facts regarding actual procedures followed by Xerox personnel.

## C. The 2010 Contract.

30. On or about August 15, 2008, HHSC released a new Request for Proposal ("2008 RFP") for administrative services to Texas Medicaid. The 2008 RFP included specifications of the Prior Authorization services HHSC expected a successful bidder to provide:

> Generally, Prior Authorization (PA) is a process used to determine the medical necessity for selected non-emergency medical services, equipment, drugs and supplies before the services or supplies are provided. . . .In compliance with State-approved policies and procedures, the Vendor prospectively implements processes to review the facts associated with certain treatments proposed by providers . . . and makes determinations regarding the medical necessity and appropriateness of care. Prior Authorization requests must be reviewed on a case-by-case basis for clients who are eligible for services. . . .

> The primary objective of the PA function by the Vendor is to manage utilization by only allowing payment for those covered services that are medically necessary, appropriate, and cost-effective, thereby reducing over-utilization and/or abuse of specified services.

The general requirements imposed upon the Vendor included:

PAC – 03    Retain and retrieve all PA records in accordance with the State-approved record-retention and retrieval guidelines.

PAC – 04    Establish and follow State-approved policies and procedures for analyzing and researching PA determinations.

PAC – 06    Submit to the State for review and approval a quality assurance plan and procedures for verifying the accuracy of analyst and medical director prior authorization dispositions/decisions (approval, denial, incomplete and modification). The quality assurance plan must include at least a bi-annual review schedule for all types of Prior Authorization decisions, and be submitted to the State annually. Changes to the quality assurance plan and procedures must be approved by the State prior to implementation.

Prior Authorization Processing tasks and activities were included in the 2008 RFP to describe the "results/outcomes" the Vendor must achieve:

PAC – 20    Receive, correctly disposition (i.e. approve, deny, modify, or determine incomplete), . . . prior authorization requests for all services. . . .

PAC – 23    Establish and maintain State-approved processes and procedures to ensure that non-covered services are not prior authorized unless specifically directed by the State.

The 2008 RFP also identified specific criteria to "ensure that appropriate Medical Necessity evaluation is conducted for PA determinations," including:

PAC – 36    Research, analyze and evaluate all PA decisions and ensure all medical facts are considered and documented prior to determination.

The 2008 RFP specified the following with regard to PA staffing:

The Vendor's PA staff must have the education and professional credentials defined by the State to perform the PA tasks and activities.

PAC – 37    Provide and maintain a sufficient number of knowledgeable and professional medical personnel to perform the PA function, in accordance with State-approved processes and procedures.

PA personnel must include:

- Medically knowledgeable PA analysts, to process requests;
- Licensed medical professionals available at all times to provide consultative services with regard to all covered service types; and
- Licensed nurses acting within their scope of practice . . .

31. On or about January 27, 2009, Xerox submitted its Proposal for Medicaid/Children with Special Health Care Needs Services Program Claims Processing, Primary Care Case Management and Pharmacy Claims and Rebate Administration ("2009 Proposal") to HHSC. The Proposal included representations specific to Prior Authorization management:

The [Xerox] Prior Authorization department offers clients, providers, and the State the benefits of detailed knowledge of medical policy authorization criteria and program services limitations, industry standard evidenced based criteria, as well as the clinical knowledge to facilitate medical necessity determinations.

The Prior Authorization (PA) department consistently demonstrates the principles of good health care program management, enabling the State to conserve health care funds while ensuring the provision of necessary services to clients who genuinely need them.

The director of the PA department . . . accepts responsibility for processing provider authorization requests according to . . . Medicaid . . . program requirements. The director ensures compliance with State and Federal regulations for authorization of services. Along with [Xerox's] medical affairs officer and the medical director, [the PA director] leads the prior authorization activities and is responsible for processing provider authorization requests in accordance with HHSC approved medical policies. We review authorization requests for clients who are eligible for services . . . on a case-by-case basis.

Xerox represented that its PA department met the "primary business objective of the PA function . . . to reduce the excessive utilization or abuse of specified services by requiring prior authorization based on Medicaid policy and sound medical/dental criteria before allowing payment . . .[ensuring] that the services are medically necessary, appropriate, and cost-effective. Xerox represented that it meets this objective by "maintaining an efficient prior authorization process using HHSC approved medical/dental criteria and experienced qualified staff to review authorization requests." Xerox represented that it was meeting HHSC's Business Objective of

Utilization Review to Ensure Appropriate Determinations for Requested Services and Supplies through its reviews of authorization requests for completeness and its determinations by professional medical personnel for medical necessity. Xerox represented that its "PA policies and procedures provide the ability for the prospective review of requested services and benefits," allowing "a comprehensive medical necessity review." Xerox addressed the quality assurance requirements as follows:

> PA quality assurance activities include reviewing that PA determinations apply . . . . established policies and procedures appropriately, thereby meeting the applicable Federal and State laws, rules, and regulations and guidelines.

Xerox stated:

> PA staff review and consider all medical facts submitted by a provider . . . when determining medical necessity for requested services. Before making a PA determination we research, analyze, evaluate, and ensure we consider all documented medical facts, in accordance with State approved criteria.

Xerox represented that its PA personnel includes "Medically knowledgeable PA Specialists who analyze and process requests," Xerox further represented that medical necessity reviews were performed only by medically qualified personnel. All of these representations were false.

32. On or about September 1, 2010, Xerox was awarded the new contract ("2010 Contract"). The 2010 contract incorporates both the 2008 RFP and Xerox's 2009 Proposal.

33. On or about January 19, 2011, HHSC issued a SAR identifying performance issues with the prior authorization of orthodontic requests. This SAR named specific authorizations approved by Xerox that did not meet Medicaid policy. On or about May 18, 2011, HHSC issued an "Oral Notice of Deficiency with Corrective Action Plan – Orthodontia Prior Authorization." On or about May 20, 2011, Xerox sent a response SAR to HHSC with what it represented as its current work instructions along with what purported to be "draft" work instructions. The "current" work instructions still described all dental prior authorization requests going to the

dental director. The "draft" work instructions describe a process wherein the Dental Specialist ensures that the request is complete, ensures that the HLD score is 26 or more, and sends orthodontic PA requests for dental director review if the score is less than 26. On or about June 8, 2011, Xerox sent a "follow-up" SAR response to the Oral Notice of Deficiency. In it, Xerox represented to HHSC that the PA specialists who process requests for orthodontia services are "medically knowledgeable PA analysts who do not make final determinations of medical necessity; therefore, these staff are not licensed or certified." Xerox represented to HHSC that the "medically knowledgeable" analysts only approved those applications with a "verified" score of 26 or above. In fact, Xerox personnel were not trained to check the validity of a score of 26 or above. On or about July 19, 2011, in response to continuing requests for clarification by HHSC, Xerox finally admitted: "[Xerox] 'validates' the score by mathematically calculating the providers recorded numbers to ensure the score totals 26 or higher."

34.    In or about October, 2011, at HHSC's insistence, Xerox implemented new procedures including a review by a licensed dental professional of all orthodontic PA requests.

35.    In or about January, 2012, HHSC instructed Xerox to discontinue processing dental prior authorization requests in anticipation of the implementation of managed care.

## VI.    APPLICABLE TEXAS STATUTORY PROVISIONS

36.    Prior to August 31, 2005, a person committed an unlawful act as defined under the Texas Medicaid Fraud Prevention Act by, among other things:

A.    Knowingly or intentionally making or causing to be made a false statement or misrepresentation of material fact on an application for a contract, benefit, or payment under the Medicaid Program; or that is intended to be used to determine a person's eligibility for a benefit or payment under the Medicaid program. TEX. HUM. RES. CODE § 36.002(1)(A) & (B).

B.      Knowingly or intentionally concealing or failing to disclose an event that the person knows affects the initial or continued right of the person to a benefit or payment under the Medicaid program and to permit a person to receive a benefit or payment that is not authorized, or that is greater than the benefit or payment that is authorized. TEX. HUM. RES. CODE § 36.002(2).

C.      Knowingly or intentionally making, or causing to be made, inducing, or seeking to induce the making of a false statement or misrepresentation of a material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid Program. TEX. HUM. RES. CODE § 36.002(4)(B).

D.      Knowingly or intentionally entering into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Medicaid program or a fiscal agent. TEX. HUM. RES. CODE § 36.002(9).

37.      Since August 31, 2005, a person commits an unlawful act as defined under the Texas Medicaid Fraud Prevention Act by, among other things:

A.      Knowingly making or causing to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized. TEX. HUM. RES. CODE ANN. § 36.002(1)(A) & (B).

B.      Knowingly concealing or failing to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized. TEX. HUM. RES. CODE ANN. § 36.002(2).

C.      Knowingly making, causing to be made, inducing, or seeking to induce the making of a false statement or misrepresentation of material fact concerning information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program. TEX. HUM. RES. CODE ANN. § 36.002(4)(B).

## VII. DEFENDANTS' VIOLATIONS OF THE
## TEXAS MEDICAID FRAUD PREVENTION ACT[2]

38.     The State re-alleges and incorporates by reference as set forth herein the allegations contained in Paragraphs 1 through 35 of this Petition.

39.     Xerox knowingly made or caused to be made false statements or misrepresentations of material facts to HHSC authorities charged with overseeing Xerox's contractual performance regarding:

- The application and enforcement of Medicaid policy with regard to orthodontic treatment;

- The conducting of medical necessity reviews of requests for orthodontic prior authorization;

- The provision of adequate medically knowledgeable personnel to make medical necessity determinations;

- The application and appropriate enforcement of Medicaid policy with regard to the review of documentation submitted by providers to support medical necessity for orthodontic treatment;

- The implementation of quality assurance processes necessary to assess the dispositions of requests for orthodontic prior authorizations;

- The retention of records necessary to justify the dispositions of requests for orthodontic prior authorizations.

Xerox's false statements and/or misrepresentations permitted orthodontic providers to receive benefits under the Medicaid program in violation of Section 36.002(1) of the TMFPA.

---

[2]     In August of 2005, applicable provisions of the TMFPA were amended as set forth in ¶¶ 36 through 37 above. Plaintiffs are seeking the appropriate remedies for Defendants' unlawful acts (which include Defendants' conduct both prior to and after August 2005 for purposes of this lawsuit) as defined in the TMFPA at the time such unlawful acts were committed.

40. Xerox knowingly concealed from, or failed to disclose to, HHSC authorities charged with overseeing Xerox's contractual performance events or information regarding:

- The application and enforcement of Medicaid policy with regard to orthodontic treatment;

- The conducting of medical necessity reviews of requests for orthodontic prior authorization;

- The provision of adequate medically knowledgeable personnel to conduct medical necessity determinations;

- The application and appropriate enforcement of Medicaid policy with regard to the submission by providers of medical documentation to support medical necessity for orthodontic treatment;

- The implementation of quality assurance processes necessary to assess the dispositions of requests for orthodontic prior authorizations;

- The retention of records necessary to justify the dispositions of requests for orthodontic prior authorizations.

Xerox's concealment and failure to disclose material information permitted orthodontic providers to receive payments under the Medicaid program that were not authorized or that were greater than the benefits authorized in violation of Section 36.002(2) of the TMFPA.

41. Xerox knowingly or intentionally made, or caused to be made, induced, or sought to induce the making of false statements or misrepresentations of material facts concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid Program in violation of Section 36.002(4) of the TMFPA. Xerox's conduct permitted Xerox to receive payments for services it failed to perform and

induced the Texas Medicaid program to make payments to both Xerox and orthodontic providers that should not have been paid.

42. As a result of Xerox's conduct, hundreds of millions of dollars in payments were made for services not performed and orthodontic benefits not authorized by Medicaid policy by the State of Texas.

43. Under the TMFPA, Xerox is liable to the State of Texas for the value of any payments or any monetary or in-kind benefits provided under the Medicaid program, directly or indirectly, as a result of its unlawful acts, two times the amount of those payments, plus pre-judgment interest on the value of those payments, and a civil penalty for each unlawful act committed, in addition to the fees, expenses, and costs of the State of Texas in investigating and obtaining civil remedies in this matter. TEX. HUM. RES. CODE §§ 36.052, 36.007.

44. The State invokes all relief possible at law or in equity under TEX. HUM. RES. CODE §36.052, whether specified in this pleading or not.

45. The amounts sought from Xerox are in excess of the minimum jurisdictional limits of this Court.

## VIII. STATUTORY INJUNCTION UNDER § 36.051 OF THE ACT

46. The Attorney General has good reason to believe the Defendants are committing, have committed, or are about to commit unlawful acts as defined by the TMFPA. These illegal acts may be enjoined under § 36.051 of the Act, and under TEX. GOVT. CODE § 2001.202.

## IX. JURY DEMAND

47. The State respectfully requests a trial by jury on all claims pursuant to Texas Rules of Civil Procedure 216.

## X.   PRAYER

48.   The State asks that judgment be entered upon trial of this case in favor of the State against Xerox to the maximum extent allowed by law.

49.   The State asks for injunctive relief pursuant to § 36.051 of the TMFPA and under TEX. GOVT. CODE § 2001.202.

50.   The State asks that it recover from Xerox:

A.   restitution of overpayments made as a result of Xerox's unlawful acts;

B.   two times the value of any overpayments made as a result of Xerox's unlawful acts;

C.   civil penalties;

D.   prejudgment interest;

E.   expenses, costs and attorneys' fees; and

F.   post-judgment interest at the legal rate.


Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

JOHN SCOTT
Deputy First Assistant Attorney General

*Margaret Moore*

RAYMOND C. WINTER
State Bar No. 21791950
Chief, Civil Medicaid Fraud Division
raymond.winter@texasattorneygeneral.gov
(512) 936-1709
MARGARET MOORE
State Bar No. 14360050
Deputy Chief, Civil Medicaid Fraud Division
margaret.moore@texasattorneygeneral.gov
(512) 936-1319 direct dial
REYNOLDS BRISSENDEN
State Bar No. 24056969
reynolds.brissenden@texasattorneygeneral.gov
(512) 936-2158 direct dial
DAVID DREW WRIGHT
State Bar No. 00789965
drew.wright@texasattorneygeneral.gov
(512) 936-1486 direct dial
DAMON T. ONG
State Bar No. 24065846
damon.ong@texasattorneygeneral.gov
(512) 936-6615 direct dial
MATTHEW MILLER
State Bar No. 24051959
matthew.miller@texasattorneygeneral.gov
(512) 936-1420 direct dial
BRADEN CIVINS
State Bar No. 24080836
braden.civins@texasattorneygeneral.gov
(512) 463-7975 direct dial
WILLIAM VAN SCHELLENBECK
State Bar No. 24084006
william.vanshellenbeck@texasattorneygeneral.gov
(512) 936-9912 direct dial
JENNIFER L. HOPGOOD
State Bar No. 24073010
jennifer.hopgood@texasattorneygeneral.gov
(512) 463-1045 direct dial
KATHRYN B. ALLEN
State Bar No. 24055134
kathryn.allen@texasattorneygeneral.gov
(512) 936-1703 direct dial

Assistant Attorneys General
P.O. Box 12548
Austin, Texas 78711-2548
(512) 499-0712 fax

ATTORNEYS FOR THE STATE OF TEXAS

# Tab C

**Office of Inspector General Report dated August 29, 2008**



# TEXAS
## Health and Human Services Commission

Albert Hawkins, Executive Commissioner

# Office of Inspector General

## Performance Audit Report
## Texas Medicaid Healthcare Partnership
## Prior Authorization Audit

August 29, 2008

Bart Bevers, Inspector General

OIG Report No 08-70-52903191-MA-03|

# CONTENTS

Transmittal Letter

Executive Summary.................................................................................................................1

Detailed Findings and Recommendations ..............................................................................3

Appendix A - Objective, Scope, and Methodology ..............................................................10

Appendix B – Report Distribution........................................................................................12



# TEXAS HEALTH AND HUMAN SERVICES COMMISSION

ALBERT HAWKINS
EXECUTIVE COMMISSIONER

August 29, 2008

Rick Pope, Vice President, Managing Director
Texas Medicaid Healthcare Partnership
12365-A Riata Trace Pkwy, Building 9
Austin, Texas 78727

Dear Mr. Pope:

The Health and Human Services Commission (HHSC) - Office of Inspector General, Audit Section (OIG) has completed its audit of the Texas Medicaid Healthcare Partnership (TMHP) Prior Authorization Process. The audit objective was to determine if TMHP's prior authorization process complies with contractual obligations, Texas Administrative Code, and federal regulations. Upon finalizing the audit objectives, the audit scope was the period September 1, 2006 to March 31, 2008.

The detailed findings and recommendations with management responses are presented in the enclosed final report.

We would like to thank you for the courtesy extended to us by TMHP Prior Authorization section management and staff during the audit. If you have any questions or concerns, please do not hesitate to contact Mark Poehl, Director of the OIG Audit Section, at mark.poehl@hhsc.state.tx.us or by phone at (512) 491-2872.

Sincerely,

Mark Poehl, CPA, CIA, CFE, CISA
Director, Audit Section

Enclosure

# EXECUTIVE SUMMARY

**Audit Results (*Statement of Findings*)**

Based upon the evidence provided and test conducted, Texas Medicaid Healthcare Partnership's (TMHP) prior authorization process partially complies with contractual obligations, Texas Administrative Code, and federal regulations. Areas of noncompliance are as follows:

- An opportunity for improvement exists in the orthodontic prior authorization requests process
- Prior authorization staff approved prior authorization requests that were not in compliance with the Texas Medicaid Providers Procedures Manual
- Four prior authorization requests were not processed in a timely manner
- USB ports are enabled on Prior Authorization systems for employees who work from home

**Objective (*Subject*)**

The Health and Human Services Commission (HHSC) - Office of the Inspector General, Medicaid/CHIP Audit Unit (OIG) has completed its audit of TMHP Prior Authorization Process. The audit covers the period September 1, 2006 to March 31, 2008. The objective of the audit was to determine if TMHP's prior authorization process complies with contractual obligations, Texas Administrative Code, and federal regulations.

This audit was conducted under the authority granted to OIG in the Texas Government Code Section 531.102(h)(4). This performance audit was conducted in accordance with *Government Auditing Standards*, 2007 revision, issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

**Summary of Scope and Methodology (*Summary of Activities Performed*)**

The audit of the TMHP Prior Authorization Process covered the period beginning September 1, 2006 and ending March 31, 2008. The methodology employed throughout this performance audit included objectively reviewing and analyzing various forms of documentation, conducting interviews and observations, and conducting tests necessary to achieve the objectives of the audit. See Appendix A for detailed objective, scope, and methodology.

**Background**

As of January 1, 2004, ACS State Healthcare LLC, under contract with the Texas Health and Human Services Commission (HHSC), assumed administration of Medicaid claims processing and the Medicaid primary care case management services program. ACS meets its new consolidated Medicaid responsibilities with a team of subcontractors under the name of TMHP.[1]

---

[1] Obtained from TMHP's website as of August 5, 2008. ACS is Affiliated Computer Services.

This Medicaid administration contract incorporates the Request for Proposal (RFP). Section 8, Vendor Responsibilities, of the RFP states: Prior authorization (PA) is a mechanism to determine the medical necessity of selected non-emergency, Medicaid-covered, and medical services prior to service delivery (and retroactively in special cases). Providers submit requests for PA to perform specified services. The PA function will serve as a utilization management measure allowing payment for only those services that are medically necessary, appropriate, and cost-effective, and reducing the misuse of specified services.

# DETAILED FINDINGS AND RECOMMENDATIONS

**Finding 1 – Opportunity for Improvement in the Orthodontic Prior Authorization Requests Process**

An opportunity for improvement was noted in the documentation review process for orthodontic prior authorization (PA) requests. Currently, not all documentation that supports the Texas Medicaid Program benefits for orthodontic PA requests, approved by the PA dental team, is reviewed. Rules and Regulations governing the orthodontic PA requests include:

- Section 19.18, Orthodontic Services, of the Texas Medicaid Providers Procedures Manual, states "Orthodontic services for cosmetic purposes only are not a benefit of the Texas Medicaid Program. Orthodontic services are limited to the treatment of severe handicapping malocclusion and other special medically necessary circumstances as outlined in Benefits and Limitations…"

- Section 19.18.2, Mandatory Prior Authorization, of the Texas Medicaid Providers Procedures Manual, states "Requests for orthodontic services must be accompanied by all the following documentation:

  - An orthodontic treatment plan…
  - Cephalometric radiograph with tracing models
  - Completed and scored HLD sheet…
  - Facial photographs
  - Full series of radiographs or a panoramic radiograph:…
  - Any additional pertinent information as determined by the dentist or requested by TMHP's Dental Director…"

- In section 8.9.5, Vendor Responsibilities, of the Request for Proposal, it is stated in PAC-6 that the Vendor must "Research, analyze, and evaluate all PA decisions and ensure all medical facts are considered and documented prior to determination."

- Additionally, PAC-17 states that the Vendor must "Provide sufficient and adequate professional medical staff for staffing and managing the PA function, including medically knowledgeable PA analysts for processing requests and availability of licensed medical professionals to provide consultative services regarding all Medicaid and CSHCN covered service types…"

To approve an orthodontic PA request the PA dental team members verify the mathematical accuracy of, and ensure that, the Handicapping Labiolingual Deviation (HLD) index score is at least 26. The PA dental team members do not review the additional documentation required per the Texas Medicaid Providers Procedures Manual (TMPPM) and do not have the dental licenses necessary to determine if the additional documentation supports the HLD index score.

TMHP staff did state that under predefined circumstances, approximately 10%[2] of the orthodontic PA requests are referred to, and the documentation reviewed by, the Dental Director. This means

---

[2] This percentage has not been audited by OIG. The audit client provided the statistic.

approximately 90% of the documentation for orthodontic PA requests is not being reviewed. Zero of the 18 orthodontic sample items tested were referred to the Dental Director.

The PA dental team members could be approving a portion of orthodontic PA requests that are not for the treatment of severe handicapping malocclusion and other special medically necessary circumstances. Dollars paid for orthodontic treatment, for the months of September 2007 through February 2008, were at least $52.6 million.

**Recommendation:**

TMHP should sample the orthodontic PA requests approved by the PA dental team members. The sample and its documentation should be reviewed by a licensed dental professional to ensure that the orthodontic PA requests meet the criteria for Texas Medicaid Program benefits.

*Management Response*:

TMHP reviews orthodontic prior authorization requests in accordance with the Medicaid administration contract, policies and rules. The contract does not require orthodontic PA requests to be reviewed by a licensed dental professional. Therefore, the absence of PA reviews by a licensed dental professional does not mean that payments for orthodontic treatment during the audit period of September 2007 through February 2008 were inappropriate.

PAC-6 and PAC-17 require consideration of documentation to determine medical necessity and adequate management and staffing of the PA function, including medically knowledgeable analysts and "*the availability of licensed medical professionals to provide consultative services.*" When a provider submits a PA request according to Section 19.18.2, the request includes a score sheet with preset scoring criteria. According to the currently approved medical policy, a score of 26 or more meets medical necessity for approval. Scores below 26 require the review of a licensed medical professional. In addition, certain high cost items are referred to a licensed medical professional for approval. As noted by the auditors, approximately 10% of the orthodontic PA requests were referred to the Dental Director for consultative services in accordance with the contract. All of the orthodontic PA requests sampled by the auditors that were not referred to the Dental Director achieved a score of 26 or higher in accordance with the policy.

TMHP is willing to add a sample step to this process; however, it may require a change order. TMHP PA will discuss the audit recommendation to sample the orthodontic PA requests approved by the PA dental team members with HHSC. The sample could be added to the current PA process once the scope, resources, methodology and reporting are agreed to by TMHP and HHSC.

**Finding 2 – Prior Authorization Staff Approved Prior Authorization Requests That Were Not in Compliance With the Texas Providers Procedures Manual**

Incorrect Signatures on the HLD Index

PA staff approved two orthodontic PA requests, out of the nine sample items tested (22.2%), with incorrect signatures for the Handicapping Labiolingaul Deviation (HLD) Index for the Comprehensive Orthodontic Treatment procedure code D8080. Section 19.18.2, Mandatory Prior Authorization, in the TMPPM states that "Requests for orthodontic services must be accompanied by all the following documentation: ... Completed and scored HLD sheet with diagnosis of Angle class (26 points required

for approval of non-cleft palate cases)." Section 19.20, How to Score the Handicapping Labiolingual Deviation (HLD) Index, in the TMPPM further states that "The orthodontic provider must complete and sign the diagnosis (Angle class)."

When the provider submitted the HLD sheet to TMHP, the primary practitioner did not sign it. A stamp was used in place of the handwritten, original signature. The two sample items in question were from the same provider. This provider had used three different signatures on the THSteps Dental Mandatory Prior Authorization Request Forms and HLD Indexes.

<u>Incomplete THSteps-CCP Prior Authorization Request Forms</u>

PA staff approved four incomplete THSteps-CCP Prior Authorization Request Forms out of the 62 sample items tested (6.5%) for the Private Duty Nursing services procedure code T1003. Section 43.4.13.6, Documentation, in the TMPPM states that "The THSteps-CCP Prior Authorization Request Form must be completed, signed, and dated by the physician. The physician must mark the Private Duty Nursing box documenting the stability of the client for PDN. All requested dates of service must be included."

When the provider submitted the THSteps-CCP Prior Authorization Request Forms to TMHP, the primary practitioner did not complete the section Primary Practitioner's Certifications

TMHP did not comply with the requirements in the TPPM for the HLD Index and the THSteps-CCP Prior Authorization Request Forms.

**Recommendation:**

TMHP should consider increasing training for current and future PA staff to ensure that incorrect signatures and incomplete forms are not approved.

*Management Response:*

<u>Incorrect Signatures on the HLD Index</u>
TMHP PA leadership will conduct retraining with PA dental team staff to ensure that stamped signatures are not approved and will update the PA Work Instructions used for new staff training to include the same information. However, the current dental medical policy does not require an original handwritten signature; neither the policy nor the provider manual specifies that a provider cannot use a stamp or an electric signature on the dental request form or the HLD Index. TMHP PA will work with DRT to draft HHSC approved provider banner and bulletin communications that dental PA requests and HLD Index sheets must have original provider signatures and that stamped signatures cannot be approved. These communications will then be included in the next revisions of the Texas Providers Procedures Manual (TMPPM) Dental section as the section does not currently state that stamped signatures cannot be approved.

<u>Incomplete THSteps-CCP Prior Authorization Request Forms</u>
The auditor correctly noted that a box was not checked on four PA request forms sampled. In each instance, the form included all substantive documentation required as well as the physician's signature, and the form was reviewed by PA staff and determined to adequately support medical necessity. In these cases, the PA was approved in the interest of efficiency rather than pending the request and requiring the provider to resubmit it.

TMHP PA leadership will conduct retraining with PA CCP team staff to ensure that Private Duty Nursing (PDN) requests where the provider has not marked the PDN box are not approved and will update the PA Work Instructions used for new staff training to include the same information. In the interest of streamlining the PA process for providers. TMHP PA leadership will work with HHSC through the Medical Policy review process to consider revisions to the CCP PDN request form removing the checkboxes from the Primary Practitioner's Certifications section and allowing the existing wording along with the physician's signature to be the provider's certification.

## Finding 3 - Four Prior Authorization Requests Were Not Processed in a Timely Manner

Four out of 10 (40%) PA requests for power wheelchairs (PWC) were not processed in a timely manner. Rules and Regulations for all prior authorization requests include:

o   In section 8.9.5, Vendor Responsibilities, of the Request for Proposal, it is stated in PAC-24 that "Upon receipt of the requested information from the provider, the Vendor must process the request and make a PA determination within one business day."

o   Additionally, PAC-25 states that "If the Vendor does not receive the requested information by the end of the fourth business day, the Vendor must send a letter to the client stating that the PA request cannot be processed until the provider responds with the specific information necessary to complete the PA request. This letter must be sent within one business day along with a copy of the initial letter to the provider that lists the specific information necessary to make the PA determination."

Two PA requests were not processed within one business day after receiving the requested information from the provider. For two PA requests the vendor did not send a letter to the client notifying the client of the need for additional information from his/her provider within four business days after the Vendor notified the provider.

A delay in processing PA requests could mean a delay in a client receiving needed medical care. TMHP is subject to liquidated damages per section 14.07 of the Service Agreement between HHSC and TMHP. Section 14.07 states "The Parties agree that, except as limited by subsection (e) of this Section 14.07, HHSC may assess a liquidated damage of up to $1,000 per calendar day for each instance of CONTRACTOR's breach or nonperformance of a duty that is not specified in the Performance Standards and Measures." The liquidated damages are determined to be $55,000.

### Calculation of Liquidated Damages

| Sample Item No. | Dates in Noncompliance | No. of Days | X $1,000/Day | Liquidated Damages |
|---|---|---|---|---|
| PWC - #2 | 8/31/07 - 9/11/07 | 12 | $1,000.00 | $12,000.00 |
| PWC - #4 | 8/22/07 - 8/23/07 | 2 | $1,000.00 | $2,000.00 |
| PWC - #6 | 1/12/08 - 1/29/08 | 18 | $1,000.00 | $18,000.00 |
| PWC - #10 | 10/11/07 - 11/2/07 | 23 | $1,000.00 | $23,000.00 |
| | | | Total | $55,000.00 |

**Recommendation:**

TMHP should consider increasing training for current and future PA staff to ensure that PA requests are processed in a timely manner. TMHP should pay the state liquidated damages in the amount of $55,000 in accordance with the Service Agreement between HHSC and TMHP.

*Management Response*:

TMHP PA leadership will conduct retraining with PA staff to ensure that requests pended for incomplete information are processed in a timely manner. The retraining will include a review of the PAC 24 requirement for processing requests within one business day upon receipt of the requested information and PAC 25 requirement for sending the Client Notification Letter for incomplete requests. Incomplete request training for new PA employees will emphasize PAC 24 and PAC 25.

The Medicaid administration contract includes specific liquidated damages for failure to meet service level agreements. The LDs for prior authorization are addressed in Appendix D of the contract. The contract sets forth a progressive and tailored remedies process that TMHP and HHSC follow to address performance deficiencies. The process must be completed as prescribed by the contract prior to the determination of liquidated damages.

### Finding 4 - USB Ports Are Enabled on Prior Authorization Systems For Employees Who Work From Home

USB ports are enabled on the computer equipment used by the PA employees who work from home. Rules and regulations include:

- HIPAA Security Rule, Section 164.310(d)(1): A covered entity must, in accordance with Section 164.306, "implement policies and procedures that govern the receipt and removal of hardware and electronic media that contain electronic protected health information into and out of a facility, and the movement of these items within the facility."

- Texas Medicaid Healthcare Partnership (TMHP) Information Technology Security Policies, Version 2.1, page 18, Section 1.6.2.b: "Workers performing specific business functions including data entry and home keying will not save confidential information data on a worker provided system or removable storage media. All TMHP, customer, provider, or client data must reside on a TMHP network server."

TMHP has not disabled USB ports on PA systems used in homes of PA employees. Flash drives (a form of removable media) could be used to copy, store, and transport electronic protected health information without the knowledge or consent of TMHP management.

**Recommendation:**
TMHP should disable USB ports to prevent the use of flash drives or external hard drives to copy electronic protected health information.

*Management Response*:
The USB ports are required for the current set up of the PA in-home workers' headsets used in conjunction with the Avaya CCQ softphone application. A USB adapter is required to connect the user's headset to the computer. All PA employees whether on-site or in-home are required to comply

with all TMHP information technology security policies, which state that they will not save confidential information data on a worker-provided system or removable storage media. However, in order to mitigate any risk, a terminal server gateway solution is currently being researched, which would prevent the download of data from the TMHP network to the local machine or removable storage media over the VPN connection.

# APPENDIXES

# OBJECTIVE, SCOPE, AND METHODOLOGY

## Objective

To determine if TMHP's prior authorization process complies with contractual obligations, Texas Administrative Code, and federal regulations

## Scope

The initial scope of the audit of TMHP's prior authorization covered the period beginning September 1, 2006 and ending March 31, 2008. An engagement letter was issued to TMHP outlining the understanding of the OIG with respect to the audit of the TMHP Prior Authorization Division for the period September 1, 2006 to March 31, 2008. The scope of procedures was based upon an assessment of risk and results of preliminary audit testing. The final scope of the audit for fieldwork testing was determined to be September 1, 2007 to February 29, 2008. Professional judgment was exercised in planning, executing and reporting the results of the audit.

## Methodology

The methodology employed throughout this performance audit included objectively reviewing various forms of documentation including:

- TMHP e-OPM (electronic-Online Procedures Manual)
- Request for Proposal part of the Medicaid administration contract
- Texas Medicaid Provider Procedures Manual (TMPPM)
- Quality Assurance reports
- Claims information, and other information maintained by TMHP

The methodology also included:
- Comparing policies and procedures to applicable Texas Administrative Codes (TAC) and contract requirements
- Observing and interviewing operational and administrative personnel
- Performing tests using statistical random samples of data
- Performing test using a judgmental sample of power wheelchair PA requests
- Analyzing various data for aspects of practices, processes, and performance

## Criteria Used

- Texas Administrative Code (TAC), Title 1, Part 15
- The contract terms identifying Prior Authorization vendor responsibilities
- TMHP e-OPM (electronic-Online Procedures Manual)
- 2007 & 2008 Texas Medicaid Provider Procedure Manual (TMPPM)
- Health Insurance Portability and Accountability Act, Security Rule
- TMHP Information Technology Security Policies, Version 2.1

## Team Members

Juanita Henry, CHC, CIG, Deputy Inspector General for Compliance
Mark Poehl, CPA, CIA, CFE, CISA, Director Audit Section
Sandra Hardin, CPA, Audit Team Leader
Richard Hutchinson, CIA, CISA, IT Audit Team Leader
Kanette Blomberg, CPA, Lead Auditor
Ikennalke Chidume, CPA, Auditor
Tamara Stephens, Auditor
Anthony Webb, Auditor
John Zappa, IT Auditor
Susan Phillips, Auditor

## REPORT DISTRIBUTION

### Texas Medicaid Healthcare Partnership

Rick Pope, Vice President, Managing Director
Texas Medicaid Healthcare Partnership
12365-A Riata Trace Pkwy, Building 9
Austin, Texas 78727

Erik Holt, Prior Authorization Director
Texas Medicaid Healthcare Partnership
12365-A Riata Trace Pkwy, Building 9
Austin, Texas 78727

### Health and Human Services Commission

Mr. Albert Hawkins, Executive Commissioner
Texas Health and Human Services Commission
4900 North Lamar Blvd.
Austin, Texas 78751
Mail code BH-1000

Dr. Charles Bell, Deputy Executive Commissioner
Texas Health and Human Services Commission
4900 North Lamar Blvd.
Austin, Texas 78751
Mail code BH-1000

Mr. Chris Traylor, Medicaid and CHIP Associate Commissioner
Texas Health and Human Services Commissioner
11209 Metric Blvd.
Austin, Texas 78758
Mail code H-100

Mr. Billy Millwee, Deputy Medicaid/CHIP Director for Claims Administrator Operations
Texas Health and Human Services Commissioner
11209 Metric Blvd.
Austin, Texas 78758
Mail code H-390

Mr. David M. Griffith, CPA, CIA, Director Internal Audit
Texas Health and Human Services Commission
4900 North Lamar Blvd.
Austin, Texas 78751
Mail code BH-1600

# Tab D

**Providers' Plea in Interventions in Cause No. D-1-GV-14-000581**

| ATLAS DENTAL, LP, AND | § | IN THE DISTRICT COURT |
|---|---|---|
| DR. HIEU HUYNH, | § | |
| INTERVENORS, | § | |
| | § | |
| VS. | § | |
| | § | |
| THE STATE OF TEXAS, | § | |
| PLAINTIFF, | § | |
| | § | 53rd JUDICIAL DISTRICT |
| VS. | § | |
| | § | |
| XEROX CORPORATION; XEROX | § | |
| STATE HEALTHCARE, LLC; ACS | § | |
| STATE HEALTHCARE, LLC, A XEROX | § | |
| CORPORATION | § | |
| DEFENDANTS. | § | TRAVIS COUNTY, TEXAS |

## PLEA IN INTERVENTION

### TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, Atlas Dental, LP and Dr. Hieu Huynh, hereinafter Intervenors, and file this Plea in Intervention, and in support hereof, would respectfully show the Court the following:

### I. Parties and Service

1. Plaintiff, State of Texas, has appeared in this action and may be served with a notice of this Plea by sending a copy to its attorney, the Attorney General of Texas, Greg Abbott, at P. O. Box 12548, Austin, Texas 78711-2548.

2. Defendant Xerox Corporation is a corporation organized under the laws of New York has agreed to accept service with process upon its Attorney in this suit. Defendant Xerox State Health Care, LLC, f/k/a ACS State Healthcare, LLC (misnamed by the State of Texas as ACS State Healthcare, LLC, a Xerox Corporation is a wholly-owned subsidiary of Xerox Corporation organized under the laws of the State of Delaware with Texas offices at 2828 N. Haskell Ave., Dallas, Texas 75204, and has agreed to accept service with process upon its Attorney in this suit.

Defendant Xerox Corporation acquired Defendant ACS in 2010. On information and belief, ACS State Healthcare, LLC, changed its name to Xerox State Healthcare. LLC, on April 1, 2012. Defendants are referred to hereinafter as "Xerox Defendants."

3.     Atlas Dental, LP, (hereinafter ATLAS) is an approved Medicaid provider. ATLAS can be served through the undersigned counsel.

4.     Dr. Hieu Huynh[1] is a licensed Texas dentist, approved Medicaid provider, and the owner of ATLAS. Dr. Hieu Huynh can be served through his undersigned counsel.

## II. Jurisdiction and Venue

5.     This Court has subject-matter jurisdiction in that the amounts sought by Intervenors from all parties (both Plaintiff and Defendants) are in excess of the minimal jurisdiction limits of this court. Intervenors affirmatively plead that this suit is not governed by the expedited-actions process in TEXAS RULE OF CIVIL PROCEDURE 169 because intervenors seek monetary relief over $100,000.

6.     This Court has jurisdiction over all parties in this petition because:

   a)  The State has waived sovereign immunity and is subject to Intervenors' claims;

   b)  This Court has jurisdiction over Xerox Defendants because each Defendant does business in the State of Texas and committed the unlawful acts alleged in this petition in whole or part in Texas.

7.     Venue is proper in Travis County under TRCP §15.020 because this suit involves a "major transaction"; Venue is permissive under TRCP §15.035(a) because Intervenor asserts claims for breach of contract. Venue is proper pursuant to TRCP §15.02 because all or a substantial part of the events or omissions giving rise to the claim occurred in Travis County. Many of the unlawful acts committed by the State and Xerox Defendants were committed in

---

[1] For the sake of simplicity, the Intervenors will be collectively referred to as "ATLAS" unless expressly noted.

Travis County, including the making of false statements and misrepresentations of material fact.

### III. Intervenors' Interest in the Suit

8.     Intervenors ATLAS and Dr. Hieu Huynh have a judicial interest in the matters and controversy in this litigation. The relationship between Intervenors, the State as the Plaintiff and the Xerox Defendants is a tripartite arrangement necessitating that, in the interest of judicial economy and justice, all claims be bound and subsumed into one cause of action. Upon information and belief, Intervenors were initially sued by the State in a *qui tam* action wherein the State alleged that Intervenors defrauded the State. The State has elected to pursue its remedies against the Intervenors in an administrative hearing. Now, the State has sued Xerox in State Court on the same facts, alleging that Xerox has committed fraud against the State. Intervenors have claims against both the State and Xerox. It is assumed that Xerox will have claims against the State, and perhaps allege claims against the Intervenors. All of the different parties' claims are inextricably intertwined, as they relate to Intervenors' submission of prior authorization requests to Xerox, the handling of those claims by the Xerox Defendants, the State's handling and oversight of its agent Xerox in Xerox's performance of its contractual and legal duties, and State's subsequent legal action against the Intervenors for services approved by Xerox.

### IV. Facts

#### What is Prior Authorization?

9.     Texas Medicaid requires that orthodontic services be independently and objectively scrutinized before the State consents to treatment and payment. Prior authorization is the mechanism the State uses to determine the medical necessity of non-emergency orthodontic items/services prior to delivery of those items/services. Pursuant to Texas Health and Human

Services Commission (hereinafter "HHSC") rules, Texas Medicaid greatly restricts when it will pay for orthodontic services:

> Orthodontic services for cosmetic reasons only are not a covered Medicaid service. **Orthodontic services must be prior authorized** and are limited to treatment of severe handicapping malocclusion and other related conditions as described and measured by the procedures and standards published in the [TMPPM[2]].

25 TEX. ADMIN. CODE §33.71 (emphasis added). Prior authorization is a statement of assurance to the orthodontic provider that, absent an intervening disqualifying factor, the delivery of the requested orthodontic service has been deemed by Xerox to be medically necessary, and therefore approved by the State.

10.      The prior authorization process is straightforward. Texas Medicaid requires that a dental provider send documentation (x-rays, cephalographs, photos, etc.) regarding the patient's orthodontic condition to Xerox for review. In addition, the orthodontic provider submits his professional opinion of the patient on a Handicapping Labio-lingual Deviation index (HLD) score sheet. Xerox knew providers relied entirely on the prior authorization process because approval was a mandatory prerequisite to providing orthodontic services and being paid. Once Xerox issued its prior authorization decision, the decision was not appealable by the provider.

11.      The HLD scoring system combines a number of treatable orthodontic conditions into an index. HLD score sheets use a mix of objective and subjective conditions to determine whether a Medicaid patient qualifies for orthodontic services. The fact that the HLD score sheet requires both objective and subjective findings highlights the importance of Xerox performing a thorough prior authorization review.

The History of Orthodontic Prior Authorization.

---

[2] "TMPPM" is the Texas Medicaid Provider Procedures Manual, which is issued yearly by the HHSC and provides valuable guidance to Medicaid providers.

12. The process for reviewing and approving orthodontic prior authorization requests pre-dates the defendant Xerox's handling of Medicaid claims processing. The National Heritage Insurance Corporation (NHIC) was responsible for reviewing prior authorization requests before Xerox assumed the contract in January 2004. Starting January 1, 2004, Xerox acted as an independent contractor, and was a contracted agent of the State, under the contract with HHSC. Xerox was responsible for reviewing each orthodontic service request, and Xerox was further charged with the responsibility to grant or deny each prior authorization request per the program requirements. The result was that Xerox had the final say in determining the medical necessity of each request for orthodontic services.

13. Prior to assuming the NHIC contract, and for a period of time after assuming the contract from NHIC, Xerox received training from NHIC personnel regarding the proper method for receiving and processing orthodontic prior authorization requests. NHIC personnel explained how and why the review of each prior authorization submission was important, and walked Xerox through the process. Despite its training from NHIC, Xerox had no intention of following the prior authorization system that had been in place for years, nor did Xerox intend to otherwise meet the prior authorization requirements set out in its contract, the TMPPM and required by state law.

Xerox rejects its contractual responsibilities.

14. When Xerox took over the contract in 2004, it immediately abandoned the prior authorization review process that had been setup by NHIC. Xerox never intended to fulfill its orthodontic prior authorization responsibilities to HHSC. From 2004 to 2011, Xerox continually misrepresented that it was acting in compliance with its contractual duties.

15. It is now known that Xerox failed to adequately staff their prior authorization division

with knowledgeable medical professionals. Xerox employed only one licensed dentist from 2004 through 2011, which was far short of the manpower necessary to handle the review of tens of thousands of orthodontic prior authorization requests every year. Xerox could not reasonably have expected to handle such a workload by employing only one dentist.

Xerox potentially commits thousands of violations.

16.     It is believed Xerox allowed "dental specialists"—unlicensed, unqualified individuals—to render prior authorization opinions regarding the medical necessity of requested orthodontic services. The "dental specialist" approvals were not reviewed or ratified by Xerox's licensed dental director or another qualified dental professional. These actions not only violated Xerox's contractual obligations, they may have also violated other Texas law such as the Dental Practice Act.[3] It is believed these unlicensed Xerox "specialists" rendered tens of thousands of prior authorization approvals/medical opinions in violation of Texas law.

17.     Xerox was paid by the state for each prior authorization decision that was made. It is believed that Xerox employed unlicensed "specialists," rather than licensed Texas dentists, as a profit generating measure.

18.     From January 2005 through February 2012, Intervenor submitted prior authorization requests, as required, to Xerox for a determination of medical necessity. Unbeknownst to Intervenor, Xerox's dental specialists—not the dental director—approved almost all of Intervenor's requests. Xerox's prior authorization approvals were promises that:

> a) the requested orthodontic services were medically necessary, and/or
>
> b) the approval had been issued by a licensed dentist, and/or

---

[3] Texas Occupations Code §251.003 prevents unlicensed individuals from diagnosing conditions of the human teeth and mouth. Section 256.001 states that a person may not practice dentistry without a license. Thus, state law requires that opinions regarding medical necessity of orthodontic treatment must be made by licensed dentists. Section 264.151 prescribes penalties for certain violations of the Dental Practice Act.

c) the approval was an actual and legitimate dental diagnosis, and/or

d) the requested orthodontic services were allowable under Texas law and as permitted by Medicaid policy, the TMPPM, and HHSC rules, and/or

e) a proper, thorough and legal review had been made, and/or

f) future orthodontic services would be properly reimburseable to Intervenors, absent some intervening disqualification (such as the patient's ineligibility).

19. Because Xerox was charged with determining medical necessity, and because prior authorization approval was a mandatory prerequisite to furnishing services, the promises were material. Intervenors expected performance of these promises. Intervenors relied on Xerox. Further, Xerox promised that its subsequent payments to Intervenors (after the services had actually been delivered) were made because the services had been, in fact, properly approved as medically necessary. Each prior authorization approval represents a separate violation of the law **if** Xerox's approval was issued illegally and/or in violation of its contractual obligations.

<u>Xerox actively concealed its potentially illegal activity.</u>

20. Xerox withheld the truth regarding its prior authorization program. In an attempt to publicly appear consistent with NHIC's prior authorization process, Xerox continued to require that dental providers (such as Intervenor) submit all supporting documentation for each HLD score sheet. It is now believed that, incredibly, Xerox did nothing with that documentation, other than assure that it had been submitted by the provider. It is believed that Xerox's specialists were instructed to forward to its dental director only those requests that had scored below the threshold for orthodontic services (i.e. below 26 points on the HLD score sheet), or had some provider justification attached. As a result, only 10% of the orthodontic prior authorization requests were actually forwarded to Xerox's one licensed dentist. Xerox's actions were

calculated to make Xerox appear compliant with its contract and HHSC policies, while Xerox knew that its actions were entirely inconsistent with the letter and spirit of its obligations. Effectively, then, Xerox's actions not only damaged the Medicaid program directly by approving services without determining their medical necessity, but Xerox's deception also exacerbated the problem by failing to give providers guidance regarding the proper standard for medical necessity, thus causing these providers substantial damages.

21. For the past ten years, Xerox has continued to publicly represent to the world that it was fulfilling its contractual and legal responsibilities. Based on Xerox's representations that it was fulfilling its duties to the State, Xerox had its contract with HHSC repeatedly renewed from 2004 through the present. Each year that Xerox had its contract renewed, it represented that it would fulfill its contractual obligations and abide by Texas law requiring that decisions about medical necessity be rendered only by licensed dentists. Xerox made those representations knowing that it had not done so in the past, and had no intention of changing its procedures to do so in the future.

The *Frew* decision magnifies Xerox's acts.

22. In September 2007, after fifteen years of litigation on the subject, Texas was ordered to implement a corrective action plan that increased the Medicaid reimbursement rates to all dental providers. That plan was required pursuant to the *Frew* case[4], which was a 1993 class-action lawsuit against the HHSC alleging that Texas' Medicaid reimbursement rates were so low that they prevented indigent children from receiving timely, comprehensive health care.

---

[4] *Frew v. Gilbert*, 109 F. Supp. 2d 579 (E.D. Tex. 2000) *vacated sub nom. Frazar v. Gilbert*, 300 F.3d 530 (5th Cir. 2002) *rev'd sub nom. Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 124 S. Ct. 899, 157 L. Ed. 2d 855 (2004) and *aff'd in part, appeal dismissed in part sub nom. Frazar v Hawkins*, 376 F.3d 444 (5th Cir. 2004); *Frew v. Hawkins*, 401 F. Supp. 2d 619 (E.D. Tex. 2005) *aff'd sub nom. Frazar v. Ladd*, 457 F.3d 432 (5th Cir. 2006); *Hawkins v. Frew*, 549 U.S. 1118, 127 S. Ct. 1039, 166 L. Ed. 2d 714 (2007).

23.     In response to *Frew's* corrective action plan, the 2007 Texas Legislature allocated $707 million ($1.8 billion in state and federal funds combined) to increase medical and dental reimbursement rates. The increase in dental reimbursement rates was intended to entice dentists to become Medicaid providers. It worked. The state raised payment rates for dental services, and, as a result, the number of dentists participating in Medicaid increased from 45.4% in 2007 to 63.4% in 2010. As expected indeed, as intended spending on Texas's dental services increased dramatically.

24.     Although the number of prior approval requests increased by 240% between 2007 and 2010, Xerox continued to employ only one dentist. That dentist was neither tasked with nor responsible for supervising the clerical specialists that were issuing the approvals.

25.     By 2010, orthodontic spending under Texas' Medicaid program had skyrocketed. Xerox was the sole entity responsible for overseeing this increase, because it was the sole gatekeeper for the approval and payment of orthodontic services. Although the Texas Legislature had increased funding to attract dentists into the Medicaid program, all of the budgeted funds were required to be spent only on medically necessary services.

The Office of Inspector General seeks recovery from Medicaid providers.

26.     In early 2011, a series of news stories began highlighting the large amount of money being spent on orthodontics in Texas. In July 2011, the Federal government notified Texas of its intent to audit whether Texas' prior authorization process was ensuring that only medically necessary orthodontic cases were being approved and paid. With the prospect of a federal clawback action looming against Texas because of Xerox's prior authorization failures, the Texas Office of Inspector General (hereinafter "State") took a drastic step. Beginning in 2011, the State generated a list of the top Medicaid orthodontic billers and placed them on "payment

hold." Intervenor was one of those providers.

27.     Given Intervenors' proximity to some of the state's poorest children, and the mandates of the *Frew* decision. Intervenor served a large Medicaid patient population. Because it served a large Medicaid population, it submitted a large number of prior authorization requests to Xerox from 2004 through 2011.

28.     Intervenors did not know that Xerox was failing to perform a true and accurate review for medical necessity. Intervenors relied on Xerox's prior authorization approvals to confirm that dentists' analysis was proper and consistent with Medicaid standards and requirements.

29.     Again unbeknownst to Intervenors, State audits in 2008 and 2012 concluded that most, if not almost all, of the prior authorization requests for patients with HLD scores of 26 or greater (indicating medical necessity) had not been actually "evaluated" at all by Xerox. These State audits made the Federal government's pending audit especially dangerous to Texas, because the 2008 and 2012 audits were admissions that Xerox had been approving and paying claims that may not have met the federal standards for prior authorization. Thus the State, through the Attorney General, concluded that a true finding of medical necessity had in reality not occurred. The Attorney General claimed that billing for services that are not necessary is fraud, despite Xerox's prior authorization approvals.

30.     It is now believed that rather than prosecute Xerox for its failure to properly evaluate dentists' prior authorization requests, the State and the Texas Attorney General protected Xerox. This protection included the State failing to allow TMHP to hire additional medically licensed staff, and in 2008-2009 telling TMHP to continue its prior authorization practices. Although the Attorney General took immediate action against the providers, the Attorney General refused to hold Xerox accountable for its orthodontic "approvals," its repeated contractual failures, or its

violation of State law. Instead, the Attorney General made fraud allegations against each of the top 25 dental providers, including Intervenor, which has caused more injury and damages to Intervenors. Stated differently, Xerox issued its approvals through a process that gutted the State's belief in the accuracy of Xerox's decision, and the Texas Attorney General punished the providers instead of Xerox.

31.     Because the acts/omissions of Xerox so undermined the process, the State eventuallyinstituted a "payment hold" against Intervenor. A payment hold temporarily freezes future Medicaid payments to a provider, despite the provider's ongoing participation in the Medicaid program. The payment hold against Intervenor was issued pursuant to what the State called a "credible allegation of fraud" regarding Intervenor's orthodontic prior authorization requests. The State placed a 100% payment hold against Intervenor's orthodontic billings.

32.     At the time the Attorney General began prosecuting Intervenor and similarly situated Medicaid providers, it knew Xerox, not Intervenor, had the sole authority and responsibility to authorize orthodontic services and payments. The Attorney General knew that the State's audits of Xerox in 2008 and 2012 had concluded that Xerox was violating its contract with the State, violating its own State-approved policies and procedures, and violating State law. Nevertheless, the Attorney General continued to only prosecute dental providers like the Intervenor; the Attorney General refused to hold Xerox responsible. In fact, in one shameless and brazen demonstration of State's unwavering protection of Xerox, the Deputy Director of Texas' Office of the Inspector General testified in a hearing that Xerox's acts and omissions were so egregious they were outside the course and scope of Xerox's agency with State.[5] Upon information and

---

[5] Incredibly, that testimony came in an administrative proceeding in which the State was seeking $8 million from a dental provider for following Xerox's instructions to provide braces to the provider's patients. The idea that the State could not hold Xerox responsible for its contractual obligations because Xerox had done such a poor job that it was acting outside of its contract is a novel and imaginative reason not to prosecute Xerox.

belief, the State and the Attorney General protected Xerox for over 6 years fearing that revealing the State's culpability would subject the State to a federal clawback for hundreds of millions of dollars. Instead, the State and the Attorney General pointed at the dental providers.

33. Ultimately, the evidence of Xerox's failures, and the State's refusal to correct Xerox for over 6 years, became too much to hide. Three months after some providers filed suit against Xerox, and following a series of news stories questioning why Xerox had not suffered for its failures, the Attorney General reversed course. On May 9, 2014, the State, through the Texas Attorney General, filed this lawsuit against Xerox for fraud, basically mirroring the suit filed approximately 100 days earlier by similarly situated providers. The State's claims in this fraud lawsuit include admissions that the State knew as early as 2006 that Xerox's actions were improper.

34. As a result of the payment hold, Intervenor was required to make significant financial concessions and changes to its business. Intervenor also engaged legal counsel to defend itself from the State's claims, at a significant expense that continues today.

35. The State's allegations against Intervenor are rooted in two assumptions. First, the State assumes Intervenor's prior authorization requests were not properly vetted by Xerox; that is, Xerox approved Intervenor's requests without knowing whether approval was actually proper. Because Xerox is not a party to Intervenor's administrative case, Intervenor is prevented from determining whether Xerox did, in fact, perform a proper review of Intervenor's prior authorization requests. By intervening in this lawsuit, Intervenor seeks to address that question, and finally determine whether Xerox reviewed Intervenor's requests as required by its contract and the law.

36. Regarding the State's second assumption, the State alleges some of Intervenor's requests

were approved when, in fact, they should have been denied. Intervenor denied that assertion in the administrative case, and Intervenor continues to deny that claim here. All services provided to Intervenor's patients were actually medically necessary, regardless of what Xerox decided and in any event under Medicaid guidelines once the authorization was approved, Intervenor was required to provide the services.

37.     The State continues to aggressively fight any allegation or affirmative defense that could result in Xerox being held accountable for its part in these HLD scoring cases, despite the State's contentions in the District Court case to the contrary. Damages continue to accrue.

## V. Causes of Action

### A. Intervenors' Claims Against Xerox

#### Common Law Fraud (Fraudulent Misrepresentation and Fraudulent Inducement)

38.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's prior authorization approvals were false representations made to Intervenor. It is believed Xerox knowingly issued these prior authorizations to Intervenor because Xerox knew that it was approving requests without a proper medical review, and/or because it approved the prior authorization requests without any knowledge of their truth. It is believed Xerox intended for Intervenor to rely on the approvals as a prerequisite for providing the requested services. Approval was material because it was a mandatory prerequisite for payment. Intervenor actually and justifiably relied on Xerox's fraudulent approvals.

39.     Xerox's approvals induced Intervenor to continue to grade subsequent HLD requests in the same or similar manner, and led Intervenor to believe that their requests were consistent with Medicaid standards and requirements.

40.     Xerox's fraudulent approvals caused injury to Intervenor. As a result of Xerox's actions,

Intervenor submitted requests for payment and Xerox actually paid for those services, Intervenor was placed on payment hold, Intervenor is forced to defend itself in an administrative payment hold hearing, and Intervenor is facing administrative claims by HHSC for repayment (including claims for treble damages and attorney fees). Intervenor's reputation and business have suffered severe injury. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

## Breach of the Xerox-State of Texas Contract

41. Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. In the alternative, Xerox's actions constitute a breach of Xerox's contract with the State for the benefit of Intervenor. Xerox's contract with the state required that it conduct a proper, thorough and legal review of prior authorization requests for the purpose of determining medical necessity. To that end, Xerox should have employed a licensed dentist.

42. Xerox was an agent of the State of Texas engaged specifically for the purpose of determining medical necessity. The third party beneficiaries of that Xerox-State of Texas contract were Medicaid patients and Intervenor. The patients were entitled to receive orthodontic services that were medically necessary. Intervenor was responsible for actually delivering the orthodontic services that Xerox had deemed medically necessary. Thus, Intervenor was a third party beneficiary that relied on Xerox's approvals.

43. Xerox breached its contract by, *inter alia*, failing to provide qualified staff; possibly violating Texas law; permitting non-dentists to make determinations of medical necessity; and issuing medical opinions without conducting a reasonable and prudent examination of evidence. The breaches were material, and recurred across many different Medicaid patients and for many years.

44. Xerox's actions proximately caused Intervenor's injury. Intervenor's injuries were caused-in-fact by Xerox's actions, and they were foreseeable. Because Xerox's prior authorization was a necessary prerequisite to providing services, Intervenor relied entirely on Xerox's determinations regarding medical necessity; thus, Xerox's actions were the direct factual cause of Intervenor's injuries. Xerox's actions were foreseeable in that a person of ordinary intelligence should have anticipated that issuing a decision without actually reviewing or considering the evidence (x-rays, photos, models, etc.) would eviscerate the credibility and reliability of the decision. Once the State assumed that Xerox's approvals were not trustworthy, it was foreseeable that the State would demand repayment, and/or would require Intervenor to independently do Xerox's job after the fact by proving that payment was proper because the services were medically necessary and reimbursable under Texas Medicaid law.

45. Intervenor suffered and continues to suffer significant damage. Intervenor seeks damages that would have given the Intervenors the benefit of the bargain by putting them in as good a position as they would have been in if the contract had been performed. Intervenor seeks reliance interest damages to restore the expenditures Intervenor made in reliance on Xerox's contract with the state and the approvals that Xerox made under that contract. Intervenor also seeks damages for its restitution interest to restore money sought by the Office of the Inspector General from Intervenor. Such damages would put the Intervenors in as good a position as it would have been in if the contract had been properly fulfilled. In addition, Intervenor seeks liquidated damages as set out in the Xerox-State of Texas contract. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor has incurred benefit of the bargain damages, out-of-pocket damages, lost profits, lost future profits, loss of credit, and loss of goodwill. Intervenor seeks recovery of actual and

exemplary damages, interest, court costs, and attorney fees.

## Breach of Contract (Promissory Estoppel)

46.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. In the alternative, Xerox's actions constitute promissory estoppel.

47.     Xerox's prior authorizations constitute promises to Intervenor in numerous ways. Because prior authorization was a prerequisite to furnishing services, and because Xerox was the entity charged with discharging prior authorization duties, Intervenor reasonably, substantially, and foreseeably relied on Xerox's promises.

48.     Intervenor suffered and continues to suffer significant damage. Intervenor suffered reliance damages by investing time, labor, equipment, and orthodontic appliances in each Medicaid patient that Xerox approved. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor has been required to do Xerox's job after the fact—namely, demonstrate that the services were medically necessary and properly reimbursable under Texas Medicaid law. Intervenor has incurred benefit of the bargain damages, out-of-pocket damages, lost profits, lost future profits, loss of credit, and loss of goodwill. All of these damages were directly and/or proximately caused by Xerox's promises. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

## Negligent Hiring/Negligent Supervision

49.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's actions constitute negligent hiring and/or negligent supervision. Xerox was required to render medical diagnoses. To that end, Xerox was required by law to employ a licensed dentist to render a diagnosis regarding medical necessity. Xerox was also required by

law to properly supervise its employees to make sure diagnoses were made only by licensed dentists.

50.     Xerox knew or should have known that decisions regarding medical necessity can only be rendered by licensed personnel. Texas Occupations Code section 251.003 defines the practice of dentistry to include a diagnosis of the human mouth and/or teeth; section 256.001 states that a person may not practice dentistry without a license; section 264.151 makes it a third-degree felony to practice dentistry without a license.

51.     Xerox's actions proximately caused Intervenor's injury. Intervenor's injuries were caused-in-fact by Xerox's actions, and they were foreseeable. Because Xerox's prior authorization was a necessary prerequisite to providing services, Intervenor relied entirely on Xerox's determinations regarding medical necessity; thus, Xerox's actions were the direct factual cause of Intervenor's injuries. Xerox's actions were foreseeable in that any person of ordinary intelligence should have anticipated that paying Intervenor for services that have not properly been determined to be medically necessity would precipitate a demand for repayment, and/or would require Intervenor to independently do Xerox's job after the fact by proving that payment was proper because those services were medically necessary and were reimbursable under Texas Medicaid law.

52.     Intervenor suffered and continues to suffer significant damage. Intervenor suffered reliance damages by investing the cost of services for each Medicaid patient that Xerox approved. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor suffered and continues to suffer significant damage to its reputation, business, referral base, earnings and earning power. Intervenor has suffered inconvenience and loss of enjoyment of life in that he has had to dedicate significant

mental and personal capital to doing Xerox's job. Intervenor has suffered exemplary damages because Xerox's conduct was grossly negligent, outrageous and malicious, and such conduct should be penalized so that it is deterred in the future. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

### Negligence

53. Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's actions constitute negligence and gross negligence. Xerox was required to render medical diagnoses. To that end, Xerox had a duty to employ a licensed dentist to render a diagnosis supporting or denying medical necessity. Xerox had a duty to assure that the personnel had appropriate education, training and experience to render such a finding. Xerox had a duty to review the supporting prior authorization documentation (such as x-rays and photos) to determine whether the requested services were medically necessary.

54. Xerox's actions breached the standard of care because Xerox: failed to provide prior authorization staff that were properly licensed, qualified and experienced dental professionals; violated the law, specifically the Dental Practice Act, by permitting non-dentists to make determinations of medical necessity, and; issued medical opinions (prior authorizations) without conducting a reasonable and prudent examination of evidence.

55. Xerox's actions proximately caused Intervenor's injury. Intervenor's injuries were caused-in-fact by Xerox's actions, and they were foreseeable. Because Xerox's prior authorization was a necessary prerequisite to providing services, Intervenor relied entirely on Xerox's determinations regarding medical necessity; thus, Xerox's actions were the direct factual cause of Intervenor's injuries. Xerox's actions were foreseeable in that any person of ordinary intelligence should have anticipated that paying Intervenor for services that have not properly

been determined to be medically necessity would precipitate a demand for repayment, and/or would require Intervenor to independently do Xerox's job after the fact.

56.    Intervenor suffered and continues to suffer significant damage to its reputation, business, referral base, earnings and earning power. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Dr. Hieu Huynh has suffered inconvenience and loss of enjoyment of life in that he has had to dedicate significant mental and personal capital to doing Xerox's job. Intervenor has suffered exemplary damages because Xerox's conduct is grossly negligent, outrageous and malicious, and such conduct should be penalized so that it is deterred in the future. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

### Negligent Misrepresentation

57.    Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's actions constitute negligent misrepresentation. Xerox's actions constitute misrepresentations to Intervenor in numerous ways. Because, *inter alia*, prior authorization approval was a prerequisite to furnishing services, these representations guided and controlled Intervenor's responses. Intervenor justifiably relied on these representations. Further, Xerox represented that its prior authorization approvals were dispositive of medical necessity; Intervenor expected that, once approved, no further inquiry into the medical necessity of the services would be required. Further, Xerox represented that its subsequent payments to Intervenor (after the services had actually been delivered) were made because services had been, in fact, properly approved as medically necessary.

58.    Xerox did not exercise reasonable care or competence in making its determinations and representations. Xerox knew or should have known that its representations were false.

Plea in Intervention
Page 19 of 25

59.    Because prior authorization was a prerequisite to furnishing services, and because Xerox was the entity charged with discharging prior authorization duties, Intervenor reasonably, substantially, foreseeably, and justifiably relied on Xerox's representations.

60.    Intervenor suffered and continues to suffer significant damage. Intervenor suffered reliance damages by investing time, labor, equipment, and orthodontic appliances in each Medicaid patient that Xerox approved. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor has been required to do Xerox's job after the fact. Intervenor has incurred benefit of the bargain damages, out-of-pocket damages, lost profits, loss of credit, and loss of goodwill. All of these damages were directly and/or proximately cause by Xerox's negligent misrepresentations. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

### Gross Negligence / Misapplication of Fiduciary Property

61.    Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Plaintiffs plead Xerox committed gross negligence and/or the misapplication of fiduciary property which would entitle Intervenors to unlimited punitive damages.

### B. Intervenors' Claims Against The State of Texas

### Waiver of Sovereign Immunity

62.    Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein.  For a number of reasons, the State has waived sovereign immunity for claims by Intervenor, including the facts that the State  brought, threatened and/or has taken civil and/or administrative action against Intervenors, and because the State has filed suit against Xerox.

### Conspiracy/Joint Enterprise

63.    Intervenor re-alleges and incorporates the above facts and allegations as if fully set out

herein. In the alternative, former Deputy Inspector General Jack Stick has stated publicly that acts and omissions of Xerox were so egregious as to be outside the course of scope of Xerox's agency relationship with the State. Assuming same to be true, then the State conspired with Xerox to breach the contract or allow the breach to continue, conspired to withhold funds from Intervenor but not Xerox, and conspired to falsely accuse Intervenor of fraud/crime.

64. The State conspired with Xerox to allow Xerox to violate its various contractual duties. The State permitted Xerox to process as many prior authorizations as possible without the required clinical dental review and without using medically knowledgeable personnel. The State conspired with Xerox to allow Xerox to violate State and Federal law. The State and Xerox created a scheme to rubber stamp and/or allow no legitimate review of prior authorizations submitted by the dentists. The conspiracy was committed with the intent to shift blame from the State and its agent, improperly blame the Intervenors, and enrich the State and Xerox. By recouping money from providers that were not actually to blame, the State and Xerox hoped to limit their own liability in the event of a Federal clawback action, and/or respond to unflattering news reports of Texas' payments for Medicaid braces. This agreement and ensuing acts of the party to blame the dentist providers for their own improper acts and omissions is a proximate cause of the injury to Intervenors.

**Not Liable for Illegal Acts of Third Party**

65. Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. As alleged by the State in Section VIII paragraph 46 of the State's petition, Xerox has committed or is about to commit unlawful acts. The illegal acts of Xerox in failing to provide proper prior authorization review in rubber stamping the doctors prior authorization requests is not the fault of the doctors. The doctors are not responsible for or liable to the State for the

illegal acts of a third party for which the doctors had no control; the State should not withhold money from the Intervenors because of the illegal acts of Xerox complained about by the State.

## Breach of Contract

66.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Intervenors are a direct or third party beneficiary of the contract with Xerox and the State of Texas. The State of Texas has breached terms of the contract by failing to supervise Xerox and/or reviewing the work product of Xerox. This breach by State, which allowed non-performance by Xerox, has created the pretext by which the State affirmatively sued Intervenors for repayment. To the extent that the State has withheld money and/or made claims for damages against Intervenors based on the contracts in question, the State has waived immunity and is liable up to those amounts plead.

## Conversion

67.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. State and Federal law required Intervenor to request prior authorization for orthodontic services. Those prior authorization requests were approved by Xerox, which required Intervenors to provide the services. The State has unilaterally made a decision to that, based on the acts and omissions of Xerox, the Intervenor should not have been paid; the State then placed Intervenor on a payment hold. To the extent that Intervenor has provided services for which Intervenor should be paid, and money which has been earmarked by the State for that payment but withheld, the State has converted the funds. In addition, the States' acts/omissions are a violation of the Texas Constitution Section 9 in that the acts/omissions constitute a seizure of money held under the pretext of a payment hold.

## VI. Damages

68. Intervenors have suffered and are entitled to recover damages including, but not limited to loss of use of funds sequestered by the State, actual damages, damage to reputation, damage to business, damage to earnings and earning power, inconvenience, loss of enjoyment of life, fees and expenses, interest, punitive/exemplary damages, and attorney fees.

## VII. Conclusion

69. Xerox's actions have harmed Intervenor because Xerox committed fraud, negligent hiring, negligence, and gross negligence. Xerox's actions have subjected Intervenor to unnecessary civil and administrative legal action, and that, in turn has caused additional injury. Xerox's actions have required Intervenor to perform Xerox's job after-the-fact, by proving to the State that the orthodontic services rendered were medically necessary and appropriate for reimbursement. The State's actions have harmed Intervenor because the state's conspiracy to improperly blame the dentists has resulted in meritless legal claims against the Intervenors and conversion of the Intervenor's property.

## VIII. Jury Demand

70. Intervenors respectfully request a trial by jury.

## IX. Request for Disclosure

71. Under Texas Rule of Civil Procedure 194, Intervenor requests that Plaintiff the State disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## X. Prayer

72. Wherefore, premises considered, Intervenors Atlas Dental, LP and Dr. Hieu Huynh pray that upon final hearing of the cause, judgment be entered jointly and severally against the

Plaintiff the State of Texas and Defendant Xerox State Healthcare, LLC for damages, together with pre-judgment and post judgment interest at the legal rate, costs of court, and other such relief to which the Intervenors may be entitled.

Respectfully submitted,

Jason Ray
Texas Bar No. 24000511
**RIGGS, ALESHIRE & RAY, P.C.**
700 Lavaca, Suite 920
Austin, Texas 78701
(512) 457-9806 (Telephone)
(512) 457-9866 (Fax)
jray@r-alaw.com


   /s/  Hart Green w/ permission by J Ray
E. Hart Green
Texas Bar No. 08349290
Mitchell A. Toups
Texas Bar No. 20151600
**WELLER, GREEN, TOUPS & TERRELL, L.L.P.**
Post Office Box 350
Beaumont, Texas 77704-0350
(409) 838-0101 (Telephone)
(409) 832-8577 (Fax)
hartgr@wgttlaw.com
matoups@wgttlaw.com
**ATTORNEYS FOR INTERVENORS**
**ATLAS DENTAL, LP AND DR. HIEU HUYNH**

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plea in Intervention was served via e-mail and certified mail, return receipt requested on this 15th day of May, 2014 on the following:

Eric J.R. Nichols
Beck Redden
515 Congress Avenue, Suite 1750
Austin, Texas, 78701
ENICHOLS@beckredden.com
**Attorney for Xerox Defendants**

Raymond Winter
Chief, Civil Medicaid Fraud Division
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
raymond.winter@texasattorneygeneral.gov
**Attorney for the Plaintiff State of Texas**

Jason Ray

| | | |
|---|---|---|
| DR. STEPHEN CHU, | § | IN THE DISTRICT COURT |
| INTERVENOR, | § | |
| | § | |
| VS. | § | |
| | § | |
| THE STATE OF TEXAS, | § | |
| PLAINTIFF, | § | |
| | § | 53rd JUDICIAL DISTRICT |
| VS. | § | |
| | § | |
| XEROX CORPORATION; XEROX | § | |
| STATE HEALTHCARE, LLC; ACS | § | |
| STATE HEALTHCARE, LLC, A XEROX | § | |
| CORPORATION | § | |
| DEFENDANTS. | § | TRAVIS COUNTY, TEXAS |

## PLEA IN INTERVENTION

### TO THE HONORABLE JUDGE OF SAID COURT:

**NOW COMES**, Dr. Stephen Chu, hereinafter Intervenor, and file this Plea in Intervention, and in support hereof, would respectfully show the Court the following:

### 1. Parties and Service

1. Plaintiff, State of Texas, has appeared in this action and may be served with a notice of this Plea by sending a copy to its attorney, the Attorney General of Texas, Greg Abbott, at P. O. Box 12548, Austin, Texas 78711-2548.

2. Defendant Xerox Corporation is a corporation organized under the laws of New York has agreed to accept service with process upon its Attorney in this suit. Defendant Xerox State Health Care, LLC, f/k/a ACS State Healthcare, LLC (misnamed by the State of Texas as ACS State Healthcare, LLC, a Xerox Corporation is a wholly-owned subsidiary of Xerox Corporation organized under the laws of the State of Delaware with Texas offices at 2828 N. Haskell Ave., Dallas, Texas 75204, and has agreed to accept service with process upon its Attorney in this suit.

Defendant Xerox Corporation acquired Defendant ACS in 2010. On information and belief, ACS State Healthcare, LLC, changed its name to Xerox State Healthcare, LLC, on April 1, 2012. Defendants are referred to hereinafter as "Xerox Defendants."

3.      Dr. Stephen Chu is a licensed Texas dentist. approved Medicaid provider. Dr Chu can be served through his undersigned counsel.

## II. Jurisdiction and Venue

4.      This Court has subject-matter jurisdiction in that the amounts sought by Intervenor from all parties (both Plaintiff and Defendants) are in excess of the minimal jurisdiction limits of this court. Intervenor affirmatively pleads that this suit is not governed by the expedited-actions process in TEXAS RULE OF CIVIL PROCEDURE 169 because Intervenor seeks monetary relief over $100,000.

5.      This Court has jurisdiction over all parties in this petition because:

   a) The State has waived sovereign immunity and is subject to Intervenor's claims;

   b) This Court has jurisdiction over Xerox Defendants because each Defendant does business in the State of Texas and committed the unlawful acts alleged in this petition in whole or part in Texas.

6.      Venue is proper in Travis County under TRCP §15.020 because this suit involves a "major transaction"; Venue is permissive under TRCP §15.035(a) because Intervenor asserts claims for breach of contract. Venue is proper pursuant to TRCP §15.02 because all or a substantial part of the events or omissions giving rise to the claim occurred in Travis County. Many of the unlawful acts committed by the State and Xerox Defendants were committed in Travis County, including the making of false statements and misrepresentations of material fact.

### III. Intervenor's Interest in the Suit

7.      Intervenor has a judicial interest in the matters and controversy in this litigation. The relationship between Intervenor, the State as the Plaintiff and the Xerox Defendants is a tripartite arrangement necessitating that, in the interest of judicial economy and justice, all claims be bound and subsumed into one cause of action. Upon information and belief, Intervenor was initially sued by the State in a *qui tam* action wherein the State alleged that Intervenor defrauded the State. The State has elected to pursue its remedies against the Intervenor in an administrative hearing. Now, the State has sued Xerox in State Court on the same facts, alleging that Xerox has committed fraud against the State. Intervenor has claims against both the State and Xerox. It is assumed that Xerox will have claims against the State, and perhaps allege claims against the Intervenor. All of the different parties' claims are inextricably intertwined, as they relate to Intervenor's submission of prior authorization requests to Xerox, the handling of those claims by the Xerox Defendants, the State's handling and oversight of its agent Xerox in Xerox's performance of its contractual and legal duties, and State's subsequent legal action against the Intervenors for services approved by Xerox.

### IV. Facts

#### What is Prior Authorization?

8.      Texas Medicaid requires that orthodontic services be independently and objectively scrutinized before the State consents to treatment and payment. Prior authorization is the mechanism the State uses to determine the medical necessity of non-emergency orthodontic items/services prior to delivery of those items/services. Pursuant to Texas Health and Human Services Commission (hereinafter "HHSC") rules, Texas Medicaid greatly restricts when it will pay for orthodontic services:

> Orthodontic services for cosmetic reasons only are not a covered Medicaid service. **Orthodontic services must be prior authorized** and are limited to treatment of severe handicapping malocclusion and other related conditions as described and measured by the procedures and standards published in the [TMPPM[1]].

25 TEX. ADMIN. CODE §33.71 (emphasis added). Prior authorization is a statement of assurance to the orthodontic provider that, absent an intervening disqualifying factor, the delivery of the requested orthodontic service has been deemed by Xerox to be medically necessary, and therefore approved by the State.

9.      The prior authorization process is straightforward. Texas Medicaid requires that a dental provider send documentation (x-rays, cephalographs, photos, etc.) regarding the patient's orthodontic condition to Xerox for review. In addition, the orthodontic provider submits his professional opinion of the patient on a Handicapping Labio-lingual Deviation index (HLD) score sheet. Xerox knew providers relied entirely on the prior authorization process because approval was a mandatory prerequisite to providing orthodontic services and being paid. Once Xerox issued its prior authorization decision, the decision was not appealable by the provider.

10.     The HLD scoring system combines a number of treatable orthodontic conditions into an index. HLD score sheets use a mix of objective and subjective conditions to determine whether a Medicaid patient qualifies for orthodontic services. The fact that the HLD score sheet requires both objective and subjective findings highlights the importance of Xerox performing a thorough prior authorization review.

The History of Orthodontic Prior Authorization.

11.     The process for reviewing and approving orthodontic prior authorization requests pre-dates the defendant Xerox's handling of Medicaid claims processing. The National Heritage

---

[1] "TMPPM" is the Texas Medicaid Provider Procedures Manual, which is issued yearly by the HHSC and provides valuable guidance to Medicaid providers.

Insurance Corporation (NHIC) was responsible for reviewing prior authorization requests before Xerox assumed the contract in January 2004. Starting January 1, 2004, Xerox acted as an independent contractor, and was a contracted agent of the State, under the contract with HHSC. Xerox was responsible for reviewing each orthodontic service request, and Xerox was further charged with the responsibility to grant or deny each prior authorization request per the program requirements. The result was that Xerox had the final say in determining the medical necessity of each request for orthodontic services.

12. Prior to assuming the NHIC contract, and for a period of time after assuming the contract from NHIC, Xerox received training from NHIC personnel regarding the proper method for receiving and processing orthodontic prior authorization requests. NHIC personnel explained how and why the review of each prior authorization submission was important, and walked Xerox through the process. Despite its training from NHIC, Xerox had no intention of following the prior authorization system that had been in place for years, nor did Xerox intend to otherwise meet the prior authorization requirements set out in its contract, the TMPPM and required by state law.

Xerox rejects its contractual responsibilities.

13. When Xerox took over the contract in 2004, it immediately abandoned the prior authorization review process that had been setup by NHIC. Xerox never intended to fulfill its orthodontic prior authorization responsibilities to HHSC. From 2004 to 2011, Xerox continually misrepresented that it was acting in compliance with its contractual duties.

14. It is now known that Xerox failed to adequately staff their prior authorization division with knowledgeable medical professionals. Xerox employed only one licensed dentist from 2004 through 2011, which was far short of the manpower necessary to handle the review of tens of

thousands of orthodontic prior authorization requests every year. Xerox could not reasonably have expected to handle such a workload by employing only one dentist.

Xerox potentially commits thousands of violations.

15. It is believed Xerox allowed "dental specialists"—unlicensed, unqualified individuals— to render prior authorization opinions regarding the medical necessity of requested orthodontic services. The "dental specialist" approvals were not reviewed or ratified by Xerox's licensed dental director or another qualified dental professional. These actions not only violated Xerox's contractual obligations, they may have also violated other Texas law such as the Dental Practice Act.[2] It is believed these unlicensed Xerox "specialists" rendered tens of thousands of prior authorization approvals/medical opinions in violation of Texas law.

16. Xerox was paid by the state for each prior authorization decision that was made. It is believed that Xerox employed unlicensed "specialists," rather than licensed Texas dentists, as a profit generating measure.

17. From January 2005 through February 2012, Intervenor submitted prior authorization requests, as required, to Xerox for a determination of medical necessity. Unbeknownst to Intervenor, Xerox's dental specialists—not the dental director—approved almost all of Intervenor's requests. Xerox's prior authorization approvals were promises that:

    a) the requested orthodontic services were medically necessary, and/or

    b) the approval had been issued by a licensed dentist, and/or

    c) the approval was an actual and legitimate dental diagnosis, and/or

    d) the requested orthodontic services were allowable under Texas law and as permitted

---

[2] Texas Occupations Code §251.003 prevents unlicensed individuals from diagnosing conditions of the human teeth and mouth. Section 256.001 states that a person may not practice dentistry without a license. Thus, state law requires that opinions regarding medical necessity of orthodontic treatment must be made by licensed dentists. Section 264.151 prescribes penalties for certain violations of the Dental Practice Act.

by Medicaid policy, the TMPPM, and HHSC rules, and/or

e) a proper, thorough and legal review had been made, and/or

f) future orthodontic services would be properly reimburseable to Intervenor, absent some intervening disqualification (such as the patient's ineligibility).

18. Because Xerox was charged with determining medical necessity, and because prior authorization approval was a mandatory prerequisite to furnishing services, the promises were material. Intervenor expected performance of these promises. Intervenor relied on Xerox. Further, Xerox promised that its subsequent payments to Intervenor (after the services had actually been delivered) were made because the services had been, in fact, properly approved as medically necessary. Each prior authorization approval represents a separate violation of the law if Xerox's approval was issued illegally and/or in violation of its contractual obligations.

<u>Xerox actively concealed its potentially illegal activity.</u>

19. Xerox withheld the truth regarding its prior authorization program. In an attempt to publicly appear consistent with NHIC's prior authorization process, Xerox continued to require that dental providers (such as Intervenor) submit all supporting documentation for each HLD score sheet. It is now believed that, incredibly, Xerox did nothing with that documentation, other than assure that it had been submitted by the provider. It is believed that Xerox's specialists were instructed to forward to its dental director only those requests that had scored below the threshold for orthodontic services (i.e. below 26 points on the HLD score sheet), or had some provider justification attached. As a result, only 10% of the orthodontic prior authorization requests were actually forwarded to Xerox's one licensed dentist. Xerox's actions were calculated to make Xerox appear compliant with its contract and HHSC policies, while Xerox knew that its actions were entirely inconsistent with the letter and spirit of its obligations.

Effectively, then, Xerox's actions not only damaged the Medicaid program directly by approving services without determining their medical necessity, but Xerox's deception also exacerbated the problem by failing to give providers guidance regarding the proper standard for medical necessity, thus causing these providers substantial damages.

20.     For the past ten years, Xerox has continued to publicly represent to the world that it was fulfilling its contractual and legal responsibilities. Based on Xerox's representations that it was fulfilling its duties to the State, Xerox had its contract with HHSC repeatedly renewed from 2004 through the present. Each year that Xerox had its contract renewed, it represented that it would fulfill its contractual obligations and abide by Texas law requiring that decisions about medical necessity be rendered only by licensed dentists. Xerox made those representations knowing that it had not done so in the past, and had no intention of changing its procedures to do so in the future.

The *Frew* decision magnifies Xerox's acts.

21.     In September 2007, after fifteen years of litigation on the subject, Texas was ordered to implement a corrective action plan that increased the Medicaid reimbursement rates to all dental providers. That plan was required pursuant to the *Frew* case[3], which was a 1993 class-action lawsuit against the HHSC alleging that Texas' Medicaid reimbursement rates were so low that they prevented indigent children from receiving timely, comprehensive health care.

22.     In response to *Frew's* corrective action plan, the 2007 Texas Legislature allocated $707 million ($1.8 billion in state and federal funds combined) to increase medical and dental

---

[3] *Frew v. Gilbert*, 109 F. Supp. 2d 579 (E.D. Tex. 2000) *vacated sub nom Frazar v. Gilbert*, 300 F.3d 530 (5th Cir. 2002) *rev'd sub nom. Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 124 S. Ct. 899, 157 L. Ed. 2d 855 (2004) and *aff'd in part, appeal dismissed in part sub nom. Frazar v Hawkins*, 376 F.3d 444 (5th Cir. 2004); *Frew v. Hawkins*, 401 F. Supp. 2d 619 (E.D. Tex. 2005) *aff'd sub nom. Frazar v. Ladd*, 457 F.3d 432 (5th Cir. 2006); *Hawkins v Frew*, 549 U.S. 1118, 127 S. Ct. 1039, 166 L. Ed. 2d 714 (2007).

reimbursement rates. The increase in dental reimbursement rates was intended to entice dentists to become Medicaid providers. It worked. The state raised payment rates for dental services, and, as a result, the number of dentists participating in Medicaid increased from 45.4% in 2007 to 63.4% in 2010. As expected indeed, as intended spending on Texas's dental services increased dramatically.

23.     Although the number of prior approval requests increased by 240% between 2007 and 2010, Xerox continued to employ only one dentist. That dentist was neither tasked with nor responsible for supervising the clerical specialists that were issuing the approvals.

24.     By 2010, orthodontic spending under Texas' Medicaid program had skyrocketed. Xerox was the sole entity responsible for overseeing this increase, because it was the sole gatekeeper for the approval and payment of orthodontic services. Although the Texas Legislature had increased funding to attract dentists into the Medicaid program, all of the budgeted funds were required to be spent only on medically necessary services.

The Office of Inspector General seeks recovery from Medicaid providers.

25.     In early 2011, a series of news stories began highlighting the large amount of money being spent on orthodontics in Texas. In July 2011, the Federal government notified Texas of its intent to audit whether Texas' prior authorization process was ensuring that only medically necessary orthodontic cases were being approved and paid. With the prospect of a federal clawback action looming against Texas because of Xerox's prior authorization failures, the Texas Office of Inspector General (hereinafter "State") took a drastic step. Beginning in 2011, the State generated a list of the top Medicaid orthodontic billers and placed them on "payment hold." Intervenor was one of those providers.

26.     Given Intervenor's proximity to some of the state's poorest children, and the mandates of

the *Frew* decision, Intervenor served a large Medicaid patient population. Because it served a large Medicaid population, it submitted a large number of prior authorization requests to Xerox from 2004 through 2011.

27.     Intervenor did not know that Xerox was failing to perform a true and accurate review for medical necessity. Intervenor relied on Xerox's prior authorization approvals to confirm that dentists' analysis was proper and consistent with Medicaid standards and requirements.

28.     Again unbeknownst to Intervenor, State audits in 2008 and 2012 concluded that most, if not almost all, of the prior authorization requests for patients with HLD scores of 26 or greater (indicating medical necessity) had not been actually "evaluated" at all by Xerox. These State audits made the Federal government's pending audit especially dangerous to Texas, because the 2008 and 2012 audits were admissions that Xerox had been approving and paying claims that may not have met the federal standards for prior authorization. Thus the State, through the Attorney General, concluded that a true finding of medical necessity had in reality not occurred. The Attorney General claimed that billing for services that are not necessary is fraud, despite Xerox's prior authorization approvals.

29.     It is now believed that rather than prosecute Xerox for its failure to properly evaluate dentists' prior authorization requests, the State and the Texas Attorney General protected Xerox. This protection included the State failing to allow TMHP to hire additional medically licensed staff, and in 2008-2009 telling TMHP to continue its prior authorization practices. Although the Attorney General took immediate action against the providers, the Attorney General refused to hold Xerox accountable for its orthodontic "approvals," its repeated contractual failures, or its violation of State law. Instead, the Attorney General made fraud allegations against each of the top 25 dental providers, including Intervenor, which has caused more injury and damages to

Intervenor. Stated differently, Xerox issued its approvals through a process that gutted the State's belief in the accuracy of Xerox's decision, and the Texas Attorney General punished the providers instead of Xerox.

30.     Because the acts/omissions of Xerox so undermined the process, the State eventually instituted a "payment hold" against Intervenor. A payment hold temporarily freezes future Medicaid payments to a provider, despite the provider's ongoing participation in the Medicaid program. The payment hold against Intervenor was issued pursuant to what the State called a "credible allegation of fraud" regarding Intervenor's orthodontic prior authorization requests. The State placed a 100% payment hold against Intervenor's orthodontic billings.

31.     At the time the Attorney General began prosecuting Intervenor and similarly situated Medicaid providers, it knew Xerox, not Intervenor, had the sole authority and responsibility to authorize orthodontic services and payments. The Attorney General knew that the State's audits of Xerox in 2008 and 2012 had concluded that Xerox was violating its contract with the State, violating its own State-approved policies and procedures, and violating State law. Nevertheless, the Attorney General continued to only prosecute dental providers like the Intervenor; the Attorney General refused to hold Xerox responsible. In fact, in one shameless and brazen demonstration of State's unwavering protection of Xerox, the Deputy Director of Texas' Office of the Inspector General testified in a hearing that Xerox's acts and omissions were so egregious they were outside the course and scope of Xerox's agency with State.[4] Upon information and belief, the State and the Attorney General protected Xerox for over 6 years fearing that revealing the State's culpability would subject the State to a federal clawback for hundreds of millions of

---

[4] Incredibly, that testimony came in an administrative proceeding in which the State was seeking $8 million from a dental provider for following Xerox's instructions to provide braces to the provider's patients. The idea that the State could not hold Xerox responsible for its contractual obligations because Xerox had done such a poor job that it was acting outside of its contract is a novel and imaginative reason not to prosecute Xerox.

Plea in Intervention
Page 11 of 25

dollars. Instead, the State and the Attorney General pointed at the dental providers.

32.     Ultimately, the evidence of Xerox's failures, and the State's refusal to correct Xerox for over 6 years, became too much to hide. Three months after some providers filed suit against Xerox, and following a series of news stories questioning why Xerox had not suffered for its failures, the Attorney General reversed course. On May 9, 2014, the State, through the Texas Attorney General, filed this lawsuit against Xerox for fraud, basically mirroring the suit filed approximately 100 days earlier by similarly situated providers. The State's claims in this fraud lawsuit include admissions that the State knew as early as 2006 that Xerox's actions were improper.

33.     As a result of the payment hold, Intervenor was required to make significant financial concessions and changes to its business. Intervenor also engaged legal counsel to defend itself from the State's claims, at a significant expense that continues today.

34.     The State's allegations against Intervenor are rooted in two assumptions. First, the State assumes Intervenor's prior authorization requests were not properly vetted by Xerox; that is, Xerox approved Intervenor's requests without knowing whether approval was actually proper. Because Xerox is not a party to Intervenor's administrative case, Intervenor is prevented from determining whether Xerox did, in fact, perform a proper review of Intervenor's prior authorization requests. By intervening in this lawsuit, Intervenor seeks to address that question, and finally determine whether Xerox reviewed Intervenor's requests as required by its contract and the law.

35.     Regarding the State's second assumption, the State alleges some of Intervenor's requests were approved when, in fact, they should have been denied. Intervenor denied that assertion in the administrative case, and Intervenor continues to deny that claim here. All services provided

to Intervenor's patients were actually medically necessary, regardless of what Xerox decided and in any event under Medicaid guidelines once the authorization was approved, Intervenor was required to provide the services.

36. The State continues to aggressively fight any allegation or affirmative defense that could result in Xerox being held accountable for its part in these HLD scoring cases, despite the State's contentions in the District Court case to the contrary. Damages continue to accrue.

### V. Causes of Action

**A. Intervenor's Claims Against Xerox**

**Common Law Fraud (Fraudulent Misrepresentation and Fraudulent Inducement)**

37. Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's prior authorization approvals were false representations made to Intervenor. It is believed Xerox knowingly issued these prior authorizations to Intervenor because Xerox knew that it was approving requests without a proper medical review, and/or because it approved the prior authorization requests without any knowledge of their truth. It is believed Xerox intended for Intervenor to rely on the approvals as a prerequisite for providing the requested services. Approval was material because it was a mandatory prerequisite for payment. Intervenor actually and justifiably relied on Xerox's fraudulent approvals.

38. Xerox's approvals induced Intervenor to continue to grade subsequent HLD requests in the same or similar manner, and led Intervenor to believe that their requests were consistent with Medicaid standards and requirements.

39. Xerox's fraudulent approvals caused injury to Intervenor. As a result of Xerox's actions, Intervenor submitted requests for payment and Xerox actually paid for those services, Intervenor was placed on payment hold. Intervenor is forced to defend itself in an administrative payment

hold hearing, and Intervenor is facing administrative claims by HHSC for repayment (including claims for treble damages and attorney fees). Intervenor's reputation and business have suffered severe injury. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

## Breach of the Xerox-State of Texas Contract

40.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. In the alternative, Xerox's actions constitute a breach of Xerox's contract with the State for the benefit of Intervenor. Xerox's contract with the state required that it conduct a proper, thorough and legal review of prior authorization requests for the purpose of determining medical necessity. To that end, Xerox should have employed a licensed dentist.

41.     Xerox was an agent of the State of Texas engaged specifically for the purpose of determining medical necessity. The third party beneficiaries of that Xerox-State of Texas contract were Medicaid patients and Intervenor. The patients were entitled to receive orthodontic services that were medically necessary. Intervenor was responsible for actually delivering the orthodontic services that Xerox had deemed medically necessary. Thus, Intervenor was a third party beneficiary that relied on Xerox's approvals.

42.     Xerox breached its contract by, *inter alia*, failing to provide qualified staff; possibly violating Texas law; permitting non-dentists to make determinations of medical necessity; and issuing medical opinions without conducting a reasonable and prudent examination of evidence. The breaches were material, and recurred across many different Medicaid patients and for many years.

43.     Xerox's actions proximately caused Intervenor's injury. Intervenor's injuries were caused-in-fact by Xerox's actions, and they were foreseeable. Because Xerox's prior

authorization was a necessary prerequisite to providing services, Intervenor relied entirely on Xerox's determinations regarding medical necessity; thus, Xerox's actions were the direct factual cause of Intervenor's injuries. Xerox's actions were foreseeable in that a person of ordinary intelligence should have anticipated that issuing a decision without actually reviewing or considering the evidence (x-rays, photos, models, etc.) would eviscerate the credibility and reliability of the decision. Once the State assumed that Xerox's approvals were not trustworthy, it was foreseeable that the State would demand repayment, and/or would require Intervenor to independently do Xerox's job after the fact by proving that payment was proper because the services were medically necessary and reimbursable under Texas Medicaid law.

44.     Intervenor suffered and continues to suffer significant damage. Intervenor seeks damages that would have given the Intervenor the benefit of the bargain by putting them in as good a position as they would have been in if the contract had been performed. Intervenor seeks reliance interest damages to restore the expenditures Intervenor made in reliance on Xerox's contract with the state and the approvals that Xerox made under that contract. Intervenor also seeks damages for its restitution interest to restore money sought by the Office of the Inspector General from Intervenor. Such damages would put the Intervenor in as good a position as it would have been in if the contract had been properly fulfilled. In addition, Intervenor seeks liquidated damages as set out in the Xerox-State of Texas contract. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor has incurred benefit of the bargain damages, out-of-pocket damages, lost profits, lost future profits, loss of credit, and loss of goodwill. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

**Breach of Contract (Promissory Estoppel)**

45.    Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. In the alternative, Xerox's actions constitute promissory estoppel.

46.    Xerox's prior authorizations constitute promises to Intervenor in numerous ways. Because prior authorization was a prerequisite to furnishing services, and because Xerox was the entity charged with discharging prior authorization duties, Intervenor reasonably, substantially, and foreseeably relied on Xerox's promises.

47.    Intervenor suffered and continues to suffer significant damage. Intervenor suffered reliance damages by investing time, labor, equipment, and orthodontic appliances in each Medicaid patient that Xerox approved. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor has been required to do Xerox's job after the fact—namely, demonstrate that the services were medically necessary and properly reimbursable under Texas Medicaid law. Intervenor has incurred benefit of the bargain damages, out-of-pocket damages, lost profits, lost future profits, loss of credit, and loss of goodwill. All of these damages were directly and/or proximately caused by Xerox's promises. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

### Negligent Hiring/Negligent Supervision

48.    Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's actions constitute negligent hiring and/or negligent supervision. Xerox was required to render medical diagnoses. To that end, Xerox was required by law to employ a licensed dentist to render a diagnosis regarding medical necessity. Xerox was also required by law to properly supervise its employees to make sure diagnoses were made only by licensed dentists.

49.     Xerox knew or should have known that decisions regarding medical necessity can only be rendered by licensed personnel. Texas Occupations Code section 251.003 defines the practice of dentistry to include a diagnosis of the human mouth and/or teeth; section 256.001 states that a person may not practice dentistry without a license; section 264.151 makes it a third-degree felony to practice dentistry without a license.

50.     Xerox's actions proximately caused Intervenor's injury. Intervenor's injuries were caused-in-fact by Xerox's actions, and they were foreseeable. Because Xerox's prior authorization was a necessary prerequisite to providing services, Intervenor relied entirely on Xerox's determinations regarding medical necessity; thus, Xerox's actions were the direct factual cause of Intervenor's injuries. Xerox's actions were foreseeable in that any person of ordinary intelligence should have anticipated that paying Intervenor for services that have not properly been determined to be medically necessity would precipitate a demand for repayment, and/or would require Intervenor to independently do Xerox's job after the fact by proving that payment was proper because those services were medically necessary and were reimbursable under Texas Medicaid law.

51.     Intervenor suffered and continues to suffer significant damage. Intervenor suffered reliance damages by investing the cost of services for each Medicaid patient that Xerox approved. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor suffered and continues to suffer significant damage to its reputation, business, referral base, earnings and earning power. Intervenor has suffered inconvenience and loss of enjoyment of life in that he has had to dedicate significant mental and personal capital to doing Xerox's job. Intervenor has suffered exemplary damages because Xerox's conduct was grossly negligent, outrageous and malicious, and such conduct

should be penalized so that it is deterred in the future. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

## Negligence

52. Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's actions constitute negligence and gross negligence. Xerox was required to render medical diagnoses. To that end, Xerox had a duty to employ a licensed dentist to render a diagnosis supporting or denying medical necessity. Xerox had a duty to assure that the personnel had appropriate education, training and experience to render such a finding. Xerox had a duty to review the supporting prior authorization documentation (such as x-rays and photos) to determine whether the requested services were medically necessary.

53. Xerox's actions breached the standard of care because Xerox: failed to provide prior authorization staff that were properly licensed, qualified and experienced dental professionals; violated the law, specifically the Dental Practice Act, by permitting non-dentists to make determinations of medical necessity, and; issued medical opinions (prior authorizations) without conducting a reasonable and prudent examination of evidence.

54. Xerox's actions proximately caused Intervenor's injury. Intervenor's injuries were caused-in-fact by Xerox's actions, and they were foreseeable. Because Xerox's prior authorization was a necessary prerequisite to providing services, Intervenor relied entirely on Xerox's determinations regarding medical necessity; thus, Xerox's actions were the direct factual cause of Intervenor's injuries. Xerox's actions were foreseeable in that any person of ordinary intelligence should have anticipated that paying Intervenor for services that have not properly been determined to be medically necessity would precipitate a demand for repayment, and/or would require Intervenor to independently do Xerox's job after the fact.

55.     Intervenor suffered and continues to suffer significant damage to its reputation, business, referral base, earnings and earning power. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Dr. Chu has suffered inconvenience and loss of enjoyment of life in that he has had to dedicate significant mental and personal capital to doing Xerox's job. Intervenor has suffered exemplary damages because Xerox's conduct is grossly negligent, outrageous and malicious, and such conduct should be penalized so that it is deterred in the future. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

### Negligent Misrepresentation

56.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's actions constitute negligent misrepresentation. Xerox's actions constitute misrepresentations to Intervenor in numerous ways. Because, *inter alia*, prior authorization approval was a prerequisite to furnishing services, these representations guided and controlled Intervenor's responses. Intervenor justifiably relied on these representations. Further, Xerox represented that its prior authorization approvals were dispositive of medical necessity; Intervenor expected that, once approved, no further inquiry into the medical necessity of the services would be required. Further, Xerox represented that its subsequent payments to Intervenor (after the services had actually been delivered) were made because services had been, in fact, properly approved as medically necessary.

57.     Xerox did not exercise reasonable care or competence in making its determinations and representations. Xerox knew or should have known that its representations were false.

58.     Because prior authorization was a prerequisite to furnishing services, and because Xerox was the entity charged with discharging prior authorization duties, Intervenor reasonably,

substantially, foreseeably, and justifiably relied on Xerox's representations.

59.     Intervenor suffered and continues to suffer significant damage. Intervenor suffered reliance damages by investing time, labor, equipment, and orthodontic appliances in each Medicaid patient that Xerox approved. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor has been required to do Xerox's job after the fact. Intervenor has incurred benefit of the bargain damages, out-of-pocket damages, lost profits, loss of credit, and loss of goodwill. All of these damages were directly and/or proximately cause by Xerox's negligent misrepresentations. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

### Gross Negligence / Misapplication of Fiduciary Property

60.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Plaintiffs plead Xerox committed gross negligence and/or the misapplication of fiduciary property which would entitle Intervenors to unlimited punitive damages.

### B. Intervenors' Claims Against The State of Texas

### Waiver of Sovereign Immunity

61.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein.   For a number of reasons, the State has waived sovereign immunity for claims by Intervenor, including the facts that the State  brought, threatened and/or has taken civil and/or administrative action against Intervenors, and because the State has filed suit against Xerox.

### Conspiracy/Joint Enterprise

62.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein.  In the alternative, former Deputy Inspector General Jack Stick has stated publicly that acts and omissions of Xerox were so egregious as to be outside the course of scope of Xerox's

agency relationship with the State. Assuming same to be true, then the State conspired with Xerox to breach the contract or allow the breach to continue, conspired to withhold funds from Intervenor but not Xerox, and conspired to falsely accuse Intervenor of fraud/crime.

63.     The State conspired with Xerox to allow Xerox to violate its various contractual duties. The State permitted Xerox to process as many prior authorizations as possible without the required clinical dental review and without using medically knowledgeable personnel. The State conspired with Xerox to allow Xerox to violate State and Federal law. The State and Xerox created a scheme to rubber stamp and/or allow no legitimate review of prior authorizations submitted by the dentists. The conspiracy was committed with the intent to shift blame from the State and its agent, improperly blame the Intervenors, and enrich the State and Xerox. By recouping money from providers that were not actually to blame, the State and Xerox hoped to limit their own liability in the event of a Federal clawback action, and/or respond to unflattering news reports of Texas' payments for Medicaid braces. This agreement and ensuing acts of the party to blame the dentist providers for their own improper acts and omissions is a proximate cause of the injury to Intervenors.

### Not Liable for Illegal Acts of Third Party

64.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. As alleged by the State in Section VIII paragraph 46 of the State's petition, Xerox has committed or is about to commit unlawful acts. The illegal acts of Xerox in failing to provide proper prior authorization review in rubber stamping the doctors prior authorization requests is not the fault of the doctors. The doctors are not responsible for or liable to the State for the illegal acts of a third party for which the doctors had no control; the State should not withhold money from the Intervenors because of the illegal acts of Xerox complained about by the State.

## Breach of Contract

65.    Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Intervenors are a direct or third party beneficiary of the contract with Xerox and the State of Texas. The State of Texas has breached terms of the contract by failing to supervise Xerox and/or reviewing the work product of Xerox. This breach by State, which allowed non-performance by Xerox, has created the pretext by which the State affirmatively sued Intervenors for repayment. To the extent that the State has withheld money and/or made claims for damages against Intervenors based on the contracts in question, the State has waived immunity and is liable up to those amounts plead.

## Conversion

66.    Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. State and Federal law required Intervenor to request prior authorization for orthodontic services. Those prior authorization requests were approved by Xerox, which required Intervenors to provide the services. The State has unilaterally made a decision to that, based on the acts and omissions of Xerox, the Intervenor should not have been paid; the State then placed Intervenor on a payment hold. To the extent that Intervenor has provided services for which Intervenor should be paid, and money which has been earmarked by the State for that payment but withheld, the State has converted the funds. In addition, the States' acts/omissions are a violation of the Texas Constitution Section 9 in that the acts/omissions constitute a seizure of money held under the pretext of a payment hold.

## VI. Damages

67.    Intervenors have suffered and are entitled to recover damages including, but not limited to loss of use of funds sequestered by the State, actual damages, damage to reputation, damage to

business, damage to earnings and earning power, inconvenience, loss of enjoyment of life, fees and expenses, interest, punitive/exemplary damages, and attorney fees.

## VII. Conclusion

68.     Xerox's actions have harmed Intervenor because Xerox committed fraud, negligent hiring, negligence, and gross negligence. Xerox's actions have subjected Intervenor to unnecessary civil and administrative legal action, and that, in turn has caused additional injury. Xerox's actions have required Intervenor to perform Xerox's job after-the-fact, by proving to the State that the orthodontic services rendered were medically necessary and appropriate for reimbursement. The State's actions have harmed Intervenor because the state's conspiracy to improperly blame the dentists has resulted in meritless legal claims against the Intervenor and conversion of the Intervenor's property.

## VIII. Jury Demand

69.     Intervenor respectfully requests a trial by jury.

## IX. Request for Disclosure

70.     Under Texas Rule of Civil Procedure 194, Intervenor requests that Plaintiff the State disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## X. Prayer

71.     Wherefore, premises considered, Intervenor Dr. Stephen Chu pray that upon final hearing of the cause, judgment be entered jointly and severally against the Plaintiff the State of Texas and Defendant Xerox State Healthcare, LLC for damages, together with pre-judgment and post judgment interest at the legal rate, costs of court, and other such relief to which the Intervenor may be entitled.

Plea in Intervention
Page 23 of 25

Respectfully submitted,

Jason Ray
Texas Bar No. 24000511
**RIGGS, ALESHIRE & RAY, P.C.**
700 Lavaca, Suite 920
Austin, Texas 78701
(512) 457-9806 (Telephone)
(512) 457-9866 (Fax)
jray@r-alaw.com


___/s/  Hart Green w/ permission by J Ray__
E. Hart Green
Texas Bar No. 08349290
Mitchell A. Toups
Texas Bar No.  20151600
**WELLER, GREEN, TOUPS & TERRELL, L.L.P.**
Post Office Box 350
Beaumont, Texas 77704-0350
(409) 838-0101 (Telephone)
(409) 832-8577 (Fax)
hartgr@wgttlaw.com
matoups@wgttlaw.com
**ATTORNEYS FOR INTERVENOR
DR. STEPHEN CHU**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plea in Intervention was served via e-mail and certified mail, return receipt requested on this 15th day of May, 2014 on the following:

Eric J.R. Nichols
Beck Redden
515 Congress Avenue, Suite 1750
Austin, Texas, 78701
ENICHOLS@beckredden.com
**Attorney for Xerox Defendants**

Raymond Winter
Chief, Civil Medicaid Fraud Division
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
raymond.winter@texasattorneygeneral.gov
**Attorney for the Plaintiff State of Texas**

Jason Ray

CAUSE NO. D-1-GV-14-000581

| DR. RICHARD F. HERRSCHER, INTERVENOR, | § § § | IN THE DISTRICT COURT |
|---|---|---|
| VS. | § § | |
| THE STATE OF TEXAS, PLAINTIFF, | § § § | |
| VS. | § § § | 53rd JUDICIAL DISTRICT |
| XEROX CORPORATION; XEROX STATE HEALTHCARE, LLC; ACS STATE HEALTHCARE, LLC, A XEROX CORPORATION DEFENDANTS. | § § § § § § | TRAVIS COUNTY, TEXAS |

<u>PLEA IN INTERVENTION</u>

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, Dr. Richard F. Herrscher, hereinafter Intervenor, and file this Plea in Intervention, and in support hereof, would respectfully show the Court the following:

### I. Parties and Service

1. Plaintiff, State of Texas, has appeared in this action and may be served with a notice of this Plea by sending a copy to its attorney, the Attorney General of Texas, Greg Abbott, at P. O. Box 12548, Austin, Texas 78711-2548.

2. Defendant Xerox Corporation is a corporation organized under the laws of New York has agreed to accept service with process upon its Attorney in this suit. Defendant Xerox State Health Care, LLC, f/k/a ACS State Healthcare. LLC (misnamed by the State of Texas as ACS State Healthcare, LLC, a Xerox Corporation is a wholly-owned subsidiary of Xerox Corporation organized under the laws of the State of Delaware with Texas offices at 2828 N. Haskell Ave., Dallas, Texas 75204, and has agreed to accept service with process upon its Attorney in this suit.

Plea in Intervention
Page 1 of 25

Defendant Xerox Corporation acquired Defendant ACS in 2010. On information and belief, ACS State Healthcare, LLC, changed its name to Xerox State Healthcare, LLC, on April 1, 2012. Defendants are referred to hereinafter as "Xerox Defendants."

3. Dr. Richard F. Herrscher is a licensed Texas dentist, approved Medicaid provider. Dr Richard F. Herrscher can be served through his undersigned counsel.

## II. Jurisdiction and Venue

4. This Court has subject-matter jurisdiction in that the amounts sought by Intervenor from all parties (both Plaintiff and Defendants) are in excess of the minimal jurisdiction limits of this court. Intervenor affirmatively pleads that this suit is not governed by the expedited-actions process in TEXAS RULE OF CIVIL PROCEDURE 169 because Intervenor seeks monetary relief over $100,000.

5. This Court has jurisdiction over all parties in this petition because:

   a) The State has waived sovereign immunity and is subject to Intervenor's claims;

   b) This Court has jurisdiction over Xerox Defendants because each Defendant does business in the State of Texas and committed the unlawful acts alleged in this petition in whole or part in Texas.

6. Venue is proper in Travis County under TRCP §15.020 because this suit involves a "major transaction"; Venue is permissive under TRCP §15.035(a) because Intervenor asserts claims for breach of contract. Venue is proper pursuant to TRCP §15.02 because all or a substantial part of the events or omissions giving rise to the claim occurred in Travis County. Many of the unlawful acts committed by the State and Xerox Defendants were committed in Travis County, including the making of false statements and misrepresentations of material fact.

### III. Intervenor's Interest in the Suit

7.     Intervenor has a judicial interest in the matters and controversy in this litigation. The relationship between Intervenor, the State as the Plaintiff and the Xerox Defendants is a tripartite arrangement necessitating that, in the interest of judicial economy and justice, all claims be bound and subsumed into one cause of action. Upon information and belief, Intervenor was initially sued by the State in a *qui tam* action wherein the State alleged that Intervenor defrauded the State. The State has elected to pursue its remedies against the Intervenor in an administrative hearing. Now, the State has sued Xerox in State Court on the same facts, alleging that Xerox has committed fraud against the State. Intervenor has claims against both the State and Xerox. It is assumed that Xerox will have claims against the State, and perhaps allege claims against the Intervenor. All of the different parties' claims are inextricably intertwined, as they relate to Intervenor's submission of prior authorization requests to Xerox, the handling of those claims by the Xerox Defendants, the State's handling and oversight of its agent Xerox in Xerox's performance of its contractual and legal duties, and State's subsequent legal action against the Intervenors for services approved by Xerox.

### IV. Facts

#### What is Prior Authorization?

8.     Texas Medicaid requires that orthodontic services be independently and objectively scrutinized before the State consents to treatment and payment. Prior authorization is the mechanism the State uses to determine the medical necessity of non-emergency orthodontic items/services prior to delivery of those items/services. Pursuant to Texas Health and Human Services Commission (hereinafter "HHSC") rules, Texas Medicaid greatly restricts when it will pay for orthodontic services:

> Orthodontic services for cosmetic reasons only are not a covered Medicaid service. **Orthodontic services must be prior authorized** and are limited to treatment of severe handicapping malocclusion and other related conditions as described and measured by the procedures and standards published in the [TMPPM[1]].

25 TEX. ADMIN. CODE §33.71 (emphasis added). Prior authorization is a statement of assurance to the orthodontic provider that, absent an intervening disqualifying factor, the delivery of the requested orthodontic service has been deemed by Xerox to be medically necessary, and therefore approved by the State.

9. The prior authorization process is straightforward. Texas Medicaid requires that a dental provider send documentation (x-rays, cephalographs, photos, etc.) regarding the patient's orthodontic condition to Xerox for review. In addition, the orthodontic provider submits his professional opinion of the patient on a Handicapping Labio-lingual Deviation index (HLD) score sheet. Xerox knew providers relied entirely on the prior authorization process because approval was a mandatory prerequisite to providing orthodontic services and being paid. Once Xerox issued its prior authorization decision, the decision was not appealable by the provider.

10. The HLD scoring system combines a number of treatable orthodontic conditions into an index. HLD score sheets use a mix of objective and subjective conditions to determine whether a Medicaid patient qualifies for orthodontic services. The fact that the HLD score sheet requires both objective and subjective findings highlights the importance of Xerox performing a thorough prior authorization review.

The History of Orthodontic Prior Authorization.

11. The process for reviewing and approving orthodontic prior authorization requests pre-dates the defendant Xerox's handling of Medicaid claims processing. The National Heritage

---

[1] "TMPPM" is the Texas Medicaid Provider Procedures Manual, which is issued yearly by the HHSC and provides valuable guidance to Medicaid providers.

Plea in Intervention
Page 4 of 25

Insurance Corporation (NHIC) was responsible for reviewing prior authorization requests before Xerox assumed the contract in January 2004. Starting January 1, 2004, Xerox acted as an independent contractor, and was a contracted agent of the State, under the contract with HHSC. Xerox was responsible for reviewing each orthodontic service request, and Xerox was further charged with the responsibility to grant or deny each prior authorization request per the program requirements. The result was that Xerox had the final say in determining the medical necessity of each request for orthodontic services.

12.     Prior to assuming the NHIC contract, and for a period of time after assuming the contract from NHIC, Xerox received training from NHIC personnel regarding the proper method for receiving and processing orthodontic prior authorization requests. NHIC personnel explained how and why the review of each prior authorization submission was important, and walked Xerox through the process. Despite its training from NHIC, Xerox had no intention of following the prior authorization system that had been in place for years, nor did Xerox intend to otherwise meet the prior authorization requirements set out in its contract, the TMPPM and required by state law.

Xerox rejects its contractual responsibilities.

13.     When Xerox took over the contract in 2004, it immediately abandoned the prior authorization review process that had been setup by NHIC.  Xerox never intended to fulfill its orthodontic prior authorization responsibilities to HHSC. From 2004 to 2011, Xerox continually misrepresented that it was acting in compliance with its contractual duties.

14.     It is now known that Xerox failed to adequately staff their prior authorization division with knowledgeable medical professionals. Xerox employed only one licensed dentist from 2004 through 2011, which was far short of the manpower necessary to handle the review of tens of

thousands of orthodontic prior authorization requests every year. Xerox could not reasonably have expected to handle such a workload by employing only one dentist.

Xerox potentially commits thousands of violations.

15. It is believed Xerox allowed "dental specialists"—unlicensed, unqualified individuals— to render prior authorization opinions regarding the medical necessity of requested orthodontic services. The "dental specialist" approvals were not reviewed or ratified by Xerox's licensed dental director or another qualified dental professional. These actions not only violated Xerox's contractual obligations, they may have also violated other Texas law such as the Dental Practice Act.[2] It is believed these unlicensed Xerox "specialists" rendered tens of thousands of prior authorization approvals/medical opinions in violation of Texas law.

16. Xerox was paid by the state for each prior authorization decision that was made. It is believed that Xerox employed unlicensed "specialists," rather than licensed Texas dentists, as a profit generating measure.

17. From January 2005 through February 2012, Intervenor submitted prior authorization requests, as required, to Xerox for a determination of medical necessity. Unbeknownst to Intervenor, Xerox's dental specialists—not the dental director—approved almost all of Intervenor's requests. Xerox's prior authorization approvals were promises that:

    a) the requested orthodontic services were medically necessary, and/or

    b) the approval had been issued by a licensed dentist, and/or

    c) the approval was an actual and legitimate dental diagnosis, and/or

    d) the requested orthodontic services were allowable under Texas law and as permitted

---

[2] Texas Occupations Code §251.003 prevents unlicensed individuals from diagnosing conditions of the human teeth and mouth. Section 256.001 states that a person may not practice dentistry without a license. Thus, state law requires that opinions regarding medical necessity of orthodontic treatment must be made by licensed dentists. Section 264.151 prescribes penalties for certain violations of the Dental Practice Act.

by Medicaid policy, the TMPPM, and HHSC rules, and/or

e) a proper, thorough and legal review had been made, and/or

f) future orthodontic services would be properly reimburseable to Intervenor, absent some intervening disqualification (such as the patient's ineligibility).

18.     Because Xerox was charged with determining medical necessity, and because prior authorization approval was a mandatory prerequisite to furnishing services, the promises were material. Intervenor expected performance of these promises. Intervenor relied on Xerox. Further, Xerox promised that its subsequent payments to Intervenor (after the services had actually been delivered) were made because the services had been, in fact, properly approved as medically necessary. Each prior authorization approval represents a separate violation of the law if Xerox's approval was issued illegally and/or in violation of its contractual obligations.

<u>Xerox actively concealed its potentially illegal activity.</u>

19.     Xerox withheld the truth regarding its prior authorization program. In an attempt to publicly appear consistent with NHIC's prior authorization process, Xerox continued to require that dental providers (such as Intervenor) submit all supporting documentation for each HLD score sheet. It is now believed that, incredibly, Xerox did nothing with that documentation, other than assure that it had been submitted by the provider. It is believed that Xerox's specialists were instructed to forward to its dental director only those requests that had scored below the threshold for orthodontic services (i.e. below 26 points on the HLD score sheet), or had some provider justification attached. As a result, only 10% of the orthodontic prior authorization requests were actually forwarded to Xerox's one licensed dentist. Xerox's actions were calculated to make Xerox appear compliant with its contract and HHSC policies, while Xerox knew that its actions were entirely inconsistent with the letter and spirit of its obligations.

Effectively, then, Xerox's actions not only damaged the Medicaid program directly by approving services without determining their medical necessity, but Xerox's deception also exacerbated the problem by failing to give providers guidance regarding the proper standard for medical necessity, thus causing these providers substantial damages.

20.     For the past ten years, Xerox has continued to publicly represent to the world that it was fulfilling its contractual and legal responsibilities.  Based on Xerox's representations that it was fulfilling its duties to the State, Xerox had its contract with HHSC repeatedly renewed from 2004 through the present. Each year that Xerox had its contract renewed, it represented that it would fulfill its contractual obligations and abide by Texas law requiring that decisions about medical necessity be rendered only by licensed dentists. Xerox made those representations knowing that it had not done so in the past, and had no intention of changing its procedures to do so in the future.

The *Frew* decision magnifies Xerox's acts.

21.     In September 2007, after fifteen years of litigation on the subject, Texas was ordered to implement a corrective action plan that increased the Medicaid reimbursement rates to all dental providers. That plan was required pursuant to the *Frew* case[3], which was a 1993 class-action lawsuit against the HHSC alleging that Texas' Medicaid reimbursement rates were so low that they prevented indigent children from receiving timely, comprehensive health care.

22.     In response to *Frew's* corrective action plan, the 2007 Texas Legislature allocated $707 million ($1.8 billion in state and federal funds combined) to increase medical and dental

---

[3] *Frew v. Gilbert*, 109 F. Supp. 2d 579 (E.D. Tex. 2000) *vacated sub nom. Frazar v. Gilbert*, 300 F.3d 530 (5th Cir. 2002) *rev'd sub nom. Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 124 S. Ct. 899, 157 L. Ed. 2d 855 (2004) and *aff'd in part, appeal dismissed in part sub nom. Frazar v. Hawkins*, 376 F.3d 444 (5th Cir. 2004); *Frew v. Hawkins*, 401 F. Supp. 2d 619 (E.D. Tex. 2005) *aff'd sub nom. Frazar v. Ladd*, 457 F.3d 432 (5th Cir. 2006); *Hawkins v. Frew*, 549 U.S. 1118, 127 S. Ct. 1039, 166 L. Ed. 2d 714 (2007).

reimbursement rates. The increase in dental reimbursement rates was intended to entice dentists to become Medicaid providers. It worked. The state raised payment rates for dental services, and, as a result, the number of dentists participating in Medicaid increased from 45.4% in 2007 to 63.4% in 2010. As expected indeed, as intended spending on Texas's dental services increased dramatically.

23. Although the number of prior approval requests increased by 240% between 2007 and 2010, Xerox continued to employ only one dentist. That dentist was neither tasked with nor responsible for supervising the clerical specialists that were issuing the approvals.

24. By 2010, orthodontic spending under Texas' Medicaid program had skyrocketed. Xerox was the sole entity responsible for overseeing this increase, because it was the sole gatekeeper for the approval and payment of orthodontic services. Although the Texas Legislature had increased funding to attract dentists into the Medicaid program, all of the budgeted funds were required to be spent only on medically necessary services.

The Office of Inspector General seeks recovery from Medicaid providers.

25. In early 2011, a series of news stories began highlighting the large amount of money being spent on orthodontics in Texas. In July 2011, the Federal government notified Texas of its intent to audit whether Texas' prior authorization process was ensuring that only medically necessary orthodontic cases were being approved and paid. With the prospect of a federal clawback action looming against Texas because of Xerox's prior authorization failures, the Texas Office of Inspector General (hereinafter "State") took a drastic step. Beginning in 2011, the State generated a list of the top Medicaid orthodontic billers and placed them on "payment hold." Intervenor was one of those providers.

26. Given Intervenor's proximity to some of the state's poorest children, and the mandates of

the *Frew* decision, Intervenor served a large Medicaid patient population. Because it served a large Medicaid population, it submitted a large number of prior authorization requests to Xerox from 2004 through 2011.

27. Intervenor did not know that Xerox was failing to perform a true and accurate review for medical necessity. Intervenor relied on Xerox's prior authorization approvals to confirm that dentists' analysis was proper and consistent with Medicaid standards and requirements.

28. Again unbeknownst to Intervenor, State audits in 2008 and 2012 concluded that most, if not almost all, of the prior authorization requests for patients with HLD scores of 26 or greater (indicating medical necessity) had not been actually "evaluated" at all by Xerox. These State audits made the Federal government's pending audit especially dangerous to Texas, because the 2008 and 2012 audits were admissions that Xerox had been approving and paying claims that may not have met the federal standards for prior authorization. Thus the State, through the Attorney General, concluded that a true finding of medical necessity had in reality not occurred. The Attorney General claimed that billing for services that are not necessary is fraud, despite Xerox's prior authorization approvals.

29. It is now believed that rather than prosecute Xerox for its failure to properly evaluate dentists' prior authorization requests, the State and the Texas Attorney General protected Xerox. This protection included the State failing to allow TMHP to hire additional medically licensed staff, and in 2008-2009 telling TMHP to continue its prior authorization practices. Although the Attorney General took immediate action against the providers, the Attorney General refused to hold Xerox accountable for its orthodontic "approvals," its repeated contractual failures, or its violation of State law. Instead, the Attorney General made fraud allegations against each of the top 25 dental providers, including Intervenor, which has caused more injury and damages to

Intervenor. Stated differently, Xerox issued its approvals through a process that gutted the State's belief in the accuracy of Xerox's decision, and the Texas Attorney General punished the providers instead of Xerox.

30. Because the acts/omissions of Xerox so undermined the process, the State eventually instituted a "payment hold" against Intervenor. A payment hold temporarily freezes future Medicaid payments to a provider, despite the provider's ongoing participation in the Medicaid program. The payment hold against Intervenor was issued pursuant to what the State called a "credible allegation of fraud" regarding Intervenor's orthodontic prior authorization requests. The State placed a 100% payment hold against Intervenor's orthodontic billings.

31. At the time the Attorney General began prosecuting Intervenor and similarly situated Medicaid providers, it knew Xerox, not Intervenor, had the sole authority and responsibility to authorize orthodontic services and payments. The Attorney General knew that the State's audits of Xerox in 2008 and 2012 had concluded that Xerox was violating its contract with the State, violating its own State-approved policies and procedures, and violating State law. Nevertheless, the Attorney General continued to only prosecute dental providers like the Intervenor; the Attorney General refused to hold Xerox responsible. In fact, in one shameless and brazen demonstration of State's unwavering protection of Xerox, the Deputy Director of Texas' Office of the Inspector General testified in a hearing that Xerox's acts and omissions were so egregious they were outside the course and scope of Xerox's agency with State.[4] Upon information and belief, the State and the Attorney General protected Xerox for over 6 years fearing that revealing the State's culpability would subject the State to a federal clawback for hundreds of millions of

_____

[4] Incredibly, that testimony came in an administrative proceeding in which the State was seeking $8 million from a dental provider for following Xerox's instructions to provide braces to the provider's patients. The idea that the State could not hold Xerox responsible for its contractual obligations because Xerox had done such a poor job that it was acting outside of its contract is a novel and imaginative reason not to prosecute Xerox.

dollars. Instead, the State and the Attorney General pointed at the dental providers.

32. Ultimately, the evidence of Xerox's failures, and the State's refusal to correct Xerox for over 6 years, became too much to hide. Three months after some providers filed suit against Xerox, and following a series of news stories questioning why Xerox had not suffered for its failures, the Attorney General reversed course. On May 9, 2014, the State, through the Texas Attorney General, filed this lawsuit against Xerox for fraud, basically mirroring the suit filed approximately 100 days earlier by similarly situated providers. The State's claims in this fraud lawsuit include admissions that the State knew as early as 2006 that Xerox's actions were improper.

33. As a result of the payment hold, Intervenor was required to make significant financial concessions and changes to its business. Intervenor also engaged legal counsel to defend itself from the State's claims, at a significant expense that continues today.

34. The State's allegations against Intervenor are rooted in two assumptions. First, the State assumes Intervenor's prior authorization requests were not properly vetted by Xerox; that is, Xerox approved Intervenor's requests without knowing whether approval was actually proper. Because Xerox is not a party to Intervenor's administrative case, Intervenor is prevented from determining whether Xerox did, in fact, perform a proper review of Intervenor's prior authorization requests. By intervening in this lawsuit, Intervenor seeks to address that question, and finally determine whether Xerox reviewed Intervenor's requests as required by its contract and the law.

35. Regarding the State's second assumption, the State alleges some of Intervenor's requests were approved when, in fact, they should have been denied. Intervenor denied that assertion in the administrative case, and Intervenor continues to deny that claim here. All services provided

to Intervenor's patients were actually medically necessary, regardless of what Xerox decided and in any event under Medicaid guidelines once the authorization was approved, Intervenor was required to provide the services.

36.     The State continues to aggressively fight any allegation or affirmative defense that could result in Xerox being held accountable for its part in these HLD scoring cases, despite the State's contentions in the District Court case to the contrary. Damages continue to accrue.

### V. Causes of Action

### A. Intervenor's Claims Against Xerox

### Common Law Fraud (Fraudulent Misrepresentation and Fraudulent Inducement)

37.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's prior authorization approvals were false representations made to Intervenor. It is believed Xerox knowingly issued these prior authorizations to Intervenor because Xerox knew that it was approving requests without a proper medical review, and/or because it approved the prior authorization requests without any knowledge of their truth. It is believed Xerox intended for Intervenor to rely on the approvals as a prerequisite for providing the requested services. Approval was material because it was a mandatory prerequisite for payment. Intervenor actually and justifiably relied on Xerox's fraudulent approvals.

38.     Xerox's approvals induced Intervenor to continue to grade subsequent HLD requests in the same or similar manner, and led Intervenor to believe that their requests were consistent with Medicaid standards and requirements.

39.     Xerox's fraudulent approvals caused injury to Intervenor. As a result of Xerox's actions, Intervenor submitted requests for payment and Xerox actually paid for those services, Intervenor was placed on payment hold, Intervenor is forced to defend itself in an administrative payment

hold hearing, and Intervenor is facing administrative claims by HHSC for repayment (including claims for treble damages and attorney fees). Intervenor's reputation and business have suffered severe injury. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

### Breach of the Xerox-State of Texas Contract

40.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. In the alternative, Xerox's actions constitute a breach of Xerox's contract with the State for the benefit of Intervenor. Xerox's contract with the state required that it conduct a proper, thorough and legal review of prior authorization requests for the purpose of determining medical necessity. To that end, Xerox should have employed a licensed dentist.

41.     Xerox was an agent of the State of Texas engaged specifically for the purpose of determining medical necessity. The third party beneficiaries of that Xerox-State of Texas contract were Medicaid patients and Intervenor. The patients were entitled to receive orthodontic services that were medically necessary. Intervenor was responsible for actually delivering the orthodontic services that Xerox had deemed medically necessary. Thus, Intervenor was a third party beneficiary that relied on Xerox's approvals.

42.     Xerox breached its contract by, *inter alia*, failing to provide qualified staff; possibly violating Texas law; permitting non-dentists to make determinations of medical necessity; and issuing medical opinions without conducting a reasonable and prudent examination of evidence. The breaches were material, and recurred across many different Medicaid patients and for many years.

43.     Xerox's actions proximately caused Intervenor's injury. Intervenor's injuries were caused-in-fact by Xerox's actions, and they were foreseeable. Because Xerox's prior

authorization was a necessary prerequisite to providing services, Intervenor relied entirely on Xerox's determinations regarding medical necessity; thus, Xerox's actions were the direct factual cause of Intervenor's injuries. Xerox's actions were foreseeable in that a person of ordinary intelligence should have anticipated that issuing a decision without actually reviewing or considering the evidence (x-rays, photos, models, etc.) would eviscerate the credibility and reliability of the decision. Once the State assumed that Xerox's approvals were not trustworthy, it was foreseeable that the State would demand repayment, and/or would require Intervenor to independently do Xerox's job after the fact by proving that payment was proper because the services were medically necessary and reimbursable under Texas Medicaid law.

44.     Intervenor suffered and continues to suffer significant damage. Intervenor seeks damages that would have given the Intervenor the benefit of the bargain by putting them in as good a position as they would have been in if the contract had been performed. Intervenor seeks reliance interest damages to restore the expenditures Intervenor made in reliance on Xerox's contract with the state and the approvals that Xerox made under that contract. Intervenor also seeks damages for its restitution interest to restore money sought by the Office of the Inspector General from Intervenor. Such damages would put the Intervenor in as good a position as it would have been in if the contract had been properly fulfilled. In addition, Intervenor seeks liquidated damages as set out in the Xerox-State of Texas contract. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor has incurred benefit of the bargain damages, out-of-pocket damages, lost profits, lost future profits, loss of credit, and loss of goodwill. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

## Breach of Contract (Promissory Estoppel)

45.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. In the alternative, Xerox's actions constitute promissory estoppel.

46.     Xerox's prior authorizations constitute promises to Intervenor in numerous ways. Because prior authorization was a prerequisite to furnishing services, and because Xerox was the entity charged with discharging prior authorization duties, Intervenor reasonably, substantially, and foreseeably relied on Xerox's promises.

47.     Intervenor suffered and continues to suffer significant damage. Intervenor suffered reliance damages by investing time, labor, equipment, and orthodontic appliances in each Medicaid patient that Xerox approved. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor has been required to do Xerox's job after the fact—namely, demonstrate that the services were medically necessary and properly reimbursable under Texas Medicaid law. Intervenor has incurred benefit of the bargain damages, out-of-pocket damages, lost profits, lost future profits, loss of credit, and loss of goodwill. All of these damages were directly and/or proximately caused by Xerox's promises. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

## Negligent Hiring/Negligent Supervision

48.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's actions constitute negligent hiring and/or negligent supervision. Xerox was required to render medical diagnoses. To that end, Xerox was required by law to employ a licensed dentist to render a diagnosis regarding medical necessity. Xerox was also required by law to properly supervise its employees to make sure diagnoses were made only by licensed

dentists.

49.    Xerox knew or should have known that decisions regarding medical necessity can only be rendered by licensed personnel. Texas Occupations Code section 251.003 defines the practice of dentistry to include a diagnosis of the human mouth and/or teeth; section 256.001 states that a person may not practice dentistry without a license; section 264.151 makes it a third-degree felony to practice dentistry without a license.

50.    Xerox's actions proximately caused Intervenor's injury. Intervenor's injuries were caused-in-fact by Xerox's actions, and they were foreseeable. Because Xerox's prior authorization was a necessary prerequisite to providing services, Intervenor relied entirely on Xerox's determinations regarding medical necessity; thus, Xerox's actions were the direct factual cause of Intervenor's injuries. Xerox's actions were foreseeable in that any person of ordinary intelligence should have anticipated that paying Intervenor for services that have not properly been determined to be medically necessity would precipitate a demand for repayment, and/or would require Intervenor to independently do Xerox's job after the fact by proving that payment was proper because those services were medically necessary and were reimbursable under Texas Medicaid law.

51.    Intervenor suffered and continues to suffer significant damage. Intervenor suffered reliance damages by investing the cost of services for each Medicaid patient that Xerox approved. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor suffered and continues to suffer significant damage to its reputation, business, referral base, earnings and earning power. Intervenor has suffered inconvenience and loss of enjoyment of life in that he has had to dedicate significant mental and personal capital to doing Xerox's job. Intervenor has suffered exemplary damages

because Xerox's conduct was grossly negligent, outrageous and malicious, and such conduct should be penalized so that it is deterred in the future. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

## Negligence

52.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's actions constitute negligence and gross negligence. Xerox was required to render medical diagnoses. To that end, Xerox had a duty to employ a licensed dentist to render a diagnosis supporting or denying medical necessity. Xerox had a duty to assure that the personnel had appropriate education, training and experience to render such a finding. Xerox had a duty to review the supporting prior authorization documentation (such as x-rays and photos) to determine whether the requested services were medically necessary.

53.     Xerox's actions breached the standard of care because Xerox: failed to provide prior authorization staff that were properly licensed, qualified and experienced dental professionals; violated the law, specifically the Dental Practice Act, by permitting non-dentists to make determinations of medical necessity, and; issued medical opinions (prior authorizations) without conducting a reasonable and prudent examination of evidence.

54.     Xerox's actions proximately caused Intervenor's injury. Intervenor's injuries were caused-in-fact by Xerox's actions, and they were foreseeable. Because Xerox's prior authorization was a necessary prerequisite to providing services, Intervenor relied entirely on Xerox's determinations regarding medical necessity; thus, Xerox's actions were the direct factual cause of Intervenor's injuries. Xerox's actions were foreseeable in that any person of ordinary intelligence should have anticipated that paying Intervenor for services that have not properly been determined to be medically necessity would precipitate a demand for repayment, and/or

would require Intervenor to independently do Xerox's job after the fact.

55. Intervenor suffered and continues to suffer significant damage to its reputation, business, referral base, earnings and earning power. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Dr. Richard F. Herrscher has suffered inconvenience and loss of enjoyment of life in that he has had to dedicate significant mental and personal capital to doing Xerox's job. Intervenor has suffered exemplary damages because Xerox's conduct is grossly negligent, outrageous and malicious, and such conduct should be penalized so that it is deterred in the future. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

### Negligent Misrepresentation

56. Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's actions constitute negligent misrepresentation. Xerox's actions constitute misrepresentations to Intervenor in numerous ways. Because, *inter alia*, prior authorization approval was a prerequisite to furnishing services, these representations guided and controlled Intervenor's responses. Intervenor justifiably relied on these representations. Further, Xerox represented that its prior authorization approvals were dispositive of medical necessity; Intervenor expected that, once approved, no further inquiry into the medical necessity of the services would be required. Further, Xerox represented that its subsequent payments to Intervenor (after the services had actually been delivered) were made because services had been, in fact, properly approved as medically necessary.

57. Xerox did not exercise reasonable care or competence in making its determinations and representations. Xerox knew or should have known that its representations were false.

58. Because prior authorization was a prerequisite to furnishing services, and because Xerox

was the entity charged with discharging prior authorization duties, Intervenor reasonably, substantially, foreseeably, and justifiably relied on Xerox's representations.

59.     Intervenor suffered and continues to suffer significant damage. Intervenor suffered reliance damages by investing time, labor, equipment, and orthodontic appliances in each Medicaid patient that Xerox approved. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor has been required to do Xerox's job after the fact. Intervenor has incurred benefit of the bargain damages, out-of-pocket damages, lost profits, loss of credit, and loss of goodwill. All of these damages were directly and/or proximately cause by Xerox's negligent misrepresentations. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

### Gross Negligence / Misapplication of Fiduciary Property

60.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Plaintiffs plead Xerox committed gross negligence and/or the misapplication of fiduciary property which would entitle Intervenors to unlimited punitive damages.

### B. Intervenors' Claims Against The State of Texas

### Waiver of Sovereign Immunity

61.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein.   For a number of reasons, the State has waived sovereign immunity for claims by Intervenor, including the facts that the State  brought, threatened and/or has taken civil and/or administrative action against Intervenors, and because the State has filed suit against Xerox.

### Conspiracy/Joint Enterprise

62.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein.   In the alternative, former Deputy Inspector General Jack Stick has stated publicly that

acts and omissions of Xerox were so egregious as to be outside the course of scope of Xerox's agency relationship with the State. Assuming same to be true, then the State conspired with Xerox to breach the contract or allow the breach to continue, conspired to withhold funds from Intervenor but not Xerox, and conspired to falsely accuse Intervenor of fraud/crime.

63.     The State conspired with Xerox to allow Xerox to violate its various contractual duties. The State permitted Xerox to process as many prior authorizations as possible without the required clinical dental review and without using medically knowledgeable personnel. The State conspired with Xerox to allow Xerox to violate State and Federal law. The State and Xerox created a scheme to rubber stamp and/or allow no legitimate review of prior authorizations submitted by the dentists. The conspiracy was committed with the intent to shift blame from the State and its agent, improperly blame the Intervenors, and enrich the State and Xerox. By recouping money from providers that were not actually to blame, the State and Xerox hoped to limit their own liability in the event of a Federal clawback action, and/or respond to unflattering news reports of Texas' payments for Medicaid braces. This agreement and ensuing acts of the party to blame the dentist providers for their own improper acts and omissions is a proximate cause of the injury to Intervenors.

**Not Liable for Illegal Acts of Third Party**

64.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. As alleged by the State in Section VIII paragraph 46 of the State's petition, Xerox has committed or is about to commit unlawful acts. The illegal acts of Xerox in failing to provide proper prior authorization review in rubber stamping the doctors prior authorization requests is not the fault of the doctors. The doctors are not responsible for or liable to the State for the

illegal acts of a third party for which the doctors had no control; the State should not withhold money from the Intervenors because of the illegal acts of Xerox complained about by the State.

## Breach of Contract

65. Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Intervenors are a direct or third party beneficiary of the contract with Xerox and the State of Texas. The State of Texas has breached terms of the contract by failing to supervise Xerox and/or reviewing the work product of Xerox. This breach by State, which allowed non-performance by Xerox, has created the pretext by which the State affirmatively sued Intervenors for repayment. To the extent that the State has withheld money and/or made claims for damages against Intervenors based on the contracts in question, the State has waived immunity and is liable up to those amounts plead.

## Conversion

66. Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. State and Federal law required Intervenor to request prior authorization for orthodontic services. Those prior authorization requests were approved by Xerox, which required Intervenors to provide the services. The State has unilaterally made a decision to that, based on the acts and omissions of Xerox, the Intervenor should not have been paid; the State then placed Intervenor on a payment hold. To the extent that Intervenor has provided services for which Intervenor should be paid, and money which has been earmarked by the State for that payment but withheld, the State has converted the funds. In addition, the States' acts/omissions are a violation of the Texas Constitution Section 9 in that the acts/omissions constitute a seizure of money held under the pretext of a payment hold.

## VI. Damages

67. Intervenors have suffered and are entitled to recover damages including, but not limited to loss of use of funds sequestered by the State, actual damages, damage to reputation, damage to business, damage to earnings and earning power, inconvenience, loss of enjoyment of life, fees and expenses, interest, punitive/exemplary damages, and attorney fees.

## VII. Conclusion

68. Xerox's actions have harmed Intervenor because Xerox committed fraud, negligent hiring, negligence, and gross negligence. Xerox's actions have subjected Intervenor to unnecessary civil and administrative legal action, and that, in turn has caused additional injury. Xerox's actions have required Intervenor to perform Xerox's job after-the-fact, by proving to the State that the orthodontic services rendered were medically necessary and appropriate for reimbursement. The State's actions have harmed Intervenor because the state's conspiracy to improperly blame the dentists has resulted in meritless legal claims against the Intervenor and conversion of the Intervenor's property.

## VIII. Jury Demand

69. Intervenor respectfully requests a trial by jury.

## IX. Request for Disclosure

70. Under Texas Rule of Civil Procedure 194, Intervenor requests that Plaintiff the State disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## X. Prayer

71. Wherefore, premises considered, Intervenor Dr. Richard F. Herrscher pray that upon final hearing of the cause, judgment be entered jointly and severally against the Plaintiff the State of

Texas and Defendant Xerox State Healthcare, LLC for damages, together with pre-judgment and post judgment interest at the legal rate, costs of court, and other such relief to which the Intervenor may be entitled.

Respectfully submitted,

Jason Ray
Texas Bar No. 24000511
**RIGGS, ALESHIRE & RAY, P.C.**
700 Lavaca, Suite 920
Austin, Texas 78701
(512) 457-9806 (Telephone)
(512) 457-9866 (Fax)
jray@r-alaw.com


   /s/ Hart Green w/ permission by J Ray
E. Hart Green
Texas Bar No. 08349290
Mitchell A. Toups
Texas Bar No. 20151600
**WELLER, GREEN, TOUPS & TERRELL, L.L.P.**
Post Office Box 350
Beaumont, Texas 77704-0350
(409) 838-0101 (Telephone)
(409) 832-8577 (Fax)
hartgr@wgttlaw.com
matoups@wgttlaw.com
**ATTORNEYS FOR INTERVENOR
DR. RICHARD F. HERRSCHER**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plea in Intervention was served via e-mail and certified mail, return receipt requested on this 15th day of May, 2014 on the following:

Eric J.R. Nichols
Beck Redden
515 Congress Avenue, Suite 1750
Austin, Texas, 78701
ENICHOLS@beckredden.com
**Attorney for Xerox Defendants**

Raymond Winter
Chief, Civil Medicaid Fraud Division
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
raymond.winter@texasattorneygeneral.gov
**Attorney for the Plaintiff State of Texas**

_____
Jason Ray

| | | |
|---|---|---|
| IRMA CANTU-THOMPSON, DDS, PC, AND IRMA CANTU-THOMPSON, INTERVENORS, | § § § § | IN THE DISTRICT COURT |
| VS. | § § | |
| THE STATE OF TEXAS, PLAINTIFF, | § § § | |
| VS. | § § § | 53rd JUDICIAL DISTRICT |
| XEROX CORPORATION; XEROX STATE HEALTHCARE, LLC; ACS STATE HEALTHCARE, LLC, A XEROX CORPORATION DEFENDANTS. | § § § § § § | TRAVIS COUNTY, TEXAS |

## PLEA IN INTERVENTION

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES, Irma Cantu-Thompson, DDS, PC and Irma Cantu-Thompson, hereinafter Intervenors, and file this Plea in Intervention, and in support hereof, would respectfully show the Court the following:

### I. Parties and Service

1.      Plaintiff, State of Texas, has appeared in this action and may be served with a notice of this Plea by sending a copy to its attorney, the Attorney General of Texas, Greg Abbott, at P. O. Box 12548, Austin, Texas 78711-2548.

2.      Defendant Xerox Corporation is a corporation organized under the laws of New York has agreed to accept service with process upon its Attorney in this suit. Defendant Xerox State Health Care, LLC, f/k/a ACS State Healthcare, LLC (misnamed by the State of Texas as ACS State Healthcare, LLC, a Xerox Corporation is a wholly-owned subsidiary of Xerox Corporation organized under the laws of the State of Delaware with Texas offices at 2828 N. Haskell Ave.,

Dallas, Texas 75204, and has agreed to accept service with process upon its Attorney in this suit. Defendant Xerox Corporation acquired Defendant ACS in 2010. On information and belief, ACS State Healthcare, LLC, changed its name to Xerox State Healthcare, LLC, on April 1, 2012. Defendants are referred to hereinafter as "Xerox Defendants."

3.  Irma Cantu-Thompson, DDS, PC, (hereinafter Thompson) is an approved Medicaid provider. Thompson can be served through the undersigned counsel.

4.  Irma Cantu-Thompson[1] is a licensed Texas dentist, approved Medicaid provider, and the owner of Thompson Irma Cantu-Thompson can be served through her undersigned counsel.

## II. Jurisdiction and Venue

5.  This Court has subject-matter jurisdiction in that the amounts sought by Intervenors from all parties (both Plaintiff and Defendants) are in excess of the minimal jurisdiction limits of this court. Intervenors affirmatively plead that this suit is not governed by the expedited-actions process in TEXAS RULE OF CIVIL PROCEDURE 169 because intervenors seek monetary relief over $100,000.

6.  This Court has jurisdiction over all parties in this petition because:

    a)  The State has waived sovereign immunity and is subject to Intervenors' claims;

    b)  This Court has jurisdiction over Xerox Defendants because each Defendant does business in the State of Texas and committed the unlawful acts alleged in this petition in whole or part in Texas.

7.  Venue is proper in Travis County under TRCP §15.020 because this suit involves a "major transaction"; Venue is permissive under TRCP §15.035(a) because Intervenor asserts claims for breach of contract. Venue is proper pursuant to TRCP §15.02 because all or a

---

[1] For the sake of simplicity, the Intervenors will be collectively referred to as "THOMPSON" unless expressly noted.

substantial part of the events or omissions giving rise to the claim occurred in Travis County. Many of the unlawful acts committed by the State and Xerox Defendants were committed in Travis County, including the making of false statements and misrepresentations of material fact.

### III. Intervenors' Interest in the Suit

8.      Intervenors THOMPSON and Irma Cantu-Thompson have a judicial interest in the matters and controversy in this litigation. The relationship between Intervenors, the State as the Plaintiff and the Xerox Defendants is a tripartite arrangement necessitating that, in the interest of judicial economy and justice, all claims be bound and subsumed into one cause of action. Upon information and belief, Intervenors were initially sued by the State in a *qui tam* action wherein the State alleged that Intervenors defrauded the State. The State has elected to pursue its remedies against the Intervenors in an administrative hearing. Now, the State has sued Xerox in State Court on the same facts, alleging that Xerox has committed fraud against the State. Intervenors have claims against both the State and Xerox. It is assumed that Xerox will have claims against the State, and perhaps allege claims against the Intervenors. All of the different parties' claims are inextricably intertwined, as they relate to Intervenors' submission of prior authorization requests to Xerox, the handling of those claims by the Xerox Defendants, the State's handling and oversight of its agent Xerox in Xerox's performance of its contractual and legal duties, and State's subsequent legal action against the Intervenors for services approved by Xerox.

### IV. Facts

#### What is Prior Authorization?

9.      Texas Medicaid requires that orthodontic services be independently and objectively scrutinized before the State consents to treatment and payment. Prior authorization is the

mechanism the State uses to determine the medical necessity of non-emergency orthodontic items/services prior to delivery of those items/services. Pursuant to Texas Health and Human Services Commission (hereinafter "HHSC") rules, Texas Medicaid greatly restricts when it will pay for orthodontic services:

> Orthodontic services for cosmetic reasons only are not a covered Medicaid service. **Orthodontic services must be prior authorized** and are limited to treatment of severe handicapping malocclusion and other related conditions as described and measured by the procedures and standards published in the [TMPPM[2]].

25 TEX. ADMIN. CODE §33.71 (emphasis added). Prior authorization is a statement of assurance to the orthodontic provider that, absent an intervening disqualifying factor, the delivery of the requested orthodontic service has been deemed by Xerox to be medically necessary, and therefore approved by the State.

10.     The prior authorization process is straightforward. Texas Medicaid requires that a dental provider send documentation (x-rays, cephalographs, photos, etc.) regarding the patient's orthodontic condition to Xerox for review. In addition, the orthodontic provider submits his professional opinion of the patient on a Handicapping Labio-lingual Deviation index (HLD) score sheet. Xerox knew providers relied entirely on the prior authorization process because approval was a mandatory prerequisite to providing orthodontic services and being paid. Once Xerox issued its prior authorization decision, the decision was not appealable by the provider.

11.     The HLD scoring system combines a number of treatable orthodontic conditions into an index. HLD score sheets use a mix of objective and subjective conditions to determine whether a Medicaid patient qualifies for orthodontic services. The fact that the HLD score sheet requires both objective and subjective findings highlights the importance of Xerox performing a thorough

---

[2] "TMPPM" is the Texas Medicaid Provider Procedures Manual, which is issued yearly by the HHSC and provides valuable guidance to Medicaid providers.

prior authorization review.

## The History of Orthodontic Prior Authorization.

12. The process for reviewing and approving orthodontic prior authorization requests pre-dates the defendant Xerox's handling of Medicaid claims processing. The National Heritage Insurance Corporation (NHIC) was responsible for reviewing prior authorization requests before Xerox assumed the contract in January 2004. Starting January 1, 2004, Xerox acted as an independent contractor, and was a contracted agent of the State, under the contract with HHSC. Xerox was responsible for reviewing each orthodontic service request, and Xerox was further charged with the responsibility to grant or deny each prior authorization request per the program requirements. The result was that Xerox had the final say in determining the medical necessity of each request for orthodontic services.

13. Prior to assuming the NHIC contract, and for a period of time after assuming the contract from NHIC, Xerox received training from NHIC personnel regarding the proper method for receiving and processing orthodontic prior authorization requests. NHIC personnel explained how and why the review of each prior authorization submission was important, and walked Xerox through the process. Despite its training from NHIC, Xerox had no intention of following the prior authorization system that had been in place for years, nor did Xerox intend to otherwise meet the prior authorization requirements set out in its contract, the TMPPM and required by state law.

## Xerox rejects its contractual responsibilities.

14. When Xerox took over the contract in 2004, it immediately abandoned the prior authorization review process that had been setup by NHIC. Xerox never intended to fulfill its orthodontic prior authorization responsibilities to HHSC. From 2004 to 2011, Xerox continually

misrepresented that it was acting in compliance with its contractual duties.

15. It is now known that Xerox failed to adequately staff their prior authorization division with knowledgeable medical professionals. Xerox employed only one licensed dentist from 2004 through 2011, which was far short of the manpower necessary to handle the review of tens of thousands of orthodontic prior authorization requests every year. Xerox could not reasonably have expected to handle such a workload by employing only one dentist.

## Xerox potentially commits thousands of violations.

16. It is believed Xerox allowed "dental specialists"—unlicensed, unqualified individuals— to render prior authorization opinions regarding the medical necessity of requested orthodontic services. The "dental specialist" approvals were not reviewed or ratified by Xerox's licensed dental director or another qualified dental professional. These actions not only violated Xerox's contractual obligations, they may have also violated other Texas law such as the Dental Practice Act.[3] It is believed these unlicensed Xerox "specialists" rendered tens of thousands of prior authorization approvals/medical opinions in violation of Texas law.

17. Xerox was paid by the state for each prior authorization decision that was made. It is believed that Xerox employed unlicensed "specialists," rather than licensed Texas dentists, as a profit generating measure.

18. From January 2005 through February 2012, Intervenor submitted prior authorization requests, as required, to Xerox for a determination of medical necessity. Unbeknownst to Intervenor, Xerox's dental specialists—not the dental director—approved almost all of Intervenor's requests. Xerox's prior authorization approvals were promises that:

---

[3] Texas Occupations Code §251.003 prevents unlicensed individuals from diagnosing conditions of the human teeth and mouth. Section 256.001 states that a person may not practice dentistry without a license. Thus, state law requires that opinions regarding medical necessity of orthodontic treatment must be made by licensed dentists. Section 264.151 prescribes penalties for certain violations of the Dental Practice Act.

Plea in Intervention
Page 6 of 25

a) the requested orthodontic services were medically necessary, and/or

b) the approval had been issued by a licensed dentist, and/or

c) the approval was an actual and legitimate dental diagnosis, and/or

d) the requested orthodontic services were allowable under Texas law and as permitted by Medicaid policy, the TMPPM, and HHSC rules, and/or

e) a proper, thorough and legal review had been made, and/or

f) future orthodontic services would be properly reimburseable to Intervenors, absent some intervening disqualification (such as the patient's ineligibility).

19. Because Xerox was charged with determining medical necessity, and because prior authorization approval was a mandatory prerequisite to furnishing services, the promises were material. Intervenors expected performance of these promises. Intervenors relied on Xerox. Further, Xerox promised that its subsequent payments to Intervenors (after the services had actually been delivered) were made because the services had been, in fact, properly approved as medically necessary. Each prior authorization approval represents a separate violation of the law if Xerox's approval was issued illegally and/or in violation of its contractual obligations.

Xerox actively concealed its potentially illegal activity.

20. Xerox withheld the truth regarding its prior authorization program. In an attempt to publicly appear consistent with NHIC's prior authorization process, Xerox continued to require that dental providers (such as Intervenor) submit all supporting documentation for each HLD score sheet. It is now believed that, incredibly, Xerox did nothing with that documentation, other than assure that it had been submitted by the provider. It is believed that Xerox's specialists were instructed to forward to its dental director only those requests that had scored below the threshold for orthodontic services (i.e. below 26 points on the HLD score sheet), or had some

provider justification attached. As a result, only 10% of the orthodontic prior authorization requests were actually forwarded to Xerox's one licensed dentist. Xerox's actions were calculated to make Xerox appear compliant with its contract and HHSC policies, while Xerox knew that its actions were entirely inconsistent with the letter and spirit of its obligations. Effectively, then, Xerox's actions not only damaged the Medicaid program directly by approving services without determining their medical necessity, but Xerox's deception also exacerbated the problem by failing to give providers guidance regarding the proper standard for medical necessity, thus causing these providers substantial damages.

21.    For the past ten years, Xerox has continued to publicly represent to the world that it was fulfilling its contractual and legal responsibilities. Based on Xerox's representations that it was fulfilling its duties to the State, Xerox had its contract with HHSC repeatedly renewed from 2004 through the present. Each year that Xerox had its contract renewed, it represented that it would fulfill its contractual obligations and abide by Texas law requiring that decisions about medical necessity be rendered only by licensed dentists. Xerox made those representations knowing that it had not done so in the past, and had no intention of changing its procedures to do so in the future.

The *Frew* decision magnifies Xerox's acts.

22.    In September 2007, after fifteen years of litigation on the subject, Texas was ordered to implement a corrective action plan that increased the Medicaid reimbursement rates to all dental providers. That plan was required pursuant to the *Frew* case[4], which was a 1993 class-action

---

[4] *Frew v. Gilbert*, 109 F. Supp. 2d 579 (E.D. Tex. 2000) *vacated sub nom. Frazar v. Gilbert*, 300 F.3d 530 (5th Cir. 2002) *rev'd sub nom. Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 124 S. Ct. 899, 157 L. Ed. 2d 855 (2004) and *aff'd in part, appeal dismissed in part sub nom. Frazar v. Hawkins*, 376 F.3d 444 (5th Cir. 2004); *Frew v. Hawkins*, 401 F. Supp. 2d 619 (E.D. Tex. 2005) *aff'd sub nom. Frazar v. Ladd*, 457 F.3d 432 (5th Cir. 2006); *Hawkins v. Frew*, 549 U.S. 1118, 127 S. Ct. 1039, 166 L. Ed. 2d 714 (2007).

lawsuit against the HHSC alleging that Texas' Medicaid reimbursement rates were so low that they prevented indigent children from receiving timely, comprehensive health care.

23. In response to *Frew's* corrective action plan, the 2007 Texas Legislature allocated $707 million ($1.8 billion in state and federal funds combined) to increase medical and dental reimbursement rates. The increase in dental reimbursement rates was intended to entice dentists to become Medicaid providers. It worked. The state raised payment rates for dental services, and, as a result, the number of dentists participating in Medicaid increased from 45.4% in 2007 to 63.4% in 2010. As expected indeed, as intended spending on Texas's dental services increased dramatically.

24. Although the number of prior approval requests increased by 240% between 2007 and 2010, Xerox continued to employ only one dentist. That dentist was neither tasked with nor responsible for supervising the clerical specialists that were issuing the approvals.

25. By 2010, orthodontic spending under Texas' Medicaid program had skyrocketed. Xerox was the sole entity responsible for overseeing this increase, because it was the sole gatekeeper for the approval and payment of orthodontic services. Although the Texas Legislature had increased funding to attract dentists into the Medicaid program, all of the budgeted funds were required to be spent only on medically necessary services.

The Office of Inspector General seeks recovery from Medicaid providers.

26. In early 2011, a series of news stories began highlighting the large amount of money being spent on orthodontics in Texas. In July 2011, the Federal government notified Texas of its intent to audit whether Texas' prior authorization process was ensuring that only medically necessary orthodontic cases were being approved and paid. With the prospect of a federal clawback action looming against Texas because of Xerox's prior authorization failures, the

Texas Office of Inspector General (hereinafter "State") took a drastic step. Beginning in 2011, the State generated a list of the top Medicaid orthodontic billers and placed them on "payment hold." Intervenor was one of those providers.

27.     Given Intervenors' proximity to some of the state's poorest children, and the mandates of the *Frew* decision, Intervenor served a large Medicaid patient population.  Because it served a large Medicaid population, it submitted a large number of prior authorization requests to Xerox from 2004 through 2011.

28.     Intervenors did not know that Xerox was failing to perform a true and accurate review for medical necessity. Intervenors relied on Xerox's prior authorization approvals to confirm that dentists' analysis was proper and consistent with Medicaid standards and requirements.

29.     Again unbeknownst to Intervenors, State audits in 2008 and 2012 concluded that most, if not almost all, of the prior authorization requests for patients with HLD scores of 26 or greater (indicating medical necessity) had not been actually "evaluated" at all by Xerox. These State audits made the Federal government's pending audit especially dangerous to Texas, because the 2008 and 2012 audits were admissions that Xerox had been approving and paying claims that may not have met the federal standards for prior authorization. Thus the State, through the Attorney General, concluded that a true finding of medical necessity had in reality not occurred. The Attorney General claimed that billing for services that are not necessary is fraud, despite Xerox's prior authorization approvals.

30.     It is now believed that rather than prosecute Xerox for its failure to properly evaluate dentists' prior authorization requests, the State and the Texas Attorney General protected Xerox. This protection included the State failing to allow TMHP to hire additional medically licensed staff, and in 2008-2009 telling TMHP to continue its prior authorization practices. Although the

Attorney General took immediate action against the providers, the Attorney General refused to hold Xerox accountable for its orthodontic "approvals," its repeated contractual failures, or its violation of State law. Instead, the Attorney General made fraud allegations against each of the top 25 dental providers, including Intervenor, which has caused more injury and damages to Intervenors. Stated differently, Xerox issued its approvals through a process that gutted the State's belief in the accuracy of Xerox's decision, and the Texas Attorney General punished the providers instead of Xerox.

31.     Because the acts/omissions of Xerox so undermined the process, the State eventuallyinstituted a "payment hold" against Intervenor. A payment hold temporarily freezes future Medicaid payments to a provider, despite the provider's ongoing participation in the Medicaid program. The payment hold against Intervenor was issued pursuant to what the State called a "credible allegation of fraud" regarding Intervenor's orthodontic prior authorization requests. The State placed a 100% payment hold against Intervenor's orthodontic billings.

32.     At the time the Attorney General began prosecuting Intervenor and similarly situated Medicaid providers, it knew Xerox, not Intervenor, had the sole authority and responsibility to authorize orthodontic services and payments. The Attorney General knew that the State's audits of Xerox in 2008 and 2012 had concluded that Xerox was violating its contract with the State, violating its own State-approved policies and procedures, and violating State law. Nevertheless, the Attorney General continued to only prosecute dental providers like the Intervenor; the Attorney General refused to hold Xerox responsible. In fact, in one shameless and brazen demonstration of State's unwavering protection of Xerox, the Deputy Director of Texas' Office of the Inspector General testified in a hearing that Xerox's acts and omissions were so egregious

they were outside the course and scope of Xerox's agency with State.[5] Upon information and belief, the State and the Attorney General protected Xerox for over 6 years fearing that revealing the State's culpability would subject the State to a federal clawback for hundreds of millions of dollars. Instead, the State and the Attorney General pointed at the dental providers.

33. Ultimately, the evidence of Xerox's failures, and the State's refusal to correct Xerox for over 6 years, became too much to hide. Three months after some providers filed suit against Xerox, and following a series of news stories questioning why Xerox had not suffered for its failures, the Attorney General reversed course. On May 9, 2014, the State, through the Texas Attorney General, filed this lawsuit against Xerox for fraud, basically mirroring the suit filed approximately 100 days earlier by similarly situated providers. The State's claims in this fraud lawsuit include admissions that the State knew as early as 2006 that Xerox's actions were improper.

34. As a result of the payment hold, Intervenor was required to make significant financial concessions and changes to its business. Intervenor also engaged legal counsel to defend itself from the State's claims, at a significant expense that continues today.

35. The State's allegations against Intervenor are rooted in two assumptions. First, the State assumes Intervenor's prior authorization requests were not properly vetted by Xerox; that is, Xerox approved Intervenor's requests without knowing whether approval was actually proper. Because Xerox is not a party to Intervenor's administrative case, Intervenor is prevented from determining whether Xerox did, in fact, perform a proper review of Intervenor's prior authorization requests. By intervening in this lawsuit, Intervenor seeks to address that question,

---

[5] Incredibly, that testimony came in an administrative proceeding in which the State was seeking $8 million from a dental provider for following Xerox's instructions to provide braces to the provider's patients. The idea that the State could not hold Xerox responsible for its contractual obligations because Xerox had done such a poor job that it was acting outside of its contract is a novel and imaginative reason not to prosecute Xerox.

and finally determine whether Xerox reviewed Intervenor's requests as required by its contract and the law.

36.     Regarding the State's second assumption, the State alleges some of Intervenor's requests were approved when, in fact, they should have been denied. Intervenor denied that assertion in the administrative case, and Intervenor continues to deny that claim here. All services provided to Intervenor's patients were actually medically necessary, regardless of what Xerox decided and in any event under Medicaid guidelines once the authorization was approved, Intervenor was required to provide the services.

37.     The State continues to aggressively fight any allegation or affirmative defense that could result in Xerox being held accountable for its part in these HLD scoring cases, despite the State's contentions in the District Court case to the contrary. Damages continue to accrue.

## V. Causes of Action

### A. Intervenors' Claims Against Xerox

### Common Law Fraud (Fraudulent Misrepresentation and Fraudulent Inducement)

38.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's prior authorization approvals were false representations made to Intervenor. It is believed Xerox knowingly issued these prior authorizations to Intervenor because Xerox knew that it was approving requests without a proper medical review, and/or because it approved the prior authorization requests without any knowledge of their truth. It is believed Xerox intended for Intervenor to rely on the approvals as a prerequisite for providing the requested services. Approval was material because it was a mandatory prerequisite for payment. Intervenor actually and justifiably relied on Xerox's fraudulent approvals.

39.     Xerox's approvals induced Intervenor to continue to grade subsequent HLD requests in

the same or similar manner, and led Intervenor to believe that their requests were consistent with Medicaid standards and requirements.

40.     Xerox's fraudulent approvals caused injury to Intervenor. As a result of Xerox's actions, Intervenor submitted requests for payment and Xerox actually paid for those services, Intervenor was placed on payment hold, Intervenor is forced to defend itself in an administrative payment hold hearing, and Intervenor is facing administrative claims by HHSC for repayment (including claims for treble damages and attorney fees). Intervenor's reputation and business have suffered severe injury. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

### Breach of the Xerox-State of Texas Contract

41.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. In the alternative, Xerox's actions constitute a breach of Xerox's contract with the State for the benefit of Intervenor. Xerox's contract with the state required that it conduct a proper, thorough and legal review of prior authorization requests for the purpose of determining medical necessity. To that end, Xerox should have employed a licensed dentist.

42.     Xerox was an agent of the State of Texas engaged specifically for the purpose of determining medical necessity. The third party beneficiaries of that Xerox-State of Texas contract were Medicaid patients and Intervenor. The patients were entitled to receive orthodontic services that were medically necessary. Intervenor was responsible for actually delivering the orthodontic services that Xerox had deemed medically necessary. Thus, Intervenor was a third party beneficiary that relied on Xerox's approvals.

43.     Xerox breached its contract by, *inter alia*, failing to provide qualified staff; possibly violating Texas law; permitting non-dentists to make determinations of medical necessity; and

issuing medical opinions without conducting a reasonable and prudent examination of evidence. The breaches were material, and recurred across many different Medicaid patients and for many years.

44.     Xerox's actions proximately caused Intervenor's injury. Intervenor's injuries were caused-in-fact by Xerox's actions, and they were foreseeable. Because Xerox's prior authorization was a necessary prerequisite to providing services, Intervenor relied entirely on Xerox's determinations regarding medical necessity; thus, Xerox's actions were the direct factual cause of Intervenor's injuries. Xerox's actions were foreseeable in that a person of ordinary intelligence should have anticipated that issuing a decision without actually reviewing or considering the evidence (x-rays, photos, models, etc.) would eviscerate the credibility and reliability of the decision. Once the State assumed that Xerox's approvals were not trustworthy, it was foreseeable that the State would demand repayment, and/or would require Intervenor to independently do Xerox's job after the fact by proving that payment was proper because the services were medically necessary and reimbursable under Texas Medicaid law.

45.     Intervenor suffered and continues to suffer significant damage. Intervenor seeks damages that would have given the Intervenors the benefit of the bargain by putting them in as good a position as they would have been in if the contract had been performed. Intervenor seeks reliance interest damages to restore the expenditures Intervenor made in reliance on Xerox's contract with the state and the approvals that Xerox made under that contract. Intervenor also seeks damages for its restitution interest to restore money sought by the Office of the Inspector General from Intervenor. Such damages would put the Intervenors in as good a position as it would have been in if the contract had been properly fulfilled. In addition, Intervenor seeks liquidated damages as set out in the Xerox-State of Texas contract. Intervenor has engaged legal

counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor has incurred benefit of the bargain damages, out-of-pocket damages, lost profits, lost future profits, loss of credit, and loss of goodwill. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

### Breach of Contract (Promissory Estoppel)

46. Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. In the alternative, Xerox's actions constitute promissory estoppel.

47. Xerox's prior authorizations constitute promises to Intervenor in numerous ways. Because prior authorization was a prerequisite to furnishing services, and because Xerox was the entity charged with discharging prior authorization duties, Intervenor reasonably, substantially, and foreseeably relied on Xerox's promises.

48. Intervenor suffered and continues to suffer significant damage. Intervenor suffered reliance damages by investing time, labor, equipment, and orthodontic appliances in each Medicaid patient that Xerox approved. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor has been required to do Xerox's job after the fact—namely, demonstrate that the services were medically necessary and properly reimbursable under Texas Medicaid law. Intervenor has incurred benefit of the bargain damages, out-of-pocket damages, lost profits, lost future profits, loss of credit, and loss of goodwill. All of these damages were directly and/or proximately caused by Xerox's promises. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

### Negligent Hiring/Negligent Supervision

49. Intervenor re-alleges and incorporates the above facts and allegations as if fully set out

herein. Xerox's actions constitute negligent hiring and/or negligent supervision. Xerox was required to render medical diagnoses. To that end, Xerox was required by law to employ a licensed dentist to render a diagnosis regarding medical necessity. Xerox was also required by law to properly supervise its employees to make sure diagnoses were made only by licensed dentists.

50. Xerox knew or should have known that decisions regarding medical necessity can only be rendered by licensed personnel. Texas Occupations Code section 251.003 defines the practice of dentistry to include a diagnosis of the human mouth and/or teeth; section 256.001 states that a person may not practice dentistry without a license; section 264.151 makes it a third-degree felony to practice dentistry without a license.

51. Xerox's actions proximately caused Intervenor's injury. Intervenor's injuries were caused-in-fact by Xerox's actions, and they were foreseeable. Because Xerox's prior authorization was a necessary prerequisite to providing services, Intervenor relied entirely on Xerox's determinations regarding medical necessity; thus, Xerox's actions were the direct factual cause of Intervenor's injuries. Xerox's actions were foreseeable in that any person of ordinary intelligence should have anticipated that paying Intervenor for services that have not properly been determined to be medically necessity would precipitate a demand for repayment, and/or would require Intervenor to independently do Xerox's job after the fact by proving that payment was proper because those services were medically necessary and were reimbursable under Texas Medicaid law.

52. Intervenor suffered and continues to suffer significant damage. Intervenor suffered reliance damages by investing the cost of services for each Medicaid patient that Xerox approved. Intervenor has engaged legal counsel to defend itself from the State's charges, and

those legal expenses continue today. Intervenor suffered and continues to suffer significant damage to its reputation, business, referral base, earnings and earning power. Intervenor has suffered inconvenience and loss of enjoyment of life in that he has had to dedicate significant mental and personal capital to doing Xerox's job. Intervenor has suffered exemplary damages because Xerox's conduct was grossly negligent, outrageous and malicious, and such conduct should be penalized so that it is deterred in the future. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

### Negligence

53.    Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's actions constitute negligence and gross negligence. Xerox was required to render medical diagnoses. To that end, Xerox had a duty to employ a licensed dentist to render a diagnosis supporting or denying medical necessity. Xerox had a duty to assure that the personnel had appropriate education, training and experience to render such a finding. Xerox had a duty to review the supporting prior authorization documentation (such as x-rays and photos) to determine whether the requested services were medically necessary.

54.    Xerox's actions breached the standard of care because Xerox: failed to provide prior authorization staff that were properly licensed, qualified and experienced dental professionals; violated the law, specifically the Dental Practice Act, by permitting non-dentists to make determinations of medical necessity, and; issued medical opinions (prior authorizations) without conducting a reasonable and prudent examination of evidence.

55.    Xerox's actions proximately caused Intervenor's injury. Intervenor's injuries were caused-in-fact by Xerox's actions, and they were foreseeable. Because Xerox's prior authorization was a necessary prerequisite to providing services, Intervenor relied entirely on

Xerox's determinations regarding medical necessity; thus, Xerox's actions were the direct factual cause of Intervenor's injuries. Xerox's actions were foreseeable in that any person of ordinary intelligence should have anticipated that paying Intervenor for services that have not properly been determined to be medically necessity would precipitate a demand for repayment, and/or would require Intervenor to independently do Xerox's job after the fact.

56.     Intervenor suffered and continues to suffer significant damage to its reputation, business, referral base, earnings and earning power. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Irma Cantu-Thompson has suffered inconvenience and loss of enjoyment of life in that she has had to dedicate significant mental and personal capital to doing Xerox's job. Intervenor has suffered exemplary damages because Xerox's conduct is grossly negligent, outrageous and malicious, and such conduct should be penalized so that it is deterred in the future. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

## Negligent Misrepresentation

57.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's actions constitute negligent misrepresentation. Xerox's actions constitute misrepresentations to Intervenor in numerous ways. Because, *inter alia*, prior authorization approval was a prerequisite to furnishing services, these representations guided and controlled Intervenor's responses. Intervenor justifiably relied on these representations. Further, Xerox represented that its prior authorization approvals were dispositive of medical necessity; Intervenor expected that, once approved, no further inquiry into the medical necessity of the services would be required. Further, Xerox represented that its subsequent payments to Intervenor (after the services had actually been delivered) were made because services had been,

in fact, properly approved as medically necessary.

58. Xerox did not exercise reasonable care or competence in making its determinations and representations. Xerox knew or should have known that its representations were false.

59. Because prior authorization was a prerequisite to furnishing services, and because Xerox was the entity charged with discharging prior authorization duties, Intervenor reasonably, substantially, foreseeably, and justifiably relied on Xerox's representations.

60. Intervenor suffered and continues to suffer significant damage. Intervenor suffered reliance damages by investing time, labor, equipment, and orthodontic appliances in each Medicaid patient that Xerox approved. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor has been required to do Xerox's job after the fact. Intervenor has incurred benefit of the bargain damages, out-of-pocket damages, lost profits, loss of credit, and loss of goodwill. All of these damages were directly and/or proximately cause by Xerox's negligent misrepresentations. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

### Gross Negligence / Misapplication of Fiduciary Property

61. Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Plaintiffs plead Xerox committed gross negligence and/or the misapplication of fiduciary property which would entitle Intervenors to unlimited punitive damages.

### B. Intervenors' Claims Against The State of Texas

### Waiver of Sovereign Immunity

62. Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. For a number of reasons, the State has waived sovereign immunity for claims by Intervenor, including the facts that the State brought, threatened and/or has taken civil and/or

administrative action against Intervenors, and because the State has filed suit against Xerox.

## Conspiracy/Joint Enterprise

63.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein.  In the alternative, former Deputy Inspector General Jack Stick has stated publicly that acts and omissions of Xerox were so egregious as to be outside the course of scope of Xerox's agency relationship with the State. Assuming same to be true, then the State conspired with Xerox to breach the contract or allow the breach to continue, conspired to withhold funds from Intervenor but not Xerox, and conspired to falsely accuse Intervenor of fraud/crime.

64.     The State conspired with Xerox to allow Xerox to violate its various contractual duties. The State permitted Xerox to process as many prior authorizations as possible without the required clinical dental review and without using medically knowledgeable personnel. The State conspired with Xerox to allow Xerox to violate State and Federal law. The State and Xerox created a scheme to rubber stamp and/or allow no legitimate review of prior authorizations submitted by the dentists. The conspiracy was committed with the intent to shift blame from the State and its agent, improperly blame the Intervenors, and enrich the State and Xerox. By recouping money from providers that were not actually to blame, the State and Xerox hoped to limit their own liability in the event of a Federal clawback action, and/or respond to unflattering news reports of Texas' payments for Medicaid braces. This agreement and ensuing acts of the party to blame the dentist providers for their own improper acts and omissions is a proximate cause of the injury to Intervenors.

## Not Liable for Illegal Acts of Third Party

65.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein.  As alleged by the State in Section VIII paragraph 46 of the State's petition, Xerox has

committed or is about to commit unlawful acts. The illegal acts of Xerox in failing to provide proper prior authorization review in rubber stamping the doctors prior authorization requests is not the fault of the doctors. The doctors are not responsible for or liable to the State for the illegal acts of a third party for which the doctors had no control; the State should not withhold money from the Intervenors because of the illegal acts of Xerox complained about by the State.

## Breach of Contract

66.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Intervenors are a direct or third party beneficiary of the contract with Xerox and the State of Texas. The State of Texas has breached terms of the contract by failing to supervise Xerox and/or reviewing the work product of Xerox. This breach by State, which allowed non-performance by Xerox, has created the pretext by which the State affirmatively sued Intervenors for repayment. To the extent that the State has withheld money and/or made claims for damages against Intervenors based on the contracts in question, the State has waived immunity and is liable up to those amounts plead.

## Conversion

67.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. State and Federal law required Intervenor to request prior authorization for orthodontic services. Those prior authorization requests were approved by Xerox, which required Intervenors to provide the services. The State has unilaterally made a decision to that, based on the acts and omissions of Xerox, the Intervenor should not have been paid; the State then placed Intervenor on a payment hold. To the extent that Intervenor has provided services for which Intervenor should be paid, and money which has been earmarked by the State for that payment but withheld, the State has converted the funds. In addition, the States' acts/omissions are a violation of the

Texas Constitution Section 9 in that the acts/omissions constitute a seizure of money held under the pretext of a payment hold.

## VI. Damages

68.     Intervenors have suffered and are entitled to recover damages including, but not limited to loss of use of funds sequestered by the State, actual damages, damage to reputation, damage to business, damage to earnings and earning power, inconvenience, loss of enjoyment of life, fees and expenses, interest, punitive/exemplary damages, and attorney fees.

## VII. Conclusion

69.     Xerox's actions have harmed Intervenor because Xerox committed fraud, negligent hiring, negligence, and gross negligence. Xerox's actions have subjected Intervenor to unnecessary civil and administrative legal action, and that, in turn has caused additional injury. Xerox's actions have required Intervenor to perform Xerox's job after-the-fact, by proving to the State that the orthodontic services rendered were medically necessary and appropriate for reimbursement. The State's actions have harmed Intervenor because the state's conspiracy to improperly blame the dentists has resulted in meritless legal claims against the Intervenors and conversion of the Intervenor's property.

## VIII. Jury Demand

70.     Intervenors respectfully request a trial by jury.

## IX. Request for Disclosure

71.     Under Texas Rule of Civil Procedure 194, Intervenor requests that Plaintiff the State disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## X. Prayer

72.     Wherefore, premises considered, Intervenors Irma Cantu-Thompson, DDS, PC and Irma Cantu-Thompson pray that upon final hearing of the cause, judgment be entered jointly and severally against the Plaintiff the State of Texas and Defendant Xerox State Healthcare, LLC for damages, together with pre-judgment and post judgment interest at the legal rate, costs of court, and other such relief to which the Intervenors may be entitled.

Respectfully submitted,

Jason Ray
Texas Bar No. 24000511
**RIGGS, ALESHIRE & RAY, P.C.**
700 Lavaca, Suite 920
Austin, Texas 78701
(512) 457-9806 (Telephone)
(512) 457-9866 (Fax)
jray@r-alaw.com


     /s/ Hart Green w/ permission by J Ray
E. Hart Green
Texas Bar No. 08349290
Mitchell A. Toups
Texas Bar No. 20151600
**WELLER, GREEN, TOUPS & TERRELL, L.L.P.**
Post Office Box 350
Beaumont, Texas 77704-0350
(409) 838-0101 (Telephone)
(409) 832-8577 (Fax)
hartgr@wgttlaw.com
matoups@wgttlaw.com
**ATTORNEYS FOR INTERVENORS
IRMA CANTU-THOMPSON, DDS, PC AND
IRMA CANTU-THOMPSON**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plea in Intervention was served via e-mail and certified mail, return receipt requested on this 15th day of May, 2014 on the following:

Eric J.R. Nichols
Beck Redden
515 Congress Avenue, Suite 1750
Austin, Texas, 78701
ENICHOLS@beckredden.com
**Attorney for Xerox Defendants**

Raymond Winter
Chief, Civil Medicaid Fraud Division
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
raymond.winter@texasattorneygeneral.gov
**Attorney for the Plaintiff State of Texas**

Jason Ray

|                                                        |   |                              |
|--------------------------------------------------------|---|------------------------------|
| MAN & CFN ORTHO, PLLC, NAVARRO                         | § | IN THE DISTRICT COURT        |
| ORTHODONTIX OF IRVING, PC, NAVARRO                     | § |                              |
| ORTHODONTIX OF FT. WORTH, PLLC,                        | § |                              |
| NAVARRO ORTHODONTIX OF MCALLEN,                        | § |                              |
| PLLC, NAVARRO ORTHODONTIX OF                           | § |                              |
| EDINBURG, PLLC, NAVARRO                                | § |                              |
| ORTHODONTIX, PC, AND DR. CARLOS F.                     | § |                              |
| NAVARRO                                               | § |                              |
| INTERVENORS,                                          | § |                              |
|                                                        | § |                              |
| VS.                                                    | § |                              |
|                                                        | § |                              |
| THE STATE OF TEXAS,                                   | § |                              |
| PLAINTIFF,                                            | § |                              |
|                                                        | § | 53rd JUDICIAL DISTRICT       |
| VS.                                                    | § |                              |
|                                                        | § |                              |
| XEROX CORPORATION; XEROX                               | § |                              |
| STATE HEALTHCARE, LLC; ACS                             | § |                              |
| STATE HEALTHCARE, LLC, A XEROX                         | § |                              |
| CORPORATION                                            | § |                              |
| DEFENDANTS.                                            | § | TRAVIS COUNTY, TEXAS         |

## PLEA IN INTERVENTION

### TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, MAN & CFN Ortho, PLLC, Navarro Orthodontix of Irving, PC, Navarro Orthodontix of Ft. Worth, PLLC, Navarro Orthodontix of McAllen, PLLC, Navarro Orthdontix of Edinburg, PLLC, Navarro Orthodontix, PC and Dr. Carlos F. Navarro, hereinafter Intervenors, and file this Plea in Intervention, and in support hereof, would respectfully show the Court the following:

### I. Parties and Service

1. Plaintiff, State of Texas, has appeared in this action and may be served with a notice of this Plea by sending a copy to its attorney, the Attorney General of Texas, Greg Abbott, at P. O. Box 12548, Austin, Texas 78711-2548.

2. Defendant Xerox Corporation is a corporation organized under the laws of New York has agreed to accept service with process upon its Attorney in this suit. Defendant Xerox State Health Care, LLC, f/k/a ACS State Healthcare, LLC (misnamed by the State of Texas as ACS State Healthcare, LLC, a Xerox Corporation is a wholly-owned subsidiary of Xerox Corporation organized under the laws of the State of Delaware with Texas offices at 2828 N. Haskell Ave., Dallas, Texas 75204, and has agreed to accept service with process upon its Attorney in this suit. Defendant Xerox Corporation acquired Defendant ACS in 2010. On information and belief, ACS State Healthcare, LLC, changed its name to Xerox State Healthcare, LLC, on April 1, 2012. Defendants are referred to hereinafter as "Xerox Defendants."

3. MAN & CFN Ortho, PLLC, Navarro Orthodontix of Irving, PC, Navarro Orthodontix of Ft. Worth, PLLC, Navarro Orthodontix of McAllen, PLLC, Navarro Orthdontix of Edinburg, PLLC, Navarro Orthodontix, PC and Dr. Carlos F. Navarro, (hereinafter Navarro) are approved Medicaid providers, and can be served through the undersigned counsel.

4. Dr. Carlos F. Navarro[1] is a licensed Texas dentist, approved Medicaid provider, and the owner of Navarro. Dr Navarro can be served through his undersigned counsel.

## II. Jurisdiction and Venue

5. This Court has subject-matter jurisdiction in that the amounts sought by Intervenors from all parties (both Plaintiff and Defendants) are in excess of the minimal jurisdiction limits of this court. Intervenors affirmatively plead that this suit is not governed by the expedited-actions process in TEXAS RULE OF CIVIL PROCEDURE 169 because intervenors seek monetary relief over $100,000.

6. This Court has jurisdiction over all parties in this petition because:

    a) The State has waived sovereign immunity and is subject to Intervenors' claims;

---

[1] For the sake of simplicity, the Intervenors will be collectively referred to as "Navarro" unless expressly noted.

b) This Court has jurisdiction over Xerox Defendants because each Defendant does business in the State of Texas and committed the unlawful acts alleged in this petition in whole or part in Texas.

7.     Venue is proper in Travis County under TRCP §15.020 because this suit involves a "major transaction"; Venue is permissive under TRCP §15.035(a) because Intervenor asserts claims for breach of contract. Venue is proper pursuant to TRCP §15.02 because all or a substantial part of the events or omissions giving rise to the claim occurred in Travis County. Many of the unlawful acts committed by the State and Xerox Defendants were committed in Travis County, including the making of false statements and misrepresentations of material fact.

### III. Intervenors' Interest in the Suit

8.     Intervenors MAN & CFN Ortho, PLLC, Navarro Orthodontix of Irving, PC, Navarro Orthodontix of Ft. Worth, PLLC, Navarro Orthodontix of McAllen, PLLC, Navarro Orthdontix of Edinburg, PLLC, Navarro Orthodontix, PC and Dr. Carlos F. Navarro have a judicial interest in the matters and controversy in this litigation. The relationship between Intervenors, the State as the Plaintiff and the Xerox Defendants is a tripartite arrangement necessitating that, in the interest of judicial economy and justice, all claims be bound and subsumed into one cause of action. Upon information and belief, Intervenors were initially sued by the State in a *qui tam* action wherein the State alleged that Intervenors defrauded the State. The State has elected to pursue its remedies against the Intervenors in an administrative hearing. Now, the State has sued Xerox in State Court on the same facts, alleging that Xerox has committed fraud against the State. Intervenors have claims against both the State and Xerox. It is assumed that Xerox will have claims against the State, and perhaps allege claims against the Intervenors. All of the different parties' claims are inextricably intertwined, as they relate to Intervenors' submission of

Plea in Intervention
Page 3 of 26

prior authorization requests to Xerox, the handling of those claims by the Xerox Defendants, the State's handling and oversight of its agent Xerox in Xerox's performance of its contractual and legal duties, and State's subsequent legal action against the Intervenors for services approved by Xerox.

### IV. Facts

<u>What is Prior Authorization?</u>

9.     Texas Medicaid requires that orthodontic services be independently and objectively scrutinized before the State consents to treatment and payment. Prior authorization is the mechanism the State uses to determine the medical necessity of non-emergency orthodontic items/services prior to delivery of those items/services. Pursuant to Texas Health and Human Services Commission (hereinafter "HHSC") rules, Texas Medicaid greatly restricts when it will pay for orthodontic services:

> Orthodontic services for cosmetic reasons only are not a covered Medicaid service. **Orthodontic services must be prior authorized** and are limited to treatment of severe handicapping malocclusion and other related conditions as described and measured by the procedures and standards published in the [TMPPM[2]].

25 TEX. ADMIN. CODE §33.71 (emphasis added). Prior authorization is a statement of assurance to the orthodontic provider that, absent an intervening disqualifying factor, the delivery of the requested orthodontic service has been deemed by Xerox to be medically necessary, and therefore approved by the State.

10.     The prior authorization process is straightforward. Texas Medicaid requires that a dental provider send documentation (x-rays, cephalographs, photos, etc.) regarding the patient's orthodontic condition to Xerox for review. In addition, the orthodontic provider submits his

---

[2] "TMPPM" is the Texas Medicaid Provider Procedures Manual, which is issued yearly by the HHSC and provides valuable guidance to Medicaid providers.

professional opinion of the patient on a Handicapping Labio-lingual Deviation index (HLD) score sheet. Xerox knew providers relied entirely on the prior authorization process because approval was a mandatory prerequisite to providing orthodontic services and being paid. Once Xerox issued its prior authorization decision, the decision was not appealable by the provider.

11. The HLD scoring system combines a number of treatable orthodontic conditions into an index. HLD score sheets use a mix of objective and subjective conditions to determine whether a Medicaid patient qualifies for orthodontic services. The fact that the HLD score sheet requires both objective and subjective findings highlights the importance of Xerox performing a thorough prior authorization review.

The History of Orthodontic Prior Authorization.

12. The process for reviewing and approving orthodontic prior authorization requests pre-dates the defendant Xerox's handling of Medicaid claims processing. The National Heritage Insurance Corporation (NHIC) was responsible for reviewing prior authorization requests before Xerox assumed the contract in January 2004. Starting January 1, 2004, Xerox acted as an independent contractor, and was a contracted agent of the State, under the contract with HHSC. Xerox was responsible for reviewing each orthodontic service request, and Xerox was further charged with the responsibility to grant or deny each prior authorization request per the program requirements. The result was that Xerox had the final say in determining the medical necessity of each request for orthodontic services.

13. Prior to assuming the NHIC contract, and for a period of time after assuming the contract from NHIC, Xerox received training from NHIC personnel regarding the proper method for receiving and processing orthodontic prior authorization requests. NHIC personnel explained how and why the review of each prior authorization submission was important, and walked

Xerox through the process. Despite its training from NHIC, Xerox had no intention of following the prior authorization system that had been in place for years, nor did Xerox intend to otherwise meet the prior authorization requirements set out in its contract, the TMPPM and required by state law.

Xerox rejects its contractual responsibilities.

14.     When Xerox took over the contract in 2004, it immediately abandoned the prior authorization review process that had been setup by NHIC.  Xerox never intended to fulfill its orthodontic prior authorization responsibilities to HHSC. From 2004 to 2011, Xerox continually misrepresented that it was acting in compliance with its contractual duties.

15.     It is now known that Xerox failed to adequately staff their prior authorization division with knowledgeable medical professionals. Xerox employed only one licensed dentist from 2004 through 2011, which was far short of the manpower necessary to handle the review of tens of thousands of orthodontic prior authorization requests every year. Xerox could not reasonably have expected to handle such a workload by employing only one dentist.

Xerox potentially commits thousands of violations.

16.     It is believed Xerox allowed "dental specialists"—unlicensed, unqualified individuals— to render prior authorization opinions regarding the medical necessity of requested orthodontic services. The "dental specialist" approvals were not reviewed or ratified by Xerox's licensed dental director or another qualified dental professional. These actions not only violated Xerox's contractual obligations, they may have also violated other Texas law such as the Dental Practice Act.[3]  It is believed these unlicensed Xerox "specialists" rendered tens of thousands of prior

---

[3] Texas Occupations Code §251.003 prevents unlicensed individuals from diagnosing conditions of the human teeth and mouth. Section 256.001 states that a person may not practice dentistry without a license. Thus, state law requires that opinions regarding medical necessity of orthodontic treatment must be made by licensed dentists. Section 264.151 prescribes penalties for certain violations of the Dental Practice Act.

authorization approvals/medical opinions in violation of Texas law.

17. Xerox was paid by the state for each prior authorization decision that was made. It is believed that Xerox employed unlicensed "specialists," rather than licensed Texas dentists, as a profit generating measure.

18. From January 2005 through February 2012, Intervenor submitted prior authorization requests, as required, to Xerox for a determination of medical necessity. Unbeknownst to Intervenor, Xerox's dental specialists—not the dental director—approved almost all of Intervenor's requests. Xerox's prior authorization approvals were promises that:

a) the requested orthodontic services were medically necessary, and/or

b) the approval had been issued by a licensed dentist, and/or

c) the approval was an actual and legitimate dental diagnosis, and/or

d) the requested orthodontic services were allowable under Texas law and as permitted by Medicaid policy, the TMPPM, and HHSC rules, and/or

e) a proper, thorough and legal review had been made, and/or

f) future orthodontic services would be properly reimburseable to Intervenors, absent some intervening disqualification (such as the patient's ineligibility).

19. Because Xerox was charged with determining medical necessity, and because prior authorization approval was a mandatory prerequisite to furnishing services, the promises were material. Intervenors expected performance of these promises. Intervenors relied on Xerox. Further, Xerox promised that its subsequent payments to Intervenors (after the services had actually been delivered) were made because the services had been, in fact, properly approved as medically necessary. Each prior authorization approval represents a separate violation of the law if Xerox's approval was issued illegally and/or in violation of its contractual obligations.

<u>Xerox actively concealed its potentially illegal activity.</u>

20.     Xerox withheld the truth regarding its prior authorization program. In an attempt to publicly appear consistent with NHIC's prior authorization process, Xerox continued to require that dental providers (such as Intervenor) submit all supporting documentation for each HLD score sheet. It is now believed that, incredibly, Xerox did nothing with that documentation, other than assure that it had been submitted by the provider. It is believed that Xerox's specialists were instructed to forward to its dental director only those requests that had scored below the threshold for orthodontic services (i.e. below 26 points on the HLD score sheet), or had some provider justification attached. As a result, only 10% of the orthodontic prior authorization requests were actually forwarded to Xerox's one licensed dentist.   Xerox's actions were calculated to make Xerox appear compliant with its contract and HHSC policies, while Xerox knew that its actions were entirely inconsistent with the letter and spirit of its obligations. Effectively, then, Xerox's actions not only damaged the Medicaid program directly by approving services without determining their medical necessity, but Xerox's deception also exacerbated the problem by failing to give providers guidance regarding the proper standard for medical necessity, thus causing these providers substantial damages.

21.     For the past ten years, Xerox has continued to publicly represent to the world that it was fulfilling its contractual and legal responsibilities.  Based on Xerox's representations that it was fulfilling its duties to the State, Xerox had its contract with HHSC repeatedly renewed from 2004 through the present. Each year that Xerox had its contract renewed, it represented that it would fulfill its contractual obligations and abide by Texas law requiring that decisions about medical necessity be rendered only by licensed dentists. Xerox made those representations knowing that it had not done so in the past, and had no intention of changing its procedures to do so in the

future.

The *Frew* decision magnifies Xerox's acts.

22.     In September 2007, after fifteen years of litigation on the subject, Texas was ordered to implement a corrective action plan that increased the Medicaid reimbursement rates to all dental providers. That plan was required pursuant to the *Frew* case[4], which was a 1993 class-action lawsuit against the HHSC alleging that Texas' Medicaid reimbursement rates were so low that they prevented indigent children from receiving timely, comprehensive health care.

23.     In response to *Frew 's* corrective action plan, the 2007 Texas Legislature allocated $707 million ($1.8 billion in state and federal funds combined) to increase medical and dental reimbursement rates. The increase in dental reimbursement rates was intended to entice dentists to become Medicaid providers. It worked. The state raised payment rates for dental services, and, as a result, the number of dentists participating in Medicaid increased from 45.4% in 2007 to 63.4% in 2010. As expected indeed, as intended spending on Texas's dental services increased dramatically.

24.     Although the number of prior approval requests increased by 240% between 2007 and 2010, Xerox continued to employ only one dentist. That dentist was neither tasked with nor responsible for supervising the clerical specialists that were issuing the approvals.

25.     By 2010, orthodontic spending under Texas' Medicaid program had skyrocketed. Xerox was the sole entity responsible for overseeing this increase, because it was the sole gatekeeper for the approval and payment of orthodontic services. Although the Texas Legislature had

---

[4] *Frew v. Gilbert*, 109 F. Supp. 2d 579 (E.D. Tex. 2000) *vacated sub nom. Frazar v. Gilbert*, 300 F.3d 530 (5th Cir. 2002) *rev'd sub nom. Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 124 S. Ct. 899, 157 L. Ed. 2d 855 (2004) and *aff'd in part, appeal dismissed in part sub nom. Frazar v. Hawkins*, 376 F.3d 444 (5th Cir. 2004); *Frew v. Hawkins*, 401 F. Supp. 2d 619 (E.D. Tex. 2005) *aff'd sub nom. Frazar v. Ladd*, 457 F.3d 432 (5th Cir. 2006); *Hawkins v. Frew*, 549 U.S. 1118, 127 S. Ct. 1039, 166 L. Ed. 2d 714 (2007).

increased funding to attract dentists into the Medicaid program, all of the budgeted funds were required to be spent only on medically necessary services.

The Office of Inspector General seeks recovery from Medicaid providers.

26.     In early 2011, a series of news stories began highlighting the large amount of money being spent on orthodontics in Texas. In July 2011, the Federal government notified Texas of its intent to audit whether Texas' prior authorization process was ensuring that only medically necessary orthodontic cases were being approved and paid. With the prospect of a federal clawback action looming against Texas because of Xerox's prior authorization failures, the Texas Office of Inspector General (hereinafter "State") took a drastic step. Beginning in 2011, the State generated a list of the top Medicaid orthodontic billers and placed them on "payment hold." Intervenor was one of those providers.

27.     Given Intervenors' proximity to some of the state's poorest children, and the mandates of the *Frew* decision, Intervenor served a large Medicaid patient population. Because it served a large Medicaid population, it submitted a large number of prior authorization requests to Xerox from 2004 through 2011.

28.     Intervenors did not know that Xerox was failing to perform a true and accurate review for medical necessity. Intervenors relied on Xerox's prior authorization approvals to confirm that dentists' analysis was proper and consistent with Medicaid standards and requirements.

29.     Again unbeknownst to Intervenors, State audits in 2008 and 2012 concluded that most, if not almost all, of the prior authorization requests for patients with HLD scores of 26 or greater (indicating medical necessity) had not been actually "evaluated" at all by Xerox. These State audits made the Federal government's pending audit especially dangerous to Texas, because the 2008 and 2012 audits were admissions that Xerox had been approving and paying claims that

may not have met the federal standards for prior authorization. Thus the State, through the Attorney General, concluded that a true finding of medical necessity had in reality not occurred. The Attorney General claimed that billing for services that are not necessary is fraud, despite Xerox's prior authorization approvals.

30.     It is now believed that rather than prosecute Xerox for its failure to properly evaluate dentists' prior authorization requests, the State and the Texas Attorney General protected Xerox. This protection included the State failing to allow TMHP to hire additional medically licensed staff, and in 2008-2009 telling TMHP to continue its prior authorization practices. Although the Attorney General took immediate action against the providers, the Attorney General refused to hold Xerox accountable for its orthodontic "approvals," its repeated contractual failures, or its violation of State law. Instead, the Attorney General made fraud allegations against each of the top 25 dental providers, including Intervenor, which has caused more injury and damages to Intervenors. Stated differently. Xerox issued its approvals through a process that gutted the State's belief in the accuracy of Xerox's decision, and the Texas Attorney General punished the providers instead of Xerox.

31.     Because the acts/omissions of Xerox so undermined the process, the State eventuallyinstituted a "payment hold" against Intervenor. A payment hold temporarily freezes future Medicaid payments to a provider, despite the provider's ongoing participation in the Medicaid program. The payment hold against Intervenor was issued pursuant to what the State called a "credible allegation of fraud" regarding Intervenor's orthodontic prior authorization requests. The State placed a 100% payment hold against Intervenor's orthodontic billings.

32.     At the time the Attorney General began prosecuting Intervenor and similarly situated Medicaid providers, it knew Xerox, not Intervenor, had the sole authority and responsibility to

authorize orthodontic services and payments. The Attorney General knew that the State's audits of Xerox in 2008 and 2012 had concluded that Xerox was violating its contract with the State, violating its own State-approved policies and procedures, and violating State law. Nevertheless, the Attorney General continued to only prosecute dental providers like the Intervenor; the Attorney General refused to hold Xerox responsible. In fact, in one shameless and brazen demonstration of State's unwavering protection of Xerox, the Deputy Director of Texas' Office of the Inspector General testified in a hearing that Xerox's acts and omissions were so egregious they were outside the course and scope of Xerox's agency with State.[5] Upon information and belief, the State and the Attorney General protected Xerox for over 6 years fearing that revealing the State's culpability would subject the State to a federal clawback for hundreds of millions of dollars. Instead, the State and the Attorney General pointed at the dental providers.

33.     Ultimately, the evidence of Xerox's failures, and the State's refusal to correct Xerox for over 6 years, became too much to hide. Three months after some providers filed suit against Xerox, and following a series of news stories questioning why Xerox had not suffered for its failures, the Attorney General reversed course. On May 9, 2014, the State, through the Texas Attorney General, filed this lawsuit against Xerox for fraud, basically mirroring the suit filed approximately 100 days earlier by similarly situated providers. The State's claims in this fraud lawsuit include admissions that the State knew as early as 2006 that Xerox's actions were improper.

34.     As a result of the payment hold, Intervenor was required to make significant financial concessions and changes to its business. Intervenor also engaged legal counsel to defend itself

---

[5] Incredibly, that testimony came in an administrative proceeding in which the State was seeking $8 million from a dental provider for following Xerox's instructions to provide braces to the provider's patients. The idea that the State could not hold Xerox responsible for its contractual obligations because Xerox had done such a poor job that it was acting outside of its contract is a novel and imaginative reason not to prosecute Xerox.

from the State's claims, at a significant expense that continues today.

35.    The State's allegations against Intervenor are rooted in two assumptions. First, the State assumes Intervenor's prior authorization requests were not properly vetted by Xerox; that is, Xerox approved Intervenor's requests without knowing whether approval was actually proper. Because Xerox is not a party to Intervenor's administrative case, Intervenor is prevented from determining whether Xerox did, in fact, perform a proper review of Intervenor's prior authorization requests. By intervening in this lawsuit, Intervenor seeks to address that question, and finally determine whether Xerox reviewed Intervenor's requests as required by its contract and the law.

36.    Regarding the State's second assumption, the State alleges some of Intervenor's requests were approved when, in fact, they should have been denied. Intervenor denied that assertion in the administrative case, and Intervenor continues to deny that claim here. All services provided to Intervenor's patients were actually medically necessary, regardless of what Xerox decided and in any event under Medicaid guidelines once the authorization was approved, Intervenor was required to provide the services.

37.    The State continues to aggressively fight any allegation or affirmative defense that could result in Xerox being held accountable for its part in these HLD scoring cases, despite the State's contentions in the District Court case to the contrary. Damages continue to accrue.

### V. Causes of Action

**A. Intervenors' Claims Against Xerox**

**Common Law Fraud (Fraudulent Misrepresentation and Fraudulent Inducement)**

38.    Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's prior authorization approvals were false representations made to Intervenor. It is

believed Xerox knowingly issued these prior authorizations to Intervenor because Xerox knew that it was approving requests without a proper medical review, and/or because it approved the prior authorization requests without any knowledge of their truth. It is believed Xerox intended for Intervenor to rely on the approvals as a prerequisite for providing the requested services. Approval was material because it was a mandatory prerequisite for payment. Intervenor actually and justifiably relied on Xerox's fraudulent approvals.

39.     Xerox's approvals induced Intervenor to continue to grade subsequent HLD requests in the same or similar manner, and led Intervenor to believe that their requests were consistent with Medicaid standards and requirements.

40.     Xerox's fraudulent approvals caused injury to Intervenor. As a result of Xerox's actions, Intervenor submitted requests for payment and Xerox actually paid for those services, Intervenor was placed on payment hold, Intervenor is forced to defend itself in an administrative payment hold hearing, and Intervenor is facing administrative claims by HHSC for repayment (including claims for treble damages and attorney fees). Intervenor's reputation and business have suffered severe injury. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

## Breach of the Xerox-State of Texas Contract

41.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. In the alternative, Xerox's actions constitute a breach of Xerox's contract with the State for the benefit of Intervenor. Xerox's contract with the state required that it conduct a proper, thorough and legal review of prior authorization requests for the purpose of determining medical necessity. To that end, Xerox should have employed a licensed dentist.

42.     Xerox was an agent of the State of Texas engaged specifically for the purpose of

determining medical necessity. The third party beneficiaries of that Xerox-State of Texas contract were Medicaid patients and Intervenor. The patients were entitled to receive orthodontic services that were medically necessary. Intervenor was responsible for actually delivering the orthodontic services that Xerox had deemed medically necessary. Thus, Intervenor was a third party beneficiary that relied on Xerox's approvals.

43.     Xerox breached its contract by, *inter alia*, failing to provide qualified staff; possibly violating Texas law; permitting non-dentists to make determinations of medical necessity; and issuing medical opinions without conducting a reasonable and prudent examination of evidence. The breaches were material, and recurred across many different Medicaid patients and for many years.

44.     Xerox's actions proximately caused Intervenor's injury. Intervenor's injuries were caused-in-fact by Xerox's actions, and they were foreseeable. Because Xerox's prior authorization was a necessary prerequisite to providing services, Intervenor relied entirely on Xerox's determinations regarding medical necessity; thus, Xerox's actions were the direct factual cause of Intervenor's injuries. Xerox's actions were foreseeable in that a person of ordinary intelligence should have anticipated that issuing a decision without actually reviewing or considering the evidence (x-rays, photos, models, etc.) would eviscerate the credibility and reliability of the decision. Once the State assumed that Xerox's approvals were not trustworthy, it was foreseeable that the State would demand repayment, and/or would require Intervenor to independently do Xerox's job after the fact by proving that payment was proper because the services were medically necessary and reimbursable under Texas Medicaid law.

45.     Intervenor suffered and continues to suffer significant damage. Intervenor seeks damages that would have given the Intervenors the benefit of the bargain by putting them in as good a

position as they would have been in if the contract had been performed. Intervenor seeks reliance interest damages to restore the expenditures Intervenor made in reliance on Xerox's contract with the state and the approvals that Xerox made under that contract. Intervenor also seeks damages for its restitution interest to restore money sought by the Office of the Inspector General from Intervenor. Such damages would put the Intervenors in as good a position as it would have been in if the contract had been properly fulfilled. In addition, Intervenor seeks liquidated damages as set out in the Xerox-State of Texas contract. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor has incurred benefit of the bargain damages, out-of-pocket damages, lost profits, lost future profits, loss of credit, and loss of goodwill. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

## Breach of Contract (Promissory Estoppel)

46.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. In the alternative, Xerox's actions constitute promissory estoppel.

47.     Xerox's prior authorizations constitute promises to Intervenor in numerous ways. Because prior authorization was a prerequisite to furnishing services, and because Xerox was the entity charged with discharging prior authorization duties, Intervenor reasonably, substantially, and foreseeably relied on Xerox's promises.

48.     Intervenor suffered and continues to suffer significant damage. Intervenor suffered reliance damages by investing time, labor, equipment, and orthodontic appliances in each Medicaid patient that Xerox approved. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor has been required to do Xerox's job after the fact—namely, demonstrate that the services were medically necessary and

properly reimbursable under Texas Medicaid law. Intervenor has incurred benefit of the bargain damages, out-of-pocket damages, lost profits, lost future profits, loss of credit, and loss of goodwill. All of these damages were directly and/or proximately caused by Xerox's promises. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

## Negligent Hiring/Negligent Supervision

49.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's actions constitute negligent hiring and/or negligent supervision. Xerox was required to render medical diagnoses. To that end, Xerox was required by law to employ a licensed dentist to render a diagnosis regarding medical necessity. Xerox was also required by law to properly supervise its employees to make sure diagnoses were made only by licensed dentists.

50.     Xerox knew or should have known that decisions regarding medical necessity can only be rendered by licensed personnel. Texas Occupations Code section 251.003 defines the practice of dentistry to include a diagnosis of the human mouth and/or teeth; section 256.001 states that a person may not practice dentistry without a license; section 264.151 makes it a third-degree felony to practice dentistry without a license.

51.     Xerox's actions proximately caused Intervenor's injury. Intervenor's injuries were caused-in-fact by Xerox's actions, and they were foreseeable. Because Xerox's prior authorization was a necessary prerequisite to providing services, Intervenor relied entirely on Xerox's determinations regarding medical necessity; thus, Xerox's actions were the direct factual cause of Intervenor's injuries. Xerox's actions were foreseeable in that any person of ordinary intelligence should have anticipated that paying Intervenor for services that have not properly

been determined to be medically necessity would precipitate a demand for repayment, and/or would require Intervenor to independently do Xerox's job after the fact by proving that payment was proper because those services were medically necessary and were reimbursable under Texas Medicaid law.

52.     Intervenor suffered and continues to suffer significant damage. Intervenor suffered reliance damages by investing the cost of services for each Medicaid patient that Xerox approved. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor suffered and continues to suffer significant damage to its reputation, business, referral base, earnings and earning power. Intervenor has suffered inconvenience and loss of enjoyment of life in that he has had to dedicate significant mental and personal capital to doing Xerox's job. Intervenor has suffered exemplary damages because Xerox's conduct was grossly negligent, outrageous and malicious, and such conduct should be penalized so that it is deterred in the future. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

### Negligence

53.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's actions constitute negligence and gross negligence. Xerox was required to render medical diagnoses. To that end, Xerox had a duty to employ a licensed dentist to render a diagnosis supporting or denying medical necessity. Xerox had a duty to assure that the personnel had appropriate education, training and experience to render such a finding. Xerox had a duty to review the supporting prior authorization documentation (such as x-rays and photos) to determine whether the requested services were medically necessary.

54.     Xerox's actions breached the standard of care because Xerox: failed to provide prior

authorization staff that were properly licensed, qualified and experienced dental professionals; violated the law, specifically the Dental Practice Act, by permitting non-dentists to make determinations of medical necessity, and; issued medical opinions (prior authorizations) without conducting a reasonable and prudent examination of evidence.

55.     Xerox's actions proximately caused Intervenor's injury. Intervenor's injuries were caused-in-fact by Xerox's actions, and they were foreseeable. Because Xerox's prior authorization was a necessary prerequisite to providing services, Intervenor relied entirely on Xerox's determinations regarding medical necessity; thus, Xerox's actions were the direct factual cause of Intervenor's injuries. Xerox's actions were foreseeable in that any person of ordinary intelligence should have anticipated that paying Intervenor for services that have not properly been determined to be medically necessity would precipitate a demand for repayment, and/or would require Intervenor to independently do Xerox's job after the fact.

56.     Intervenor suffered and continues to suffer significant damage to its reputation, business, referral base, earnings and earning power. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Dr. Navarro has suffered inconvenience and loss of enjoyment of life in that he has had to dedicate significant mental and personal capital to doing Xerox's job. Intervenor has suffered exemplary damages because Xerox's conduct is grossly negligent, outrageous and malicious, and such conduct should be penalized so that it is deterred in the future. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

## Negligent Misrepresentation

57.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's actions constitute negligent misrepresentation. Xerox's actions constitute

misrepresentations to Intervenor in numerous ways. Because, *inter alia*, prior authorization approval was a prerequisite to furnishing services, these representations guided and controlled Intervenor's responses. Intervenor justifiably relied on these representations. Further, Xerox represented that its prior authorization approvals were dispositive of medical necessity; Intervenor expected that, once approved, no further inquiry into the medical necessity of the services would be required. Further, Xerox represented that its subsequent payments to Intervenor (after the services had actually been delivered) were made because services had been, in fact, properly approved as medically necessary.

58.     Xerox did not exercise reasonable care or competence in making its determinations and representations. Xerox knew or should have known that its representations were false.

59.     Because prior authorization was a prerequisite to furnishing services, and because Xerox was the entity charged with discharging prior authorization duties, Intervenor reasonably, substantially, foreseeably, and justifiably relied on Xerox's representations.

60.     Intervenor suffered and continues to suffer significant damage. Intervenor suffered reliance damages by investing time, labor, equipment, and orthodontic appliances in each Medicaid patient that Xerox approved. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor has been required to do Xerox's job after the fact. Intervenor has incurred benefit of the bargain damages, out-of-pocket damages, lost profits, loss of credit, and loss of goodwill. All of these damages were directly and/or proximately cause by Xerox's negligent misrepresentations. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

### Gross Negligence / Misapplication of Fiduciary Property

61.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out

herein. Plaintiffs plead Xerox committed gross negligence and/or the misapplication of fiduciary property which would entitle Intervenors to unlimited punitive damages.

**B. Intervenors' Claims Against The State of Texas**

### Waiver of Sovereign Immunity

62. Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. For a number of reasons, the State has waived sovereign immunity for claims by Intervenor, including the facts that the State brought, threatened and/or has taken civil and/or administrative action against Intervenors, and because the State has filed suit against Xerox.

### Conspiracy/Joint Enterprise

63. Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. In the alternative, former Deputy Inspector General Jack Stick has stated publicly that acts and omissions of Xerox were so egregious as to be outside the course of scope of Xerox's agency relationship with the State. Assuming same to be true, then the State conspired with Xerox to breach the contract or allow the breach to continue, conspired to withhold funds from Intervenor but not Xerox, and conspired to falsely accuse Intervenor of fraud/crime.

64. The State conspired with Xerox to allow Xerox to violate its various contractual duties. The State permitted Xerox to process as many prior authorizations as possible without the required clinical dental review and without using medically knowledgeable personnel. The State conspired with Xerox to allow Xerox to violate State and Federal law. The State and Xerox created a scheme to rubber stamp and/or allow no legitimate review of prior authorizations submitted by the dentists. The conspiracy was committed with the intent to shift blame from the State and its agent, improperly blame the Intervenors, and enrich the State and Xerox. By recouping money from providers that were not actually to blame, the State and Xerox hoped to

limit their own liability in the event of a Federal clawback action, and/or respond to unflattering news reports of Texas' payments for Medicaid braces. This agreement and ensuing acts of the party to blame the dentist providers for their own improper acts and omissions is a proximate cause of the injury to Intervenors.

## Not Liable for Illegal Acts of Third Party

65.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein.  As alleged by the State in Section VIII paragraph 46 of the State's petition, Xerox has committed or is about to commit unlawful acts. The illegal acts of Xerox in failing to provide proper prior authorization review in rubber stamping the doctors prior authorization requests is not the fault of the doctors.  The doctors are not responsible for or liable to the State for the illegal acts of a third party for which the doctors had no control; the State should not withhold money from the Intervenors because of the illegal acts of Xerox complained about by the State.

## Breach of Contract

66.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Intervenors are a direct or third party beneficiary of the contract with Xerox and the State of Texas. The State of Texas has breached terms of the contract by failing to supervise Xerox and/or reviewing the work product of Xerox. This breach by State, which allowed non-performance by Xerox, has created the pretext by which the State affirmatively sued Intervenors for repayment. To the extent that the State has withheld money and/or made claims for damages against Intervenors based on the contracts in question, the State has waived immunity and is liable up to those amounts plead.

## Conversion

67.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out

herein. State and Federal law required Intervenor to request prior authorization for orthodontic services. Those prior authorization requests were approved by Xerox, which required Intervenors to provide the services. The State has unilaterally made a decision to that, based on the acts and omissions of Xerox, the Intervenor should not have been paid; the State then placed Intervenor on a payment hold. To the extent that Intervenor has provided services for which Intervenor should be paid, and money which has been earmarked by the State for that payment but withheld, the State has converted the funds. In addition, the States' acts/omissions are a violation of the Texas Constitution Section 9 in that the acts/omissions constitute a seizure of money held under the pretext of a payment hold.

## VI. Damages

68. Intervenors have suffered and are entitled to recover damages including, but not limited to loss of use of funds sequestered by the State, actual damages, damage to reputation, damage to business, damage to earnings and earning power, inconvenience, loss of enjoyment of life, fees and expenses, interest, punitive/exemplary damages, and attorney fees.

## VII. Conclusion

69. Xerox's actions have harmed Intervenor because Xerox committed fraud, negligent hiring, negligence, and gross negligence. Xerox's actions have subjected Intervenor to unnecessary civil and administrative legal action, and that, in turn has caused additional injury. Xerox's actions have required Intervenor to perform Xerox's job after-the-fact, by proving to the State that the orthodontic services rendered were medically necessary and appropriate for reimbursement. The State's actions have harmed Intervenor because the state's conspiracy to improperly blame the dentists has resulted in meritless legal claims against the Intervenors and conversion of the Intervenor's property.

## VIII. Jury Demand

70.    Intervenors respectfully request a trial by jury.

## IX. Request for Disclosure

71.    Under Texas Rule of Civil Procedure 194, Intervenor requests that Plaintiff the State disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## X. Prayer

72.    Wherefore, premises considered, Intervenors MAN & CFN Ortho, PLLC, Navarro Orthodontix of Irving, PC, Navarro Orthodontix of Ft. Worth, PLLC, Navarro Orthodontix of McAllen, PLLC, Navarro Orthdontix of Edinburg, PLLC, Navarro Orthodontix, PC and Dr. Carlos F. Navarro pray that upon final hearing of the cause, judgment be entered jointly and severally against the Plaintiff the State of Texas and Defendant Xerox State Healthcare, LLC for damages, together with pre-judgment and post judgment interest at the legal rate, costs of court, and other such relief to which the Intervenors may be entitled.

Respectfully submitted,

Jason Ray
Texas Bar No. 24000511
**RIGGS, ALESHIRE & RAY, P.C.**
700 Lavaca, Suite 920
Austin, Texas 78701
(512) 457-9806 (Telephone)
(512) 457-9866 (Fax)
jray@r-alaw.com


/s/ Hart Green w/ permission by J Ray
E. Hart Green
Texas Bar No. 08349290
Mitchell A. Toups
Texas Bar No. 20151600
**WELLER, GREEN, TOUPS & TERRELL, L.L.P.**
Post Office Box 350
Beaumont, Texas 77704-0350
(409) 838-0101 (Telephone)
(409) 832-8577 (Fax)
hartgr@wgttlaw.com
matoups@wgttlaw.com
**ATTORNEYS FOR INTERVENORS MAN & CFO ORTHO, PLLC, NAVARRO ORTHODONTIX OF IRVING, PC, NAVARRO ORTHODONTIX OF FT. WORTH, PLLC, NAVARRO ORTHODONTIX OF EDINBURG, PLLC, NAVARRO ORTHODONTIX, PC, AND DR. CARLOS F. NAVARRO**

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plea in Intervention was served via e-mail and certified mail, return receipt requested on this 15th day of May, 2014 on the following:

Eric J.R. Nichols
Beck Redden
515 Congress Avenue, Suite 1750
Austin, Texas, 78701
ENICHOLS@beckredden.com
**Attorney for Xerox Defendants**

Raymond Winter
Chief, Civil Medicaid Fraud Division
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
raymond.winter@texasattorneygeneral.gov
**Attorney for the Plaintiff State of Texas**

Jason Ray

| | | |
|---|---|---|
| RGV SMILES BY ROCKY L. SALINAS, | § | IN THE DISTRICT COURT |
| DDS, PA, AND DR. ROCKY SALINAS, | § | |
| INTERVENORS, | § | |
| | § | |
| VS. | § | |
| | § | |
| THE STATE OF TEXAS, | § | |
| PLAINTIFF, | § | |
| | § | 53rd JUDICIAL DISTRICT |
| VS. | § | |
| | § | |
| XEROX CORPORATION; XEROX | § | |
| STATE HEALTHCARE, LLC; ACS | § | |
| STATE HEALTHCARE, LLC, A XEROX | § | |
| CORPORATION | § | |
| DEFENDANTS. | § | TRAVIS COUNTY, TEXAS |

## PLEA IN INTERVENTION

### TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, RGV Smiles by Rocky L. Salinas, DDS. PA and Dr. Rocky Salinas, hereinafter Intervenors, and file this Plea in Intervention, and in support hereof, would respectfully show the Court the following:

### I. Parties and Service

1. Plaintiff, State of Texas, has appeared in this action and may be served with a notice of this Plea by sending a copy to its attorney, the Attorney General of Texas, Greg Abbott, at P. O. Box 12548, Austin, Texas 78711-2548.

2. Defendant Xerox Corporation is a corporation organized under the laws of New York has agreed to accept service with process upon its Attorney in this suit. Defendant Xerox State Health Care, LLC, f/k/a ACS State Healthcare, LLC (misnamed by the State of Texas as ACS State Healthcare, LLC, a Xerox Corporation is a wholly-owned subsidiary of Xerox Corporation organized under the laws of the State of Delaware with Texas offices at 2828 N. Haskell Ave.,

Dallas, Texas 75204, and has agreed to accept service with process upon its Attorney in this suit. Defendant Xerox Corporation acquired Defendant ACS in 2010. On information and belief, ACS State Healthcare, LLC, changed its name to Xerox State Healthcare, LLC, on April 1, 2012. Defendants are referred to hereinafter as "Xerox Defendants."

3. RGV Smiles by Rocky L. Salinas, DDS, PA, (hereinafter RGV) is a Texas professional association, and an approved Medicaid provider, with its principal place of business listed as 805 N. Cage, Pharr, Texas 78577. RGV can be served through the undersigned counsel.

4. Dr. Rocky Salinas[1] is a licensed Texas dentist, approved Medicaid provider, and the owner of RGV. Dr Salinas can be served through his undersigned counsel.

## II. Jurisdiction and Venue

5. This Court has subject-matter jurisdiction in that the amounts sought by Intervenors from all parties (both Plaintiff and Defendants) are in excess of the minimal jurisdiction limits of this court. Intervenors affirmatively plead that this suit is not governed by the expedited-actions process in TEXAS RULE OF CIVIL PROCEDURE 169 because intervenors seek monetary relief over $100,000.

6. This Court has jurisdiction over all parties in this petition because:

   a) The State has waived sovereign immunity and is subject to Intervenors' claims;

   b) This Court has jurisdiction over Xerox Defendants because each Defendant does business in the State of Texas and committed the unlawful acts alleged in this petition in whole or part in Texas.

7. Venue is proper in Travis County under TRCP §15.020 because this suit involves a "major transaction"; Venue is permissive under TRCP §15.035(a) because Intervenor asserts claims for breach of contract. Venue is proper pursuant to TRCP §15.02 because all or a

---

[1] For the sake of simplicity, the Intervenors will be collectively referred to as "RGV" unless expressly noted.

substantial part of the events or omissions giving rise to the claim occurred in Travis County. Many of the unlawful acts committed by the State and Xerox Defendants were committed in Travis County, including the making of false statements and misrepresentations of material fact.

### III. Intervenors' Interest in the Suit

8.      Intervenors RGV Smiles and Dr. Rocky Salinas have a judicial interest in the matters and controversy in this litigation. The relationship between Intervenors, the State as the Plaintiff and the Xerox Defendants is a tripartite arrangement necessitating that, in the interest of judicial economy and justice, all claims be bound and subsumed into one cause of action. Upon information and belief, Intervenors were initially sued by the State in a *qui tam* action wherein the State alleged that Intervenors defrauded the State. The State has elected to pursue its remedies against the Intervenors in an administrative hearing. Now, the State has sued Xerox in State Court on the same facts, alleging that Xerox has committed fraud against the State. Intervenors have claims against both the State and Xerox. It is assumed that Xerox will have claims against the State, and perhaps allege claims against the Intervenors. All of the different parties' claims are inextricably intertwined. as they relate to Intervenors' submission of prior authorization requests to Xerox, the handling of those claims by the Xerox Defendants, the State's handling and oversight of its agent Xerox in Xerox's performance of its contractual and legal duties, and State's subsequent legal action against the Intervenors for services approved by Xerox.

### IV. Facts

What is Prior Authorization?

9.      Texas Medicaid requires that orthodontic services be independently and objectively scrutinized before the State consents to treatment and payment. Prior authorization is the

mechanism the State uses to determine the medical necessity of non-emergency orthodontic items/services prior to delivery of those items/services. Pursuant to Texas Health and Human Services Commission (hereinafter "HHSC") rules, Texas Medicaid greatly restricts when it will pay for orthodontic services:

> Orthodontic services for cosmetic reasons only are not a covered Medicaid service. **Orthodontic services must be prior authorized** and are limited to treatment of severe handicapping malocclusion and other related conditions as described and measured by the procedures and standards published in the [TMPPM[2]].

25 TEX. ADMIN. CODE §33.71 (emphasis added). Prior authorization is a statement of assurance to the orthodontic provider that, absent an intervening disqualifying factor, the delivery of the requested orthodontic service has been deemed by Xerox to be medically necessary, and therefore approved by the State.

10.     The prior authorization process is straightforward. Texas Medicaid requires that a dental provider send documentation (x-rays, cephalographs, photos, etc.) regarding the patient's orthodontic condition to Xerox for review. In addition, the orthodontic provider submits his professional opinion of the patient on a Handicapping Labio-lingual Deviation index (HLD) score sheet. Xerox knew providers relied entirely on the prior authorization process because approval was a mandatory prerequisite to providing orthodontic services and being paid. Once Xerox issued its prior authorization decision, the decision was not appealable by the provider.

11.     The HLD scoring system combines a number of treatable orthodontic conditions into an index. HLD score sheets use a mix of objective and subjective conditions to determine whether a Medicaid patient qualifies for orthodontic services. The fact that the HLD score sheet requires both objective and subjective findings highlights the importance of Xerox performing a thorough

---

[2] "TMPPM" is the Texas Medicaid Provider Procedures Manual, which is issued yearly by the HHSC and provides valuable guidance to Medicaid providers.

prior authorization review.

## The History of Orthodontic Prior Authorization.

12.     The process for reviewing and approving orthodontic prior authorization requests pre-dates the defendant Xerox's handling of Medicaid claims processing. The National Heritage Insurance Corporation (NHIC) was responsible for reviewing prior authorization requests before Xerox assumed the contract in January 2004. Starting January 1, 2004, Xerox acted as an independent contractor, and was a contracted agent of the State, under the contract with HHSC. Xerox was responsible for reviewing each orthodontic service request, and Xerox was further charged with the responsibility to grant or deny each prior authorization request per the program requirements. The result was that Xerox had the final say in determining the medical necessity of each request for orthodontic services.

13.     Prior to assuming the NHIC contract, and for a period of time after assuming the contract from NHIC, Xerox received training from NHIC personnel regarding the proper method for receiving and processing orthodontic prior authorization requests. NHIC personnel explained how and why the review of each prior authorization submission was important, and walked Xerox through the process. Despite its training from NHIC, Xerox had no intention of following the prior authorization system that had been in place for years, nor did Xerox intend to otherwise meet the prior authorization requirements set out in its contract, the TMPPM and required by state law.

## Xerox rejects its contractual responsibilities.

14.     When Xerox took over the contract in 2004, it immediately abandoned the prior authorization review process that had been setup by NHIC. Xerox never intended to fulfill its orthodontic prior authorization responsibilities to HHSC. From 2004 to 2011, Xerox continually

misrepresented that it was acting in compliance with its contractual duties.

15. It is now known that Xerox failed to adequately staff their prior authorization division with knowledgeable medical professionals. Xerox employed only one licensed dentist from 2004 through 2011, which was far short of the manpower necessary to handle the review of tens of thousands of orthodontic prior authorization requests every year. Xerox could not reasonably have expected to handle such a workload by employing only one dentist.

Xerox potentially commits thousands of violations.

16. It is believed Xerox allowed "dental specialists"—unlicensed, unqualified individuals—to render prior authorization opinions regarding the medical necessity of requested orthodontic services. The "dental specialist" approvals were not reviewed or ratified by Xerox's licensed dental director or another qualified dental professional. These actions not only violated Xerox's contractual obligations, they may have also violated other Texas law such as the Dental Practice Act.[3] It is believed these unlicensed Xerox "specialists" rendered tens of thousands of prior authorization approvals/medical opinions in violation of Texas law.

17. Xerox was paid by the state for each prior authorization decision that was made. It is believed that Xerox employed unlicensed "specialists," rather than licensed Texas dentists, as a profit generating measure.

18. From January 2005 through February 2012, Intervenor submitted prior authorization requests, as required, to Xerox for a determination of medical necessity. Unbeknownst to Intervenor, Xerox's dental specialists—not the dental director—approved almost all of Intervenor's requests. Xerox's prior authorization approvals were promises that:

---

[3] Texas Occupations Code §251.003 prevents unlicensed individuals from diagnosing conditions of the human teeth and mouth. Section 256.001 states that a person may not practice dentistry without a license. Thus, state law requires that opinions regarding medical necessity of orthodontic treatment must be made by licensed dentists. Section 264.151 prescribes penalties for certain violations of the Dental Practice Act.

Plea in Intervention
Page 6 of 25

a) the requested orthodontic services were medically necessary, and/or

b) the approval had been issued by a licensed dentist, and/or

c) the approval was an actual and legitimate dental diagnosis, and/or

d) the requested orthodontic services were allowable under Texas law and as permitted by Medicaid policy, the TMPPM, and HHSC rules, and/or

e) a proper, thorough and legal review had been made, and/or

f) future orthodontic services would be properly reimburseable to Intervenors, absent some intervening disqualification (such as the patient's ineligibility).

19.     Because Xerox was charged with determining medical necessity, and because prior authorization approval was a mandatory prerequisite to furnishing services, the promises were material. Intervenors expected performance of these promises. Intervenors relied on Xerox. Further, Xerox promised that its subsequent payments to Intervenors (after the services had actually been delivered) were made because the services had been, in fact, properly approved as medically necessary. Each prior authorization approval represents a separate violation of the law **if** Xerox's approval was issued illegally and/or in violation of its contractual obligations.

Xerox actively concealed its potentially illegal activity.

20.     Xerox withheld the truth regarding its prior authorization program. In an attempt to publicly appear consistent with NHIC's prior authorization process, Xerox continued to require that dental providers (such as Intervenor) submit all supporting documentation for each HLD score sheet. It is now believed that, incredibly, Xerox did nothing with that documentation, other than assure that it had been submitted by the provider. It is believed that Xerox's specialists were instructed to forward to its dental director only those requests that had scored below the threshold for orthodontic services (i.e. below 26 points on the HLD score sheet), or had some

provider justification attached. As a result, only 10% of the orthodontic prior authorization requests were actually forwarded to Xerox's one licensed dentist. Xerox's actions were calculated to make Xerox appear compliant with its contract and HHSC policies, while Xerox knew that its actions were entirely inconsistent with the letter and spirit of its obligations. Effectively, then, Xerox's actions not only damaged the Medicaid program directly by approving services without determining their medical necessity, but Xerox's deception also exacerbated the problem by failing to give providers guidance regarding the proper standard for medical necessity, thus causing these providers substantial damages.

21. For the past ten years, Xerox has continued to publicly represent to the world that it was fulfilling its contractual and legal responsibilities. Based on Xerox's representations that it was fulfilling its duties to the State, Xerox had its contract with HHSC repeatedly renewed from 2004 through the present. Each year that Xerox had its contract renewed, it represented that it would fulfill its contractual obligations and abide by Texas law requiring that decisions about medical necessity be rendered only by licensed dentists. Xerox made those representations knowing that it had not done so in the past, and had no intention of changing its procedures to do so in the future.

The *Frew* decision magnifies Xerox's acts.

22. In September 2007, after fifteen years of litigation on the subject, Texas was ordered to implement a corrective action plan that increased the Medicaid reimbursement rates to all dental providers. That plan was required pursuant to the *Frew* case[4], which was a 1993 class-action

---

[4] *Frew v. Gilbert*, 109 F. Supp. 2d 579 (E.D. Tex. 2000) *vacated sub nom. Frazar v. Gilbert*, 300 F.3d 530 (5th Cir. 2002) *rev'd sub nom Frew ex rel Frew v. Hawkins*, 540 U.S. 431, 124 S. Ct. 899, 157 L. Ed. 2d 855 (2004) and *aff'd in part, appeal dismissed in part sub nom. Frazar v. Hawkins*, 376 F.3d 444 (5th Cir. 2004); *Frew v. Hawkins*, 401 F. Supp. 2d 619 (E.D. Tex. 2005) *aff'd sub nom. Frazar v Ladd*, 457 F.3d 432 (5th Cir. 2006); *Hawkins v. Frew*, 549 U.S. 1118, 127 S. Ct. 1039, 166 L. Ed. 2d 714 (2007).

lawsuit against the HHSC alleging that Texas' Medicaid reimbursement rates were so low that they prevented indigent children from receiving timely, comprehensive health care.

23.     In response to *Frew's* corrective action plan, the 2007 Texas Legislature allocated $707 million ($1.8 billion in state and federal funds combined) to increase medical and dental reimbursement rates. The increase in dental reimbursement rates was intended to entice dentists to become Medicaid providers. It worked. The state raised payment rates for dental services, and, as a result, the number of dentists participating in Medicaid increased from 45.4% in 2007 to 63.4% in 2010. As expected indeed, as intended spending on Texas's dental services increased dramatically.

24.     Although the number of prior approval requests increased by 240% between 2007 and 2010, Xerox continued to employ only one dentist. That dentist was neither tasked with nor responsible for supervising the clerical specialists that were issuing the approvals.

25.     By 2010, orthodontic spending under Texas' Medicaid program had skyrocketed. Xerox was the sole entity responsible for overseeing this increase, because it was the sole gatekeeper for the approval and payment of orthodontic services. Although the Texas Legislature had increased funding to attract dentists into the Medicaid program, all of the budgeted funds were required to be spent only on medically necessary services.

The Office of Inspector General seeks recovery from Medicaid providers.

26.     In early 2011, a series of news stories began highlighting the large amount of money being spent on orthodontics in Texas. In July 2011, the Federal government notified Texas of its intent to audit whether Texas' prior authorization process was ensuring that only medically necessary orthodontic cases were being approved and paid. With the prospect of a federal clawback action looming against Texas because of Xerox's prior authorization failures, the

Texas Office of Inspector General (hereinafter "State") took a drastic step. Beginning in 2011, the State generated a list of the top Medicaid orthodontic billers and placed them on "payment hold." Intervenor was one of those providers.

27. Given Intervenors' proximity to some of the state's poorest children, and the mandates of the *Frew* decision, Intervenor served a large Medicaid patient population. Because it served a large Medicaid population, it submitted a large number of prior authorization requests to Xerox from 2004 through 2011.

28. Intervenors did not know that Xerox was failing to perform a true and accurate review for medical necessity. Intervenors relied on Xerox's prior authorization approvals to confirm that dentists' analysis was proper and consistent with Medicaid standards and requirements.

29. Again unbeknownst to Intervenors, State audits in 2008 and 2012 concluded that most, if not almost all, of the prior authorization requests for patients with HLD scores of 26 or greater (indicating medical necessity) had not been actually "evaluated" at all by Xerox. These State audits made the Federal government's pending audit especially dangerous to Texas, because the 2008 and 2012 audits were admissions that Xerox had been approving and paying claims that may not have met the federal standards for prior authorization. Thus the State, through the Attorney General, concluded that a true finding of medical necessity had in reality not occurred. The Attorney General claimed that billing for services that are not necessary is fraud, despite Xerox's prior authorization approvals.

30. It is now believed that rather than prosecute Xerox for its failure to properly evaluate dentists' prior authorization requests, the State and the Texas Attorney General protected Xerox. This protection included the State failing to allow TMHP to hire additional medically licensed staff, and in 2008-2009 telling TMHP to continue its prior authorization practices. Although the

Attorney General took immediate action against the providers, the Attorney General refused to hold Xerox accountable for its orthodontic "approvals," its repeated contractual failures, or its violation of State law. Instead, the Attorney General made fraud allegations against each of the top 25 dental providers, including Intervenor, which has caused more injury and damages to Intervenors. Stated differently, Xerox issued its approvals through a process that gutted the State's belief in the accuracy of Xerox's decision, and the Texas Attorney General punished the providers instead of Xerox.

31. Because the acts/omissions of Xerox so undermined the process, the State eventuallyinstituted a "payment hold" against Intervenor. A payment hold temporarily freezes future Medicaid payments to a provider, despite the provider's ongoing participation in the Medicaid program. The payment hold against Intervenor was issued pursuant to what the State called a "credible allegation of fraud" regarding Intervenor's orthodontic prior authorization requests. The State placed a 100% payment hold against Intervenor's orthodontic billings.

32. At the time the Attorney General began prosecuting Intervenor and similarly situated Medicaid providers, it knew Xerox, not Intervenor, had the sole authority and responsibility to authorize orthodontic services and payments. The Attorney General knew that the State's audits of Xerox in 2008 and 2012 had concluded that Xerox was violating its contract with the State, violating its own State-approved policies and procedures, and violating State law. Nevertheless, the Attorney General continued to only prosecute dental providers like the Intervenor; the Attorney General refused to hold Xerox responsible. In fact, in one shameless and brazen demonstration of State's unwavering protection of Xerox, the Deputy Director of Texas' Office of the Inspector General testified in a hearing that Xerox's acts and omissions were so egregious

they were outside the course and scope of Xerox's agency with State.[5] Upon information and belief, the State and the Attorney General protected Xerox for over 6 years fearing that revealing the State's culpability would subject the State to a federal clawback for hundreds of millions of dollars. Instead, the State and the Attorney General pointed at the dental providers.

33. Ultimately, the evidence of Xerox's failures, and the State's refusal to correct Xerox for over 6 years, became too much to hide. Three months after some providers filed suit against Xerox, and following a series of news stories questioning why Xerox had not suffered for its failures, the Attorney General reversed course. On May 9, 2014, the State, through the Texas Attorney General, filed this lawsuit against Xerox for fraud, basically mirroring the suit filed approximately 100 days earlier by similarly situated providers. The State's claims in this fraud lawsuit include admissions that the State knew as early as 2006 that Xerox's actions were improper.

34. As a result of the payment hold, Intervenor was required to make significant financial concessions and changes to its business. Intervenor also engaged legal counsel to defend itself from the State's claims, at a significant expense that continues today.

35. The State's allegations against Intervenor are rooted in two assumptions. First, the State assumes Intervenor's prior authorization requests were not properly vetted by Xerox; that is, Xerox approved Intervenor's requests without knowing whether approval was actually proper. Because Xerox is not a party to Intervenor's administrative case, Intervenor is prevented from determining whether Xerox did, in fact, perform a proper review of Intervenor's prior authorization requests. By intervening in this lawsuit, Intervenor seeks to address that question,

---

[5] Incredibly, that testimony came in an administrative proceeding in which the State was seeking $8 million from a dental provider for following Xerox's instructions to provide braces to the provider's patients. The idea that the State could not hold Xerox responsible for its contractual obligations because Xerox had done such a poor job that it was acting outside of its contract is a novel and imaginative reason not to prosecute Xerox.

and finally determine whether Xerox reviewed Intervenor's requests as required by its contract and the law.

36. Regarding the State's second assumption, the State alleges some of Intervenor's requests were approved when, in fact, they should have been denied. Intervenor denied that assertion in the administrative case, and Intervenor continues to deny that claim here. All services provided to Intervenor's patients were actually medically necessary, regardless of what Xerox decided and in any event under Medicaid guidelines once the authorization was approved, Intervenor was required to provide the services.

37. The State continues to aggressively fight any allegation or affirmative defense that could result in Xerox being held accountable for its part in these HLD scoring cases, despite the State's contentions in the District Court case to the contrary. Damages continue to accrue.

## V. Causes of Action

**A. Intervenors' Claims Against Xerox**

**Common Law Fraud (Fraudulent Misrepresentation and Fraudulent Inducement)**

38. Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's prior authorization approvals were false representations made to Intervenor. It is believed Xerox knowingly issued these prior authorizations to Intervenor because Xerox knew that it was approving requests without a proper medical review, and/or because it approved the prior authorization requests without any knowledge of their truth. It is believed Xerox intended for Intervenor to rely on the approvals as a prerequisite for providing the requested services. Approval was material because it was a mandatory prerequisite for payment. Intervenor actually and justifiably relied on Xerox's fraudulent approvals.

39. Xerox's approvals induced Intervenor to continue to grade subsequent HLD requests in

the same or similar manner, and led Intervenor to believe that their requests were consistent with Medicaid standards and requirements.

40.     Xerox's fraudulent approvals caused injury to Intervenor. As a result of Xerox's actions, Intervenor submitted requests for payment and Xerox actually paid for those services, Intervenor was placed on payment hold, Intervenor is forced to defend itself in an administrative payment hold hearing, and Intervenor is facing administrative claims by HHSC for repayment (including claims for treble damages and attorney fees). Intervenor's reputation and business have suffered severe injury. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

## Breach of the Xerox-State of Texas Contract

41.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. In the alternative, Xerox's actions constitute a breach of Xerox's contract with the State for the benefit of Intervenor. Xerox's contract with the state required that it conduct a proper, thorough and legal review of prior authorization requests for the purpose of determining medical necessity. To that end, Xerox should have employed a licensed dentist.

42.     Xerox was an agent of the State of Texas engaged specifically for the purpose of determining medical necessity. The third party beneficiaries of that Xerox-State of Texas contract were Medicaid patients and Intervenor. The patients were entitled to receive orthodontic services that were medically necessary. Intervenor was responsible for actually delivering the orthodontic services that Xerox had deemed medically necessary. Thus, Intervenor was a third party beneficiary that relied on Xerox's approvals.

43.     Xerox breached its contract by, *inter alia*, failing to provide qualified staff; possibly violating Texas law; permitting non-dentists to make determinations of medical necessity; and

issuing medical opinions without conducting a reasonable and prudent examination of evidence. The breaches were material, and recurred across many different Medicaid patients and for many years.

44.     Xerox's actions proximately caused Intervenor's injury. Intervenor's injuries were caused-in-fact by Xerox's actions, and they were foreseeable. Because Xerox's prior authorization was a necessary prerequisite to providing services, Intervenor relied entirely on Xerox's determinations regarding medical necessity; thus, Xerox's actions were the direct factual cause of Intervenor's injuries. Xerox's actions were foreseeable in that a person of ordinary intelligence should have anticipated that issuing a decision without actually reviewing or considering the evidence (x-rays, photos, models, etc.) would eviscerate the credibility and reliability of the decision. Once the State assumed that Xerox's approvals were not trustworthy, it was foreseeable that the State would demand repayment, and/or would require Intervenor to independently do Xerox's job after the fact by proving that payment was proper because the services were medically necessary and reimbursable under Texas Medicaid law.

45.     Intervenor suffered and continues to suffer significant damage. Intervenor seeks damages that would have given the Intervenors the benefit of the bargain by putting them in as good a position as they would have been in if the contract had been performed.   Intervenor seeks reliance interest damages to restore the expenditures Intervenor made in reliance on Xerox's contract with the state and the approvals that Xerox made under that contract.  Intervenor also seeks damages for its restitution interest to restore money sought by the Office of the Inspector General from Intervenor. Such damages would put the Intervenors in as good a position as it would have been in if the contract had been properly fulfilled. In addition, Intervenor seeks liquidated damages as set out in the Xerox-State of Texas contract. Intervenor has engaged legal

counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor has incurred benefit of the bargain damages, out-of-pocket damages, lost profits, lost future profits, loss of credit, and loss of goodwill. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

## Breach of Contract (Promissory Estoppel)

46.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. In the alternative, Xerox's actions constitute promissory estoppel.

47.     Xerox's prior authorizations constitute promises to Intervenor in numerous ways. Because prior authorization was a prerequisite to furnishing services, and because Xerox was the entity charged with discharging prior authorization duties, Intervenor reasonably, substantially, and foreseeably relied on Xerox's promises.

48.     Intervenor suffered and continues to suffer significant damage. Intervenor suffered reliance damages by investing time, labor, equipment, and orthodontic appliances in each Medicaid patient that Xerox approved. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor has been required to do Xerox's job after the fact—namely, demonstrate that the services were medically necessary and properly reimbursable under Texas Medicaid law. Intervenor has incurred benefit of the bargain damages, out-of-pocket damages, lost profits, lost future profits, loss of credit, and loss of goodwill. All of these damages were directly and/or proximately caused by Xerox's promises. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

## Negligent Hiring/Negligent Supervision

49.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out

herein. Xerox's actions constitute negligent hiring and/or negligent supervision. Xerox was required to render medical diagnoses. To that end, Xerox was required by law to employ a licensed dentist to render a diagnosis regarding medical necessity. Xerox was also required by law to properly supervise its employees to make sure diagnoses were made only by licensed dentists.

50.     Xerox knew or should have known that decisions regarding medical necessity can only be rendered by licensed personnel. Texas Occupations Code section 251.003 defines the practice of dentistry to include a diagnosis of the human mouth and/or teeth; section 256.001 states that a person may not practice dentistry without a license; section 264.151 makes it a third-degree felony to practice dentistry without a license.

51.     Xerox's actions proximately caused Intervenor's injury. Intervenor's injuries were caused-in-fact by Xerox's actions, and they were foreseeable. Because Xerox's prior authorization was a necessary prerequisite to providing services, Intervenor relied entirely on Xerox's determinations regarding medical necessity; thus, Xerox's actions were the direct factual cause of Intervenor's injuries. Xerox's actions were foreseeable in that any person of ordinary intelligence should have anticipated that paying Intervenor for services that have not properly been determined to be medically necessity would precipitate a demand for repayment, and/or would require Intervenor to independently do Xerox's job after the fact by proving that payment was proper because those services were medically necessary and were reimbursable under Texas Medicaid law.

52.     Intervenor suffered and continues to suffer significant damage. Intervenor suffered reliance damages by investing the cost of services for each Medicaid patient that Xerox approved. Intervenor has engaged legal counsel to defend itself from the State's charges, and

those legal expenses continue today. Intervenor suffered and continues to suffer significant damage to its reputation, business, referral base, earnings and earning power. Intervenor has suffered inconvenience and loss of enjoyment of life in that he has had to dedicate significant mental and personal capital to doing Xerox's job. Intervenor has suffered exemplary damages because Xerox's conduct was grossly negligent, outrageous and malicious, and such conduct should be penalized so that it is deterred in the future. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

## Negligence

53. Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's actions constitute negligence and gross negligence. Xerox was required to render medical diagnoses. To that end, Xerox had a duty to employ a licensed dentist to render a diagnosis supporting or denying medical necessity. Xerox had a duty to assure that the personnel had appropriate education, training and experience to render such a finding. Xerox had a duty to review the supporting prior authorization documentation (such as x-rays and photos) to determine whether the requested services were medically necessary.

54. Xerox's actions breached the standard of care because Xerox: failed to provide prior authorization staff that were properly licensed, qualified and experienced dental professionals; violated the law, specifically the Dental Practice Act, by permitting non-dentists to make determinations of medical necessity, and; issued medical opinions (prior authorizations) without conducting a reasonable and prudent examination of evidence.

55. Xerox's actions proximately caused Intervenor's injury. Intervenor's injuries were caused-in-fact by Xerox's actions, and they were foreseeable. Because Xerox's prior authorization was a necessary prerequisite to providing services, Intervenor relied entirely on

Xerox's determinations regarding medical necessity; thus, Xerox's actions were the direct factual cause of Intervenor's injuries. Xerox's actions were foreseeable in that any person of ordinary intelligence should have anticipated that paying Intervenor for services that have not properly been determined to be medically necessity would precipitate a demand for repayment, and/or would require Intervenor to independently do Xerox's job after the fact.

56.     Intervenor suffered and continues to suffer significant damage to its reputation, business, referral base, earnings and earning power. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Dr. Salinas has suffered inconvenience and loss of enjoyment of life in that he has had to dedicate significant mental and personal capital to doing Xerox's job. Intervenor has suffered exemplary damages because Xerox's conduct is grossly negligent, outrageous and malicious, and such conduct should be penalized so that it is deterred in the future. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

## Negligent Misrepresentation

57.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's actions constitute negligent misrepresentation. Xerox's actions constitute misrepresentations to Intervenor in numerous ways. Because, *inter alia*, prior authorization approval was a prerequisite to furnishing services, these representations guided and controlled Intervenor's responses. Intervenor justifiably relied on these representations. Further, Xerox represented that its prior authorization approvals were dispositive of medical necessity; Intervenor expected that, once approved, no further inquiry into the medical necessity of the services would be required. Further, Xerox represented that its subsequent payments to Intervenor (after the services had actually been delivered) were made because services had been,

in fact, properly approved as medically necessary.

58. Xerox did not exercise reasonable care or competence in making its determinations and representations. Xerox knew or should have known that its representations were false.

59. Because prior authorization was a prerequisite to furnishing services, and because Xerox was the entity charged with discharging prior authorization duties, Intervenor reasonably, substantially, foreseeably, and justifiably relied on Xerox's representations.

60. Intervenor suffered and continues to suffer significant damage. Intervenor suffered reliance damages by investing time, labor, equipment, and orthodontic appliances in each Medicaid patient that Xerox approved. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor has been required to do Xerox's job after the fact. Intervenor has incurred benefit of the bargain damages, out-of-pocket damages, lost profits, loss of credit, and loss of goodwill. All of these damages were directly and/or proximately cause by Xerox's negligent misrepresentations. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

### Gross Negligence / Misapplication of Fiduciary Property

61. Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Plaintiffs plead Xerox committed gross negligence and/or the misapplication of fiduciary property which would entitle Intervenors to unlimited punitive damages.

### B. Intervenors' Claims Against The State of Texas

### Waiver of Sovereign Immunity

62. Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. For a number of reasons, the State has waived sovereign immunity for claims by Intervenor, including the facts that the State brought, threatened and/or has taken civil and/or

administrative action against Intervenors, and because the State has filed suit against Xerox.

### Conspiracy/Joint Enterprise

63.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. In the alternative, former Deputy Inspector General Jack Stick has stated publicly that acts and omissions of Xerox were so egregious as to be outside the course of scope of Xerox's agency relationship with the State. Assuming same to be true, then the State conspired with Xerox to breach the contract or allow the breach to continue, conspired to withhold funds from Intervenor but not Xerox, and conspired to falsely accuse Intervenor of fraud/crime.

64.     The State conspired with Xerox to allow Xerox to violate its various contractual duties. The State permitted Xerox to process as many prior authorizations as possible without the required clinical dental review and without using medically knowledgeable personnel. The State conspired with Xerox to allow Xerox to violate State and Federal law. The State and Xerox created a scheme to rubber stamp and/or allow no legitimate review of prior authorizations submitted by the dentists. The conspiracy was committed with the intent to shift blame from the State and its agent, improperly blame the Intervenors, and enrich the State and Xerox. By recouping money from providers that were not actually to blame, the State and Xerox hoped to limit their own liability in the event of a Federal clawback action, and/or respond to unflattering news reports of Texas' payments for Medicaid braces. This agreement and ensuing acts of the party to blame the dentist providers for their own improper acts and omissions is a proximate cause of the injury to Intervenors.

### Not Liable for Illegal Acts of Third Party

65.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. As alleged by the State in Section VIII paragraph 46 of the State's petition, Xerox has

committed or is about to commit unlawful acts. The illegal acts of Xerox in failing to provide proper prior authorization review in rubber stamping the doctors prior authorization requests is not the fault of the doctors. The doctors are not responsible for or liable to the State for the illegal acts of a third party for which the doctors had no control; the State should not withhold money from the Intervenors because of the illegal acts of Xerox complained about by the State.

## Breach of Contract

66. Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Intervenors are a direct or third party beneficiary of the contract with Xerox and the State of Texas. The State of Texas has breached terms of the contract by failing to supervise Xerox and/or reviewing the work product of Xerox. This breach by State, which allowed non-performance by Xerox, has created the pretext by which the State affirmatively sued Intervenors for repayment. To the extent that the State has withheld money and/or made claims for damages against Intervenors based on the contracts in question, the State has waived immunity and is liable up to those amounts plead.

## Conversion

67. Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. State and Federal law required Intervenor to request prior authorization for orthodontic services. Those prior authorization requests were approved by Xerox, which required Intervenors to provide the services. The State has unilaterally made a decision to that, based on the acts and omissions of Xerox, the Intervenor should not have been paid; the State then placed Intervenor on a payment hold. To the extent that Intervenor has provided services for which Intervenor should be paid, and money which has been earmarked by the State for that payment but withheld, the State has converted the funds. In addition, the States' acts/omissions are a violation of the

Texas Constitution Section 9 in that the acts/omissions constitute a seizure of money held under the pretext of a payment hold.

## VI. Damages

68.    Intervenors have suffered and are entitled to recover damages including, but not limited to loss of use of funds sequestered by the State, actual damages, damage to reputation, damage to business, damage to earnings and earning power, inconvenience, loss of enjoyment of life, fees and expenses, interest, punitive/exemplary damages, and attorney fees.

## VII. Conclusion

69.    Xerox's actions have harmed Intervenor because Xerox committed fraud, negligent hiring, negligence, and gross negligence. Xerox's actions have subjected Intervenor to unnecessary civil and administrative legal action, and that, in turn has caused additional injury. Xerox's actions have required Intervenor to perform Xerox's job after-the-fact, by proving to the State that the orthodontic services rendered were medically necessary and appropriate for reimbursement. The State's actions have harmed Intervenor because the state's conspiracy to improperly blame the dentists has resulted in meritless legal claims against the Intervenors and conversion of the Intervenor's property.

## VIII. Jury Demand

70.    Intervenors respectfully requests a trial by jury.

## IX. Request for Disclosure

71.    Under Texas Rule of Civil Procedure 194, Intervenor requests that Plaintiff the State disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## X. Prayer

72.     Wherefore, premises considered, Intervenors RGV Smiles by Rocky L. Salinas, DDS, PA and Dr. Rocky Salinas pray that upon final hearing of the cause, judgment be entered jointly and severally against the Plaintiff the State of Texas and Defendant Xerox State Healthcare, LLC for damages, together with pre-judgment and post judgment interest at the legal rate, costs of court, and other such relief to which the Intervenors may be entitled.

Respectfully submitted,

Jason Ray
Texas Bar No. 24000511
**RIGGS, ALESHIRE & RAY, P.C.**
700 Lavaca, Suite 920
Austin, Texas 78701
(512) 457-9806 (Telephone)
(512) 457-9866 (Fax)
jray@r-alaw.com


    /s/  Hart Green w/ permission by J Ray
E. Hart Green
Texas Bar No. 08349290
Mitchell A. Toups
Texas Bar No.  20151600
**WELLER, GREEN, TOUPS & TERRELL, L.L.P.**
Post Office Box 350
Beaumont, Texas 77704-0350
(409) 838-0101 (Telephone)
(409) 832-8577 (Fax)
hartgr@wgttlaw.com
matoups@wgttlaw.com
**ATTORNEYS FOR INTERVENORS
RGV SMILES BY ROCKY L. SALINAS, DDS,
PA AND DR. ROCKY SALINAS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plea in Intervention was served via e-mail and certified mail, return receipt requested on this 15th day of May, 2014 on the following:

Eric J.R. Nichols
Beck Redden
515 Congress Avenue, Suite 1750
Austin, Texas, 78701
ENICHOLS@beckredden.com
**Attorney for Xerox Defendants**

Raymond Winter
Chief, Civil Medicaid Fraud Division
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
raymond.winter@texasattorneygeneral.gov
**Attorney for the Plaintiff State of Texas**

Jason Ray

| | | |
|---|---|---|
| WESTMORELAND DENTAL, PA, | § | IN THE DISTRICT COURT |
| WESTMORELAND DENTAL OF GARLAND, | § | |
| PC, WESTMORELAND DENTAL AND | § | |
| ORTHODONTICS, PA, AND SCOTTIE H. | § | |
| NGUYEN, DDS | § | |
| INTERVENORS, | § | |
| | § | |
| VS. | § | |
| | § | |
| THE STATE OF TEXAS, | § | |
| PLAINTIFF, | § | |
| | § | 53rd JUDICIAL DISTRICT |
| VS. | § | |
| | § | |
| XEROX CORPORATION; XEROX | § | |
| STATE HEALTHCARE, LLC; ACS | § | |
| STATE HEALTHCARE, LLC, A XEROX | § | |
| CORPORATION | § | |
| DEFENDANTS. | § | TRAVIS COUNTY, TEXAS |

## PLEA IN INTERVENTION

TO THE HONORABLE JUDGE OF SAID COURT:

**NOW COMES**, Westmoreland Dental, PA, Westmoreland Dental of Garland, PC, Westmoreland Dental and Orthodontics, PA, and Scottie H. Nguyen, DDS, hereinafter Intervenors, and file this Plea in Intervention, and in support hereof, would respectfully show the Court the following:

### I. Parties and Service

1.      Plaintiff, State of Texas, has appeared in this action and may be served with a notice of this Plea by sending a copy to its attorney, the Attorney General of Texas, Greg Abbott, at P. O. Box 12548, Austin, Texas 78711-2548.

2.      Defendant Xerox Corporation is a corporation organized under the laws of New York has agreed to accept service with process upon its Attorney in this suit.  Defendant Xerox State

Plea in Intervention
Page 1 of 25

Health Care, LLC, f/k/a ACS State Healthcare, LLC (misnamed by the State of Texas as ACS State Healthcare, LLC, a Xerox Corporation is a wholly-owned subsidiary of Xerox Corporation organized under the laws of the State of Delaware with Texas offices at 2828 N. Haskell Ave., Dallas, Texas 75204, and has agreed to accept service with process upon its Attorney in this suit. Defendant Xerox Corporation acquired Defendant ACS in 2010. On information and belief, ACS State Healthcare, LLC, changed its name to Xerox State Healthcare, LLC, on April 1, 2012. Defendants are referred to hereinafter as "Xerox Defendants."

3.      Westmoreland Dental, PA, Westmoreland Dental of Garland, PC, Westmoreland Dental and Orthodontics, PA (hereinafter Westmoreland) are approved Medicaid providers, and can be served through the undersigned counsel.

4.      Dr. Scottie H. Nguyen[1] is a licensed Texas dentist, approved Medicaid provider, and the owner of Westmoreland. Dr Nguyen can be served through his undersigned counsel.

## II. Jurisdiction and Venue

5.      This Court has subject-matter jurisdiction in that the amounts sought by Intervenors from all parties (both Plaintiff and Defendants) are in excess of the minimal jurisdiction limits of this court. Intervenors affirmatively plead that this suit is not governed by the expedited-actions process in TEXAS RULE OF CIVIL PROCEDURE 169 because intervenors seek monetary relief over $100,000.

6.      This Court has jurisdiction over all parties in this petition because:

a)   The State has waived sovereign immunity and is subject to Intervenors' claims;

b)   This Court has jurisdiction over Xerox Defendants because each Defendant does business in the State of Texas and committed the unlawful acts alleged in this petition

_____

[1] For the sake of simplicity, the Intervenors will be collectively referred to as "Westmoreland" unless expressly noted.

in whole or part in Texas.

7.      Venue is proper in Travis County under TRCP §15.020 because this suit involves a "major transaction"; Venue is permissive under TRCP §15.035(a) because Intervenor asserts claims for breach of contract. Venue is proper pursuant to TRCP §15.02 because all or a substantial part of the events or omissions giving rise to the claim occurred in Travis County. Many of the unlawful acts committed by the State and Xerox Defendants were committed in Travis County, including the making of false statements and misrepresentations of material fact.

### III. Intervenors' Interest in the Suit

8.      Intervenors Westmoreland Dental, PA, Westmoreland Dental of Garland, PC, Westmoreland Dental and Orthodontics, PA, and Scottie H. Nguyen, DDS have a judicial interest in the matters and controversy in this litigation. The relationship between Intervenors, the State as the Plaintiff and the Xerox Defendants is a tripartite arrangement necessitating that, in the interest of judicial economy and justice, all claims be bound and subsumed into one cause of action. Upon information and belief, Intervenors were initially sued by the State in a *qui tam* action wherein the State alleged that Intervenors defrauded the State. The State has elected to pursue its remedies against the Intervenors in an administrative hearing. Now, the State has sued Xerox in State Court on the same facts, alleging that Xerox has committed fraud against the State. Intervenors have claims against both the State and Xerox. It is assumed that Xerox will have claims against the State, and perhaps allege claims against the Intervenors. All of the different parties' claims are inextricably intertwined, as they relate to Intervenors' submission of prior authorization requests to Xerox, the handling of those claims by the Xerox Defendants, the State's handling and oversight of its agent Xerox in Xerox's performance of its contractual and legal duties, and State's subsequent legal action against the Intervenors for services approved by

Xerox.

## IV. Facts

### What is Prior Authorization?

9.     Texas Medicaid requires that orthodontic services be independently and objectively scrutinized before the State consents to treatment and payment. Prior authorization is the mechanism the State uses to determine the medical necessity of non-emergency orthodontic items/services prior to delivery of those items/services. Pursuant to Texas Health and Human Services Commission (hereinafter "HHSC") rules, Texas Medicaid greatly restricts when it will pay for orthodontic services:

> Orthodontic services for cosmetic reasons only are not a covered Medicaid service. **Orthodontic services must be prior authorized** and are limited to treatment of severe handicapping malocclusion and other related conditions as described and measured by the procedures and standards published in the [TMPPM[2]].

25 TEX. ADMIN. CODE §33.71 (emphasis added).  Prior authorization is a statement of assurance to the orthodontic provider that, absent an intervening disqualifying factor, the delivery of the requested orthodontic service has been deemed by Xerox to be medically necessary, and therefore approved by the State.

10.     The prior authorization process is straightforward. Texas Medicaid requires that a dental provider send documentation (x-rays, cephalographs, photos, etc.) regarding the patient's orthodontic condition to Xerox for review. In addition, the orthodontic provider submits his professional opinion of the patient on a Handicapping Labio-lingual Deviation index (HLD) score sheet. Xerox knew providers relied entirely on the prior authorization process because approval was a mandatory prerequisite to providing orthodontic services and being paid. Once

---

[2] "TMPPM" is the Texas Medicaid Provider Procedures Manual, which is issued yearly by the HHSC and provides valuable guidance to Medicaid providers.

Xerox issued its prior authorization decision, the decision was not appealable by the provider.

11.     The HLD scoring system combines a number of treatable orthodontic conditions into an index. HLD score sheets use a mix of objective and subjective conditions to determine whether a Medicaid patient qualifies for orthodontic services. The fact that the HLD score sheet requires both objective and subjective findings highlights the importance of Xerox performing a thorough prior authorization review.

The History of Orthodontic Prior Authorization.

12.     The process for reviewing and approving orthodontic prior authorization requests pre-dates the defendant Xerox's handling of Medicaid claims processing.  The National Heritage Insurance Corporation (NHIC) was responsible for reviewing prior authorization requests before Xerox assumed the contract in January 2004. Starting January 1, 2004, Xerox acted as an independent contractor, and was a contracted agent of the State, under the contract with HHSC. Xerox was responsible for reviewing each orthodontic service request, and Xerox was further charged with the responsibility to grant or deny each prior authorization request per the program requirements. The result was that Xerox had the final say in determining the medical necessity of each request for orthodontic services.

13.     Prior to assuming the NHIC contract, and for a period of time after assuming the contract from NHIC, Xerox received training from NHIC personnel regarding the proper method for receiving and processing orthodontic prior authorization requests. NHIC personnel explained how and why the review of each prior authorization submission was important, and walked Xerox through the process. Despite its training from NHIC, Xerox had no intention of following the prior authorization system that had been in place for years, nor did Xerox intend to otherwise meet the prior authorization requirements set out in its contract, the TMPPM and required by

state law.

Xerox rejects its contractual responsibilities.

14. When Xerox took over the contract in 2004, it immediately abandoned the prior authorization review process that had been setup by NHIC. Xerox never intended to fulfill its orthodontic prior authorization responsibilities to HHSC. From 2004 to 2011, Xerox continually misrepresented that it was acting in compliance with its contractual duties.

15. It is now known that Xerox failed to adequately staff their prior authorization division with knowledgeable medical professionals. Xerox employed only one licensed dentist from 2004 through 2011, which was far short of the manpower necessary to handle the review of tens of thousands of orthodontic prior authorization requests every year. Xerox could not reasonably have expected to handle such a workload by employing only one dentist.

Xerox potentially commits thousands of violations.

16. It is believed Xerox allowed "dental specialists"—unlicensed, unqualified individuals—to render prior authorization opinions regarding the medical necessity of requested orthodontic services. The "dental specialist" approvals were not reviewed or ratified by Xerox's licensed dental director or another qualified dental professional. These actions not only violated Xerox's contractual obligations, they may have also violated other Texas law such as the Dental Practice Act.[3] It is believed these unlicensed Xerox "specialists" rendered tens of thousands of prior authorization approvals/medical opinions in violation of Texas law.

17. Xerox was paid by the state for each prior authorization decision that was made. It is believed that Xerox employed unlicensed "specialists," rather than licensed Texas dentists, as a

---

[3] Texas Occupations Code §251.003 prevents unlicensed individuals from diagnosing conditions of the human teeth and mouth. Section 256.001 states that a person may not practice dentistry without a license. Thus, state law requires that opinions regarding medical necessity of orthodontic treatment must be made by licensed dentists. Section 264.151 prescribes penalties for certain violations of the Dental Practice Act.

profit generating measure.

18.    From January 2005 through February 2012, Intervenor submitted prior authorization requests, as required, to Xerox for a determination of medical necessity. Unbeknownst to Intervenor, Xerox's dental specialists—not the dental director—approved almost all of Intervenor's requests. Xerox's prior authorization approvals were promises that:

a) the requested orthodontic services were medically necessary, and/or

b) the approval had been issued by a licensed dentist, and/or

c) the approval was an actual and legitimate dental diagnosis, and/or

d) the requested orthodontic services were allowable under Texas law and as permitted by Medicaid policy, the TMPPM, and HHSC rules, and/or

e) a proper, thorough and legal review had been made, and/or

f) future orthodontic services would be properly reimburseable to Intervenors, absent some intervening disqualification (such as the patient's ineligibility).

19.    Because Xerox was charged with determining medical necessity, and because prior authorization approval was a mandatory prerequisite to furnishing services, the promises were material. Intervenors expected performance of these promises. Intervenors relied on Xerox. Further, Xerox promised that its subsequent payments to Intervenors (after the services had actually been delivered) were made because the services had been, in fact, properly approved as medically necessary. Each prior authorization approval represents a separate violation of the law **if** Xerox's approval was issued illegally and/or in violation of its contractual obligations.

<u>Xerox actively concealed its potentially illegal activity.</u>

20.    Xerox withheld the truth regarding its prior authorization program. In an attempt to publicly appear consistent with NHIC's prior authorization process, Xerox continued to require

that dental providers (such as Intervenor) submit all supporting documentation for each HLD score sheet. It is now believed that, incredibly, Xerox did nothing with that documentation, other than assure that it had been submitted by the provider. It is believed that Xerox's specialists were instructed to forward to its dental director only those requests that had scored below the threshold for orthodontic services (i.e. below 26 points on the HLD score sheet), or had some provider justification attached. As a result, only 10% of the orthodontic prior authorization requests were actually forwarded to Xerox's one licensed dentist. Xerox's actions were calculated to make Xerox appear compliant with its contract and HHSC policies, while Xerox knew that its actions were entirely inconsistent with the letter and spirit of its obligations. Effectively, then, Xerox's actions not only damaged the Medicaid program directly by approving services without determining their medical necessity, but Xerox's deception also exacerbated the problem by failing to give providers guidance regarding the proper standard for medical necessity, thus causing these providers substantial damages.

21.     For the past ten years, Xerox has continued to publicly represent to the world that it was fulfilling its contractual and legal responsibilities. Based on Xerox's representations that it was fulfilling its duties to the State, Xerox had its contract with HHSC repeatedly renewed from 2004 through the present. Each year that Xerox had its contract renewed, it represented that it would fulfill its contractual obligations and abide by Texas law requiring that decisions about medical necessity be rendered only by licensed dentists. Xerox made those representations knowing that it had not done so in the past, and had no intention of changing its procedures to do so in the future.

The *Frew* decision magnifies Xerox's acts.

22.     In September 2007, after fifteen years of litigation on the subject, Texas was ordered to

implement a corrective action plan that increased the Medicaid reimbursement rates to all dental providers. That plan was required pursuant to the *Frew* case[4], which was a 1993 class-action lawsuit against the HHSC alleging that Texas' Medicaid reimbursement rates were so low that they prevented indigent children from receiving timely, comprehensive health care.

23.     In response to *Frew*'s corrective action plan, the 2007 Texas Legislature allocated $707 million ($1.8 billion in state and federal funds combined) to increase medical and dental reimbursement rates. The increase in dental reimbursement rates was intended to entice dentists to become Medicaid providers. It worked. The state raised payment rates for dental services, and, as a result, the number of dentists participating in Medicaid increased from 45.4% in 2007 to 63.4% in 2010. As expected indeed, as intended spending on Texas's dental services increased dramatically.

24.     Although the number of prior approval requests increased by 240% between 2007 and 2010. Xerox continued to employ only one dentist. That dentist was neither tasked with nor responsible for supervising the clerical specialists that were issuing the approvals.

25.     By 2010, orthodontic spending under Texas' Medicaid program had skyrocketed. Xerox was the sole entity responsible for overseeing this increase, because it was the sole gatekeeper for the approval and payment of orthodontic services. Although the Texas Legislature had increased funding to attract dentists into the Medicaid program, all of the budgeted funds were required to be spent only on medically necessary services.

The Office of Inspector General seeks recovery from Medicaid providers.

---

[4] *Frew v. Gilbert*, 109 F. Supp. 2d 579 (E.D. Tex. 2000) *vacated sub nom. Frazar v. Gilbert*, 300 F.3d 530 (5th Cir. 2002) *rev'd sub nom. Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 124 S. Ct. 899, 157 L. Ed. 2d 855 (2004) and *aff'd in part, appeal dismissed in part sub nom. Frazar v. Hawkins*, 376 F.3d 444 (5th Cir. 2004); *Frew v. Hawkins*, 401 F. Supp. 2d 619 (E.D. Tex. 2005) *aff'd sub nom Frazar v Ladd*, 457 F.3d 432 (5th Cir. 2006); *Hawkins v. Frew*, 549 U.S. 1118, 127 S. Ct. 1039, 166 L. Ed. 2d 714 (2007).

26. In early 2011, a series of news stories began highlighting the large amount of money being spent on orthodontics in Texas. In July 2011, the Federal government notified Texas of its intent to audit whether Texas' prior authorization process was ensuring that only medically necessary orthodontic cases were being approved and paid. With the prospect of a federal clawback action looming against Texas because of Xerox's prior authorization failures, the Texas Office of Inspector General (hereinafter "State") took a drastic step. Beginning in 2011, the State generated a list of the top Medicaid orthodontic billers and placed them on "payment hold." Intervenor was one of those providers.

27. Given Intervenors' proximity to some of the state's poorest children, and the mandates of the *Frew* decision, Intervenor served a large Medicaid patient population. Because it served a large Medicaid population, it submitted a large number of prior authorization requests to Xerox from 2004 through 2011.

28. Intervenors did not know that Xerox was failing to perform a true and accurate review for medical necessity. Intervenors relied on Xerox's prior authorization approvals to confirm that dentists' analysis was proper and consistent with Medicaid standards and requirements.

29. Again unbeknownst to Intervenors, State audits in 2008 and 2012 concluded that most, if not almost all, of the prior authorization requests for patients with HLD scores of 26 or greater (indicating medical necessity) had not been actually "evaluated" at all by Xerox. These State audits made the Federal government's pending audit especially dangerous to Texas, because the 2008 and 2012 audits were admissions that Xerox had been approving and paying claims that may not have met the federal standards for prior authorization. Thus the State, through the Attorney General, concluded that a true finding of medical necessity had in reality not occurred. The Attorney General claimed that billing for services that are not necessary is fraud, despite

Xerox's prior authorization approvals.

30.    It is now believed that rather than prosecute Xerox for its failure to properly evaluate dentists' prior authorization requests, the State and the Texas Attorney General protected Xerox. This protection included the State failing to allow TMHP to hire additional medically licensed staff, and in 2008-2009 telling TMHP to continue its prior authorization practices. Although the Attorney General took immediate action against the providers, the Attorney General refused to hold Xerox accountable for its orthodontic "approvals," its repeated contractual failures, or its violation of State law. Instead, the Attorney General made fraud allegations against each of the top 25 dental providers, including Intervenor, which has caused more injury and damages to Intervenors. Stated differently, Xerox issued its approvals through a process that gutted the State's belief in the accuracy of Xerox's decision, and the Texas Attorney General punished the providers instead of Xerox.

31.    Because the acts/omissions of Xerox so undermined the process, the State eventuallyinstituted a "payment hold" against Intervenor. A payment hold temporarily freezes future Medicaid payments to a provider, despite the provider's ongoing participation in the Medicaid program. The payment hold against Intervenor was issued pursuant to what the State called a "credible allegation of fraud" regarding Intervenor's orthodontic prior authorization requests. The State placed a 100% payment hold against Intervenor's orthodontic billings.

32.    At the time the Attorney General began prosecuting Intervenor and similarly situated Medicaid providers, it knew Xerox, not Intervenor, had the sole authority and responsibility to authorize orthodontic services and payments. The Attorney General knew that the State's audits of Xerox in 2008 and 2012 had concluded that Xerox was violating its contract with the State, violating its own State-approved policies and procedures, and violating State law. Nevertheless,

the Attorney General continued to only prosecute dental providers like the Intervenor; the Attorney General refused to hold Xerox responsible. In fact, in one shameless and brazen demonstration of State's unwavering protection of Xerox, the Deputy Director of Texas' Office of the Inspector General testified in a hearing that Xerox's acts and omissions were so egregious they were outside the course and scope of Xerox's agency with State.[5] Upon information and belief, the State and the Attorney General protected Xerox for over 6 years fearing that revealing the State's culpability would subject the State to a federal clawback for hundreds of millions of dollars. Instead, the State and the Attorney General pointed at the dental providers.

33.     Ultimately, the evidence of Xerox's failures, and the State's refusal to correct Xerox for over 6 years, became too much to hide. Three months after some providers filed suit against Xerox, and following a series of news stories questioning why Xerox had not suffered for its failures, the Attorney General reversed course. On May 9, 2014, the State, through the Texas Attorney General, filed this lawsuit against Xerox for fraud, basically mirroring the suit filed approximately 100 days earlier by similarly situated providers. The State's claims in this fraud lawsuit include admissions that the State knew as early as 2006 that Xerox's actions were improper.

34.     As a result of the payment hold, Intervenor was required to make significant financial concessions and changes to its business. Intervenor also engaged legal counsel to defend itself from the State's claims, at a significant expense that continues today.

35.     The State's allegations against Intervenor are rooted in two assumptions. First, the State assumes Intervenor's prior authorization requests were not properly vetted by Xerox; that is,

---

[5] Incredibly, that testimony came in an administrative proceeding in which the State was seeking $8 million from a dental provider for following Xerox's instructions to provide braces to the provider's patients. The idea that the State could not hold Xerox responsible for its contractual obligations because Xerox had done such a poor job that it was acting outside of its contract is a novel and imaginative reason not to prosecute Xerox.

Xerox approved Intervenor's requests without knowing whether approval was actually proper. Because Xerox is not a party to Intervenor's administrative case, Intervenor is prevented from determining whether Xerox did, in fact, perform a proper review of Intervenor's prior authorization requests. By intervening in this lawsuit, Intervenor seeks to address that question, and finally determine whether Xerox reviewed Intervenor's requests as required by its contract and the law.

36. Regarding the State's second assumption, the State alleges some of Intervenor's requests were approved when, in fact, they should have been denied. Intervenor denied that assertion in the administrative case, and Intervenor continues to deny that claim here. All services provided to Intervenor's patients were actually medically necessary, regardless of what Xerox decided and in any event under Medicaid guidelines once the authorization was approved, Intervenor was required to provide the services.

37. The State continues to aggressively fight any allegation or affirmative defense that could result in Xerox being held accountable for its part in these HLD scoring cases, despite the State's contentions in the District Court case to the contrary. Damages continue to accrue.

### V. Causes of Action

**A. Intervenors' Claims Against Xerox**

**Common Law Fraud (Fraudulent Misrepresentation and Fraudulent Inducement)**

38. Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's prior authorization approvals were false representations made to Intervenor. It is believed Xerox knowingly issued these prior authorizations to Intervenor because Xerox knew that it was approving requests without a proper medical review, and/or because it approved the prior authorization requests without any knowledge of their truth. It is believed Xerox intended

for Intervenor to rely on the approvals as a prerequisite for providing the requested services. Approval was material because it was a mandatory prerequisite for payment. Intervenor actually and justifiably relied on Xerox's fraudulent approvals.

39. Xerox's approvals induced Intervenor to continue to grade subsequent HLD requests in the same or similar manner, and led Intervenor to believe that their requests were consistent with Medicaid standards and requirements.

40. Xerox's fraudulent approvals caused injury to Intervenor. As a result of Xerox's actions, Intervenor submitted requests for payment and Xerox actually paid for those services, Intervenor was placed on payment hold, Intervenor is forced to defend itself in an administrative payment hold hearing, and Intervenor is facing administrative claims by HHSC for repayment (including claims for treble damages and attorney fees). Intervenor's reputation and business have suffered severe injury. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

## Breach of the Xerox-State of Texas Contract

41. Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. In the alternative, Xerox's actions constitute a breach of Xerox's contract with the State for the benefit of Intervenor. Xerox's contract with the state required that it conduct a proper, thorough and legal review of prior authorization requests for the purpose of determining medical necessity. To that end, Xerox should have employed a licensed dentist.

42. Xerox was an agent of the State of Texas engaged specifically for the purpose of determining medical necessity. The third party beneficiaries of that Xerox-State of Texas contract were Medicaid patients and Intervenor. The patients were entitled to receive orthodontic services that were medically necessary. Intervenor was responsible for actually delivering the

orthodontic services that Xerox had deemed medically necessary. Thus, Intervenor was a third party beneficiary that relied on Xerox's approvals.

43.    Xerox breached its contract by, *inter alia*, failing to provide qualified staff; possibly violating Texas law; permitting non-dentists to make determinations of medical necessity; and issuing medical opinions without conducting a reasonable and prudent examination of evidence. The breaches were material, and recurred across many different Medicaid patients and for many years.

44.    Xerox's actions proximately caused Intervenor's injury. Intervenor's injuries were caused-in-fact by Xerox's actions, and they were foreseeable. Because Xerox's prior authorization was a necessary prerequisite to providing services, Intervenor relied entirely on Xerox's determinations regarding medical necessity; thus, Xerox's actions were the direct factual cause of Intervenor's injuries. Xerox's actions were foreseeable in that a person of ordinary intelligence should have anticipated that issuing a decision without actually reviewing or considering the evidence (x-rays, photos, models, etc.) would eviscerate the credibility and reliability of the decision. Once the State assumed that Xerox's approvals were not trustworthy, it was foreseeable that the State would demand repayment, and/or would require Intervenor to independently do Xerox's job after the fact by proving that payment was proper because the services were medically necessary and reimbursable under Texas Medicaid law.

45.    Intervenor suffered and continues to suffer significant damage. Intervenor seeks damages that would have given the Intervenors the benefit of the bargain by putting them in as good a position as they would have been in if the contract had been performed. Intervenor seeks reliance interest damages to restore the expenditures Intervenor made in reliance on Xerox's contract with the state and the approvals that Xerox made under that contract. Intervenor also

seeks damages for its restitution interest to restore money sought by the Office of the Inspector General from Intervenor. Such damages would put the Intervenors in as good a position as it would have been in if the contract had been properly fulfilled. In addition, Intervenor seeks liquidated damages as set out in the Xerox-State of Texas contract. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor has incurred benefit of the bargain damages, out-of-pocket damages, lost profits, lost future profits, loss of credit, and loss of goodwill. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

## Breach of Contract (Promissory Estoppel)

46.    Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. In the alternative, Xerox's actions constitute promissory estoppel.

47.    Xerox's prior authorizations constitute promises to Intervenor in numerous ways. Because prior authorization was a prerequisite to furnishing services, and because Xerox was the entity charged with discharging prior authorization duties, Intervenor reasonably, substantially, and foreseeably relied on Xerox's promises.

48.    Intervenor suffered and continues to suffer significant damage. Intervenor suffered reliance damages by investing time, labor, equipment, and orthodontic appliances in each Medicaid patient that Xerox approved. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor has been required to do Xerox's job after the fact—namely, demonstrate that the services were medically necessary and properly reimbursable under Texas Medicaid law. Intervenor has incurred benefit of the bargain damages, out-of-pocket damages, lost profits, lost future profits, loss of credit, and loss of goodwill. All of these damages were directly and/or proximately caused by Xerox's promises.

Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

## Negligent Hiring/Negligent Supervision

49.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's actions constitute negligent hiring and/or negligent supervision. Xerox was required to render medical diagnoses. To that end, Xerox was required by law to employ a licensed dentist to render a diagnosis regarding medical necessity. Xerox was also required by law to properly supervise its employees to make sure diagnoses were made only by licensed dentists.

50.     Xerox knew or should have known that decisions regarding medical necessity can only be rendered by licensed personnel. Texas Occupations Code section 251.003 defines the practice of dentistry to include a diagnosis of the human mouth and/or teeth; section 256.001 states that a person may not practice dentistry without a license; section 264.151 makes it a third-degree felony to practice dentistry without a license.

51.     Xerox's actions proximately caused Intervenor's injury. Intervenor's injuries were caused-in-fact by Xerox's actions, and they were foreseeable. Because Xerox's prior authorization was a necessary prerequisite to providing services, Intervenor relied entirely on Xerox's determinations regarding medical necessity; thus, Xerox's actions were the direct factual cause of Intervenor's injuries. Xerox's actions were foreseeable in that any person of ordinary intelligence should have anticipated that paying Intervenor for services that have not properly been determined to be medically necessity would precipitate a demand for repayment, and/or would require Intervenor to independently do Xerox's job after the fact by proving that payment was proper because those services were medically necessary and were reimbursable under Texas

Medicaid law.

52.     Intervenor suffered and continues to suffer significant damage. Intervenor suffered reliance damages by investing the cost of services for each Medicaid patient that Xerox approved. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor suffered and continues to suffer significant damage to its reputation, business, referral base, earnings and earning power. Intervenor has suffered inconvenience and loss of enjoyment of life in that he has had to dedicate significant mental and personal capital to doing Xerox's job. Intervenor has suffered exemplary damages because Xerox's conduct was grossly negligent, outrageous and malicious, and such conduct should be penalized so that it is deterred in the future. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

**Negligence**

53.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's actions constitute negligence and gross negligence. Xerox was required to render medical diagnoses. To that end, Xerox had a duty to employ a licensed dentist to render a diagnosis supporting or denying medical necessity. Xerox had a duty to assure that the personnel had appropriate education, training and experience to render such a finding. Xerox had a duty to review the supporting prior authorization documentation (such as x-rays and photos) to determine whether the requested services were medically necessary.

54.     Xerox's actions breached the standard of care because Xerox: failed to provide prior authorization staff that were properly licensed, qualified and experienced dental professionals; violated the law, specifically the Dental Practice Act, by permitting non-dentists to make determinations of medical necessity, and; issued medical opinions (prior authorizations) without

conducting a reasonable and prudent examination of evidence.

55.    Xerox's actions proximately caused Intervenor's injury. Intervenor's injuries were caused-in-fact by Xerox's actions, and they were foreseeable. Because Xerox's prior authorization was a necessary prerequisite to providing services, Intervenor relied entirely on Xerox's determinations regarding medical necessity; thus, Xerox's actions were the direct factual cause of Intervenor's injuries. Xerox's actions were foreseeable in that any person of ordinary intelligence should have anticipated that paying Intervenor for services that have not properly been determined to be medically necessity would precipitate a demand for repayment, and/or would require Intervenor to independently do Xerox's job after the fact.

56.    Intervenor suffered and continues to suffer significant damage to its reputation, business, referral base, earnings and earning power. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Dr. Nguyen has suffered inconvenience and loss of enjoyment of life in that he has had to dedicate significant mental and personal capital to doing Xerox's job. Intervenor has suffered exemplary damages because Xerox's conduct is grossly negligent, outrageous and malicious, and such conduct should be penalized so that it is deterred in the future. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

### Negligent Misrepresentation

57.    Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's actions constitute negligent misrepresentation. Xerox's actions constitute misrepresentations to Intervenor in numerous ways. Because, *inter alia*, prior authorization approval was a prerequisite to furnishing services, these representations guided and controlled Intervenor's responses. Intervenor justifiably relied on these representations. Further, Xerox

represented that its prior authorization approvals were dispositive of medical necessity; Intervenor expected that, once approved, no further inquiry into the medical necessity of the services would be required. Further, Xerox represented that its subsequent payments to Intervenor (after the services had actually been delivered) were made because services had been, in fact, properly approved as medically necessary.

58.    Xerox did not exercise reasonable care or competence in making its determinations and representations. Xerox knew or should have known that its representations were false.

59.    Because prior authorization was a prerequisite to furnishing services, and because Xerox was the entity charged with discharging prior authorization duties, Intervenor reasonably, substantially, foreseeably, and justifiably relied on Xerox's representations.

60.    Intervenor suffered and continues to suffer significant damage. Intervenor suffered reliance damages by investing time, labor, equipment, and orthodontic appliances in each Medicaid patient that Xerox approved. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor has been required to do Xerox's job after the fact. Intervenor has incurred benefit of the bargain damages, out-of-pocket damages, lost profits, loss of credit, and loss of goodwill. All of these damages were directly and/or proximately cause by Xerox's negligent misrepresentations. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

### Gross Negligence / Misapplication of Fiduciary Property

61.    Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Plaintiffs plead Xerox committed gross negligence and/or the misapplication of fiduciary property which would entitle Intervenors to unlimited punitive damages.

**B. Intervenors' Claims Against The State of Texas**

## Waiver of Sovereign Immunity

62.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein.   For a number of reasons, the State has waived sovereign immunity for claims by Intervenor. including the facts that the State  brought, threatened and/or has taken civil and/or administrative action against Intervenors, and because the State has filed suit against Xerox.

## Conspiracy/Joint Enterprise

63.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein.   In the alternative, former Deputy Inspector General Jack Stick has stated publicly that acts and omissions of Xerox were so egregious as to be outside the course of scope of Xerox's agency relationship with the State. Assuming same to be true, then the State conspired with Xerox to breach the contract or allow the breach to continue, conspired to withhold funds from Intervenor but not Xerox, and conspired to falsely accuse Intervenor of fraud/crime.

64.     The State conspired with Xerox to allow Xerox to violate its various contractual duties. The State permitted Xerox to process as many prior authorizations as possible without the required clinical dental review and without using medically knowledgeable personnel. The State conspired with Xerox to allow Xerox to violate State and Federal law. The State and Xerox created a scheme to rubber stamp and/or allow no legitimate review of prior authorizations submitted by the dentists. The conspiracy was committed with the intent to shift blame from the State and its agent, improperly blame the Intervenors, and enrich the State and Xerox. By recouping money from providers that were not actually to blame, the State and Xerox hoped to limit their own liability in the event of a Federal clawback action, and/or respond to unflattering news reports of Texas' payments for Medicaid braces. This agreement and ensuing acts of the party to blame the dentist providers for their own improper acts and omissions is a proximate

cause of the injury to Intervenors.

## Not Liable for Illegal Acts of Third Party

65.    Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. As alleged by the State in Section VIII paragraph 46 of the State's petition, Xerox has committed or is about to commit unlawful acts. The illegal acts of Xerox in failing to provide proper prior authorization review in rubber stamping the doctors prior authorization requests is not the fault of the doctors. The doctors are not responsible for or liable to the State for the illegal acts of a third party for which the doctors had no control; the State should not withhold money from the Intervenors because of the illegal acts of Xerox complained about by the State.

## Breach of Contract

66.    Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Intervenors are a direct or third party beneficiary of the contract with Xerox and the State of Texas. The State of Texas has breached terms of the contract by failing to supervise Xerox and/or reviewing the work product of Xerox. This breach by State, which allowed non-performance by Xerox, has created the pretext by which the State affirmatively sued Intervenors for repayment. To the extent that the State has withheld money and/or made claims for damages against Intervenors based on the contracts in question, the State has waived immunity and is liable up to those amounts plead.

## Conversion

67.    Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. State and Federal law required Intervenor to request prior authorization for orthodontic services. Those prior authorization requests were approved by Xerox, which required Intervenors to provide the services. The State has unilaterally made a decision to that, based on the acts and

omissions of Xerox, the Intervenor should not have been paid; the State then placed Intervenor on a payment hold. To the extent that Intervenor has provided services for which Intervenor should be paid, and money which has been earmarked by the State for that payment but withheld, the State has converted the funds. In addition, the States' acts/omissions are a violation of the Texas Constitution Section 9 in that the acts/omissions constitute a seizure of money held under the pretext of a payment hold.

## VI. Damages

68.    Intervenors have suffered and are entitled to recover damages including, but not limited to loss of use of funds sequestered by the State, actual damages, damage to reputation, damage to business, damage to earnings and earning power, inconvenience, loss of enjoyment of life, fees and expenses, interest, punitive/exemplary damages, and attorney fees.

## VII. Conclusion

69.    Xerox's actions have harmed Intervenor because Xerox committed fraud, negligent hiring, negligence, and gross negligence. Xerox's actions have subjected Intervenor to unnecessary civil and administrative legal action, and that, in turn has caused additional injury. Xerox's actions have required Intervenor to perform Xerox's job after-the-fact, by proving to the State that the orthodontic services rendered were medically necessary and appropriate for reimbursement. The State's actions have harmed Intervenor because the state's conspiracy to improperly blame the dentists has resulted in meritless legal claims against the Intervenors and conversion of the Intervenor's property.

## VIII. Jury Demand

70.    Intervenors respectfully requests a trial by jury.

## IX. Request for Disclosure

71.     Under Texas Rule of Civil Procedure 194, Intervenors request that Plaintiff the State disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## X. Prayer

72.     Wherefore, premises considered, Intervenors Westmoreland Dental, PA, Westmoreland Dental of Garland, PC, Westmoreland Dental and Orthodontics, PA, and Scottie H. Nguyen, DDS pray that upon final hearing of the cause, judgment be entered jointly and severally against the Plaintiff the State of Texas and Defendant Xerox State Healthcare, LLC for damages, together with pre-judgment and post judgment interest at the legal rate, costs of court, and other such relief to which the Intervenors may be entitled.

Respectfully submitted,

Jason Ray
Texas Bar No. 24000511
RIGGS, ALESHIRE & RAY, P.C.
700 Lavaca, Suite 920
Austin, Texas 78701
(512) 457-9806 (Telephone)
(512) 457-9866 (Fax)
jray@r-alaw.com


___/s/__Hart Green w/ permission by J Ray__
E. Hart Green
Texas Bar No. 08349290
Mitchell A. Toups
Texas Bar No. 20151600
WELLER, GREEN, TOUPS & TERRELL, L.L.P.
Post Office Box 350
Beaumont, Texas 77704-0350
(409) 838-0101 (Telephone)
(409) 832-8577 (Fax)
hartgr@wgttlaw.com
matoups@wgttlaw.com

**ATTORNEYS FOR INTERVENORS, WESTMORELAND DENTAL PA, WESTMORELAND DENTAL OF GARLAND, PC, WESTMORELAND DENTAL AND ORTHODONTICS, PA, AND SCOTTIE H. NGUYEN, DDS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plea in Intervention was served via e-mail and certified mail, return receipt requested on this 15th day of May, 2014 on the following:

Eric J.R. Nichols
Beck Redden
515 Congress Avenue, Suite 1750
Austin, Texas, 78701
ENICHOLS@beckredden.com
**Attorney for Xerox Defendants**

Raymond Winter
Chief, Civil Medicaid Fraud Division
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
raymond.winter@texasattorneygeneral.gov
**Attorney for the Plaintiff State of Texas**

Jason Ray

| | | |
|---|---|---|
| VICTOR M. ZURITA, DDS<br>INTERVENOR, | § <br> § <br> § | IN THE DISTRICT COURT |
| VS. | § <br> § | |
| THE STATE OF TEXAS,<br>PLAINTIFF, | § <br> § <br> § | 53rd JUDICIAL DISTRICT |
| VS. | § <br> § | |
| XEROX CORPORATION; XEROX<br>STATE HEALTHCARE, LLC; ACS<br>STATE HEALTHCARE, LLC, A XEROX<br>CORPORATION<br>DEFENDANTS. | § <br> § <br> § <br> § <br> § | TRAVIS COUNTY, TEXAS |

## PLEA IN INTERVENTION

### TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, Victor M. Zurita, DDS, hereinafter Intervenor, and file this Plea in Intervention, and in support hereof, would respectfully show the Court the following:

### I. Parties and Service

1.      Plaintiff, State of Texas, has appeared in this action and may be served with a notice of this Plea by sending a copy to its attorney, the Attorney General of Texas, Greg Abbott, at P. O. Box 12548, Austin, Texas 78711-2548.

2.      Defendant Xerox Corporation is a corporation organized under the laws of New York has agreed to accept service with process upon its Attorney in this suit. Defendant Xerox State Health Care, LLC, f/k/a ACS State Healthcare, LLC (misnamed by the State of Texas as ACS State Healthcare, LLC, a Xerox Corporation is a wholly-owned subsidiary of Xerox Corporation organized under the laws of the State of Delaware with Texas offices at 2828 N. Haskell Ave., Dallas, Texas 75204, and has agreed to accept service with process upon its Attorney in this suit.

Defendant Xerox Corporation acquired Defendant ACS in 2010. On information and belief, ACS State Healthcare, LLC, changed its name to Xerox State Healthcare, LLC, on April 1, 2012. Defendants are referred to hereinafter as "Xerox Defendants."

3.      Victor M. Zurita, DDS is a licensed Texas dentist, approved Medicaid provider. Victor M. Zurtita, DDS can be served through his undersigned counsel.

## II. Jurisdiction and Venue

4.      This Court has subject-matter jurisdiction in that the amounts sought by Intervenor from all parties (both Plaintiff and Defendants) are in excess of the minimal jurisdiction limits of this court. Intervenor affirmatively pleads that this suit is not governed by the expedited-actions process in TEXAS RULE OF CIVIL PROCEDURE 169 because Intervenor seeks monetary relief over $100,000.

5.      This Court has jurisdiction over all parties in this petition because:

   a)  The State has waived sovereign immunity and is subject to Intervenor's claims;

   b)  This Court has jurisdiction over Xerox Defendants because each Defendant does business in the State of Texas and committed the unlawful acts alleged in this petition in whole or part in Texas.

6.      Venue is proper in Travis County under TRCP §15.020 because this suit involves a "major transaction"; Venue is permissive under TRCP §15.035(a) because Intervenor asserts claims for breach of contract. Venue is proper pursuant to TRCP §15.02 because all or a substantial part of the events or omissions giving rise to the claim occurred in Travis County. Many of the unlawful acts committed by the State and Xerox Defendants were committed in Travis County, including the making of false statements and misrepresentations of material fact.

## III. Intervenor's Interest in the Suit

7.     Intervenor has a judicial interest in the matters and controversy in this litigation. The relationship between Intervenor, the State as the Plaintiff and the Xerox Defendants is a tripartite arrangement necessitating that, in the interest of judicial economy and justice, all claims be bound and subsumed into one cause of action. Upon information and belief, Intervenor was initially sued by the State in a *qui tam* action wherein the State alleged that Intervenor defrauded the State. The State has elected to pursue its remedies against the Intervenor in an administrative hearing. Now, the State has sued Xerox in State Court on the same facts, alleging that Xerox has committed fraud against the State. Intervenor has claims against both the State and Xerox. It is assumed that Xerox will have claims against the State, and perhaps allege claims against the Intervenor. All of the different parties' claims are inextricably intertwined, as they relate to Intervenor's submission of prior authorization requests to Xerox, the handling of those claims by the Xerox Defendants, the State's handling and oversight of its agent Xerox in Xerox's performance of its contractual and legal duties, and State's subsequent legal action against the Intervenors for services approved by Xerox.

## IV. Facts

### What is Prior Authorization?

8.     Texas Medicaid requires that orthodontic services be independently and objectively scrutinized before the State consents to treatment and payment. Prior authorization is the mechanism the State uses to determine the medical necessity of non-emergency orthodontic items/services prior to delivery of those items/services. Pursuant to Texas Health and Human Services Commission (hereinafter "HHSC") rules, Texas Medicaid greatly restricts when it will pay for orthodontic services:

> Orthodontic services for cosmetic reasons only are not a covered Medicaid service. **Orthodontic services must be prior authorized** and are limited to treatment of severe handicapping malocclusion and other related conditions as described and measured by the procedures and standards published in the [TMPPM[1]].

25 TEX. ADMIN. CODE §33.71 (emphasis added). Prior authorization is a statement of assurance to the orthodontic provider that, absent an intervening disqualifying factor, the delivery of the requested orthodontic service has been deemed by Xerox to be medically necessary, and therefore approved by the State.

9.     The prior authorization process is straightforward. Texas Medicaid requires that a dental provider send documentation (x-rays, cephalographs, photos, etc.) regarding the patient's orthodontic condition to Xerox for review. In addition, the orthodontic provider submits his professional opinion of the patient on a Handicapping Labio-lingual Deviation index (HLD) score sheet. Xerox knew providers relied entirely on the prior authorization process because approval was a mandatory prerequisite to providing orthodontic services and being paid. Once Xerox issued its prior authorization decision, the decision was not appealable by the provider.

10.     The HLD scoring system combines a number of treatable orthodontic conditions into an index. HLD score sheets use a mix of objective and subjective conditions to determine whether a Medicaid patient qualifies for orthodontic services. The fact that the HLD score sheet requires both objective and subjective findings highlights the importance of Xerox performing a thorough prior authorization review.

The History of Orthodontic Prior Authorization.

11.     The process for reviewing and approving orthodontic prior authorization requests pre-dates the defendant Xerox's handling of Medicaid claims processing. The National Heritage

---

[1] "TMPPM" is the Texas Medicaid Provider Procedures Manual, which is issued yearly by the HHSC and provides valuable guidance to Medicaid providers.

Insurance Corporation (NHIC) was responsible for reviewing prior authorization requests before Xerox assumed the contract in January 2004. Starting January 1, 2004, Xerox acted as an independent contractor, and was a contracted agent of the State, under the contract with HHSC. Xerox was responsible for reviewing each orthodontic service request, and Xerox was further charged with the responsibility to grant or deny each prior authorization request per the program requirements. The result was that Xerox had the final say in determining the medical necessity of each request for orthodontic services.

12.    Prior to assuming the NHIC contract, and for a period of time after assuming the contract from NHIC, Xerox received training from NHIC personnel regarding the proper method for receiving and processing orthodontic prior authorization requests. NHIC personnel explained how and why the review of each prior authorization submission was important, and walked Xerox through the process. Despite its training from NHIC, Xerox had no intention of following the prior authorization system that had been in place for years, nor did Xerox intend to otherwise meet the prior authorization requirements set out in its contract, the TMPPM and required by state law.

Xerox rejects its contractual responsibilities.

13.    When Xerox took over the contract in 2004, it immediately abandoned the prior authorization review process that had been setup by NHIC. Xerox never intended to fulfill its orthodontic prior authorization responsibilities to HHSC. From 2004 to 2011, Xerox continually misrepresented that it was acting in compliance with its contractual duties.

14.    It is now known that Xerox failed to adequately staff their prior authorization division with knowledgeable medical professionals. Xerox employed only one licensed dentist from 2004 through 2011, which was far short of the manpower necessary to handle the review of tens of

thousands of orthodontic prior authorization requests every year. Xerox could not reasonably have expected to handle such a workload by employing only one dentist.

Xerox potentially commits thousands of violations.

15.     It is believed Xerox allowed "dental specialists"—unlicensed, unqualified individuals—to render prior authorization opinions regarding the medical necessity of requested orthodontic services. The "dental specialist" approvals were not reviewed or ratified by Xerox's licensed dental director or another qualified dental professional. These actions not only violated Xerox's contractual obligations, they may have also violated other Texas law such as the Dental Practice Act.[2] It is believed these unlicensed Xerox "specialists" rendered tens of thousands of prior authorization approvals/medical opinions in violation of Texas law.

16.     Xerox was paid by the state for each prior authorization decision that was made. It is believed that Xerox employed unlicensed "specialists," rather than licensed Texas dentists, as a profit generating measure.

17.     From January 2005 through February 2012, Intervenor submitted prior authorization requests, as required, to Xerox for a determination of medical necessity. Unbeknownst to Intervenor, Xerox's dental specialists—not the dental director—approved almost all of Intervenor's requests. Xerox's prior authorization approvals were promises that:

        a) the requested orthodontic services were medically necessary, and/or

        b) the approval had been issued by a licensed dentist, and/or

        c) the approval was an actual and legitimate dental diagnosis, and/or

        d) the requested orthodontic services were allowable under Texas law and as permitted

_____

[2] Texas Occupations Code §251.003 prevents unlicensed individuals from diagnosing conditions of the human teeth and mouth. Section 256.001 states that a person may not practice dentistry without a license. Thus, state law requires that opinions regarding medical necessity of orthodontic treatment must be made by licensed dentists. Section 264.151 prescribes penalties for certain violations of the Dental Practice Act.

by Medicaid policy, the TMPPM, and HHSC rules, and/or

e) a proper, thorough and legal review had been made, and/or

f) future orthodontic services would be properly reimburseable to Intervenor, absent some intervening disqualification (such as the patient's ineligibility).

18.     Because Xerox was charged with determining medical necessity, and because prior authorization approval was a mandatory prerequisite to furnishing services, the promises were material. Intervenor expected performance of these promises. Intervenor relied on Xerox. Further, Xerox promised that its subsequent payments to Intervenor (after the services had actually been delivered) were made because the services had been, in fact, properly approved as medically necessary. Each prior authorization approval represents a separate violation of the law **if** Xerox's approval was issued illegally and/or in violation of its contractual obligations.

<u>Xerox actively concealed its potentially illegal activity.</u>

19.     Xerox withheld the truth regarding its prior authorization program. In an attempt to publicly appear consistent with NHIC's prior authorization process, Xerox continued to require that dental providers (such as Intervenor) submit all supporting documentation for each HLD score sheet. It is now believed that, incredibly, Xerox did nothing with that documentation, other than assure that it had been submitted by the provider. It is believed that Xerox's specialists were instructed to forward to its dental director only those requests that had scored below the threshold for orthodontic services (i.e. below 26 points on the HLD score sheet), or had some provider justification attached. As a result, only 10% of the orthodontic prior authorization requests were actually forwarded to Xerox's one licensed dentist. Xerox's actions were calculated to make Xerox appear compliant with its contract and HHSC policies, while Xerox knew that its actions were entirely inconsistent with the letter and spirit of its obligations.

Effectively, then, Xerox's actions not only damaged the Medicaid program directly by approving services without determining their medical necessity, but Xerox's deception also exacerbated the problem by failing to give providers guidance regarding the proper standard for medical necessity, thus causing these providers substantial damages.

20.     For the past ten years, Xerox has continued to publicly represent to the world that it was fulfilling its contractual and legal responsibilities. Based on Xerox's representations that it was fulfilling its duties to the State, Xerox had its contract with HHSC repeatedly renewed from 2004 through the present. Each year that Xerox had its contract renewed, it represented that it would fulfill its contractual obligations and abide by Texas law requiring that decisions about medical necessity be rendered only by licensed dentists. Xerox made those representations knowing that it had not done so in the past, and had no intention of changing its procedures to do so in the future.

The *Frew* decision magnifies Xerox's acts.

21.     In September 2007, after fifteen years of litigation on the subject, Texas was ordered to implement a corrective action plan that increased the Medicaid reimbursement rates to all dental providers. That plan was required pursuant to the *Frew* case[3], which was a 1993 class-action lawsuit against the HHSC alleging that Texas' Medicaid reimbursement rates were so low that they prevented indigent children from receiving timely, comprehensive health care.

22.     In response to *Frew's* corrective action plan, the 2007 Texas Legislature allocated $707 million ($1.8 billion in state and federal funds combined) to increase medical and dental

---

[3] *Frew v. Gilbert*, 109 F. Supp. 2d 579 (E.D. Tex. 2000) *vacated sub nom. Frazar v. Gilbert*, 300 F.3d 530 (5th Cir. 2002) *rev'd sub nom. Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 124 S. Ct. 899, 157 L. Ed. 2d 855 (2004) and *aff'd in part, appeal dismissed in part sub nom. Frazar v. Hawkins*, 376 F.3d 444 (5th Cir. 2004); *Frew v. Hawkins*, 401 F. Supp. 2d 619 (E.D. Tex. 2005) *aff'd sub nom. Frazar v. Ladd*, 457 F.3d 432 (5th Cir. 2006); *Hawkins v Frew*, 549 U.S. 1118, 127 S. Ct. 1039, 166 L. Ed. 2d 714 (2007).

reimbursement rates. The increase in dental reimbursement rates was intended to entice dentists to become Medicaid providers. It worked. The state raised payment rates for dental services, and, as a result, the number of dentists participating in Medicaid increased from 45.4% in 2007 to 63.4% in 2010. As expected indeed, as intended spending on Texas's dental services increased dramatically.

23. Although the number of prior approval requests increased by 240% between 2007 and 2010, Xerox continued to employ only one dentist. That dentist was neither tasked with nor responsible for supervising the clerical specialists that were issuing the approvals.

24. By 2010, orthodontic spending under Texas' Medicaid program had skyrocketed. Xerox was the sole entity responsible for overseeing this increase, because it was the sole gatekeeper for the approval and payment of orthodontic services. Although the Texas Legislature had increased funding to attract dentists into the Medicaid program, all of the budgeted funds were required to be spent only on medically necessary services.

The Office of Inspector General seeks recovery from Medicaid providers.

25. In early 2011, a series of news stories began highlighting the large amount of money being spent on orthodontics in Texas. In July 2011, the Federal government notified Texas of its intent to audit whether Texas' prior authorization process was ensuring that only medically necessary orthodontic cases were being approved and paid. With the prospect of a federal clawback action looming against Texas because of Xerox's prior authorization failures, the Texas Office of Inspector General (hereinafter "State") took a drastic step. Beginning in 2011, the State generated a list of the top Medicaid orthodontic billers and placed them on "payment hold." Intervenor was one of those providers.

26. Given Intervenor's proximity to some of the state's poorest children, and the mandates of

the *Frew* decision, Intervenor served a large Medicaid patient population. Because it served a large Medicaid population, it submitted a large number of prior authorization requests to Xerox from 2004 through 2011.

27.    Intervenor did not know that Xerox was failing to perform a true and accurate review for medical necessity. Intervenor relied on Xerox's prior authorization approvals to confirm that dentists' analysis was proper and consistent with Medicaid standards and requirements.

28.    Again unbeknownst to Intervenor, State audits in 2008 and 2012 concluded that most, if not almost all, of the prior authorization requests for patients with HLD scores of 26 or greater (indicating medical necessity) had not been actually "evaluated" at all by Xerox. These State audits made the Federal government's pending audit especially dangerous to Texas, because the 2008 and 2012 audits were admissions that Xerox had been approving and paying claims that may not have met the federal standards for prior authorization. Thus the State, through the Attorney General, concluded that a true finding of medical necessity had in reality not occurred. The Attorney General claimed that billing for services that are not necessary is fraud, despite Xerox's prior authorization approvals.

29.    It is now believed that rather than prosecute Xerox for its failure to properly evaluate dentists' prior authorization requests, the State and the Texas Attorney General protected Xerox. This protection included the State failing to allow TMHP to hire additional medically licensed staff, and in 2008-2009 telling TMHP to continue its prior authorization practices. Although the Attorney General took immediate action against the providers, the Attorney General refused to hold Xerox accountable for its orthodontic "approvals," its repeated contractual failures, or its violation of State law. Instead, the Attorney General made fraud allegations against each of the top 25 dental providers, including Intervenor, which has caused more injury and damages to

Intervenor. Stated differently, Xerox issued its approvals through a process that gutted the State's belief in the accuracy of Xerox's decision, and the Texas Attorney General punished the providers instead of Xerox.

30.     Because the acts/omissions of Xerox so undermined the process, the State eventually instituted a "payment hold" against Intervenor. A payment hold temporarily freezes future Medicaid payments to a provider, despite the provider's ongoing participation in the Medicaid program. The payment hold against Intervenor was issued pursuant to what the State called a "credible allegation of fraud" regarding Intervenor's orthodontic prior authorization requests. The State placed a 100% payment hold against Intervenor's orthodontic billings.

31.     At the time the Attorney General began prosecuting Intervenor and similarly situated Medicaid providers, it knew Xerox, not Intervenor, had the sole authority and responsibility to authorize orthodontic services and payments. The Attorney General knew that the State's audits of Xerox in 2008 and 2012 had concluded that Xerox was violating its contract with the State, violating its own State-approved policies and procedures, and violating State law. Nevertheless, the Attorney General continued to only prosecute dental providers like the Intervenor; the Attorney General refused to hold Xerox responsible. In fact, in one shameless and brazen demonstration of State's unwavering protection of Xerox, the Deputy Director of Texas' Office of the Inspector General testified in a hearing that Xerox's acts and omissions were so egregious they were outside the course and scope of Xerox's agency with State.[4] Upon information and belief, the State and the Attorney General protected Xerox for over 6 years fearing that revealing the State's culpability would subject the State to a federal clawback for hundreds of millions of

---

[4] Incredibly, that testimony came in an administrative proceeding in which the State was seeking $8 million from a dental provider for following Xerox's instructions to provide braces to the provider's patients. The idea that the State could not hold Xerox responsible for its contractual obligations because Xerox had done such a poor job that it was acting outside of its contract is a novel and imaginative reason not to prosecute Xerox.

dollars. Instead, the State and the Attorney General pointed at the dental providers.

32. Ultimately, the evidence of Xerox's failures, and the State's refusal to correct Xerox for over 6 years, became too much to hide. Three months after some providers filed suit against Xerox, and following a series of news stories questioning why Xerox had not suffered for its failures, the Attorney General reversed course. On May 9, 2014, the State, through the Texas Attorney General, filed this lawsuit against Xerox for fraud, basically mirroring the suit filed approximately 100 days earlier by similarly situated providers. The State's claims in this fraud lawsuit include admissions that the State knew as early as 2006 that Xerox's actions were improper.

33. As a result of the payment hold, Intervenor was required to make significant financial concessions and changes to its business. Intervenor also engaged legal counsel to defend itself from the State's claims, at a significant expense that continues today.

34. The State's allegations against Intervenor are rooted in two assumptions. First, the State assumes Intervenor's prior authorization requests were not properly vetted by Xerox; that is, Xerox approved Intervenor's requests without knowing whether approval was actually proper. Because Xerox is not a party to Intervenor's administrative case, Intervenor is prevented from determining whether Xerox did, in fact, perform a proper review of Intervenor's prior authorization requests. By intervening in this lawsuit, Intervenor seeks to address that question, and finally determine whether Xerox reviewed Intervenor's requests as required by its contract and the law.

35. Regarding the State's second assumption, the State alleges some of Intervenor's requests were approved when, in fact, they should have been denied. Intervenor denied that assertion in the administrative case, and Intervenor continues to deny that claim here. All services provided

to Intervenor's patients were actually medically necessary, regardless of what Xerox decided and in any event under Medicaid guidelines once the authorization was approved, Intervenor was required to provide the services.

36. The State continues to aggressively fight any allegation or affirmative defense that could result in Xerox being held accountable for its part in these HLD scoring cases, despite the State's contentions in the District Court case to the contrary. Damages continue to accrue.

## V. Causes of Action

### A. Intervenor's Claims Against Xerox

### Common Law Fraud (Fraudulent Misrepresentation and Fraudulent Inducement)

37. Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's prior authorization approvals were false representations made to Intervenor. It is believed Xerox knowingly issued these prior authorizations to Intervenor because Xerox knew that it was approving requests without a proper medical review, and/or because it approved the prior authorization requests without any knowledge of their truth. It is believed Xerox intended for Intervenor to rely on the approvals as a prerequisite for providing the requested services. Approval was material because it was a mandatory prerequisite for payment. Intervenor actually and justifiably relied on Xerox's fraudulent approvals.

38. Xerox's approvals induced Intervenor to continue to grade subsequent HLD requests in the same or similar manner, and led Intervenor to believe that their requests were consistent with Medicaid standards and requirements.

39. Xerox's fraudulent approvals caused injury to Intervenor. As a result of Xerox's actions, Intervenor submitted requests for payment and Xerox actually paid for those services, Intervenor was placed on payment hold, Intervenor is forced to defend itself in an administrative payment

hold hearing, and Intervenor is facing administrative claims by HHSC for repayment (including claims for treble damages and attorney fees). Intervenor's reputation and business have suffered severe injury. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

## Breach of the Xerox-State of Texas Contract

40. Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. In the alternative, Xerox's actions constitute a breach of Xerox's contract with the State for the benefit of Intervenor. Xerox's contract with the state required that it conduct a proper, thorough and legal review of prior authorization requests for the purpose of determining medical necessity. To that end, Xerox should have employed a licensed dentist.

41. Xerox was an agent of the State of Texas engaged specifically for the purpose of determining medical necessity. The third party beneficiaries of that Xerox-State of Texas contract were Medicaid patients and Intervenor. The patients were entitled to receive orthodontic services that were medically necessary. Intervenor was responsible for actually delivering the orthodontic services that Xerox had deemed medically necessary. Thus, Intervenor was a third party beneficiary that relied on Xerox's approvals.

42. Xerox breached its contract by, *inter alia*, failing to provide qualified staff; possibly violating Texas law; permitting non-dentists to make determinations of medical necessity; and issuing medical opinions without conducting a reasonable and prudent examination of evidence. The breaches were material, and recurred across many different Medicaid patients and for many years.

43. Xerox's actions proximately caused Intervenor's injury. Intervenor's injuries were caused-in-fact by Xerox's actions, and they were foreseeable. Because Xerox's prior

authorization was a necessary prerequisite to providing services, Intervenor relied entirely on Xerox's determinations regarding medical necessity; thus, Xerox's actions were the direct factual cause of Intervenor's injuries. Xerox's actions were foreseeable in that a person of ordinary intelligence should have anticipated that issuing a decision without actually reviewing or considering the evidence (x-rays, photos, models, etc.) would eviscerate the credibility and reliability of the decision. Once the State assumed that Xerox's approvals were not trustworthy, it was foreseeable that the State would demand repayment, and/or would require Intervenor to independently do Xerox's job after the fact by proving that payment was proper because the services were medically necessary and reimbursable under Texas Medicaid law.

44.     Intervenor suffered and continues to suffer significant damage. Intervenor seeks damages that would have given the Intervenor the benefit of the bargain by putting them in as good a position as they would have been in if the contract had been performed.   Intervenor seeks reliance interest damages to restore the expenditures Intervenor made in reliance on Xerox's contract with the state and the approvals that Xerox made under that contract.   Intervenor also seeks damages for its restitution interest to restore money sought by the Office of the Inspector General from Intervenor. Such damages would put the Intervenor in as good a position as it would have been in if the contract had been properly fulfilled. In addition, Intervenor seeks liquidated damages as set out in the Xerox-State of Texas contract. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor has incurred benefit of the bargain damages, out-of-pocket damages, lost profits, lost future profits, loss of credit, and loss of goodwill.   Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

## Breach of Contract (Promissory Estoppel)

45.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. In the alternative, Xerox's actions constitute promissory estoppel.

46.     Xerox's prior authorizations constitute promises to Intervenor in numerous ways. Because prior authorization was a prerequisite to furnishing services, and because Xerox was the entity charged with discharging prior authorization duties, Intervenor reasonably, substantially, and foreseeably relied on Xerox's promises.

47.     Intervenor suffered and continues to suffer significant damage. Intervenor suffered reliance damages by investing time, labor, equipment, and orthodontic appliances in each Medicaid patient that Xerox approved. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor has been required to do Xerox's job after the fact—namely, demonstrate that the services were medically necessary and properly reimbursable under Texas Medicaid law. Intervenor has incurred benefit of the bargain damages, out-of-pocket damages, lost profits, lost future profits, loss of credit, and loss of goodwill. All of these damages were directly and/or proximately caused by Xerox's promises. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

## Negligent Hiring/Negligent Supervision

48.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's actions constitute negligent hiring and/or negligent supervision. Xerox was required to render medical diagnoses. To that end, Xerox was required by law to employ a licensed dentist to render a diagnosis regarding medical necessity. Xerox was also required by law to properly supervise its employees to make sure diagnoses were made only by licensed

dentists.

49. Xerox knew or should have known that decisions regarding medical necessity can only be rendered by licensed personnel. Texas Occupations Code section 251.003 defines the practice of dentistry to include a diagnosis of the human mouth and/or teeth; section 256.001 states that a person may not practice dentistry without a license; section 264.151 makes it a third-degree felony to practice dentistry without a license.

50. Xerox's actions proximately caused Intervenor's injury. Intervenor's injuries were caused-in-fact by Xerox's actions, and they were foreseeable. Because Xerox's prior authorization was a necessary prerequisite to providing services, Intervenor relied entirely on Xerox's determinations regarding medical necessity; thus, Xerox's actions were the direct factual cause of Intervenor's injuries. Xerox's actions were foreseeable in that any person of ordinary intelligence should have anticipated that paying Intervenor for services that have not properly been determined to be medically necessity would precipitate a demand for repayment, and/or would require Intervenor to independently do Xerox's job after the fact by proving that payment was proper because those services were medically necessary and were reimbursable under Texas Medicaid law.

51. Intervenor suffered and continues to suffer significant damage. Intervenor suffered reliance damages by investing the cost of services for each Medicaid patient that Xerox approved. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor suffered and continues to suffer significant damage to its reputation, business, referral base, earnings and earning power. Intervenor has suffered inconvenience and loss of enjoyment of life in that he has had to dedicate significant mental and personal capital to doing Xerox's job. Intervenor has suffered exemplary damages

because Xerox's conduct was grossly negligent, outrageous and malicious, and such conduct should be penalized so that it is deterred in the future. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

## Negligence

52.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's actions constitute negligence and gross negligence. Xerox was required to render medical diagnoses. To that end, Xerox had a duty to employ a licensed dentist to render a diagnosis supporting or denying medical necessity. Xerox had a duty to assure that the personnel had appropriate education, training and experience to render such a finding. Xerox had a duty to review the supporting prior authorization documentation (such as x-rays and photos) to determine whether the requested services were medically necessary.

53.     Xerox's actions breached the standard of care because Xerox: failed to provide prior authorization staff that were properly licensed, qualified and experienced dental professionals; violated the law, specifically the Dental Practice Act, by permitting non-dentists to make determinations of medical necessity, and; issued medical opinions (prior authorizations) without conducting a reasonable and prudent examination of evidence.

54.     Xerox's actions proximately caused Intervenor's injury. Intervenor's injuries were caused-in-fact by Xerox's actions, and they were foreseeable. Because Xerox's prior authorization was a necessary prerequisite to providing services, Intervenor relied entirely on Xerox's determinations regarding medical necessity; thus, Xerox's actions were the direct factual cause of Intervenor's injuries. Xerox's actions were foreseeable in that any person of ordinary intelligence should have anticipated that paying Intervenor for services that have not properly been determined to be medically necessity would precipitate a demand for repayment, and/or

would require Intervenor to independently do Xerox's job after the fact.

55.     Intervenor suffered and continues to suffer significant damage to its reputation, business, referral base, earnings and earning power. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Victor M. Zurita, DDS has suffered inconvenience and loss of enjoyment of life in that he has had to dedicate significant mental and personal capital to doing Xerox's job. Intervenor has suffered exemplary damages because Xerox's conduct is grossly negligent, outrageous and malicious, and such conduct should be penalized so that it is deterred in the future. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

### Negligent Misrepresentation

56.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Xerox's actions constitute negligent misrepresentation. Xerox's actions constitute misrepresentations to Intervenor in numerous ways. Because, *inter alia*, prior authorization approval was a prerequisite to furnishing services, these representations guided and controlled Intervenor's responses. Intervenor justifiably relied on these representations. Further, Xerox represented that its prior authorization approvals were dispositive of medical necessity; Intervenor expected that, once approved, no further inquiry into the medical necessity of the services would be required. Further, Xerox represented that its subsequent payments to Intervenor (after the services had actually been delivered) were made because services had been, in fact, properly approved as medically necessary.

57.     Xerox did not exercise reasonable care or competence in making its determinations and representations. Xerox knew or should have known that its representations were false.

58.     Because prior authorization was a prerequisite to furnishing services, and because Xerox

was the entity charged with discharging prior authorization duties, Intervenor reasonably, substantially, foreseeably, and justifiably relied on Xerox's representations.

59.     Intervenor suffered and continues to suffer significant damage. Intervenor suffered reliance damages by investing time, labor, equipment, and orthodontic appliances in each Medicaid patient that Xerox approved. Intervenor has engaged legal counsel to defend itself from the State's charges, and those legal expenses continue today. Intervenor has been required to do Xerox's job after the fact. Intervenor has incurred benefit of the bargain damages, out-of-pocket damages, lost profits, loss of credit, and loss of goodwill. All of these damages were directly and/or proximately cause by Xerox's negligent misrepresentations. Intervenor seeks recovery of actual and exemplary damages, interest, court costs, and attorney fees.

### Gross Negligence / Misapplication of Fiduciary Property

60.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Plaintiffs plead Xerox committed gross negligence and/or the misapplication of fiduciary property which would entitle Intervenors to unlimited punitive damages.

### B. Intervenors' Claims Against The State of Texas

### Waiver of Sovereign Immunity

61.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein.  For a number of reasons, the State has waived sovereign immunity for claims by Intervenor, including the facts that the State  brought, threatened and/or has taken civil and/or administrative action against Intervenors, and because the State has filed suit against Xerox.

### Conspiracy/Joint Enterprise

62.     Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein.  In the alternative, former Deputy Inspector General Jack Stick has stated publicly that

Plea in Intervention
Page 20 of 25

acts and omissions of Xerox were so egregious as to be outside the course of scope of Xerox's agency relationship with the State. Assuming same to be true, then the State conspired with Xerox to breach the contract or allow the breach to continue, conspired to withhold funds from Intervenor but not Xerox, and conspired to falsely accuse Intervenor of fraud/crime.

63.    The State conspired with Xerox to allow Xerox to violate its various contractual duties. The State permitted Xerox to process as many prior authorizations as possible without the required clinical dental review and without using medically knowledgeable personnel. The State conspired with Xerox to allow Xerox to violate State and Federal law. The State and Xerox created a scheme to rubber stamp and/or allow no legitimate review of prior authorizations submitted by the dentists. The conspiracy was committed with the intent to shift blame from the State and its agent, improperly blame the Intervenors, and enrich the State and Xerox. By recouping money from providers that were not actually to blame, the State and Xerox hoped to limit their own liability in the event of a Federal clawback action, and/or respond to unflattering news reports of Texas' payments for Medicaid braces. This agreement and ensuing acts of the party to blame the dentist providers for their own improper acts and omissions is a proximate cause of the injury to Intervenors.

## Not Liable for Illegal Acts of Third Party

64.    Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. As alleged by the State in Section VIII paragraph 46 of the State's petition, Xerox has committed or is about to commit unlawful acts. The illegal acts of Xerox in failing to provide proper prior authorization review in rubber stamping the doctors prior authorization requests is not the fault of the doctors. The doctors are not responsible for or liable to the State for the

Plea in Intervention
Page 21 of 25

illegal acts of a third party for which the doctors had no control; the State should not withhold money from the Intervenors because of the illegal acts of Xerox complained about by the State.

## Breach of Contract

65.    Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. Intervenors are a direct or third party beneficiary of the contract with Xerox and the State of Texas. The State of Texas has breached terms of the contract by failing to supervise Xerox and/or reviewing the work product of Xerox. This breach by State, which allowed non-performance by Xerox, has created the pretext by which the State affirmatively sued Intervenors for repayment. To the extent that the State has withheld money and/or made claims for damages against Intervenors based on the contracts in question, the State has waived immunity and is liable up to those amounts plead.

## Conversion

66.    Intervenor re-alleges and incorporates the above facts and allegations as if fully set out herein. State and Federal law required Intervenor to request prior authorization for orthodontic services. Those prior authorization requests were approved by Xerox, which required Intervenors to provide the services. The State has unilaterally made a decision to that, based on the acts and omissions of Xerox, the Intervenor should not have been paid; the State then placed Intervenor on a payment hold. To the extent that Intervenor has provided services for which Intervenor should be paid, and money which has been earmarked by the State for that payment but withheld, the State has converted the funds. In addition, the States' acts/omissions are a violation of the Texas Constitution Section 9 in that the acts/omissions constitute a seizure of money held under the pretext of a payment hold.

## VI. Damages

67.    Intervenors have suffered and are entitled to recover damages including, but not limited to loss of use of funds sequestered by the State, actual damages, damage to reputation, damage to business, damage to earnings and earning power, inconvenience, loss of enjoyment of life, fees and expenses, interest, punitive/exemplary damages, and attorney fees.

## VII. Conclusion

68.    Xerox's actions have harmed Intervenor because Xerox committed fraud, negligent hiring, negligence, and gross negligence. Xerox's actions have subjected Intervenor to unnecessary civil and administrative legal action, and that, in turn has caused additional injury. Xerox's actions have required Intervenor to perform Xerox's job after-the-fact, by proving to the State that the orthodontic services rendered were medically necessary and appropriate for reimbursement. The State's actions have harmed Intervenor because the state's conspiracy to improperly blame the dentists has resulted in meritless legal claims against the Intervenor and conversion of the Intervenor's property.

## VIII. Jury Demand

69.    Intervenor respectfully requests a trial by jury.

## IX. Request for Disclosure

70.    Under Texas Rule of Civil Procedure 194, Intervenor requests that Plaintiff the State disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## X. Prayer

71.    Wherefore, premises considered, Intervenor Victor M. Zurita, DDS pray that upon final hearing of the cause, judgment be entered jointly and severally against the Plaintiff the State of

Texas and Defendant Xerox State Healthcare, LLC for damages, together with pre-judgment and post judgment interest at the legal rate, costs of court, and other such relief to which the Intervenor may be entitled.

Respectfully submitted,

Jason Ray
Texas Bar No. 24000511
**RIGGS, ALESHIRE & RAY, P.C.**
700 Lavaca, Suite 920
Austin, Texas 78701
(512) 457-9806 (Telephone)
(512) 457-9866 (Fax)
jray@r-alaw.com


    /s/ Hart Green w/ permission by J Ray
E. Hart Green
Texas Bar No. 08349290
Mitchell A. Toups
Texas Bar No. 20151600
**WELLER, GREEN, TOUPS & TERRELL, L.L.P.**
Post Office Box 350
Beaumont, Texas 77704-0350
(409) 838-0101 (Telephone)
(409) 832-8577 (Fax)
hartgr@wgttlaw.com
matoups@wgttlaw.com
**ATTORNEYS FOR INTERVENOR**
**VICTOR M. ZURITA, DDS**

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plea in Intervention was served via e-mail and certified mail, return receipt requested on this 15th day of May, 2014 on the following:

Eric J.R. Nichols
Beck Redden
515 Congress Avenue, Suite 1750
Austin, Texas, 78701
ENICHOLS@beckredden.com
**Attorney for Xerox Defendants**

Raymond Winter
Chief, Civil Medicaid Fraud Division
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
raymond.winter@texasattorneygeneral.gov
**Attorney for the Plaintiff State of Texas**

Jason Ray

# Tab E

**Xerox's Original Answer to Defendants' Original Third Party Petition**

CAUSE NO. D-1-GN-14-005380

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| v. | § | |
| | § | |
| DR. BEHZAD NAZARI, D.D.S. D/B/A | § | |
| ANTOINE DENTAL CENTER, et. al. | § | |
| | § | 53RD JUDICIAL DISTRICT |
| Defendants/Third Party | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| XEROX CORPORATION, et al. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| Third-Party Defendants. | § | |

## XEROX'S ORIGINAL ANSWER TO
## DEFENDANTS' ORIGINAL THIRD PARTY PETITION

TO THE HONORABLE JUDGE OF THIS COURT:

COME NOW Xerox Corporation, and Xerox State Healthcare, LLC, formerly known as ACS State Healthcare, LLC (collectively the "Xerox Parties") and file this original answer, pursuant to Rule 92 of the Texas Rules of Civil Procedure, in order to respond to the allegations and causes of action asserted in the Original Answer and Third Party Petition filed by Defendants/Third Party Plaintiffs Dr. Behzad Nazari. D.D.S. d/b/a Antoine Dental Center, Dr. Behzad Nazari, Harlingen Family Dentistry, PC a/k/a Practical Business Solutions, Series LLC, Juan D. Villarreal D.D.S., Series PLLC d/b/a/ Harlingen Family Dentistry Group, Dr. Juan Villarreal, Dr. Richard F. Herrscher, D.D.S., M.S.D., P.C., Dr. Richard F. Herrscher, M&M Orthodontics, PA, Dr. Scott Malone, Dr. Diana Malone, Michelle Smith, National Orthodontix, Mgmt., PLLC, Dr. John Vondrak, RGV Smiles by Rocky Salinas, D.D.S. PA, and Dr. Rocky Salinas (collectively "Defendants/Third Party Plaintiffs") and any subsequently amended or

supplemented third party petition. In support thereof, the Xerox Parties would respectfully show the Court as follows:

## GENERAL DENIAL

Subject to stipulations or admissions that may hereafter be made, the Xerox Parties enter their general denial, pursuant to Rule 92 of the Texas Rules of Civil Procedure, thereby denying each and every, all and singular, of the material allegations made by Defendants/Third Party Plaintiffs, and the Xerox Parties request that each of Defendants/Third Party Plaintiffs be required to prove all charges and allegations by the applicable standard of proof required by the laws of the State of Texas.

## AMENDMENT AND SUPPLEMENTATION OF ANSWER

The Xerox Parties reserve their rights to amend and/or supplement their answer pursuant to the Texas Rules of Civil Procedure and orders of the Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, The Xerox Parties respectfully request that this Court, upon full and final hearing of this matter, enter judgment that Defendants/Third Party Plaintiffs take nothing against the Xerox Parties by way of their claims in this action and for such other relief, both special and general, in law and in equity, to which the Xerox Parties may show themselves to be justly entitled.

2

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: _/s/ Robert C. Walters_
        Robert C. Walters
        State Bar No. 20820300
        E-mail: RWalters@gibsondunn.com
2100 McKinney Avenue, Suite 1100
Dallas, Texas 75201
Tel: 214-698-3100
Fax: 214-571-2900

BECK | REDDEN LLP

By: _/s/ Eric J.R. Nichols_
        Eric J.R. Nichols
        State Bar No. 14994500
        E-mail: enichols@beckredden.com
        Christopher R. Cowan
        State Bar No. 24084975
        E-mail: ccowan@beckredden.com
515 Congress Avenue, Suite 1750
Austin, Texas 78701
Tel: 512-708-1000
Fax: 512-708-1002
        W. Curt Webb
        State Bar No. 21035900
        E-mail: cwebb@beckredden.com
        Constance H. Pfeiffer
        E-mail: cpfeiffer@beckredden.com
        State Bar No. 24046627
1221 McKinney Street, Suite 4500
Houston, Texas 77010
Tel: 713-951-3700
Fax: 713-951-3720

ATTORNEYS FOR
XEROX CORPORATION, XEROX STATE
HEALTHCARE, LLC, F/K/A ACS STATE
HEALTHCARE, LLC

3

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of February, 2015, I caused a copy of the foregoing to be served to the following counsel via e-mail:

### Counsel for Plaintiff State of Texas:

Raymond Winter
Chief, Civil Medicaid Fraud Division
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
E-mail: raymond.winter@texasattorneygeneral.gov

Reynolds Brissenden
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Email: reynolds.brissenden@texasattorneygeneral.gov

### Counsel for Defendants/Third-Party Plaintiffs:

Jason Ray
Riggs, Aleshire & Ray, P.C.
700 Lavaca, Suite 920
Austin, Texas 78701
E-mail: jray@r-alaw.com

E. Hart Green
Weller, Green, Toups & Terrell, L.L.P.
Post Office Box 350
Beaumont, Texas 77704-0350
E-mail: hartgr@wgttlaw.com

/s/Christopher R. Cowan
Christopher R. Cowan

4

# Tab F

**Xerox Corporation and Xerox State Healthcare, LLC
f/k/a ACS State Healthcare, LLC's Mandamus Petition**

ACCEPTED
03-15-00401-CV
5900102
THIRD COURT OF APPEALS
AUSTIN, TEXAS
7/1/2015 1:29:01 PM
JEFFREY D. KYLE
CLERK

No. _____

# IN THE THIRD COURT OF APPEALS
## AUSTIN, TEXAS

## *IN RE XEROX CORPORATION AND XEROX STATE HEALTHCARE, LLC F/K/A ACS STATE HEALTHCARE, LLC,*
### *Relators.*

Original Proceeding from the 53rd District Court,
Travis County, Texas, Trial Court Cause No. D-1-GV-14-000581
The Honorable Stephen Yelenosky, Presiding

## PETITION FOR WRIT OF MANDAMUS

**BECK REDDEN LLP**
  Eric J.R. Nichols
  State Bar No. 14994900
  enichols@beckredden.com
  Gretchen Sween
  State Bar No. 24041996
  gsween@beckredden.com
  Christopher R. Cowan
  State Bar No. 24084975
  ccowan@beckredden.com
515 Congress Ave., Ste. 1900
Austin, TX 78701
Tel: 512.708.1000
Fax: 512.708.1002

**BECK REDDEN LLP**
  Constance H. Pfeiffer
  State Bar No. 24046627
  cpfeiffer@beckredden.com
1221 McKinney St., Ste. 4500
Houston, TX 77010
Tel: 713.951.3700
Fax: 713.951.3720

**GIBSON, DUNN & CRUTCHER LLP**
  Robert C. Walters
  State Bar No. 20820300
  rwalters@gibsondunn.com
2100 McKinney Ave., Ste. 1100
Dallas, TX 75201
Tel: 214.698.3100
Fax: 214.571.2900

**KELLY HART & HALLMAN LLP**
  C. Andrew Weber
  State Bar No. 00797641
  andrew.weber@kellyhart.com
301 Congress, Ste. 2000
Austin, TX 78701
Tel: 512.495.6451
Fax: 512.495.6930

**COUNSEL FOR RELATORS**

*Oral Argument Requested*

## IDENTITY OF PARTIES AND COUNSEL

**Relators (Defendants in the Trial Court):**

    Xerox Corporation;
    Xerox State Healthcare, LLC f/k/a ACS State Healthcare, LLC

**Counsel for Relators:**

    Eric J.R. Nichols (SBN 14994500)
    enichols@beckredden.com
    Gretchen Sween (SBN 24041996)
    gsween@beckredden.com
    Christopher R. Cowan (SBN 24084975)
    ccowan@beckredden.com
    **BECK REDDEN LLP**
    515 Congress Avenue, Suite 1900
    Austin, TX  78701

    Constance H. Pfeiffer (SBN 24046627)
    cpfeiffer@beckredden.com
    **BECK REDDEN LLP**
    1221 McKinney Street, Suite 4500
    Houston, TX  77010

    Robert C. Walters (SBN 20820300)
    rwalters@gibsondunn.com
    **GIBSON, DUNN & CRUTCHER LLP**
    2100 McKinney Avenue, Suite 1100
    Dallas, TX  75201

    C. Andrew Weber (SBN 00797641)
    andrew.weber@kellyhart.com
    **KELLY HART & HALLMAN LLP**
    301 Congress, Ste. 2000
    Austin, TX 78701

**Respondent:**

> Honorable Stephen Yelenosky
> Judge, 345th District Court
> Travis County Courthouse
> P.O. Box 1748
> Austin, TX  78767
> Tel: 512.854.9374

**Real Party in Interest (Plaintiff in the Trial Court):**

> The State of Texas

**Counsel for Real Party in Interest The State of Texas:**

> Raymond Winter (SBN 21791950)
> Chief, Civil Medicaid Fraud Division
> raymond.winter@texasattorneygeneral.gove
> Reynolds B. Brissenden (SBN 24056969)
> Managing Attorney, Civil Medicaid Fraud Division
> reynolds.brissenden@texasattorneygeneral.gov
> Assistant Attorneys General
> Civil Medicaid Fraud Division
> P.O. Box 12548 MC 056-1
> Austin, TX  78711
> Tel: 512.935.1709
> Fax: 512.499.0712

## REQUEST FOR ORAL ARGUMENT

Relators request the opportunity to present oral argument.

# TABLE OF CONTENTS

**Page**

IDENTITY OF PARTIES AND COUNSEL ............................................................. i

REQUEST FOR ORAL ARGUMENT ................................................................ ii

TABLE OF CONTENTS ................................................................................ iii

INDEX OF AUTHORITIES .............................................................................. v

STATEMENT OF THE CASE .......................................................................... xi

STATEMENT OF JURISDICTION ................................................................... xii

ISSUE PRESENTED ..................................................................................... xii

STATEMENT OF FACTS ................................................................................. 1

SUMMARY OF THE ARGUMENT ..................................................................... 9

ARGUMENT .............................................................................................. 10

    I.     THE TRIAL COURT ERRED IN ITS LEGAL CONCLUSIONS. ....................... 10

        A.    Chapter 33 Applies to Claims "Based on Tort." ........................ 11

            1.    Chapter 33 broadly applies to torts, with limited exceptions. ............................................................ 11

            2.    A TMFPA claim is a statutory tort that is not excepted from Chapter 33. .................................... 13

            3.    The State's arguments to the contrary are unpersuasive. ..................................................... 16

            4.    The trial court rejected the State's arguments but erred for different reasons. .......................... 18

        B.    The State Seeks "Recovery of Damages" Within the Scope of Chapter 33. ....................................................... 21

   1.  The State is seeking recovery of damages.......................22

   2.  The trial court failed to recognize that the State is seeking damages. ........................................23

  C. Refusing to Apply Chapter 33 Was an Abuse of Discretion. ..................................................24

   1.  The trial court improperly denied Xerox leave to designate responsible third parties. ..........................25

   2.  The trial court improperly struck Xerox's third-party claims..................................................26

 II. THERE IS NO ADEQUATE REMEDY BY APPEAL...................................27

  A. Appellate Remedies Are Held Inadequate in This Context. ..................................................28

  B. Appellate Remedies Are Inadequate in This Case. ...................31

CONCLUSION AND PRAYER FOR RELIEF ...................................................35

RULE 52.3(J) CERTIFICATION..................................................................36

CERTIFICATE OF SERVICE.......................................................................37

APPENDIX

Order Granting Motion to Strike Petitions in Intervention and Plea to the Jurisdiction..............................................................Tab A

Order Denying The Xerox Parties' Motion for Leave to Designate Responsible Third Parties..................................................Tab B

Order Granting State's Plea to the Jurisdiction and Motion to Dismiss Third Party Claims....................................................Tab C

# INDEX OF AUTHORITIES

**CASES**                                                   **PAGE(S)**

*In re Altec Indus., Inc.*,
No. 10-12-00207-CV, 2012 WL 2469542
(Tex. App.—Waco June 22, 2012,
orig. proceeding)(mem. op.) ...............................................25, 30, 34

*In re Arthur Andersen, LLP*,
121 S.W.3d 471 (Tex. App.—Houston
[14th Dist.] 2003, orig. proceeding) ..........................................*passim*

*In re Brokers Logistics, Ltd.*,
320 S.W.3d 402 (Tex. App.—El Paso
2010, orig. proceeding) ...............................................................30, 34

*Casa Ford, Inc. v. Ford Motor Co.*,
951 S.W.2d 865 (Tex. App.—Texarkana
1997, pet. denied) ...............................................................................30

*Davis v. Estridge*,
85 S.W.3d 308 (Tex. App.—Tyler
2001, pet. denied) .........................................................................12, 16

*Del Lago Partners, Inc. v. Smith*,
307 S.W.3d 762 (Tex. 2010) ..............................................................17

*Dugger v. Arredondo*,
408 S.W.3d 825 (Tex. 2013) ......................................................*passim*

*Elston v. City of Panhandle*,
50 S.W.2d 1090 (Tex. 1932) ..............................................................19

*Eslon Thermoplastics v. Dynamic Sys., Inc.*,
49 S.W.3d 891 (Tex. App—Austin
2001, no pet.) .....................................................................................27

*F.F.P. Operating Partners, L.P. v. Duenez*,
237 S.W.3d 680 (Tex. 2007) ......................................................*passim*

*In re Frank Kent Motor Co.*,
361 S.W.3d 628 (Tex. 2012)
(orig. proceeding)...............................................................................10

*In re Greyhound Lines, Inc.*,
   No. 05-13-01646-CV, 2014 WL 1022329
   (Tex. App.—Dallas Feb. 21, 2014,
   orig. proceeding) (mem. op.) ...........................................................................25

*Grogan v. Garner*,
   498 U.S. 279 (1991)..........................................................................................16

*Harlingen Family Dentistry, P.C. v. Tex. Health & Human Servs.*
   *Comm'n.*,
   452 S.W.3d 479 (Tex. App.—Austin
   2014, pet. filed) ................................................................................................15

*Huie v. DeShazo*,
   922 S.W.2d 920 (Tex. 1996) (orig. proceeding) ...............................................10

*Issacs v. Bishop*,
   249 S.W.3d 100 (Tex. App.—Texarkana
   2008, pet. denied)..............................................................................................11

*JCW Elecs., Inc. v. Garza*,
   257 S.W.3d 701 (Tex. 2008) .......................................................................*passim*

*Jones v. Ray*,
   886 S.W.2d 817 (Tex. App.—Houston
   [1st Dist.] 1994, orig. proceeding).............................................................20, 29

*United States ex rel. Jordan v. Northrop Grumman Corp.*,
   No. CV 95-2985, 2002 WL 35454612
   (C.D. Cal. Aug. 5, 2002)...................................................................................14

*In re Lewis Casing Crews, Inc.*,
   No. 11-14-00137-CV, 2014 WL 3398170
   (Tex. App.—Eastland July 10, 2014,
   orig. proceeding) (mem. op.) .................................................................25, 30, 34

*In re Masonite*,
   997 S.W.2d 194 (Tex. 1999) .............................................................................33

*Nabors Well Servs., Ltd. v. Romero*,
   456 S.W.3d 553 (Tex. 2015) .............................................................................1, 2

*In re Oncor Elec. Delivery Co.*,
    355 S.W.3d 304 (Tex. App.—Dallas
    2011, orig. proceeding) .................................................................25, 31

*Parker v. Highland Park, Inc.*,
    565 S.W.2d 512 (Tex. 1978) ...................................................................1

*Pemex Exploracion y Produccion v. BASF Corp.*,
    2011 WL 9523407 (S.D. Tex. Oct. 20, 2011) ......................................12

*PPG Indus., Inc. v. JMB/Hous. Ctrs. Partners Ltd. P'ship*,
    146 S.W.3d 79 (Tex. 2004).....................................................................15

*In re Prudential Ins. Co. of Am.*,
    148 S.W.3d 124 (Tex. 2004) (orig. proceeding) .....................27, 28, 33

*Reata Const. Corp. v. City of Dallas*,
    197 S.W.3d 371 (Tex. 2006) .................................................................21

*Sec. Trust Co. of Austin v. Lipscomb Cnty*,
    180 S.W.2d 151 (Tex. 1944) .................................................................21

*Shipp v. Malouf*,
    439 S.W.2d 432 (Tex. App.—Dallas
    2014, pet. denied)....................................................................................4

*Shoemake v. Fogel, Ltd.*,
    826 S.W.2d 933 (Tex. 1992) .................................................................27

*In re Smith*,
    366 S.W.3d 282 (Tex. App.—Dallas
    2012, orig. proceeding)...................................................................25, 31

*Smith v. Sewell*,
    858 S.W.2d 350 (Tex. 1993) .................................................................20

*In re State*,
    355 S.W.3d 611 (Tex. 2011) .................................................................33

*State v. Naylor*,
    No. 11-0114, 2015 WL 3852284 (Tex. June 19, 2015) .......................20

*Stewart Title Guar. Co. v. Sterling*,
    822 S.W.2d 1 (Tex. 1991).....................................................................19

*Sw. Bank v. Info. Support Concepts, Inc.*,
149 S.W.3d 104 (Tex. 2004) ......................................11, 18

*In re Team Rocket, L.P.*,
256 S.W.3d 257 (Tex. 2008) (orig. proceeding) ...........................27, 33

*In re Tex. Educ. Agency*,
441 S.W.3d 747 (Tex. App.—Austin
2014, orig. proceeding) ...................................................10

*Texas Dep't of Corr. v. Herring*,
513 S.W.2d 6 (Tex. 1974).................................................20

*Texas v. Merck & Co.*,
385 F. Supp. 2d 604 (W.D. Tex. 2005) .............................22

*In re Unitec Elevator Servs. Co.*,
178 S.W.3d 53 (Tex. App.—Houston
[1st Dist.] 2005, orig. proceeding).................................31

*United States v. Hero*,
No. 78 CIV-4587, 1981 WL 1982
(S.D.N.Y. July 27, 1981) ..................................................14

*United States v. RePass*,
688 F.2d 154 (2d Cir. 1982) ...........................................14

*United States v. Temple*,
299 F.2d 30 (7th Cir. 1962) ...........................................14

*Villarreal v. Wells Fargo Brokerage Servs., LLC*,
315 S.W.3d 109 (Tex. App.—Houston
[1st Dist.] 2010, no pet.) .........................................11, 12

*Walker v. Packer*,
827 S.W.2d 833 (Tex. 1992) (orig. proceeding) ...............10

*Werner v. KPMG LLP*,
415 F. Supp. 2d 688 (S.D. Tex. 2006).............................13

*United States ex rel. Westmoreland v. Amgen, Inc.*,
738 F. Supp. 2d 267 (D. Mass. 2010).............................14

viii

*Wortham v. Walker,*
128 S.W.2d 1138 (Tex. 1939) (orig. proceeding) .................................................21

**RULES & STATUTES**

31 U.S.C.
§ 3729(a)(1)(A).................................................................................................14
§ 3729(a)(1)(G).................................................................................................14

42 U.S.C.
§ 1320a-7b .......................................................................................................16
§ 1320a-7b(g).....................................................................................................16

25 TEX. ADMIN. CODE § 33.71 (2015) .......................................................................3

TEX. CIV. PRAC. & REM. CODE
§ 33.001.......................................................................................................xi, 1
§ 33.002(a)(1) ...............................................................................................xii, 11
§ 33.002(c) ...................................................................................................11, 15
§ 33.002(c)(1) ....................................................................................................2
§ 33.002(c)(3) ....................................................................................................2
§ 33.003..........................................................................................................13
§ 33.003(a) ...................................................................................................17, 21
§ 33.004(f)......................................................................................................25
§ 33.004(g).....................................................................................................25

TEX. CIV. PRAC. & REM. CODE § 33.011 .................................................................21
§ 33.011(6).....................................................................................................24
§ 41.002(d)(3) .................................................................................................15

TEX. GOV'T CODE § 22.221(b)..............................................................................xii

ix

TEX. HUM. RES. CODE
§ 36.002 ..................................................................................................5
§ 36.002(1) ...........................................................................................13
§ 36.007 ..................................................................................................5
§ 36.052 ..................................................................................................5
§ 36.052(a)(1) ..........................................................................17, 22, 23
§ 36.052(a)(3)(A) ..................................................................................24
§ 36.101 ................................................................................................26
§ 36.106 ................................................................................................26
§ 36.113 ................................................................................................26
§ 36.131 ................................................................................................16
§ 36.1021 ..............................................................................................22

TEX. R. CIV. P.
2 ...........................................................................................................27
38(a) ....................................................................................................26

**OTHER AUTHORITIES**

Act of June 17, 2005, 79th Leg. R.S., ch. 806, 2005 Tex. Sess. Law
Serv. Ch. 806 (West) (codified at TEX. HUM. RES. CODE § 36.131) ...................16

Black's Law Dictionary (10th ed. 2014) .......................................................14, 23

John E. Clark,
*The Texas Medicaid Fraud Prevention Statute: Sharp New Teeth
for the State and Cash Rewards for Relators Exposing
Wrongdoers*,
65 TEX. B.J. 120 (2002) ....................................................................................5

May 8, 2014
(https://www.texasattorneygeneral.gov/oagnews/release.php?id=47
34) ....................................................................................................................5

## STATEMENT OF THE CASE

*Nature of the case*   This is a civil Medicaid fraud case brought by the State of Texas for damages that allegedly exceed $1 billion.

The alleged fraud involves multiple parties, triggering the contribution and fault-allocation scheme of Chapter 33. TEX. CIV. PRAC. & REM. CODE § 33.001 *et seq.*

In <u>this</u> lawsuit, the State has sued only Xerox, seeking to recoup from Xerox payments the State made to others. The State has sued the third parties in separate lawsuits.

*Respondent*   Honorable Stephen Yelenosky
345th Judicial District Court of Travis County

*Respondent's action*:   The trial court ruled that Chapter 33 does not apply to the State's claim. Thus, the trial court:

(1) granted the State's motion to strike Xerox's third-party claims, **Tab A**, and

(2) denied Xerox's motion for leave to designate responsible third parties. **Tab B**.

## STATEMENT OF JURISDICTION

This Court has mandamus jurisdiction under TEX. GOV'T CODE § 22.221(b).

## ISSUE PRESENTED

Chapter 33 broadly applies to "any cause of action based on tort." TEX. CIV. PRAC. & REM. CODE § 33.002(a)(1). Did the trial court erroneously conclude that the State's statutory fraud claim is not a tort claim subject to Chapter 33?

## STATEMENT OF FACTS

This is a fraud suit brought by the State of Texas against two Xerox entities. But the alleged fraud also involves third parties and claims that are intertwined. The State simultaneously accuses Xerox and third-party Medicaid providers of a fraudulent scheme and is suing them in separate lawsuits for the same damages. Choosing to sue in tort, the State has pleaded itself right into Chapter 33.

### *Chapter 33 sets a broad legislative mandate*

"Gone is the 'harsh system of absolute victory or total defeat.'" *Nabors Well Servs., Ltd. v. Romero*, 456 S.W.3d 553, 559 (Tex. 2015) (quoting *Parker v. Highland Park, Inc.*, 565 S.W.2d 512, 518 (Tex. 1978)). For more than four decades, the Texas Legislature has required fact-finders to apportion responsibility according to the relative fault of the actors. *Id*. Plaintiffs cannot put 100% of the liability on a single actor when multiple actors contribute to causing the harm. This directive is so well known that it is often simply called "Chapter 33." *See* TEX. CIV. PRAC. & REM. CODE § 33.001 *et seq.*

Chapter 33 "casts a wide net over conduct that may be considered in this determination." *Nabors Well Servs.*, 456 S.W.3d at 560. "Whereas the 1987 version had expressly excluded intentional torts, the 1995 amendments removed that exclusion" and now broadly applies to "*any* cause of action based on tort." *JCW Elecs., Inc. v. Garza*, 257 S.W.3d 701, 704 (Tex. 2008). It likewise applies to statutory torts. *Id.*

The exceptions to Chapter 33 are very few. "When the Legislature intends an exception to Chapter 33's broad scheme, it creates specific exceptions for matters that are outside the scope of proportionate responsibility." *Dugger v. Arredondo*, 408 S.W.3d 825, 832 (Tex. 2013). The statute excepts claims for workers compensation benefits and for damages arising from methamphetamine manufacturing, for example. TEX. CIV. PRAC. & REM. CODE § 33.002(c)(1), (3). No express exception is at issue in this case.

When Chapter 33 applies, it sets a clear directive: "fact-finders should consider each person's role in causing, 'in any way,' harm for which recovery of damages is sought." *Nabors Well Servs.*, 456 S.W.3d at 560.

Against the backdrop of this broad statutory directive, the State has brought a tort suit for damages and seeks to be relieved of the legislature's dictates.

### *HHSC contracts for processing of Medicaid claims*

The Texas Health and Human Services Commission oversees the Texas Medicaid program, which serves low-income Texans. The program includes a process for reimbursing providers for the services provided to eligible children.

HHSC has in recent years hired contractors to assist it in claims processing. R.409. During the time period from 2004 to 2014, HHSC contracted with a private entity to be its fiscal agent and claims processor. R.30. That entity was acquired by Xerox Corporation. R.2.

2

Long known as a brand name for copiers, Xerox now has a business division that provides analytic, consulting, revenue improvement, technological, and business process outsourcing solutions to the healthcare industry worldwide. The Xerox entity that contracted with HHSC is Xerox State Healthcare, LLC. R.2.[1]

HHSC contracted with Xerox State Healthcare in 2003 and again in 2010 to provide multiple Medicaid administrative and technical services, including the processing of "prior authorizations" for orthodontic services submitted by the providers. R.7, R.16. The "prior authorization" process requires providers to submit forms, materials, and certifications related to the provider's diagnosis and the patient's condition in order to receive prior approval for the orthodontic services. R.131. Instead of performing services first and then submitting the bill for payment, Medicaid "[o]rthodontic services must be prior authorized" before the provider performs the service. 25 TEX. ADMIN. CODE § 33.71 (2015).

Under the contract, Xerox State Healthcare established the Texas Medicaid & Healthcare Partnership (TMHP), a consortium of Xerox State Healthcare and other subcontractors. TMHP processed hundreds of thousands of prior-authorization requests for orthodontic services over the span of a decade. During that time period, the State alleges that it spent approximately $1.1 billion for orthodontic services to Medicaid-eligible children. R.3, R.131.

---

[1] HHSC first contracted with ACS State Healthcare LLC, which changed its name to Xerox State Healthcare, LLC after it was acquired by Xerox Corporation. R.2. Xerox Corporation and Xerox State Healthcare, LLC are distinct entities with separate legal arguments about the underlying claims; references to them jointly as "Xerox" are solely for ease of reading.

3

HHSC approved the contract and prior authorization policies under which TMHP operated, and it oversaw the work of Xerox State Healthcare (and the other TMHP contractors). R.406-20. In fact, HHSC's Office of Inspector General conducted a full contract audit of the prior authorization process, and the results were made public in a 2008 report. *Id*. (OIG audit report). Xerox State Healthcare continued to perform under its contract until May 2014, when the State terminated the contract and simultaneously filed this suit.

### Negative publicity prompts the State to cast blame

This lawsuit followed a cycle of negative publicity about HHSC and the State's spending on Medicaid orthodontic services. *See, e.g.*, R.310-11, 315-16, 357-58, 360-63.[2] A series of "investigative" news reports in 2011 raised questions about the State's spending on orthodontic services to Medicaid-eligible children and about the medical judgments of orthodontic providers, causing HHSC to second-guess that spending and begin casting blame on others.

HHSC's Office of Inspector General, led by a now-departed deputy, R.360-63, R.365-78, made sweeping pronouncements of a vast fraud against the Medicaid program by orthodontic providers across the State. Then, in this lawsuit, filed in May 2014, the State accused Xerox of failing to "catch" the providers' alleged fraud through the prior authorization process.

---

[2] *See e.g.*, *Shipp v. Malouf*, 439 S.W.2d 432, 437–38 (Tex. App.—Dallas 2014, pet. denied) (discussing publicity about Medicaid provider).

In a press release that accompanied this lawsuit, the State declared that "Xerox had not been properly reviewing orthodontic claims as required by its contract with the State."[3] But the lawsuit did not plead a claim for breach of contract.

Instead, the State sued for fraud, taking the view that contract breaches can be cast as "misrepresentations" and "nondisclosures" about how the contract was performed. By doing this, the State has sought to dramatically up the ante. Instead of seeking ordinary contract remedies, the State seeks extraordinary statutory tort remedies—available to it only under the Texas Medicaid Fraud Prevention Act.

### *The State brings a claim under the Texas Medicaid Fraud Prevention Act*

The TMFPA defines "unlawful acts," beginning with knowing misrepresentations and nondisclosures. *See* TEX. HUM. RES. CODE § 36.002.

It also provides substantial civil remedies. A person who commits an "unlawful act" can be sued for the amount of payments made "as a result of the unlawful act," plus double damages, civil penalties for each unlawful act between $5,500 and $15,000, prejudgment interest, and reimbursement of the State's reasonable attorneys' fees, expenses, and costs. *See id*. §§ 36.052, 36.007. When aggregated, these damages claims "can amount to huge sums." *John E. Clark*, *The Texas Medicaid Fraud Prevention Statute: Sharp New Teeth for the State and Cash Rewards for Relators Exposing Wrongdoers*, 65 TEX. B.J. 120, 123 (2002).

---

[3] May 8, 2014 (https://www.texasattorneygeneral.gov/oagnews/release.php?id=4734).

***The State seeks the same recovery***
***from Xerox and the providers in separate lawsuits***

The State's suit against Xerox seeks "all relief possible" under the TMFPA. R.21. This relief includes the value of payments made under the Medicaid program to the Medicaid orthodontic-service providers—not to Xerox. R.21.

Meanwhile, the State has sued the orthodontic-service providers for the same Medicaid payments in separate proceedings and lawsuits. R.156-81, R.286-308. For example, HHSC has issued payment holds and recoupment claims against providers and has brought administrative claims against them. R.320-325, R.534-606. And the State has also alleged a TMFPA claim against other providers. R.286-308. The providers have likewise sued the State and Xerox in separate lawsuits, all involving the same basic facts and allegations at issue in the State's suit against Xerox.

As a result, several orthodontic-service providers intervened in this lawsuit, asserting common-law tort claims against both the State and Xerox and seeking to recover for losses incurred as a result of the State's payment holds. The State moved to strike the intervention, and its motion was granted. R.98-99.

Xerox then invoked its rights as a tort defendant under Chapter 33. It filed a third-party petition suing 27 specific providers for contribution. R66-76. But the State moved to strike the third-party petition, and the motion was granted. **Tab A** (R.629).

The trial court explained its reasoning: (1) there "is no authority for treating an enforcement action [under the TMFPA] by the State as a statutory tort;" (2) "the civil remedy in the TMFPA is not a damage provision;" and (3) "[i]f [the Xerox Parties] have any right to contribution, it must be pursued in a separate action between alleged wrongdoers." R.232-33. The trial court further emphasized that the TMFPA does not have a fault-allocation scheme: "There is no comparative fault, joint-and-several liability, contribution, single-satisfaction, or settlement credit in a TMFPA action." R.232.

Xerox then moved for leave to designate the same providers as responsible third parties. The State opposed the motion on the same grounds as before, and the trial court ruled that Chapter 33 does not apply. R.632-33. The trial court denied Xerox's motion for leave. **Tab B** (R.631).

In deference to the trial court, Xerox first sought the court's permission for an interlocutory appeal. It presented briefing on why immediate appellate review would be appropriate. The trial court declined to certify the issue. R.634.

Xerox now petitions this Court for mandamus relief from the two orders denying it fundamental procedural rights under Chapter 33 afforded to defendants facing tort claims.

### *The providers bring an appeal in Nazari v. State of Texas*

The issues in this original proceeding are related to the issues before the Court on direct appeal in *Nazari v. State of Texas*, No. 03-15-00252-CV, in which Medicaid providers filed their opening brief on June 19, 2015.

The various lawsuits between the State, Medicaid providers, and the Xerox entities have all been specially assigned, through the Travis County district court administrative process, to one district judge. The trial court was made aware that the State is seeking the same damages against separate parties in separate lawsuits based on factually related allegations. Yet the trial court has ruled that the defendants in each case cannot bring claims against each other in the same lawsuit:

> Consistent with this Court's rulings in the State's litigation against Xerox, the Court finds that the State is entitled to bring this action against defendants to the exclusion of other parties.

**Tab C** (order dismissing providers' counterclaims against the State and third-party claims against Xerox, on appeal in *Nazari v. State of Texas*).

The issues in the *Nazari* appeal and this proceeding are not identical, but they underscore that the State's claims against Xerox and the providers are intertwined and that it is not only impermissible but also fundamentally unfair to permit the State to take a divide-and-conquer approach.

## SUMMARY OF THE ARGUMENT

The Texas Supreme Court is quite clear about Chapter 33's broad scope. It honors Chapter 33's plain language, which applies to "any cause of action based on tort" for "recovery of damages." It further holds that Chapter 33's statutory mandates are "not discretionary." *F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 694 (Tex. 2007).

Chapter 33 applies to the State's fraud claim against Xerox because it is "based on tort" and seeks "recovery of damages." The State's claim is merely a statutory tort, and such torts are subject to Chapter 33 so long as the Legislature has not excepted the statute from Chapter 33's broad scope. *See JCW Elecs., Inc. v. Garza*, 257 S.W.3d 701, 704–06 (Tex. 2008). Further, the State has repeatedly acknowledged that it seeks to recover "damages" from Xerox. Chapter 33 squarely applies, and the trial court erred by holding otherwise.

Courts frequently grant mandamus relief from refusals to apply Chapter 33. They recognize that trials without all potentially responsible parties are unfairly skewed. In exceptional cases like this one, with an enormous damage model, multiple parties, and hundreds of thousands of transactions, a trial without all responsible parties is thus "destined to fail in the appellate process." *See In re Arthur Andersen, LLP*, 121 S.W.3d 486 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding). Like many of its sister courts across the state, this Court should grant mandamus relief.

**ARGUMENT**

"Mandamus relief is proper to correct a clear abuse of discretion when there is no adequate remedy by appeal." *In re Frank Kent Motor Co.*, 361 S.W.3d 628, 630 (Tex. 2012) (orig. proceeding); *see In re Tex. Educ. Agency*, 441 S.W.3d 747, 750 (Tex. App.—Austin 2014, orig. proceeding). Both prongs are satisfied here.

## I. THE TRIAL COURT ERRED IN ITS LEGAL CONCLUSIONS.

Whether Chapter 33 applies to a claim is a matter of statutory construction and thus a question of law. *See F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 683 (Tex. 2007). "A trial court has no 'discretion' in determining what the law is or applying the law to the facts." *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding). This is true even when addressing questions of first impression. "[T]he trial court's erroneous legal conclusion, even in an unsettled area of law, is an abuse of discretion." *Huie v. DeShazo*, 922 S.W.2d 920, 927-28 (Tex. 1996) (orig. proceeding).

This case presents a paradigmatic scenario for bringing contribution claims and designating responsible third parties. Factually intertwined fraud claims against multiple parties resulted in the same alleged injury. Yet the trial judge held that the State's TMFPA claim does not sound in "tort" or seek "damages." R.232. Each of these conclusions is incorrect. The State is bringing a tort claim for damages, which squarely triggers Chapter 33.

10

### A. Chapter 33 Applies to Claims "Based on Tort."

#### 1. Chapter 33 broadly applies to torts, with limited exceptions.

Chapter 33 applies to "any cause of action based on tort." TEX. CIV. PRAC. & REM. CODE § 33.002(a)(1). It applies to intentional torts. *See, e.g., JCW Elecs., Inc. v. Garza*, 257 S.W.3d 701, 704–06 (Tex. 2008); *Issacs v. Bishop*, 249 S.W.3d 100, 116–17 (Tex. App.—Texarkana 2008, pet. denied) (fraud). And it applies to statutory torts, so long as the tort statute does not include its own separate fault-allocation scheme. *E.g., Sw. Bank v. Info. Support Concepts, Inc.*, 149 S.W.3d 104, 107 (Tex. 2004) (Chapter 33 does not apply where tort statute has separate fault-allocation scheme); *Villarreal v. Wells Fargo Brokerage Servs., LLC*, 315 S.W.3d 109, 124–25 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (synthesizing rule for statutory torts in light of *Garza* and *Southwest Bank*).

The exceptions to Chapter 33 are very few. "When the Legislature intends an exception to Chapter 33's broad scheme, it creates specific exceptions for matters that are outside the scope of proportionate responsibility." *Dugger v. Arredondo*, 408 S.W.3d 825, 831 (Tex. 2013) (citing *Duenez*, 237 S.W.3d at 690–91). The Legislature expressly excepts certain claims in Chapter 33 itself, or it creates a separate fault-allocation scheme. *See* TEX. CIV. PRAC. & REM. CODE § 33.002(c) ("This chapter does not apply to . . . ."); *Sw. Bank*, 149 S.W.3d at 107. Unless the Legislature excepts a claim, then Chapter 33—by its plain terms—applies to "any cause of action based on tort."

11

Following these rules, courts have held that Chapter 33 applies to statutory tort claims under:

- the Wrongful Death Act, *Dugger v. Arredondo*, 408 S.W.3d 825, 831 (Tex. 2013);

- the Dram Shop Act, *Duenez*, 237 S.W.3d at 689;

- UCC-based implied warranty claims, *Garza*, 257 S.W.3d at 702;

- the Texas Securities Act, *Villarreal*, 315 S.W.3d at 124;

- the Texas Trust Act, *id.*; and

- the Texas Theft Liability Act, *Pemex Exploracion y Produccion v. BASF Corp.*, 2011 WL 9523407, at *13 (S.D. Tex. Oct. 20, 2011).

The lone outlier is a 2001 Tyler Court of Appeals decision holding that Chapter 33 does not apply to a claim under the Fraud in Real Estate and Stock Transactions statute. *See Davis v. Estridge*, 85 S.W.3d 308, 312 (Tex. App.—Tyler 2001, pet. denied). Because *Davis* predated the supreme court's recent guidance in *Garza* and *Southwest Bank*, the First Court of Appeals rejected its holding as unpersuasive:

> Since *Davis*, the Texas supreme court has held that Chapter 33 applied to a statutory tort claim in *JCW Electronics, Inc. v. Garza*, 257 S.W.3d 701, 705–06 (Tex. 2008). Moreover, the express language of section 33.002(a) provides that Chapter 33 applies "to *any* action based in tort."

*Villarreal*, 315 S.W.3d at 125 n.7. In light of *Duenez*, *Garza*, and *Dugger*, courts now recognize that Chapter 33 broadly includes statutory torts as well.

### 2. A TMFPA claim is a statutory tort that is not excepted from Chapter 33.

No one can dispute that "fraud" is a tort. And "fraud" is the TMFPA's middle name. The Texas Medicaid *Fraud* Prevention Act merely codifies a particular species of fraud against the State. The statute generally requires the plaintiff to prove that the defendant "knowingly ma[de] or cause[d] to be made a false statement or misrepresentation of a material fact." TEX. HUM. RES. CODE § 36.002(1). In this case, the State alleges that Xerox "knowingly made or caused to be made false statements or misrepresentations of material facts." R.19, ¶39. These allegations plainly sound in tort.

In *Garza*, the supreme court explained that "[a]lthough the 1995 statute does not define the term 'tort,' its meaning is nevertheless clear from section 33.003." 257 S.W.3d at 704. It encompasses claims for negligence, products liability, and harm caused by conduct or activity "that violates an applicable legal standard." *Id.* at 705 (quoting TEX. CIV. PRAC. & REM. CODE § 33.003(a)).

The court then held: "The language 'other conduct or activity that violates an applicable legal standard'" was "clearly broad enough" to encompass a claim for breach of an implied warranty under UCC article 2. *Id.* The same language in Chapter 33 is likewise broad enough to encompass the State's statutory fraud claim. *See Werner v. KPMG LLP*, 415 F. Supp. 2d 688, 703 (S.D. Tex. 2006) ("Texas courts apply Chapter 33 to fraud claims and to statutory tort claims[.]").

13

Other sources further confirm that a TMFPA claim sounds in tort. Black's Law Dictionary defines "tort" as: "A civil wrong, other than breach of contract, for which a remedy may be obtained, usu. in the form of damages[.]" Black's Law Dictionary, Tort (10th ed. 2014). It is undisputed that the State's TMFPA claim is civil, not criminal. *See* R.3, ¶7 (the State seeks "civil remedies"). And while the State could have brought its claim in contract, it did not. By choosing to bring its claim in tort, the State must live with *all* of Texas tort law—including Chapter 33.

The TMFPA's closest federal analogue is the False Claims Act,[4] which federal courts characterize as authorizing the federal government to bring "tort" claims. *United States v. RePass*, 688 F.2d 154, 157 (2d Cir. 1982) ("The gravamen of this [False Claims Act] claim is the tort of intentional fraud and misrepresentation."); *United States v. Temple*, 299 F.2d 30, 32 (7th Cir. 1962) (characterizing a False Claims Act suit as "an action sounding in tort").[5] The unanimous recognition that False Claims Act claims sound in tort is a strong basis to hold a TMFPA claim does as well.[6]

---

[4] Like the TMFPA, the False Claims Act creates liability for a person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" and permits the government to recover "3 [three] times the amount of damages which the Government sustains because of the act." 31 U.S.C. § 3729(a)(1)(A), (G).

[5] *See also United States ex rel. Westmoreland v. Amgen, Inc.*, 738 F. Supp. 2d 267, 271-72 (D. Mass. 2010) ("Since the False Claims Act creates a statutory tort . . . ."); *United States ex rel. Jordan v. Northrop Grumman Corp.*, No. CV 95-2985, 2002 WL 35454612, at *20 (C.D. Cal. Aug. 5, 2002) (same); *United States v. Hero*, No. 78 CIV-4587, 1981 WL 1982, at *3 (S.D.N.Y. July 27, 1981) (same).

[6] Analogizing to federal decisions interpreting the False Claims Act is helpful in properly characterizing a TMFPA claim as one sounding in "tort" and seeking "damages." But federal law also has limited utility, as Chapter 33's scheme for tort claims has no federal counterpart.

A TMFPA claim plainly sounds in tort, and the Texas Legislature has not excepted it from the dictates of Chapter 33. The TMFPA does not include provisions for allocating responsibility among parties who caused or contributed to causing the State's injury, so it has no competing fault allocation scheme. Indeed, the trial court acknowledged this point and embraced it in its letter ruling: "There is no comparative fault, joint-and-several liability, contribution, single-satisfaction, or settlement credit in a TMFPA action." R.232.

Further, Chapter 33 does not expressly except the TMFPA. *See* TEX. CIV. PRAC. & REM. CODE § 33.002(c) ("This chapter does not apply to . . . ."). The TMFPA is not among the claims that are excluded. By contrast, the exemplary damages provisions in Chapter 41 expressly exclude the TMFPA. *See* TEX. CIV. PRAC. & REM. CODE § 41.002(d)(3) ("Notwithstanding any provision to the contrary, this chapter does not apply to . . . an action brought under Chapter 36, Human Resources Code.").

The inference is straightforward: when the Legislature intends to exclude a TMFPA claim from general statutes governing civil litigation, it does so expressly. *See Dugger*, 408 S.W.3d at 831; *PPG Indus., Inc. v. JMB/Hous. Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 84 (Tex. 2004) (explaining *expressio unius est exclusio alterius*); *Harlingen Family Dentistry, P.C. v. Tex. Health & Human Servs. Comm'n.*, 452 S.W.3d 479, 482 (Tex. App.—Austin 2014, pet. filed) (same). It is undisputed that the TMFPA has not been expressly excluded from Chapter 33.

15

### 3. The State's arguments to the contrary are unpersuasive.

At first the State sought to avoid Chapter 33 by relying on the 2001 Tyler decision. R.80 (citing *Davis v. Estridge*, 85 S.W.3d 308, 312 (Tex. App.—Tyler 2001, pet. denied)). The State did not appear to have realized that *Davis* may be bad law in light of the supreme court's more recent decisions in *Duenez*, *Garza*, and *Dugger*.

When confronted with the supreme court's cases, the State switched tacks. The State argued that the TMFPA has its origins in criminal law, and therefore does not sound in tort. R.195 (citing 42 U.S.C. § 1320a-7b). But the State failed to notice that the same statute it cited to support its position indicates that the *civil* remedies it seeks in this case would be available only through a *civil* action under federal law. *See* 42 U.S.C. § 1320a-7b(g). Under federal law, claims to recover damages for overpayments based on false statements for Medicaid reimbursement are "substantive causes of action for fraud." *Grogan v. Garner*, 498 U.S. 279, 288 (1991). There is no reason for Texas courts to reach a different result.

Moreover, the Texas Legislature amended the TMFPA in 2005 to remove "Criminal Penalties" from TEX. HUM. RES. CODE § 36.131. *See* Act of June 17, 2005, 79th Leg. R.S., ch. 806, 2005 Tex. Sess. Law Serv. Ch. 806 (West). Whatever criminal origins the TMFPA may have had, it is now exclusively a civil statute.

16

The State also argued that a TMFPA violation is not a statutory tort because "traditional common law notions of reliance and causation are wholly absent from the TMFPA." R.199. But the State overlooked the TMFPA's causation standard: the statute makes "a person who commits an unlawful act" liable for the amount of the payment or benefit provided "as a result of the unlawful act." TEX. HUM. RES. CODE § 36.052(a)(1). The TMFPA's causation requirement is consistent with concluding it is a tort that is subject to apportionment for "causing or contributing to cause in any way the harm for which recovery of damages is sought." TEX. CIV. PRAC. & REM. CODE § 33.003(a).

The State also argued that Chapter 33 does not apply "because under the TMFPA, Xerox can only ever be held responsible for damages resulting from its *own* conduct" and "can never be held responsible for the actions of third parties." R.200. This argument is a *non sequitur*. Black-letter law provides: "There may be more than one proximate cause of an event[.]" *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010). Under the State's theory of liability, its damages resulted from Xerox's conduct in combination with the conduct of third parties. R.3, ¶8. That multiple parties allegedly caused the State's harm is precisely why Chapter 33 applies.

Last, the State argued that it is not "workable" to "mesh" Chapter 33 with the TMFPA, because "the TMFPA does contain its own 'separate and conflicting legislative fault-allocation scheme.'" R.201. This argument attempts to bring the

17

TMFPA within the holding of *Southwest Bank,* where the supreme court held that Chapter 33 was displaced where a statute includes "a comprehensive and carefully considered allocation of responsibility among parties to [a] relationship[]." *Sw. Bank*, 149 S.W.3d at 107. This exacting standard was satisfied in *Southwest Bank* because the UCC statute had "its own comparative negligence provisions." *Id.*

By contrast, the TMFPA does not allocate liability among parties or have comparative fault provisions, and the State has not seriously contended otherwise. The State has pointed only to the TMFPA's scienter requirements and argued the statute does not "differentiate between the culpability of potential violators, holding a person who acts with reckless disregard equally as liable as a person who acts with actual knowledge or conscious indifference." R.202.

This observation about scienter is the exact opposite of showing a fault-allocation scheme. It is perfectly acceptable under Chapter 33 to hold persons of different levels of culpability responsible for their share of the harm. Indeed, that is the point. The State cannot manufacture a fault-allocation scheme out of the fact that the TMFPA (like all intentional torts) has a scienter requirement.

### 4. The trial court rejected the State's arguments but erred for different reasons.

The trial court correctly rejected the State's arguments and recognized that the TMFPA does *not* have its own separate fault-allocation scheme. R.232. This conclusion should have bound the trial court to apply Chapter 33 to a statutory tort

18

that "does not undertake a comprehensive fault scheme." *Garza*, 257 S.W.3d at 706; *see also Dugger*, 408 S.W.3d at 831; *Duenez*, 237 S.W.3d at 689.

However, the trial court did not fully apply the supreme court cases. Instead, the trial court appeared to interpret the *lack* of a fault-allocation scheme in the TMFPA to mean that those principles do not apply:

> Each wrongful actor is liable for a civil remedy . . . in multiples of the State's actual loss that is undiminished by the civil remedy . . . paid by another actor. … There is no comparative fault, joint-and-several liability, contribution, single satisfaction, or settlement credit in a TMFPA action.

R.232. In short, the trial court read the TMFPA as if Chapter 33 did not exist. Xerox respectfully submits that such a reading is erroneous.

In addition, such an interpretation of the TMFPA is unsound because it would create extraordinary liability unknown to the common law. The bar against double recovery existed long before 1995, when the TMFPA was enacted. *See, e.g.*, *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 6 (Tex. 1991) ("There is no reason we should allow a windfall double recovery in cases involving multiple defendants when double recovery is clearly prohibited against a single defendant."); *see also Elston v. City of Panhandle*, 50 S.W.2d 1090, 1090–91 (Tex. 1932) ("There was but one injury and there can be but one satisfaction of the damages arising from the injury, whether the satisfaction was reached through the act of one or all of the tort-feasors.").

19

Thus, the notion that the TMFPA permits double recoveries could be created only expressly by a statute's plain text. *See Smith v. Sewell*, 858 S.W.2d 350, 354 (Tex. 1993). The TMFPA's silence regarding contribution, single satisfaction, etcetera cannot be interpreted as expressly permitting a double recovery. *See also Jones v. Ray*, 886 S.W.2d 817, 822 (Tex. App.—Houston [1st Dist.] 1994, orig. proceeding) (describing "two different judgments for full compensation for the same injuries" as a "nonsensical result"). Instead, the TMFPA's silence about a comprehensive fault-allocation scheme is precisely why Chapter 33 applies.

Separately, the trial court incorrectly concluded that the State's claim is brought as an "enforcement action" and thus is not a "statutory tort." R.232. The State presented no authority for such an argument, and we have found none.

Calling the state's claim an "enforcement action" seems to contemplate that the State is special, and that when it sues as a plaintiff under the TMFPA the rules apply differently. But the State is bound here by the same rules that apply to private litigants.

The Texas Supreme Court recently reaffirmed: "where the Legislature has given no indication to the contrary the State must abide by the same rules to which private litigants are beholden." *State v. Naylor*, No. 11-0114, 2015 WL 3852284, at \*6 (Tex. June 19, 2015). "As a general rule, the State litigates as any other party in Texas courts." *Texas Dep't of Corr. v. Herring*, 513 S.W.2d 6, 7 (Tex. 1974).

20

This principle is settled:

> [W]hen a State enters the Courts as a litigant, it must be held subject to the same rules that govern the other litigants, and abide the consequences of the suit . . . . When a state appears as a party to a suit, she voluntarily casts off the robes of her sovereignty, and stands before the bar of a court of her own creation in the same attitude as an individual litigant; and her rights are determined and fixed by the same principles of law and equity . . . .

*Wortham v. Walker*, 128 S.W.2d 1138, 1145–46 (Tex. 1939) (orig. proceeding) (internal quotation marks omitted); *accord Reata Const. Corp. v. City of Dallas*, 197 S.W.3d 371, 377 (Tex. 2006) ("Once it asserts affirmative claims for monetary recovery, the City must participate in the litigation process as an ordinary litigant . . . ."); *Sec. Trust Co. of Austin v. Lipscomb Cnty*, 180 S.W.2d 151, 159 (Tex. 1944) ("When the state becomes a party to a suit it is subject to the same rules that govern other parties . . . ."). These rules likewise apply here.

In short, there is no basis for concluding that the State's claim falls outside Chapter 33's broad scope.

### B. The State Seeks "Recovery of Damages" Within the Scope of Chapter 33.

The proportionate responsibility and contribution provisions of Chapter 33 apply to claims resulting from harm for which "recovery of damages" is sought. TEX. CIV. PRAC. & REM. CODE § 33.003(a) (proportionate responsibility); *id.* § 33.011 (contribution). Here, Chapter 33 also applies because the State seeks recovery of damages.

21

### 1. The State is seeking recovery of damages.

The TMFPA expressly recognizes that its civil remedies include the recovery of "damages": "In an action under this subchapter, *the state* or person bringing the action must establish each element of the action, *including damages*, by a preponderance of the evidence." TEX. HUM. RES. CODE § 36.1021 (emphasis added); *see also Texas v. Merck & Co.*, 385 F. Supp. 2d 604, 606 (W.D. Tex. 2005) (Yeakel, J.) ("Texas brought suit against Merck for damages and civil penalties pursuant to the [TMFPA]."). There can be no debate that the TMFPA creates liability for "damages."

The TMFPA permits the State to recover money as compensation in "the amount of any payment or the value of any monetary or in-kind benefit provided under the Medicaid program, directly or indirectly, as a result of the unlawful act, including any payment made to a third party." *Id.* § 36.052(a)(1). This provision is plainly a measure of "damages."

The State's Original Petition states that it is "seeking civil remedies under the TMFPA." R.3. It alleges: "As a result of Xerox's conduct," the State made "hundreds of millions of dollars in payments." R.21. It therefore seeks from Xerox "the value of any payments or any monetary or in-kind benefits provided under the Medicaid program, directly or indirectly, as a result of its unlawful acts,

22

[and] two times the amount of those payments." R.21, ¶43 . This is precisely the language used in Section 36.052(a)(1) of the TMFPA—a damages provision.[7]

In fact, the State has repeatedly admitted that it is seeking damages. *See* R.80, ¶5 (referring to "damages that are awarded to the State in this TMFPA lawsuit"); R.193 (referring to "the State's theory of damages"); *Id.* (noting that "amounts unlawfully paid to Xerox as well as amounts unlawfully paid to providers" are "a *measure* of damages"); R.200 ("Xerox can only ever be held responsible for damages resulting from its *own* conduct."); R.205 (describing payments to providers as "one potential measure of damages"); R.133 (disclosures regarding the "amount of damages [that will be] requested by Texas at trial"). The State's repeated concessions correctly recognize that it has a claim for damages.

### 2. The trial court failed to recognize that the State is seeking damages.

Despite the TMFPA's plain text and the State's repeated acknowledgements that it was seeking damages, the trial court concluded that "the civil remedy in the TMFPA is not a damage provision." R.232. The trial court did not offer reasoning to support this assertion.

---

[7] The ordinary meaning of the word "damages" plainly includes compensation to the State for overpayments. "Damages" refers to "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury." Black's Law Dictionary, Damages (10th ed. 2014). "Compensatory damages" are "[d]amages sufficient in amount to indemnify the injured person for the loss suffered." Black's Law Dictionary, Compensatory Damages (10th ed. 2014).

23

It is possible the trial court was focused on the State's claim for civil penalties, wherein it seeks $5,500 to $15,000 for each "unlawful act." R.21–22; TEX. HUM. RES. CODE § 36.052(a)(3)(A). But the alleged basis for the civil penalties sought against Xerox is the alleged misrepresentations about the prior authorization process—not the Medicaid providers' claims for payment. Xerox seeks to apply Chapter 33 to the State's damages claims, which seek the amounts of alleged overpayments made to the Medicaid providers. There is no basis for concluding that the alleged overpayments are anything but damages, and thus subject to Chapter 33.

## C. Refusing to Apply Chapter 33 Was an Abuse of Discretion.

The State's liability theory presents a classic case for applying Chapter 33. According to the State, "predatory and unscrupulous dental providers" sought payment for orthodontic services that were outside the scope of Medicaid coverage. R.3. It alleges that Xerox "failed to adequately review the orthodontic prior authorization requests and documentation submitted by providers." R.4.

The State seeks damages for overpayments made to Medicaid providers—not to Xerox. Even if these overpayments resulted from Xerox's unlawful acts—which is adamantly denied—the providers "caused or contributed to causing . . . the harm for which recovery of damages is sought." TEX. CIV. PRAC. & REM. CODE § 33.011(6). As a tort defendant facing damages for these allegations, Xerox is entitled to invoke Chapter 33.

24

Based on the trial court's conclusion that Chapter 33 does not apply, the trial court issued two orders that represent a clear abuse of discretion.

### 1. The trial court improperly denied Xerox leave to designate responsible third parties.

In one order, the trial court improperly denied Xerox's motion for leave to designate responsible third parties. **Tab B**.

Courts uniformly hold that denying leave to designate responsible third parties without first granting leave to replead is an abuse of discretion.[8] This is because Chapter 33 imposes a mandatory duty on trial courts: "A court shall grant leave to designate the named person as a responsible third party[.]" TEX. CIV. PRAC. & REM. CODE § 33.004(f); *see Duenez*, 237 S.W.3d at 694 (Chapter 33's statutory mandates are "not discretionary").

The only basis for denying leave to designate a responsible third party is if the defendant fails to plead sufficient facts concerning the alleged responsibility after an opportunity to replead. TEX. CIV. PRAC. & REM. CODE § 33.004(g). That did not happen here. Because Chapter 33 applies, the trial court had no discretion to deny Xerox leave to designate responsible third parties.

---

[8] *See, e.g.*, *In re Lewis Casing Crews, Inc.*, No. 11-14-00137-CV, 2014 WL 3398170, at *1 (Tex. App.—Eastland July 10, 2014, orig. proceeding) (mem. op.); *In re Greyhound Lines, Inc.*, No. 05-13-01646-CV, 2014 WL 1022329, at *3 (Tex. App.—Dallas Feb. 21, 2014, orig. proceeding) (mem. op.); *In re Smith*, 366 S.W.3d 282, 284 (Tex. App.—Dallas 2012, orig. proceeding); *In re Altec Indus., Inc.*, No. 10-12-00207-CV, 2012 WL 2469542, at *2 (Tex. App.—Waco June 22, 2012, orig. proceeding)(mem. op.); *In re Oncor Elec. Delivery Co.*, 355 S.W.3d 304, 306 (Tex. App.—Dallas 2011, orig. proceeding).

### 2. The trial court improperly struck Xerox's third-party claims.

In a second order, the trial court improperly struck Xerox's third-party petition asserting contribution claims against Medicaid providers. **Tab A.**

In urging the court to strike this pleading, the State argued (1) that Chapter 33 does not apply and (2) that the TMFPA bars Xerox from joining third parties. R.78-82. The first argument is already refuted, and the second can be swiftly rejected.

The State argued that Xerox cannot join third parties based on the statutory text in Subchapter C of the TMFPA, which governs "Action[s] By Private Persons," a.k.a. *qui tam* actions. *See* TEX. HUM. RES. CODE § 36.101. That subchapter prohibits "interventions" by "other parties" into *qui tam* or copy-cat actions by other parties based on the same underlying facts as those asserted in a first-filed *qui tam* action or an existing state action. *See id.* §§ 36.106, 36.113. But Xerox's third-party petition is plainly not a "*qui tam* action," and by filing it, Xerox was plainly not seeking to "intervene" in such an action or bring an action under Subchapter C. Sections 36.106 and 36.113 simply do not apply.

Instead, Rule 38(a) allows a defendant to bring into a lawsuit "a person . . . who is or may be liable to him or the plaintiff for all or part of the plaintiff's claim against him." TEX. R. CIV. P. 38(a). A Rule 38 third-party claim does not involve an independent theory of recovery; it is a contribution claim derivative of the

26

plaintiff's claim. *See Shoemake v. Fogel, Ltd.*, 826 S.W.2d 933, 935 (Tex. 1992); *Eslon Thermoplastics v. Dynamic Sys., Inc.*, 49 S.W.3d 891, 901-02 (Tex. App—Austin 2001, no pet.). Xerox has a right to bring these third parties into the suit under Rule 38(a), because the rules of civil procedure apply to the State's claim. *See* Tex. R. Civ. P. 2 (civil rules of procedure "shall govern the procedure … in all actions of a civil nature" absent exceptions within the rules).

Because Chapter 33 applies to claims seeking damages under the TMFPA, this Court should hold that both rulings constitute an abuse of discretion.

## II.    THERE IS NO ADEQUATE REMEDY BY APPEAL.

"The adequacy of an appellate remedy must be determined by balancing the benefits of mandamus review against the detriments." *In re Team Rocket, L.P.*, 256 S.W.3d 257, 262 (Tex. 2008) (orig. proceeding). The benefits of mandamus review can be critically important, as it allows appellate courts to:

- "preserve important substantive and procedural rights from impairment or loss,"

- "give needed and helpful direction to the law that would otherwise prove elusive in appeals from final judgments," and

- "spare private parties and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings."

*In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 136 (Tex. 2004) (orig. proceeding). Indeed, in exceptional cases, mandamus review of significant rulings "may be essential." *Id.*

## A. Appellate Remedies Are Held Inadequate in This Context.

The adequacy of appellate remedies depends heavily upon the circumstances. *See id.* at 137. A car wreck or slip-and-fall suit presents different considerations from massive fraud cases involving enormous damage models, multiple parties, and hundreds of thousands of transactions. The mandamus proceedings dealing with joinder and responsible third party denials recognize that large, complex and high-stakes cases cannot be tried piecemeal or remedied by ordinary appeal when the defendant has a right to try all the facts in one proceeding.

In another complex fraud suit, the Fourteenth Court of Appeals granted mandamus relief from the denial of leave to join responsible third parties. *See In re Arthur Andersen, LLP*, 121 S.W.3d 471 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding). There, the plaintiffs sued Arthur Andersen and certain top executives for fraud related to the collapse of Enron, and Arthur Andersen moved for leave to join Enron employees and major financial institutions as responsible third parties. *Id.* at 474-75.

After the trial court denied its motion, Arthur Andersen sought mandamus relief. *Id.* at 476. The court of appeals held that the trial court's denial of Arthur Andersen's motion to join the responsible third parties was an "error of law" that constituted an abuse of discretion. *Id.* at 485.

In holding that Arthur Andersen had no adequate remedy on appeal, the court emphasized several points. *One*, trying complicated cases piecemeal affects a defendant's substantial rights: A defendant facing complex, intertwined facts "has a substantial right to present the complete set of intertwined facts and issues germane to [its] claims, to *one* factfinder, in *one* proceeding, rather than in two separate suits that are all but foreordained to generate, collectively, a decision destined to fail in the appellate process." *Id*. at 486 (quoting *Jones v. Ray*, 886 S.W.2d 817, 822 (Tex. App.—Houston [1st Dist.] 1994, orig. proceeding) (granting mandamus relief from a severance order)).

*Two*, restricting a complex fraud trial to only a few parties in the alleged scheme is unquestionably harmful, but demonstrating that harm may prove elusive. The absence of the third parties "would likely profoundly affect the conduct and outcome of this suit in ways unlikely to be apparent in the appellate record." *Id*. at 486.

*Three*, when a lawsuit is high-stakes and involves extensive, complicated facts, even one trial takes a serious toll on judicial and public resources. Multiplying that toll by two (or more) is unjustified. "[A]ny separate action against the third parties, or even a successful appeal in this suit, would result in an enormous waste of resources." *Id*. An enormous waste of judicial resources is a proper consideration in granting mandamus relief. *Id*. (citing *Jones*, 886 S.W.2d at 822 n.9).

*Four*, defendants could potentially lose their contribution rights because the law is not settled on whether contribution claims may be brought after judgment. *Id*. at 485 (citing *Casa Ford, Inc. v. Ford Motor Co.*, 951 S.W.2d 865, 877 (Tex. App.—Texarkana 1997, pet. denied), as holding that "Chapter 33 does not permit a tortfeasor subject to a judgment to bring a post-judgment contribution claim against a tortfeasor who was not a party to the primary suit"). This issue has not been decided by this Court or the supreme court. Until it is settled, tort defendants risk substantial losses if they cannot sue for contribution in the primary suit.

Based on these kinds of considerations, courts across the state have held that mandamus relief should be granted because appellate remedies are inadequate when a defendant is denied leave to designate responsible third parties. Some courts focus generally on the tendency of an absent responsible third party to "skew the proceedings" and the unjustified waste of having two trials. *See, e.g.*, *In re Altec Indus., Inc.*, No. 10-12-00207-CV, 2012 WL 2469542, at *2 (Tex. App.—Waco June 22, 2012, orig. proceeding) (mem. op.); *In re Brokers Logistics, Ltd.*, 320 S.W.3d 402, 408 (Tex. App.—El Paso 2010, orig. proceeding) (same).

Other courts have adopted bright-line holdings that a trial court's improper denial of leave to designate a responsible third party can never be adequately remedied on appeal. *See, e.g.*, *In re Lewis Casing Crews, Inc.*, No. 11-14-00137-CV, 2014 WL 3398170, at *1 (Tex. App.—Eastland July 10, 2014, orig. proceeding) (mem. op.) (declining to limit mandamus relief to "extraordinary

circumstances"); *In re Smith*, 366 S.W.3d 282, 289 (Tex. App.—Dallas 2012, orig. proceeding) ("[A]ppeal is ordinarily an inadequate remedy when a trial judge erroneously denies a motion for leave to designate a responsible third party without granting leave to replead."); *In re Oncor Elec. Delivery Co.*, 355 S.W.3d 304, 306 (Tex. App.—Dallas 2011, orig. proceeding) ("An improper denial of leave to designate a responsible third party may not be adequately addressed by appeal.").

The few decisions declining to grant mandamus relief have arisen in the personal injury context. *E.g.*, *In re Unitec Elevator Servs. Co.*, 178 S.W.3d 53, 64 (Tex. App.—Houston [1st Dist.] 2005, orig. proceeding) (distinguishing *Arthur Anderson* "because here, we are not dealing with the complex, intertwined facts surrounding the collapse of a major corporation, but a relatively straightforward personal injury case."). Small personal injury cases are not analogous here.

## B. Appellate Remedies Are Inadequate in This Case.

For several reasons, this is an exceptional case. The facts will span nearly a decade of Xerox State Healthcare's performance under a contract (2004 to 2014). R7, R.17. During that time, TMHP was the claims processor for hundreds of thousands of prior-authorization requests. R.29. The State alleges that it spent approximately $1.1 billion on orthodontic services for most of these years, and it is claiming not just damages for overpayments but also doubling of damages, civil penalties, fees, interest and costs. R.3-4. The complexity, scale, and stakes of this suit put it in a class of its own.

31

The State admits that its allegations against the providers and Xerox are intertwined: "As a result of the conduct of both Xerox and these providers," the State claims it was harmed. R.3 (original petition). The State claims that the providers submitted fraudulent requests that Xerox fraudulently approved. The State has thus sued the providers separately for TMFPA claims arising out of the same set of facts. R.156-81, R.286-308.

The State's fraud theory triggers Xerox's "substantial right to present the complete set of intertwined facts and issues germane to [its] claims, to *one* factfinder, in *one* proceeding, rather than in two separate suits that are all but foreordained to generate, collectively, a decision destined to fail in the appellate process.'" *Arthur Anderson*, 121 S.W.3d at 486. Having piecemeal trials on the State's claims would be fundamentally unfair.

The trial court recognized that its rulings would create multiple lawsuits. R.633 ("Separate suits Xerox may bring against third parties will not revisit my ruling - they result from it."). But the trial court failed to adequately account for the unfairness of piecemeal litigation to the parties, whose claims and defenses would be harmed if not tried in one proceeding before one factfinder. Separate lawsuits "are all but foreordained to generate, collectively, a decision destined to fail in the appellate process." *Arthur Anderson*, 121 S.W.3d at 486.

Multiple trials and appeals would also be an enormous waste of resources. The State has acknowledged as much when it sought mandamus relief in the supreme court, asking for review of a severance order requiring it to try eight separate lawsuits instead of one. *In re State*, 355 S.W.3d 611, 615 (Tex. 2011). In granting mandamus relief, the supreme court emphasized that each lawsuit had essentially identical factual issues, such that eight separate trials required the parties to pay "the same lawyers to argue, and the same experts to testify, in eight separate cases, an issue that could be tried once." *Id.* at 614.

The supreme court further emphasized that an appeal from these trials would be inadequate because of the "enormous waste of judicial and public resources." *Id.* at 615. It noted that it had granted mandamus relief where:

- An erroneous venue ruling "subject[ed] taxpayers, defendants and all of the state's district courts to meaningless proceedings and trials." *Id.* (quoting *In re Team Rocket, L.P.*, 256 S.W.3d 257, 262 (Tex. 2008)); and

- An order severing two suits into sixteen had no adequate appellate remedies because there would be "no remedy at all for the irreversible waste of judicial and public resources that would be required here if mandamus does not issue." *Id.* (citing *In re Masonite*, 997 S.W.2d 194, 196 (Tex. 1999)).

Thus, the public interests of the system itself—not to mention the litigants in the lawsuits—provided a sound basis for mandamus relief. *Id.*; *see also Prudential*, 148 S.W.3d at 137 (mandamus relief considers broader public concerns, such as "putting the civil justice system . . . to the trouble of grinding through proceedings that were certain to be 'little more than a fiction.'").

33

Further, multiple separate proceedings without all relevant parties would be fundamentally skewed. But showing how the outcomes would have been different would likely prove elusive on appeal. Denying Xerox its right to join or designate the providers as responsible third parties might "skew the proceedings, potentially affect the outcome of the litigation, and compromise the presentation of [Xerox's] defense in ways unlikely to be apparent in the appellate record." *Brokers Logistics, Ltd.*, 320 S.W.3d at 408 (citing *Arthur Anderson*, 121 S.W.3d at 486). Courts have granted mandamus relief in this context in recognition that the trial would be skewed and it might be too difficult to show harm on appeal in the wake of a jury verdict. *See id.*; *accord Lewis Casing Crews*, 2014 WL 3398170, at *5; *Altec Indus.*, 2012 WL 2469542, at *2.

Last, the statutory question presented in this case may evade review entirely unless reached by mandamus. No appellate court in Texas has ever decided whether Chapter 33 applies to a claim under the TMFPA. While Xerox sought to certify this issue for permissive interlocutory appeal, the trial court declined to certify it. R.634. And while Xerox believes the ruling is reversible error, it should not be required to face an expensive array of skewed trials without knowing this Court's view of the issue. Meanwhile, this Court will be reviewing on direct appeal a related issue in the State's separate lawsuit against the providers, *see* p. 8 *supra*, and it would advance both the fairness and efficiency of this entire landscape of lawsuits to ensure that the decisions are consistent.

For all of these reasons, the benefits of mandamus review far outweigh any detriments, and Xerox has no adequate remedy on appeal.

## CONCLUSION AND PRAYER FOR RELIEF

Xerox respectfully requests that mandamus relief be conditionally granted. The trial court should be directed to vacate its order striking Xerox's third-party petition and to grant Xerox's motion for leave to designate responsible third parties under Chapter 33. Xerox prays for any further relief to which it may be entitled.

Respectfully submitted,

By: */s/ Eric J.R. Nichols*
    Eric J.R. Nichols
    State Bar No. 14994900
    Gretchen Sween
    State Bar No. 24041996
    Christopher R. Cowan
    State Bar No. 24084975
**BECK REDDEN LLP**
515 Congress Ave., Ste. 1900
Austin, TX 78701
Tel: 512.708.1000

    Robert C. Walters
    State Bar No. 20820300
**GIBSON, DUNN & CRUTCHER LLP**
2100 McKinney Ave., Ste. 1100
Dallas, TX 75201
Tel: 214.698.3100

By: */s/ Constance H. Pfeiffer*
    Constance H. Pfeiffer
    State Bar No. 24046627
**BECK REDDEN LLP**
1221 McKinney St., Ste. 4500
Houston, TX 77010
Tel: 713.951.3700

    C. Andrew Weber
    State Bar No. 00797641
    301 Congress, Ste. 2000
**KELLY HART & HALLMAN LLP**
Austin, TX 78701
Tel: 512.495.6451

**COUNSEL FOR RELATORS**

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Tex. R. App. P. 9.4 because it contains 8,507 words, excluding the parts of the brief exempted by Tex. R. App. P. 9.4(i).

2.     This brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14 point Times New Roman font.

Dated: July 1, 2015.

*/s/ Constance H. Pfeiffer*
Constance H. Pfeiffer
***Counsel for Relators***

## RULE 52.3(J) CERTIFICATION

I have reviewed the petition and concluded that every factual statement in the petition is supported by competent evidence included in the appendix or record.

*/s/ Constance H. Pfeiffer*
Constance H. Pfeiffer

**CERTIFICATE OF SERVICE**

I hereby certify that on July 1, 2015, a true and correct copy of the above and foregoing Petition for Writ of Mandamus was forwarded to all counsel of record by the Electronic Service Provider, if registered, otherwise by email, and to Respondent, by hand delivery, as follows:

Raymond Winter
Chief, Civil Medicaid Fraud Division
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, TX 78711-2548
raymond.winter@texasattorneygeneral.gov

Reynolds Brissenden
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548
Austin, TX 78711-2548
reynolds.brissenden@texasattorneygeneral.gov

*Counsel for Real Party in Interest, The State of Texas*

Jason Ray
Riggs, Aleshire & Ray, P.C.
700 Lavaca, Suite 920
Austin, TX 78701
jray@r-alaw.com

E. Hart Green
Weller, Green, Toups & Terrell, L.L.P.
Post Office Box 350
Beaumont, TX 77704-0350
hartgr@wgttlaw.com

*Counsel for Intervenors,*
*Atlas Dental, LP, et al. and Antoine Dental Center, et al.*

Honorable Stephen Yelenosky
Judge, 345th District Court
Travis County Courthouse
P.O. Box 1748
Austin, TX  78767

*Respondent*

By: */s/ Constance H. Pfeiffer*
Constance H. Pfeiffer

No. _____

**IN THE THIRD COURT OF APPEALS**
**AUSTIN, TEXAS**

*IN RE XEROX CORPORATION AND XEROX STATE HEALTHCARE, LLC*
*F/K/A ACS STATE HEALTHCARE, LLC,*
*Relators.*

Original Proceeding from the 53rd District Court,
Travis County, Texas, Trial Court Cause No. D-1-GV-14-000581
The Honorable Stephen Yelenosky, Presiding

# APPENDIX TO
# PETITION FOR WRIT OF MANDAMUS

**TAB**

A  Order Granting Motion to Strike Petitions in Intervention and Plea to the Jurisdiction

B  Order Denying The Xerox Parties' Motion for Leave to Designate Responsible Third Parties

C  Order Granting State's Plea to the Jurisdiction and Motion to Dismiss Third Party Claims

# Tab A
# Order Granting Motion to Strike Petitions in Intervention and Plea to the Jurisdiction

CAUSE NO. D-1-GV-14-000581

| | | |
|---|---|---|
| THE STATE OF TEXAS, Plaintiff, | § § § | IN THE DISTRICT COURT |
| V. | § § | |
| XEROX CORPORATION; XEROX STATE HEALTHCARE, LLC; ACS HEATHCARE LLC, A XEROX CORPORATION, Defendants. | § § § § § § | TRAVIS COUNTY, TEXAS<br><br>53RD JUDICIAL DISTRICT |

## ORDER GRANTING MOTION TO STIKE PETITIONS IN INTERVENTION AND PLEA TO THE JURISDICTION

On Monday, September 15, 2014, the Court heard the State of Texas's Motion to Strike Petitions in Intervention and Plea to the Jurisdiction. After review and consideration of the motions and the responses thereto, the Court finds that the State of Texas's Motion to Strike Petitions in Intervention and Plea to the Jurisdiction should be GRANTED, and therefore,

IT IS ORDERED that the State of Texas's Motion to Strike Petitions in Intervention and Plea to the Jurisdiction is GRANTED, and all claims asserted by Intervenors (Dr. Stephen Chu; Dr. Richard F. Herrscher; Atlas Dental, L.L.P., and Dr. Hieu Huynh; Man & CFN Ortho, PLLC, Navarro Orthordontix of Fort Worth, PLLC Navarro Orthodontix of Irving, PC, Navarro Orthordontix of Edinburg, PLLC, Navarro Orthordontix of McAllen, PLLC, Navarro Orthordontix, PC, and Dr. Carlos F. Nararro; RGV Smiles by Rocky L. Salinas, DDS, PA, and Dr.Rocky Sakinas; Irma Cantu-Thompson, DDS, PC, and Irma CantuThompson; Westmoreland Dental, PA,

Westmoreland Dental of Garland, PC Westmoreland Dental and Othodontics, PA, and

Scottie H. Nguyen, DDS; and Victor M. Zurita, DDS) in this case are DISMISSED.

SIGNED this 18th Day of September 2014.

Stephen Yelenosky
Judge Presiding

# Tab B
## Order Denying The Xerox Parties' Motion for Leave to Designate Responsible Third Parties

CAUSE NO. D-1-GV-14-000581

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| | § | TRAVIS COUNTY, TEXAS |
| XEROX CORPORATION; XEROX | § | |
| STATE HEALTHCARE, LLC; | § | |
| ACS HEALTHCARE LLC, | § | |
| A XEROX CORPORATION, | § | |
| | § | |
| *Defendants.* | § | 53RD JUDICIAL DISTRICT |
| | § | |

## ORDER DENYING THE XEROX PARTIES' MOTION FOR LEAVE TO DESIGNATE RESPONSIBLE THIRD PARTIES

On April 15, 2015, the Court heard the Xerox Parties' Motion for Leave to Designate Responsible Third Parties filed on March 13, 2015. All parties appeared through their respective counsel and announced ready.

Having considered the Motion, response briefs, and arguments of counsel, the Court ORDERS that the Xerox Parties' Motion for Leave to Designate Responsible Third Parties is DENIED.

Signed this 15th day of April, 2015

_____
Judge Stephen Yelenosky

# Tab C
## Order Granting State's Plea to the Jurisdiction and Motion to Dismiss Third Party Claims

Filed in The District Court
of Travis County, Texas

APR 28 2015

At_____M.
Velva L. Price, District Clerk

CAUSE NO. D-1-GN-14-005380

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| DR. BEHZAD NAZARI, D.D.S. | § | TRAVIS COUNTY, TEXAS |
| D/B/A ANTOINE DENTAL | § | |
| CENTER, DR. BEHZAD NAZARI, | § | |
| DR. WAEL KANAAN, | § | |
| HARLINGEN FAMILY | § | |
| DENTISTRY, P.C., N/K/A, | § | |
| PRACTICAL BUSINESS | § | |
| SOLUTIONS, SERIES LLC, JUAN | § | |
| D. VILLAREAL D.D.S., SERIES, | § | |
| PLLC D/B/A HARLINGEN | § | |
| FAMILY DENTISTRY GROUP, | § | |
| DR. JUAN VILLAREAL, DR. | § | |
| VIVIAN TEEGARDIN, RICHARD | § | |
| F. HERRSCHER, D.D.S., M.S.D., | § | |
| P.C., DR. RICHARD F. | § | |
| HERRSCHER, M & M | § | |
| ORTHODONTICS, PA, DR. SCOTT | § | |
| MALONE, DR. DIANA MALONE, | § | |
| MICHELLE SMITH, NATIONAL | § | |
| ORTHODONTIX, MGMT, PLLC, | § | |
| DR. JOHN VONDRAK, RGV | § | |
| SMILES BY ROCKY L. SALINAS, | § | |
| D.D.S. PA, AND DR. ROCKY | § | |
| SALINAS | § | 53RD JUDICIAL DISTRICT |
| | § | |
| *Defendants.* | § | |

## ORDER GRANTING STATE'S PLEA TO THE JURISDICTION AND MOTION TO DISMISS THIRD PARTY CLAIMS

On April 15, 2015, the Court heard the State of Texas's Plea to the Jurisdiction, Plea in Bar and Motion to Dismiss Third Party Claims, filed on January 20, 2015. All parties appeared through their respective counsel and announced ready.

1

D-1-GN-14-005380
page 2 of 2

Having considered the Pleas, Motion, response briefs, and arguments of counsel, the Court ORDERS that the State of Texas's Plea to the Jurisdiction is GRANTED. Defendants' counterclaims against the State are DISMISSED with prejudice. The Court further ORDERS that the State of Texas's Motion to Dismiss Third Party Claims is also GRANTED. Consistent with this Court's rulings in the State's litigation against Xerox, the Court finds that the State is entitled to bring this action against defendants to the exclusion of other parties. Defendants' third party claims against Xerox are DISMISSED.

Signed this 28th day of April, 2015

_____
Judge Stephen Yelenosky

2